**Docket No. 25-5754**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles and COUNTY OF LOS ANGELES,

*Plaintiffs-Appellees,*

v.

CHIQUITA CANYON, LLC, a Delaware limited liability company, CHIQUITA CANYON, INC., a Delaware corporation and WASTE CONNECTIONS US, INC.,

*Defendants-Appellants.*

*Appeal from a Decision of the United States District Court for the Central District of California, No. 2:24-cv-10819-MEMF-MAR · Honorable Maame Ewusi-Mensah Frimpong*

## EXCERPTS OF RECORD
## VOLUME 1 of 12 - Pages 1 to 22

PAUL S. CHAN
ARIEL A. NEUMAN
SHOSHANA E. BANNETT
BIRD, MARELLA, RHOW, LINCENBERG,
DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
(310) 201-2100

JACOB P. DUGINSKI
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
(415) 262-4000

KAITLYN D. SHANNON
MEGAN L. MORGAN
JAMES B. SLAUGHTER
MEGAN R. BRILLAULT
KATELYN E. CIOLINO
BEVERIDGE & DIAMOND P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036-1661
(202) 789-6000

*Attorneys for Defendants-Appellants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connections US, Inc.*

 

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA ET AL., | Case No.: 2:24-cv-10819-MEMF-MAR |
| Plaintiffs, | **ORDER GRANTING AS MODIFIED PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 58] AND GRANTING REQUEST FOR JUDICIAL NOTICE [ECF NO. 84]** |
| v. | |
| CHIQUITA CANYON, LLC ET AL., | |
| Defendants. | |

Before the Court is the Motion for Preliminary Injunction filed by Plaintiffs the People of the State of California and the County of Los Angeles. ECF No. 58. Also before the Court is the Request for Judicial Notice filed by Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connections US Inc. ECF No. 84. For the reasons stated herein, the Court hereby GRANTS AS MODIFIED the Motion for Preliminary Injunction and GRANTS the Request for Judicial Notice.

/ / /

/ / /

## I.  Background

The Court provided the factual background and procedural history of this case in its prior Order Regarding Defendants' Motion to Dismiss and the Parties' Requests for Judicial Notice. ECF No. 67 ("MTD Order"). The Court therefore includes here only the background relevant to the instant Motion for Preliminary Injunction. ECF No. 58 ("Motion" or "Mot.").

### A.  Factual Background[1]

Plaintiff the County of Los Angeles ("County") is a political subdivision of the State of California and a charter county organized and existing under the constitution and laws of the State of California. Compl. ¶ 12. Plaintiff the People of the State of California ("People"; together with the County, "Plaintiffs") brings this action by and through the County's Office of the County Counsel. *Id*. ¶ 13. For simplicity, the Court will simply refer to "the County" throughout this Order.

Defendant Chiquita Canyon, LLC ("Chiquita LLC") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Texas. *Id*. ¶ 14. Defendant Chiquita Canyon, Inc. ("Chiquita Inc.") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Texas. *Id*. ¶ 15. Defendant Waste Connections US, Inc. ("Waste Connections"; together with Chiquita LLC and Chiquita Inc., "Defendants") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Texas. *Id*. ¶ 16. Waste Connections is the sole owner of Chiquita Inc., which in turn is the sole member of Chiquita LLC. *Id*. ¶¶ 18, 19. Waste Connections exercises significant control over Chiquita LLC and Chiquita Inc. *Id*. ¶ 17.

Chiquita LLC is the record owner of the 639-acre land at 29201 Henry Mayo Drive in the unincorporated community of Castaic, California. *Id*. ¶¶ 20, 23. Chiquita LLC obtained a conditional use permit ("CUP") from the County to operate a landfill at the site ("Landfill"). *Id*. ¶ 21. Chiquita Inc. and Waste Connections also operate the Landfill. *Id*. Waste Connections's employees operate the Landfill and represent the Landfill before regulatory and governmental entities. *Id*.

---

[1]All facts stated herein are taken from allegations in the County's Complaint (ECF No. 1) and the evidence in the record. These facts are included for background only.

1    The Landfill is experiencing a "Noxious Reaction"—a continuing, underground, smoldering

2    reaction—which causes noxious odors and gases to be released into the surrounding communities.

3    *Id*. ¶ 35. The Noxious Reaction began underground in May 2022 in an approximately 30-acre

4    inactive area in the northwestern portion of the Landfill ("Reaction Area"). *Id*. ¶ 36. It has since

5    grown in size. *Id*.

6    For close to two years, numerous Federal, State, and local agencies and governmental entities

7    charged with protecting the communities' air, water, health, and proper disposal of waste have

8    investigated and engaged in enforcement efforts regarding the Noxious Reaction and its effects. *Id*. ¶

9    56. These entities include the South Coast Air Quality Management District ("AQMD"); the

10   California Environmental Protection Agency and four sub-departments, including the California

11   Department of Resources, Recycling, and Recovery ("CalRecycle"), the Los Angeles Regional

12   Water Quality Control Board ("Water Board"), the Department of Toxic Substances Control

13   ("DTSC"), and the California Air Resources Board; the United States Environmental Protection

14   Agency ("USEPA"); as well as the County's Department of Public Health ("DPH"; certified by

15   CalRecycle to act as the local enforcement agency for the Noxious Reaction) and Department of

16   Regional Planning. *Id*. ¶ 57. In November 2023, these entities formed a Multi-Agency Critical

17   Action Team ("MCAT"), led by the USEPA, to coordinate their investigations and enforcement

18   efforts. *Id*. ¶ 58.

19   **B. Procedural History**

20   On December 16, 2024, the County filed suit. Compl. Plaintiffs allege the following causes

21   of action: (1) Public Nuisance – Nuisance Per Se and (2) Public Nuisance. *See generally id.* The

22   People allege (3) Violation of California Business and Professions Code section 17200, *et seq*.

23   ("UCL"). *See generally id.* The County alleges (4) Violation of Los Angeles County Code sections

24   1.23.010, *et seq*., 22.02.030(B), 22.242.020–22.242.040. *See generally id.*

25   Plaintiffs seek the following relief:

26   (i)    an injunction ordering Defendants to bring the Landfill into compliance with the Los

27          Angeles County Code, the operative CUP, and all applicable laws and regulations of

28          the various local, state, and federal regulatory entities;

3

4

     (ii)    an injunction requiring Defendants to subsidize the relocation of citizens living in proximity to the Landfill and who are affected by the Noxious Reaction;

     (iii)   an injunction requiring Defendants to subsidize the remedial measures certain citizens are required to take to mitigate the effects they are suffering until the Noxious Reaction is extinguished (such as air purifiers, air filtration system, and assistance with utility bills);

     (iv)   civil penalties against Defendants pursuant to Los Angeles County Code section 1.23.090 and California Business and Professions Code sections 17206(a); and

     (v)    attorneys' fees and costs of suit.

*See generally id.* Plaintiffs alternatively seek (vi) appointment of a receiver if Defendants fail to abate or are incapable of abating the violations at the Landfill. *See generally id.*

On April 3, 2025, the Court consolidated the instant action for discovery purposes only to *In re Chiquita Canyon Landfill Litigation*, Case No. 2:23-cv-08380-MEMF-MAR ("Lead Case"). ECF No. 42.

On February 28, 2025, Defendants filed a Motion to Dismiss. ECF No. 33. The Court issued the MTD Order on May 30, 2025. MTD Order. The Court limited any request for relocation subsidies to *temporary* relocation only. *Id*. at 22–24.

On May 29, 2025, the County filed the instant Motion. Mot. The Motion is fully briefed. *See* ECF Nos. 82 ("Opposition" or "Opp'n"), 87 ("Reply"). The parties also filed their respective evidentiary objections and responses thereto. ECF Nos. 82-9 ("Defendants' Evidentiary Objections"), 87-1 ("County's Evidentiary Objections"), 87-2 ("County's Responses"), 92-3 ("Defendants' Responses").[2] Defendants also filed a Request for Judicial Notice, which the County has not opposed. ECF No. 84 ("RJN").

---

[2] Defendants filed an ex parte application for leave to file (1) a Sur-Reply and (2) the Defendants' Responses. ECF No. 92. The Court denied the ex parte application with respect to the Sur-Reply but granted as to the Defendants' Responses. *See* ECF No. 112.

4

5

1    On May 29, 2025, the County requested the Court conduct a Judicial Site Visit. ECF No. 56.

2    On July 1, 2025, the Court conducted the Judicial Site Visit. *See* ECF No. 88 (sealed order regarding

3    the Judicial Site Visit).

4    On June 30, 2025, Defendants filed two motions *in limine* and an ex parte application to

5    shorten the time therefor. ECF Nos. 99–101. On July 7, 2025, the Court issued an order denying the

6    motions *in limine* and the ex parte application. ECF No. 119.

7    On July 14 and 15, 2025, the Court held evidentiary hearings regarding the Motion.

8    On July 17, 2025, the Court held a hearing on the Motion.

9    **REQUEST FOR JUDICIAL NOTICE [ECF NO. 84]**

10   **I.    Applicable Law**

11   A court may judicially notice facts that "(1) [are] generally known within the trial court's

12   territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy

13   cannot reasonably be questioned." Fed. R. Evid. 201(b). A court "must take judicial notice if a party

14   requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Once a

15   fact is judicially noticed, the court "must instruct the jury to accept the noticed fact as conclusive."

16   Fed. R. Evid. 201(f).

17   **II.    Discussion**

18   Defendants ask this court to judicially notice Exhibits 1 to 10 because they are public

19   records. In particular, Exhibits 1 and 2 are copies of letters between government officials. ECF Nos.

20   84-1, 84-2. Exhibit 3 is a letter from the Los Angeles County Department of Regional Planning

21   granting extension to Defendants regarding a notice of violation. ECF No. 84-3. Exhibit 4 is a copy

22   of the 2024–25 Final Adopted Budget Charts for Los Angeles County. ECF No. 84-4. Exhibits 5, 6,

23   7, and 8 are letters from Defendants or their attorneys to government employees. *See* ECF Nos. 84-5

24   at 15–16, 84-6 at 20–21; 84-7 at 10, 84-8 at 12–13. Exhibits 9 and 10 are transcripts of South Coast

25   AQMD hearings. ECF Nos. 84-9, 84-10. The County does not oppose the RJN.

26   The Court takes judicial notice of Exhibits 1 to 10 and the facts contained therein. The Court

27   finds that it is undisputed that the exhibits are public documents available through the relevant

28   government agencies and satisfy Federal Rule of Evidence 201(b). *See City of Sausalito v. O'Neill*,

5

386 F.3d 1186, 1223 n.2 (9th Cir. 2004) (recognizing that courts may take judicial notice of a state

agency record that is not subject to reasonable dispute). Therefore, the Court will take notice of

Exhibit 1 to 10, including the facts therein.

As such, the Court GRANTS the RJN.

## MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 58]

### I.     Applicable Law

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat.*
*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must

establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is

in the public interest." *Id.* at 20 ("*Winter* Test"). The Ninth Circuit also recognizes a "serious

questions" variation of the *Winter* Test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1131 (9th Cir. 2011). Under this variation, "a preliminary injunction is proper if there are serious

questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of

the hardships tips sharply in favor of plaintiff; and injunction is in the public interest." *Lopez v.*
*Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

A preliminary injunction is "an extraordinary and drastic remedy" and "should not be granted

unless the movant, *by clear showing*, carries the burden of persuasion." *All. for the Wild Rockies*,

632 F.3d at 1072 (emphasis in original) (quotations omitted). At this stage, the Court is only

determining whether the County has met their burden for a preliminary injunction. *See Los Angeles*
*Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

**Accordingly, this Order is not a final decision on the merits of any claim, nor is it a decision on**
**the merits of the factual assertions either party made in support of any claim.**

/ / /

/ / /

1    **II.    Discussion[3]**

2         For the reasons discussed below, the Court finds that the County has carried its burden of

3    persuasion under *Winter*. The Court, however, finds that the County has not adequately shown, at

4    this stage, that the requested injunction is narrowly tailored. Therefore, the Court GRANTS AS

5    MODIFIED the Motion.

6         **A.    The County Has Shown that It is Likely to Succeed on the Merits.**

7         The County argues that it has a "high likelihood of success" on the merits of each of their

8    claims. *See generally* Mot. at 20–30. Defendants respond that, among other things, the County failed

9    to establish causation, which is "a key element of each of the County's claims." Opp'n at 20. The

10   Court finds that the County has established a likelihood of success on the merits for its nuisance per

11   se claim.

12        To satisfy the first *Winter* factor, the moving party need only show that it is likely to succeed

13   on the merits on *one* claim. *See League of Wilderness Defenders/Blue Mountains Biodiversity*

14   *Project v. Connaughton*, 752 F.3d 755, 759 n.1 (9th Cir. 2014). Where a moving party seeks a

15   mandatory injunction—i.e., requiring the other party "to take affirmative action"—the moving

16   party's burden on the first *Winter* factor is "doubly demanding," as it "must establish that the law

17   and facts *clearly favor*" its position.[4] *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

18

19

20   _____

21   [3] For this Order, the Court considered the parties' evidentiary objections and the responses thereto. ECF Nos.
     82-9, 87-1, 87-2, 92-3. The parties' objections appear to be boilerplate objections based on hearsay, lack of
     foundation/speculation, improper lay opinion, relevance, legal conclusion, and lack of reliability. A court

22   "may consider inadmissible evidence on a motion for preliminary injunction." *Puricle, Inc. v. Church &*
     *Dwight Co., Inc.*, 568 F. Supp. 2d 1144, 1147 (C.D. Cal. 2008) (quoting *Flynt Distrib. Co. v. Harvey*, 734

23   F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt
     determination and makes it difficult to obtain affidavits from persons who would be competent to testify at

24   trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of
     preventing irreparable harm.")). In other words, when evidence is not presented in an admissible form at

25   motion for preliminary injunction but could be later presented in an admissible form at trial, a court may still
     consider the evidence for the purposes of preliminary injunction motion. As such, the Court OVERRULES

26   the parties' evidentiary objections to the extent any evidence objected to is relied on herein.

27   [4] At the hearing, the Court sought clarification from Defendants whether this "doubly demanding" standard
     applies to all four *Winter* factors. In light of the Ninth Circuit's guidance in *Garcia* and Defendants' failure to
     provide authority to the contrary, the Court applies this "doubly demanding" standard on the first *Winter*

28   factor only.

1       "[W]here the law expressly declares something to be a nuisance, then no inquiry beyond its

2 existence need be made and in this sense its mere existence is said to be a nuisance per se. . . . [T]o

3 be considered a nuisance per se the object, substance, activity or circumstance at issue must be

4 expressly declared to be a nuisance by its very existence by some applicable law." *Beck Dev. Co. v.*

5 *S. Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1207 (Cal. 1996).

6       AQMD Rule 402, titled "Nuisance," states: "A person shall not discharge from any source

7 whatsoever such quantities of air contaminants or other material which cause injury, detriment,

8 nuisance, or annoyance to any considerable number of persons or to the public, or which endanger

9 the comfort, repose, health or safety of any such persons or the public, or which cause, or have a

10 natural tendency to cause, injury or damage to business or property." Similarly, California Health

11 and Safety Code section 41700 provides: "Except as otherwise provided in Section 41705, a person

12 shall not discharge from any source whatsoever quantities of air contaminants or other material that

13 cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the

14 public, or that endanger the comfort, repose, health, or safety of any of those persons or the public,

15 or that cause, or have a natural tendency to cause, injury or damage to business or property." Cal.

16 Health & Safety Code § 41700(a). "Air contaminant" is defined as "any discharge, release, or other

17 propagation into the atmosphere and includes, but is not limited to, smoke, charred paper, dust, soot,

18 grime, carbon, fumes, gases, odors, particulate matter, acids, or any combination thereof." *Id.* §

19 39013.

20       AQMD has authority to enforce Defendants' compliance with air pollution-related rules and

21 laws. Amanda Sanders, the Air Quality Analysis and Compliance Supervisor at AQMD, has testified

22 that AQMD has authority "to regulate air pollution from 'all sources, other than emissions from

23 motor vehicles.'" ECF No. 63 ("Sanders Declaration" or "Sanders Decl.") ¶ 7. Under this authority,

24 AQMD adopts rules and regulations related to controlling air pollution, as well as a permitting

25 program "that requires most stationary sources of air pollution to obtain and comply with a permit

26 that imposes certain limits on that source's emission of air contaminants." *Id.* It also enforces its own

27 rules and regulations, including Rule 402 and California Health and Safety Code section 41700

28 ("Section 41700"). Defendants operate the Landfill under a Facility-Wide Title V Permit, which is

1    issued and enforced by AQMD. *Id*. ¶ 12. AQMD is therefore authorized to enforce Defendants'

2    compliance with Rule 402 and Section 41700. *Id*. During the evidentiary hearings and the hearing on

3    the Motion, Defendants did not dispute AQMD's authority.

4          AQMD's numerous notices of violation ("NOVs") warrant the finding of likelihood of

5    success on the merits for the County's nuisance per se claim. Starting in April 2023, AQMD has

6    received more than 25,000 odor complaints from the communities around the Landfill. *Id*. ¶ 31. In

7    the first quarter of 2025 only, AQMD received more than 1,600 complaints related to the Landfill,

8    with most of the verified complaints coming from Val Verde, Live Oak, and Hasley Hills

9    neighborhoods. *Id*. ¶ 32. These complaints report, among other things, that the residents "experience

10    continual annoyance from the smells." *Id*. ¶ 33. Based on such complaints, AQMD issued its first

11    NOV on May 18, 2023, which described the violation at issue as "[f]or discharging such quantities

12    of air contaminants to cause . . . annoyance to a considerable number of persons." *Id*. ¶ 42; *see* ECF

13    No. 63 at 20[5] (Exhibit 10) (May 18, 2023 NOV). As of late May 2025—nearly two years after the

14    first NOV—AQMD has issued over *320 additional NOVs* for violation of Rule 402 and Section

15    41700. Sanders Decl. ¶ 45. During the evidentiary hearing, Sanders testified that AQMD issued 29

16    NOVs in the first quarter of 2025. Insofar as AQMD has designated Rule 402 violations as a

17    "Nuisance"—and deems an "annoyance" that endangers "comfort" or "repose" as a sufficient

18    ground for finding nuisance and does not require there be an injury—and has issued hundreds of

19    NOVs to Defendants for violating Rule 402 (and Section 41700, whose language closely mirrors that

20    of Rule 402), the Court finds that the County has shown that the law and facts "clearly favor" its

21    position that it is likely to succeed on the merits of its nuisance per se claim.[6]

22          Relying on *Citizens for Odor Nuisance Abatement v. City of San Diego*, Defendants argue

23    that the County cannot establish causation merely on the fact that Defendants own or operate the

24    Landfill. *See* 8 Cal. App. 5th 350, 359 (2017) ("Public nuisance liability does not hinge on whether

25

26

27    [5] Unless otherwise noted, when citing to the documents submitted by the parties, the Court cites to the page numbers generated by the CM/ECF system.

28    [6] Having found that there is a likelihood of success on the merits based on AQMD's NOVs, there is no need for the Court to engage in separate analyses based on other agencies' actions.

1    the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the

2    nuisance; the critical question is *whether the defendant created or assisted in the creation of the*

3    *nuisance*.") (citation modified) (emphasis in original). This argument—and the alleged fact that the

4    parties have not yet identified the root cause of the Noxious Reaction—is of no moment given that

5    causation is not an element of a *nuisance per se* claim. Notably, Defendants have not provided any

6    authority compelling this Court to find that it is. *See* Opp'n at 20–22 (focusing on public nuisance

7    claim).

8         As such, the Court finds that the first *Winter* factor weighs toward granting the Motion.

9         **B.    The County Has Shown that the Residents Living Near the Landfill Are at an**

10             **Imminent Risk of Irreparable Harm.**

11        The County argues that the County and the residents living near the Landfill will suffer

12    irreparable harm if preliminary injunction is not granted. Mot. at 19 ("The Landfill reaction continue

13    to expand . . . . [T]he problems persist and there is no end in sight."), 25 ("Additionally, it is clear

14    that the subsurface reaction has been and continues to be harmful to the health of the residents in the

15    adjacent neighborhoods and communities surrounding the Landfill . . . ."). Defendants respond that

16    the serious claims of irreparable harm call for serious evidentiary support, which the County has

17    failed to proffer. Opp'n at 9–15 (discussing defects with the County's evidence). The Court finds

18    that the County has sufficiently shown the imminence of irreparable harm.

19        The party requesting injunctive relief must show "present or imminent risk of likely

20    irreparable harm." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (quoting

21    *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162); *see City of Los Angeles v. Lyons*, 461

22    U.S. 95, 96 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a

23    requirement that cannot be met where there is no showing of any real or immediate threat that the

24    plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'").

25    "[T]he party seeking the injunction must demonstrate that it will be exposed to some significant risk

26    of irreparable injury. . . . A plaintiff must do more than merely allege imminent harm . . . , he or she

27    must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."

28    *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir.

1    1991) (citations omitted); *Caribbean Marine Servs. Co. Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.

2    1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a

3    preliminary injunction.").

4        **1. The County's Evidence is Admittedly Limited.**

5        The Court acknowledges the limits of the County's evidence of imminent irreparable harm.

6    For instance, to establish the imminence of harm to the residents living near the Landfill, the County

7    relies on its online odor survey, but the Court finds the implications of the survey data more limited

8    than the County's contentions. *See* Mot. at 23–24. According to the survey analytics and insights,

9    between late 2024 and as recently as May 2025, 1,246 responses were submitted, of which only 754

10   were "100% complete surveys." ECF No. 60-1 (Exhibit 5) at 23; *id*. ("Campbell Declaration" or

11   "Campbell Decl.") ¶ 8 (counting the number of the responses at 754). Of the 1,246 total responses,

12   only about 132 responses were submitted in 2025.[7] *Id*. Limiting the number of responses to between

13   March and May 2025 in light of Defendants' Community Relief Program having been terminated in

14   February 2025, the number of responses decreases to approximately 85. ECF No. 60-1 at 23;[8] *see*

15   Opp'n at 6 (explaining that Defendants closed its voluntary $23.5 million relief program in February

16   2025). Although the survey data shows that the 2025 respondents reported "highly offensive" odors,

17   ECF No. 60-1 at 24, sometimes as long as "more than twelve hours," *id*. at 25, as frequently as

18   "daily," *id*. at 27, and that the odors impacted their daily activities "a lot," *id*. at 30, the County

19   provides no further details as to these responses—namely, they do not explain whether these

20   responses were submitted by the residents who live nearest to the Landfill (i.e., those who would

21   benefit from the injunctive relief sought here), how many families or households these responses

22   represent, or whether these respondents experienced odors and/or related health issues continuously

23

24   _____

25   [7] The County does not specify how many of the 132 responses submitted in 2025 are "100% completed surveys."

26   [8] Likewise, the County does not specify how many of these 85 post-February 2025 responses are "100% completed surveys."

27   Moreover, the Court is not persuaded that regardless of the survey count (85, 132, 754, or 1,246), the results are from a representative sample because they are based on the *cumulative* responses, whereas the standard

28   for preliminary injunction is to show the likelihood of *future* harm. *See* Opp'n. at 13.

1    or for the first time when they submitted their responses. The survey therefore fails to establish that a

2    significant number of the residents whom the County seeks to have temporarily relocated are

3    currently experiencing or likely to experience offensive odors.

4         Similarly, the County relies on air quality complaints to show the imminence of harm to the

5    residents, but as the evidentiary hearing revealed, this data has its limits as well. Although Sanders

6    testifies that "[f]rom the beginning of 2025 to May 2, 2025, South Coast AQMD has received over

7    2,260 complaints [regarding air quality], and has issued 29 additional NOVs," the County has failed

8    to provide the details the Court has found lacking in the County's survey data—whether those

9    complaints were submitted by the residents who live nearest to the Landfill, how many families or

10   households those complaints represent, or whether those complainants experienced odors and/or

11   related health issues continuously or for the first time when they submitted their complaints. *See*

12   Sanders Decl. ¶ 64.[9] Likewise, AQMD's most recent Finding and Decision for a Modified Stipulated

13   Order for Abatement does not provide such details. *See generally* ECF No. 63 at 461–562 (Exhibit

14   18).

15        In an attempt to show a risk of harm to the broader public, the County relies on a variety of

16   declarations and orders. For instance, Elizabeth Anne Berg of the DTSC represents that Defendants'

17   recent data "confirms that settlement is occurring around leachate Tank Farm 9, which threatens the

18   continued operation and integrity of the tanks and piping and threatens a release of hazardous

19   waste."[10] ECF No. 62-1 ("Berg Declaration" or "Berg Decl.") ¶ 25; *see id.* at 22–23 (Exhibit 44,

20

21   _____

22   [9] The Court notes that the issuance of 29 NOVs means that AQMD received approximately 180 verified complaints. *See* Sanders Decl. ¶¶ 19–21 (explaining the agency's policies regarding issuing a notice of

23   violation following receipt of complaints). However, the Court finds this number still limited, as the County has not explained where in relation to the Landfill these complainants are located, how many residents this number represents, or the severity of the odors these complainants reported.

24   [10] It appears to the Court that the County is also relying on the expansion of the subsurface reaction to argue

25   that the remedial actions currently in place are insufficient to protect the public from harm and that future harm is likely. *See, e.g.*, Nakagawa-Ota Decl. ¶ 53 ("Given the expanding reaction, the geomembrane cover

26   that was installed is no longer covering the entire reaction and it cannot reduce the odors from the reaction."); deBie Decl. ¶ 39 ("Given the [subsurface elevated temperature ("SET")] Event's ongoing expansion, the

27   membrane cover that was installed is no longer covering the entire reaction area, which means that odors are continuing to be emitted throughout the community."); Berg Decl. ¶ 32 ("Given the continued expansion of

28   the SET event, it is highly likely that the related impacts to the nearby communities discussed above will persist.").

1   DTSC's "Imminent and Substantial Endangerment Determination and Order," ordering installation

2   of a DTSC-approved landfill cover, "relocation and stabilization of containerized waste," and

3   installation of a vertical barrier to limit the subsurface elevated temperature event from spreading to

4   other areas); *see also* ECF No. 65-1 (Exhibit 34, DPH and CalRecycle's April 1, 2025 order

5   regarding Tank Farm 9);[11] ECF No. 62 ("deBie Declaration" or "deBie Decl.") ¶ 43 (discussing the

6   same remedial actions). But the Court finds that many of the deadlines that these agencies have

7   imposed on Defendants to submit workplans—i.e., not deadlines to complete the implementation of

8   approved remedial actions—have not yet even passed. *See* ECF No. 62-1 at 23–24 (DTSC's April

9   2025 order granting thirty- to ninety-day deadlines to submit workplans); ECF No. 62 at 124–25

10  (DPH and CalRecycle's May 2025 order granting June, July, and August deadlines to submit

11  workplans). Therefore, it remains to be seen whether the newly ordered remedial actions will

12  adequately address the settlement (and the expansion of the subsurface reaction).

13          **2.   Despite the Limits, the County Has Shown Imminent Irreparable Harm.**

14          As a preliminary matter, the Court finds that offensive odors constitute irreparable harm.

15  Defendants argue in general terms that "odorous emissions" are "not the kind of harm typically

16  deemed irreparable for the purpose of granting a preliminary injunction," Opp'n at 9 (quoting *Cmtys.*

17  *for a Better Env't v. Pac. Steel Casting Co.*, No. C06-4184 BZ, 2006 WL 4491437, at *3 (N.D. Cal.

18  Sept. 21, 2006)), but the Court finds this argument unavailing. First, the court in *Communities for a*

19  *Better Environment* does not describe the kind or duration of the odor at issue; the court simply finds

20  that the odorous emission at issue is insufficient. *See id.* Absent such an analysis, the Court does not

21  find *Communities for a Better Environment* persuasive or otherwise compelling. Second,

22  *Communities for a Better Environment* is not binding upon this Court; instead, the Court is bound by

23  the holdings in *Gould & Kane v. Valterza* and *Williams v. Blue Bird Laundry Co.*, where state

24

25

26

27  _____

28  [11] Exhibit 34 was attached to the Declaration of Shikari Nakagawa-Ota of the DPH. *See* ECF No. 65 ("Nakagawa-Ota Declaration" or "Nakagawa-Ota Decl.").

1  appellate courts found that offensive odors may constitute irreparable injury.[12] *See Gould & Kane v.*

2  *Valterza*, 37 Cal. App. 2d 678, 680–81 (1940) (finding allegations that "stenches and offensive

3  smells," among other harms, from a hatchery are sufficient for irreparable injury); *Williams v. Blue*

4  *Bird Laundry Co.*, 85 Cal. App. 388, 391 (1927) (finding allegations that the plaintiff's "homes will

5  be made uninhabitable by reason of the noxious fumes arising and emanating from said laundry and

6  the operation of said laundry" sufficient for purposes of irreparable injury). As such, the Court finds

7  that offensive odors, like the ones at issue in the instant action, warrant a finding of irreparable harm.

8        Insofar as the *odors continue*, the Court finds that the above-referenced limits in the County's

9  evidence do not preclude a finding of imminence. Defendants do not explain why a positive trend

10  line in the odors or some demonstrated success in addressing the causes means that the residents are

11  *not* at imminent risk of harm. The Court heard the testimony of the three individual plaintiffs who

12  submitted declarations in support of the Motion—Steven Howse (ECF No. 59 ("Howse Declaration"

13  or "Howse Decl.")), Stephen D. Perera (ECF No. 59-1("Perera Declaration" or "Perera Decl.")), and

14  John Suggs II (ECF No. 29-2 ("Suggs Declaration" or "Suggs Decl."))—and finds them to be highly

15  credible.[13] In opposition, Defendants filed declarations from several residents from the Val Verde

16  community and the Castaic community, many of whom testify either that they have not experienced

17  "odors [they] believe are from the Chiquita Canyon Landfill" or that if they did, the odors were not

18  so intense that they were prevented from doing outdoor activities or experienced health impacts. *See*

19  ECF No. 82-3 (Exhibits 1 and 2 to "Shannon Declaration" or "Shannon Decl."). But the fact that

20

21  _____

22  [12] Defendants argue that the Court should disregard these two cases because they are "nearly 100 years old
and did not address a mandatory preliminary injunction . . . ." Opp'n at 9 n.8. But these cases are good law;

23  Defendants make no showing that these cases have been overruled. Moreover, other than arguing that
"extreme or very severe damage" is needed for a mandatory preliminary injunction, Defendants do not
provide any binding authority that odors cannot meet this standard.

24  Relatedly, the Court does not find Defendants' argument that "general claims of emotional distress" are

25  insufficient to establish irreparable harm unavailing, insofar as the two California appellate cases support the
finding that offensive odors warrant irreparable harm. *See id.* at 12 (quoting *Brignac v. Clark Cnty. Scho.*

26  *Dist.*, 2025 WL 1089498 (D. Nev. Mar. 5, 2025). Moreover, during the hearing, upon the Court's inquiry into
why emotional distress cannot support a finding of irreparable harm, Defendants pointed only to the County's

27  alleged failure to establish causation, and failed to provide any binding authority in support of their position.

28  [13] As such, the Court concludes that it has appropriately weighed the evidence. *Cf.* Opp'n at 13 n.16 (arguing
that the County's evidence is lacking).

14

15

1    some residents have not experienced the odors or are not as bothered by the odors they have

2    experienced does not convince this Court that the residents who have spoken to these odors are not

3    to be believed; Suggs testified during the evidentiary hearing that as of the morning thereof, he

4    smelled foul odors from the Landfill, which immediately gave him a headache.

5        Similarly, the fact that there are questions about the County survey and the AQMD complaint

6    data and that the monitoring data is inconsistent with the reports of these residents is of no moment,

7    as it is also insufficient to convince this Court that the testimony of these individual plaintiffs should

8    *not* be believed. In particular, during the evidentiary hearing, Defendants examined the credentials of

9    AQMD inspectors and the kinds of training they undertake. But Defendants provide no authority

10   requiring such government inspectors to be experts in odor science or landfill operation to

11   successfully verify resident complaints. Rather, the Court heard from Sanders the processes through

12   which AQMD inspectors verify complaints and finds no defect in the agency's processes such that it

13   should find that the County has failed to demonstrate imminent irreparable harm.

14       Defendants also assert that because the County's evidence is based on subjective data, it is

15   unreliable and therefore does not warrant the finding of imminence. *See* Opp'n at 9–15; *id.* at 12

16   n.14. But Defendants provide no binding authority requiring any party moving for a preliminary

17   injunction to base their arguments solely (or even largely) on objective data. Although Defendants

18   rely on *Citizens for Odor Nuisance Abatement v. City of San Diego* to argue that "subject complaint

19   data does not establish causation," there, the court found that the declarations submitted by local

20   citizens improperly attempted to establish causation through "mere temporal sequence," which is not

21   the case here, and Defendants proffer no other logical fallacy with the County's data. *See* 8 Cal.

22   App. 5th at 363. Rather, as the Court found in its prior order denying Defendants' motions *in limine*,

23   a court "may consider inadmissible evidence on a motion for preliminary injunction." *Pucicle, Inc.*,

24   568 F. Supp. 2d at 1147 (quoting *FlyntDistrib. Co.*, 734 F.2d at 1394 ("The urgency of obtaining a

25   preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits

26   from persons who would be competent to testify at trial. The trial court may give even inadmissible

27   evidence some weight, when to do so serves the purpose of preventing irreparable harm.")). This

28

Ninth Circuit precedent instructs the Court that it may consider even subjective and unreliable evidence, and this Court finds that doing so is appropriate in light of the facts of this case.

Defendants further argue that because the County has failed to provide long-term health impacts data, the Motion fails, but they provide no binding authority that long-term adverse health conditions are required to find irreparable harm. *See* Opp'n at 10–11.[14]

Lastly, Defendants argue that the finding of irreparable harm is "foreclosed" because the County could have spent, but did not use, "some of its $47.9 billion annual budget . . . to pay for the purported nuisance and thereafter seek recovery," but this argument fails. *See* Opp'n at 8–9; *id.* at 1 ("[T]he County does not inform this Court that it has the legal authority to provide relocation and home hardening expense and seek reimbursement from Defendants after a trial on the merits or through its own enforcement mechanisms."). Defendants do not provide any authority holding that a government entity's refusal to take an abatement action should be construed against a finding of imminent irreparable harm on behalf of the entity's constituents. More specifically to this case, Defendants do not explain why and how the County's refusal to "pay first and seek reimbursement later" should preclude the finding that the odors continue in the surrounding communities. And nor can it, because, if Defendants' argument were to be accepted, a party would never be able to demonstrate irreparable harm unless the party (or a governmental entity) took abatement into their own hands, even where the party may not have caused the harm in the first instance. As such, the Court is not persuaded that irreparable harm is "foreclosed" simply because the County did not pay for the abatement first.

In sum, although Defendants point to a number of potential problems with the County's evidence, ultimately, even Defendants do not attempt to argue that the odors have ceased. In light of that fact, and given the length of time that the residents have been subjected to the odors, the arguments that the number of complaints has decreased, or that the surveys are improperly designed,

---

[14] It appears to the Court that Defendants rely on the "extreme or very serious damage" language from *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009). But, again, Defendants do not explain, with binding authority, why offensive odors cannot constitute irreparable harm that meets the "extreme or very serious damage," especially in light of the *continuing* odors in the communities surrounding the Landfill.

16

17

1    or that odor scientists would contradict the residents' characterizations of the odor, do not cast doubt

2    on the basic question of whether those residents who are experiencing, and continue to experience,

3    offensive odors are likely to experience irreparable harm. The Court finds that *they are*. As such, the

4    second *Winter* factor weighs in the County's favor.

**C.    The County Has Shown that the Balance of Equities Tips on Its Favor and that Temporary Relocation and/or Home Hardening is in the Public Interest.**

7         The County argues that the last two *Winter* factors—balance of equities and public interest—

8    weigh in favor of the requested injunctive relief because the residents would otherwise "continue to

9    experience serious adverse health effects and be unable to use their property." Mot. at 30. It further

10   contends that Defendants will not be harmed because the relief it seeks is "narrowly tailored to

11   address the harm to those most severely impacted by exposure to the Landfill." *Id*. at 30–31.

12   Defendants respond that because the County has failed to show that the emissions caused health

13   impacts and that other "nearby neighbors claim no impacts at all," the two *Winter* factors weigh in

14   their favor. Opp'n at 24. They further assert that the County has an alternative remedy ("pay for any

15   necessarily relocation or home hardening" and "seek cost-recovery in the ordinary course of

16   litigation") and that their interests would be harmed if they "ultimately prevail on the merits"

17   (because the money will have been spent without a way to seek recovery). *Id*. The Court finds that

18   the final two *Winter* factors weigh in the County's favor.

19        "Where the government is a party to a case in which a preliminary injunction is sought, the

20   balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940 (9th

21   Cir. 2020). "The public interest analysis for the issuance of a preliminary injunction requires [courts]

22   to consider whether there exists some critical public interest that would be injured by the grant of

23   preliminary relief." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1114–15 (9th Cir.

24   2010) (internal quotation marks and citation omitted).

25        Although the amount for the relief fund is subject to modification (as discussed in the section

26   below), the Court finds that in light of the evidence before the Court concerning the nature, duration,

27   and geographical breadth of the odor, the last two *Winter* factors favor establishing such a fund to

28   enable and facilitate the temporary relocation or home hardening of the residents that are still

17

18

1    affected by the odors from the Landfill. Moreover, in light of the continued odors and their impact

2    on the residents, i.e., imminent irreparable harm, Defendants' argument that the County should wait

3    until the resolution of the case fails, as doing so would only expose the residents to further harm.

4        **D.    The County Has Not Shown that the Requested Injunctive Relief is Narrowly Tailored to Avoid the Alleged Harm.**

5

6        Finally, the Court addresses the *Winter* factor concerning whether the requested relief is

7    narrowly tailored. The County seeks a fund of $22,512,000 to relocate 938 households for six

8    months at a rental rate of $4,000 per month. Mot. at 31. For any fund not used for relocation, the

9    County seeks to use them to harden complainants' homes against the odor. *Id.* Defendants respond

10   that the requested injunctive relief is overly broad and would not address the alleged harm. Opp'n at

11   15–19. The Court finds that the requested relief is not narrowly tailored and therefore orders the

12   parties to meet and confer to jointly propose a more narrowly tailored fund.

13       "A district court has inherent authority to modify a preliminary injunction . . . ." *A&M*

14   *Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002); *see also Melendres v. Arpaio*,

15   784 F.3d 1254, 1265 (9th Cir. 2015) (holding that a "district court has broad discretion in

16   fashioning" an injunctive relief to address constitutional violations).

17       The Court finds that the County has not demonstrated that the requested injunctive relief is

18   an appropriate remedy for the alleged harm. Even assuming that $4,000 is the best estimate for

19   monthly rent around the Landfill, the County has not explained why *six months* are a sufficient time

20   to abate the conditions at the Landfill, and it is not clear that the six month time frame accounts for

21   current mitigation activity. Also, the County has not described in detail how it will administer the

22   allocation of the fund.[15] Moreover, in light of the questions raised regarding the complaint data, the

23   Court does not find that the County has sufficiently justified that *all* 938 households should be

24   included when calculating the amount of the relief sought and/or that those households are the

25   correct households. Accordingly, the Court is not persuaded that the fund as proposed  is a "narrowly

26   _____

27   [15] The County contends that the Campbell Declaration supports how to fashion the relocation payments, but the Campbell Declaration contains no testimony on this issue. *See generally* Campbell Decl. (discussing

28   survey and complaint data results but otherwise silent on how to administer the abatement funds).

18

19

tailored" injunction to avoid the alleged irreparable harm.[16] *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018) ("A trial court abuses its discretion by fashioning an injunction which is overly broad.") (internal quotation marks and citation omitted).

As such, the Court orders the parties to meet and confer and file a joint statement within thirty (30) days of this Order proposing a manner of more narrowly tailoring the injunction with respect to (1) the households to be included; (2) the availability of relocation versus home hardening; and (3) the duration of any relocation. Some factors that the parties may consider include (1) the number of households that filed a complaint with relevant government agencies for the odors related to the Noxious Reaction at the Landfill; (2) which households submitted complaints and where they were located; (3) any results from any additional surveys or questionnaires; (4) the reported severity and pervasiveness of the odors in the neighborhoods where the residents filed air quality complaints; and (5) the recency of the complaints filed.

With this, the Court finds that all four *Winter* factors favor the granting of the Motion.

### E.    The Parties Are Ordered to Meet and Confer Regarding Whether the County is Required to Post a Bond.

Defendants request a bond. *See* Opp'n at 24–25. The County responds that a government entity is exempt from making a bond but provides no binding authority.[17] *See* Reply at 6 n.2 ("Once an injunction issues, this Court may order separate briefing as to the terms of the abatement fund and if a bond is needed or required here."). The Court orders the parties to meet and confer regarding whether the County is required to post a bond.

---

[16] Notwithstanding the conclusion that the amount is not narrowly tailored, the Court finds Defendants' argument that the relocation fund is not a proper equitable relief unavailing. *See* Opp'n at 8–9. Insofar as the purpose of the fund is to pay for relocation and/or home-hardening, the Court finds that it will serve the same function that typical injunctive relief would serve. Further, the caselaw that Defendants rely on to argue that the possibility of "adequate compensatory or other correct relief" should weigh heavily against a claim of irreparable harm concerned "temporary loss of income," whereas here, the issue is offensive odors and related health effects, even if short-term. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."). Moreover, at the hearing, Defendants, upon the Court's inquiry, did not state one way or another whether they would prefer to coordinate the requested relocation and/or home-hardening on their own if the Court granted the Motion.

[17] The County did not provide any binding authority during the hearing as well.

1  "It is a well-settled rule that there can be no recovery for damages sustained by a wrongful

2  issuance of a preliminary injunction in the absence of a bond." *Buddy Sys., Inc. v. Exer-Genie, Inc.*,

3  545 F.2d 1164, 1167 (9th Cir. 1976). But under California Code of Civil Procedure section 995.220,

4  it appears that certain public entities, including a county, are "not required to give [a] bond and shall

5  have the same rights, remedies and benefits as if the bond were given" "if a statute provides for a

6  bond in an action or proceeding." Code Civ. Proc. § 995.220.

7       The Court orders the parties to meet and confer and submit a written joint statement within

8  seven (7) days of this Order regarding *whether* the County is exempt from the posting of a bond.[18]

9  **III.  Conclusion**

10      For the foregoing reasons, the Court hereby ORDERS as follows:

11   1. The Motion for Preliminary Injunction (ECF No. 58) is GRANTED AS MODIFIED.

12      a.  The parties are ORDERED to meet and confer and file a joint statement within thirty

13          (30) days of this Order regarding a more narrowly tailored injunction as discussed

14          above.

15      b.  The parties are ORDERED to meet and confer and file a joint statement within seven

16          (7) days of this Order discussing whether the County is exempt from the posting of a

17          bond.

18   2. The Request for Judicial Notice (ECF No. 84) is GRANTED.

19

20      IT IS SO ORDERED.

21

22   Dated: August 29, 2025                    _____

23                                             MAAME EWUSI-MENSAH FRIMPONG

24                                             United States District Judge

25  _____

26  [18] The parties shall note that this joint statement is not to address whether the Court should order a bond, and,
27  if so, in what amount. It should merely address whether the County is exempt. The Court will issue a separate
    order on whether the County is exempt, and, if it is not, request supplemental briefing as needed on whether
28  the Court should order a bond, and, if so, in what amount once the Court considers the parties' joint
    statements on a more narrowly tailored injunction. *See* Section II.D, *supra*.

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28