## Docket No. 25-5754

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles and COUNTY OF LOS ANGELES,

*Plaintiffs-Appellees,*

v.

CHIQUITA CANYON, LLC, a Delaware limited liability company,
CHIQUITA CANYON, INC., a Delaware corporation and WASTE CONNECTIONS US, INC.,

*Defendants-Appellants.*

*Appeal from a Decision of the United States District Court for the Central District of California,*
*No. 2:24-cv-10819-MEMF-MAR · Honorable Maame Ewusi-Mensah Frimpong*

## EXCERPTS OF RECORD
## VOLUME 2 of 12 - Pages 23 to 318

PAUL S. CHAN
ARIEL A. NEUMAN
SHOSHANA E. BANNETT
BIRD, MARELLA, RHOW, LINCENBERG,
DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
(310) 201-2100

JACOB P. DUGINSKI
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
(415) 262-4000

KAITLYN D. SHANNON
MEGAN L. MORGAN
JAMES B. SLAUGHTER
MEGAN R. BRILLAULT
KATELYN E. CIOLINO
BEVERIDGE & DIAMOND P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036-1661
(202) 789-6000

*Attorneys for Defendants-Appellants Chiquita Canyon, LLC,*
*Chiquita Canyon, Inc., and Waste Connections US, Inc.*



COUNSEL PRESS INC. (213) 680-2300

PRINTED ON RECYCLED PAPER



# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

People of the State of California, et al.

PLAINTIFF

v.

Chiquita Canyon, LLC, Chiquita Canyon, Inc., & Waste Connections US, Inc.

DEFENDANT.

DISTRICT COURT CASE NO:  2:24-cv-10819-MEMF

APPEALS COURT CASE NO:  25-5754

**TRANSCRIPT DESIGNATION FORM**

**INSTRUCTIONS:**

For additional information about designating transcripts on appeal, refer to the Federal Rules of Appellate Procedure, the local rules of the circuit in which the appeal is pending, and the instructions below.  Please file a separate Transcript Designation Form ("TDF") in each district court case in which transcripts are being designated.

**1. Decide Which Transcripts to Designate.**  The parties to the appeal must each decide which parts of the proceedings in this Court are necessary to the record on appeal, and ensure that a transcript is prepared for each such part, which must be listed in the chart below (attach additional pages if necessary).  If you do not intend to designate any transcripts of the proceedings in this Court as part of the record on appeal, you must so indicate below.

**2. Determine Whether Those Transcripts Have Already Been Filed.**  For each proceeding listed in the chart below, you must review the Court's docket to see if a transcript has already been prepared and filed.  If it has, provide the docket number; if not, check the box to indicate that you have ordered it.

**3. Order Any Transcripts That Have Not Yet Been Filed.**  Before filing this form, you must complete and submit a G-120 Transcript Order Form for any transcripts not already on the docket.  IMPORTANT:  Transcripts are not considered ordered until the G-120 form has been submitted and you have made payment arrangements with the court reporter or transcription company, or received authorization for the transcript to be paid for out of Criminal Justice Act ("CJA") funds.

| DATE | JUDGE (initials) | PROCEEDING TYPE / PORTION | COURT REPORTER | TRANSCRIPT E-FILED? CM/ECF DOCKET NO.? |
|------|------------------|---------------------------|----------------|----------------------------------------|
| 07/14/2025 | MEMF | Evidentiary Hearing on Preliminary Injunction | Recorded, CourtSmart | ☑ Yes; Dkt # 139 <br> ☐ No; I have ordered it. |
| 07/15/2025 | MEMF | Evidentiary Hearing on Preliminary Injunction | Recorded, CourtSmart | ☑ Yes; Dkt # 140 <br> ☐ No; I have ordered it. |
| 07/17/2025 | MEMF | Motion for Preliminary Injunction | Recorded, CourtSmart | ☑ Yes; Dkt # 147 <br> ☐ No; I have ordered it. |
|  |  |  |  | ☐ Yes; Dkt # <br> ☐ No; I have ordered it. |
|  |  |  |  | ☐ Yes; Dkt # <br> ☐ No; I have ordered it. |
|  |  |  |  | ☐ Yes; Dkt # <br> ☐ No; I have ordered it. |
|  |  |  |  | ☐ Yes; Dkt # <br> ☐ No; I have ordered it. |
|  |  |  |  | ☐ Yes; Dkt # <br> ☐ No; I have ordered it. |

I hereby certify that (*check one of the following and sign below*):

Continued on additional page(s)?  ☐ Yes  ☐ No

☐ I do not intend to designate any portion of the transcript.

☒ All transcripts listed above are already on file in the U.S. District Court case at the docket numbers provided.

☐ All transcripts listed above that are not already on file in the U.S. District Court have been ordered.  I have submitted one or more G-120 Transcript Order Forms in accordance with that form's instructions, and have made all necessary payment arrangements. I will pay all charges for transcripts I have ordered, or, where applicable, take all necessary steps to secure payment under the CJA. (Indicate here if CJA funds to be used: ☐ .)

Date  09/24/2025        Signature  /s/ Paul S. Chan

G-126 (10/15)                    TRANSCRIPT DESIGNATION FORM

# Appeal Documents

[2:24-cv-10819-MEMF-MAR The People of the State of California et al v. Chiquita Canyon, LLC et al](#)

ACCO,
(MARx),APPEAL,CONSOLDS,DISCOVERY,MANADR,PROTORD,RELATED-G,REOPENED

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Chan, Paul on 9/24/2025 at 9:25 PM PDT and filed on 9/24/2025

| | |
|---|---|
| **Case Name:** | The People of the State of California et al v. Chiquita Canyon, LLC et al |
| **Case Number:** | [2:24-cv-10819-MEMF-MAR](#) |
| **Filer:** | Chiquita Canyon, Inc. |
| | Chiquita Canyon, LLC |
| | Waste Connections US, Inc. |
| **Document Number:** | [158](#) |

**Docket Text:**
**DESIGNATION of Record on Appeal by Defendants Chiquita Canyon, Inc., Chiquita Canyon, LLC, Waste Connections US, Inc. re [156] (Chan, Paul)**

**2:24-cv-10819-MEMF-MAR Notice has been electronically mailed to:**

Ariel A Neuman      aneuman@birdmarella.com, brl@birdmarella.com, mlw@birdmarella.com, rec@birdmarella.com

Caroline Karabian Castillo      ccastillo@counsel.lacounty.gov

Catherine L Carlisle      ccarlisle@meyersnave.com, gduran@meyersnave.com, lgonzales@meyersnave.com

Cristina L Talley      ctalley@meyersnave.com, lcastro@meyersnave.com, tle@meyersnave.com

Dawyn Renae Harrison      dharrison@counsel.lacounty.gov

Deborah J Fox      dfox@meyersnave.com, calendardept@meyersnave.com, dmehretu@meyersnave.com, gduran@meyersnave.com

Dusan Pavlovic      dpavlovic@counsel.lacounty.gov

Grant Rigdon      grigdon@birdmarella.com, ssmall@birdmarella.com

Jacob P. Duginski      jduginski@bdlaw.com, arivas@bdlaw.com

James B. Slaughter      jslaughter@bdlaw.com

Jennifer Lauren Riggs      jriggs@meyersnave.com, lcastro@meyersnave.com

Jon Scott Kuhn      skuhn@counsel.lacounty.gov

Kaitlyn Day Shannon    kshannon@bdlaw.com, aahmed@bdlaw.com, hwebb@bdlaw.com, mmorgan@bdlaw.com, mvitris@bdlaw.com, vpodolsky@bdlaw.com

Katelyn E. Ciolino    kciolino@bdlaw.com

Louis J. Manzo    LManzo@bdlaw.com

Megan L. Marzec Morgan    mmorgan@bdlaw.com

Megan R. Brillault    MBrillault@bdlaw.com

Michael Lee Huggins    mhuggins@meyersnave.com, gduran@meyersnave.com, lgonzales@meyersnave.com

Paul S. Chan    pchan@birdmarella.com, docket@birdmarella.com, dthrockmorton@birdmarella.com

Seena Samimi    ssamimi@meyersnave.com, calendardept@meyersnave.com, scandy@meyersnave.com

Shoshana E Bannett    sbannett@birdmarella.com, karen-minutelli-9770@ecf.pacerpro.com, kminutelli@birdmarella.com

**2:24-cv-10819-MEMF-MAR Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\Chiquita Transcript Designation Form (PI Appeal).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=9/24/2025] [FileNumber=40996600-0
] [c416d5f4df9e287d13474e3df2d7c30993c26d37069cc42caccb80ef50590328cea
4cbb32709f6aabb01ceeacaeb73bc974a0465d3df178600452209bac670c1]]

26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:24-cv-10819-MEMF-MAR                    Date: September 2, 2025

Title    _The People of the State of California et al v. Chiquita Canyon, LLC et al_

Present: The Honorable:   Maame Ewusi-Mensah Frimpong

| Damon Berry | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: Order DENYING Ex Parte Application for Leave to File Supplemental Evidence in Opposition to Plaintiffs' Motion for Preliminary Injunction [ECF No. 151][1]**

The Court is in receipt of Defendants' Ex Parte Application for Leave to File Supplemental Evidence in Opposition to Plaintiffs' Motion for Preliminary Injunction. ECF No. 151 ("Application"). The County filed an opposition to the Application (ECF No. 152 ("Opposition")) and a Request for Judicial Notice in support thereof (ECF No. 152-2 ("RJN")). For the reasons below, the Court DENIES the Application and the RJN.

On May 29, 2025, the County filed a Motion for Preliminary Injunction. ECF No. 58. The Motion was fully briefed. ECF Nos. 82 (Opposition), 87 (Reply). After the briefing had ended, Defendants filed supplemental declarations of Patrick Sullivan (ECF No. 113), Steven J. Cassulo (ECF No. 114), and Laurentius Marais (ECF No. 121). At the hearing for the Motion for Preliminary Injunction, the Court permitted the supplemental declaration of Marais but not the other two. ECF No. 139 (July 14, 2025 Evidentiary Hearing Transcript) at 15:9–12. On July 17, 2025, the Court held a hearing on the Motion for Preliminary Injunction. ECF No. 146.

On August 11, 2025, Defendants filed the Application, requesting the Court permit leave to file an updated supplemental declaration of Patrick Sullivan. _See generally_ Application; ECF No. 151-2 (Supplemental Declaration of Patrick Sullivan ("Sullivan Supplemental Declaration")).

---

[1] This Order was decided prior to deciding the Motion for Preliminary Injunction, but inadvertently not docketed on time.

27

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.  2:24-cv-10819-MEMF-MAR                    Date: September 2, 2025

Title    _The People of the State of California et al v. Chiquita Canyon, LLC et al_

The Court does not find leave to file the Sullivan Supplemental Declaration warranted. Defendants argue that the supplemental declaration provides "valuable, relevant evidence" and that refusal to admit it would constitute an "error." Application at 4–5. But the Ninth Circuit precedent to which Defendants cite are distinguishable. In _Fellowship of Christian Athletes v. San Jose Unified School District Board of Education_, the Ninth Circuit found the supplemental declaration at issue "highly relevant." 82 F.4th 664, 696 n.14 (9th Cir. 2023). But here, the Sullivan Supplemental Declaration does not meet this threshold. In particular, Sullivan represents that his analyses are based on only "preliminary results." Supplemental Declaration at 2–3 ("This means we have not received carbon dioxide data from the laboratory and have not finalized our quality assurance and quality control on the calculations or the written report that accompanies and summarizes the data. Nevertheless, I have been asked to report the preliminary results and provide a further update once the results are finalized."). Defendants provide no binding authority that held that findings based on preliminary data satisfy the "highly relevant" standard in this Circuit.

Similarly, the Court finds _Ocean Beauty Seafoods, LLC v. Pacific Seafood Group Acquisition Co., Inc._ distinguishable. There, the excluded documents were filed for the district court's consideration "fifty-four days before oral argument on the preliminary injunction." 611 F.App'x 385, 387 (9th Cir. 2015). But here, Defendants filed the Sullivan Supplemental Declaration _after_ the oral argument on the Motion for Preliminary Injunction. As such, the Court finds _Ocean Beauty_ not applicable to the issue at hand.

For the reasons above, the Court DENIES the Application.

As to the County's RJN, the Court did not need to consider any of the exhibits attached to the RJN for this Order. As such, the Court DENIES the RJN.

**IT IS SO ORDERED.**

|  |  |
|---|---|
|  | : |
| **Initials of Preparer** | DBE |

28

Dawyn R. Harrison, County Counsel (SBN: 173855)
Scott Kuhn, Assistant County Counsel, (SBN: 190517)
Dušan Pavlović, Senior Deputy County Counsel (SBN: 228509)
Caroline K. Castillo, Deputy County Counsel (SBN: 236987)
OFFICE OF THE COUNTY COUNSEL
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-1811
Facsimile: (213) 626-7446

Deborah J. Fox (SBN: 110929)
dfox@meyersnave.com
Jenny L. Riggs (SBN: 204417)
jriggs@meyersnave.com
Cristina L. Talley (SBN: 107298)
ctalley@meyersnave.com
Catherine L. Carlisle (SBN: 298316)
ccarlisle@meyersnave.com
Seena M. Samimi (SBN: 246335)
ssamimi@meyersnave.com
MEYERS NAVE
707 Wilshire Blvd., 24th Floor
Los Angeles, California 90017
Telephone: (213) 626-2906
Facsimile: (213) 626-0215

Attorneys for Plaintiffs
THE PEOPLE OF THE STATE OF
CALIFORNIA and THE COUNTY OF
LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES, <br><br> Plaintiffs, <br><br> v. <br><br> CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; WASTE CONNECTIONS US, INC., a Delaware corporation; and DOES 1-50, inclusive, <br><br> Defendants. | Case No. 2:24-cv-10819-MEMF (MARx) <br> Related Case: 2:23-cv-08380-MEMF (MARx) <br><br> Hon. Maame Ewusi-Mensah Frimpong <br><br> **COUNTY PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Action Filed:    December 16, 2024 <br> Trial Date:      None Set |

1

## <u>TABLE OF CONTENTS</u>

2                                                                                      <u>**Page**</u>

3  I.    INTRODUCTION ................................................................................................. 3

4  II.   ARGUMENT ....................................................................................................... 4

5        A.   The Chiquita Defendants Have Not Offered Grounds to Admit
             the Second Supplemental Sullivan Declaration ...................................... 4
6
        B.   The Chiquita Defendants Present a Skewed Version of the
7            Current Conditions at the Landfill ........................................................... 7

8  III.  CONCLUSION .................................................................................................... 8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL
EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs the People of the State of California, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and Plaintiff the County of Los Angeles (collectively, the "County Plaintiffs") hereby submit the following opposition to the *Ex Parte* Application for Leave to File Supplemental Evidence in Opposition to Plaintiffs' Motion for Preliminary Injunction (the "*Ex Parte* Application") filed by Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connections US, Inc. (collectively, the "Chiquita Defendants").

## I.    INTRODUCTION

The Chiquita Defendants request that this Court allow them to raise "supplemental" evidence after the conclusion of the preliminary injunction hearing, which included two days of evidentiary hearings and argument on the County Plaintiffs' Motion for Preliminary Injunction. They argue that the Court should consider this "new" evidence, which the Chiquita Defendants contend shows that they continue inching toward regulatory compliance, or, as they put it, "emissions data and odor complaint data show continued improvement." [ECF 151, ID 17342.] Simply, this "newly-obtained evidence" neither informs the matter before the Court, nor does it provide an accurate picture of the current state of the Chiquita Landfill. The Court has rejected the prior attempts by the Chiquita Defendants to reopen the briefing [ECF 112, ID 16435] and the evidence in this matter. This Court should deny this new request by the Chiquita Defendants for more of the same as well.

The "new" evidence offered by the Chiquita Defendants – a second supplemental declaration of Patrick Sullivan – does not provide reliable evidence to the Court regarding emissions data, and simply confirms that the Chiquita Defendants remain out of compliance. Most importantly, it offers nothing new as to the odors that are impacting the residents of the Val Verde and Castaic communities.

Indeed, Mr. Sullivan admits in his second supplemental declaration that the new information he offers "simply updates and reinforces" his prior opinions. [ECF 151-2, ID 17347.] More tellingly, however, the Chiquita Defendants fail to offer to

3

this Court the most relevant evidence regarding the current state of the Chiquita Landfill: the directive by the United States Environmental Protection Agency (USEPA) ordering the Chiquita Defendants to install "an EPA-approved landfill cover on all areas of the Landfill which are not presently covered by a geomembrane and to which the reaction area has expanded or has the potential to expand." [RJN, Exh. A at pp. 1-2.] Consistent with the Local Enforcement Agency Order that the Court considered at the Preliminary Injunction hearing [Exh. 34, ECF 65-1, ID 5333; Exh. 35, ECF 65-1, ID 5342-5343], this "additional geomembrane cover must be installed over at least 100 acres outside the existing geomembrane cover." [RJN, Exh. A at p. 2.] The Chiquita Defendants have not offered this information to the Court.

The Chiquita Defendants' request to supplement their evidentiary record with carefully curated information comes after all evidence has been submitted, the matter fully briefed, a full hearing on the motion, and the matter taken under submission by the Court nearly four weeks ago. There are no grounds here for the requested ex parte relief.

## II.    ARGUMENT

### A.    The Chiquita Defendants Have Not Offered Grounds to Admit the Second Supplemental Sullivan Declaration

The Chiquita Defendants' continuing attempts to bring in new matter on the Preliminary Injunction Motion should be denied. This Court has received and reviewed Mr. Sullivan's initial declaration in support of the Chiquita Defendants' Opposition to the Motion for Preliminary Injunction. [ECF 82-6.] In that Declaration, Mr. Sullivan testified, essentially, that in his view things were improving at the Chiquita Landfill with regard to the odors it was emitting that are causing the nuisance to the community. After the close of briefing, the Chiquita Defendants filed the first Supplemental Declaration of Patrick Sullivan, which simply updated the data Mr. Sullivan relied on to support his opinion that things

4

1  were improving at the Chiquita Landfill.  [ECF 112.]  This Court sustained the

2  County Plaintiffs' objection to the Supplemental Declaration, and it was not

3  introduced into evidence at the preliminary injunction hearing.  [RJN, Exh. B at

4  15:9-10.]

5        The second Supplemental Declaration of Patrick Sullivan, offered here with

6  the Chiquita Defendants' Ex Parte Application, is simply a repeat of the first

7  supplemental declaration that this Court rejected – it offers information that

8  Mr. Sullivan admits "simply updates and reinforces some of [his] prior analyses" in

9  his prior declaration.  [ECF 151-2, ID 17347.]  This second Supplemental Sullivan

10  Declaration, however, is even less probative and relevant than the first supplemental

11  declaration, because it is admittedly based on "preliminary" data.[1]  "This means

12  [Mr. Sullivan has] not received carbon dioxide data from the laboratory and [*has*

13  *not finalized* [*his*] *quality assurance and quality control on the calculations* or the

14  written report that accompanies and summarizes the data."  [ECF 151-2, ID 17347-

15  17348; emphasis added.]  In short, it is not reliable, even by the declarant's

16  standards.

17        But Mr. Sullivan's second supplemental declaration does confirm that the

18  Chiquita Landfill is still a nuisance; Mr. Sullivan admits that the South Coast

19  AQMD has continued to issue Notices of Violation in numbers that exceed those

20  permitted by the CUP.  (*Compare* ECF 151-2, ID 17350 [five NOVs issued in July

21  2025] *with* ECF 64, ID 3803 [four NOVs in a calendar year violate the CUP].)

22  Indeed, this Court heard testimony from Steve Cassulo, manager of the Chiquita

23

24  _____

[1] The Chiquita Defendants further advise the Court, "If the PI Motion remains
pending, Defendants will further supplement to reflect finalized quality assurance
25  and quality control on the calculations and any updates to the data table contained in
Mr. Sullivan's declaration as needed."  [ECF 151, ID 17340; emphasis added.]
26  In other words, should this Court grant the instant ex parte application, the Chiquita
Defendants will continue to file additional supplemental declarations, even though
27  briefing, evidence, and argument are closed.

28

OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL
EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Landfill, regarding the fact that the Chiquita Landfill operates under a CUP, and that the CUP limits the Chiquita Landfill to no more than four NOVs in a calendar year from the South Coast AQMD.  Thus, at best, Mr. Sullivan's second supplemental declaration confirms both that the community continues to suffer from the odors and that the County Plaintiffs should prevail on their nuisance per se claim.

The Chiquita Defendants argue that this Court would err if it denied them a chance to supplement the record with their new, albeit unreliable, evidence.  But the cases cited by the Chiquita Defendants to support their Ex Parte Application are easily distinguishable.  In *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023), the Ninth Circuit ruled that the District Court abused its discretion in failing to allow the plaintiffs to file a declaration that was "highly relevant for determining mootness."  *Id*., at 696, fn. 14.  Here, the second Supplemental Sullivan Declaration is not "highly relevant" to show the lack of a public nuisance.  As Mr. Sullivan admits, the data is "preliminary" and has not gone through quality assurance and quality control.  It is simply a partial snapshot of a moment, which, viewed in isolation, could show some movement toward abating the nuisance.  Even if believed, that is not sufficient to demonstrate the absence of the nuisance.

Similarly, the Chiquita Defendants' citation to *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, *Inc*., 611 F. App'x 385 (9th Cir. 2015) does not support granting the Chiquita Defendants' Ex Parte Application.  In that case, the defendants *timely moved* to supplement the record on a preliminary injunction motion with discovery responses the day after they were received and 54 days before argument on the motion.  Under these circumstances, the Ninth Circuit held the district court abused its discretion by denying the motion to supplement the evidence and then denying the preliminary injunction motion for lack of evidence.  Here, the second Supplemental Sullivan Declaration is anything but timely (and it certainly is not relevant discovery responses).  It is filed almost four weeks after the

OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

matter was taken under submission by the Court and after the Court rejected the first Sullivan Supplemental Declaration.  This Court should exercise its discretion to deny the Ex Parte application.

**B.    The Chiquita Defendants Present a Skewed Version of the Current Conditions at the Landfill**

While the Chiquita Defendants present preliminary, unverified data that purports to show that the odor levels are dropping, what they do not mention is the fact that the government agencies tasked with regulating the Landfill do not agree that conditions at the Landfill are improving.  The Chiquita Defendants' Ex Parte Application should be denied, but if this Court is inclined to permit it, the County Defendants request permission to submit additional evidence regarding the current conditions at the Chiquta Landfill.

At the preliminary injunction hearing, this Court heard testimony from Elizabeth Anne Berg of the Department of Toxic Substances Control ("DTSC"), Shikari Nakagawa-Ota of the Local Enforcement Agency ("LEA"), and Amanda Sanders of the South Coast AQMD, who testified that nuisance conditions exist at the Chiquita Landfill.  This Court accepted into evidence the April 1, 2025 DTSC Imminent and Substantial Endangerment Determination and Order, and the May 1, 2025 LEA Compliance Order, requiring, among other things, that the Chiquita Landfill extend the existing geomembrane covering to include those areas where the reaction has expanded or appears to be expanding.  Those orders remain in place pending the Chiquita Defendants' compliance.

But, beyond that, the Chiquita Defendants neglect to advise the Court that on July 25, 2025, the United States EPA issued an order consistent with the April 1, 2025 DTSC Imminent and Substantial Endangerment Determination and Order [Exh. 44, ECF 62-1, ID 3011] and the May 1, 2025 LEA Compliance Order [Exh. 43, ECF 62, ID 2766], directing the Chiquita Defendants to install an EPA-

OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1 approved additional cover at the Chiquita Landfill, to be installed over at least 100

2 acres outside the existing geomembrane.  [RJN, Exh. A.]

3      Thus, the Chiquita Defendants urge this Court to consider some new if

4 unreliable evidence that presents only a sliver of the picture of current conditions at

5 the Chiquita Landfill.  Should this Court consider the Chiquita Defendants' request,

6 therefore, the County Plaintiffs request permission to submit additional evidence to

7 show an accurate picture of the Chiquita Landfill at present.

8 **III.   CONCLUSION**

9      The County Plaintiffs respectfully request that the Ex Parte Application be

10 denied.  Alternatively, if the application is granted, that County Plaintiffs request

11 that they be granted leave to file supplemental evidence.

12

13 DATED:  August 14, 2025          MEYERS NAVE

14

15

16                               By:   /s/Jenny L. Riggs

17                                    DEBORAH J. FOX
                                      JENNY L. RIGGS
18                                    CRISTINA L. TALLEY
                                      CATHERINE L. CARLISLE
19                                    SEENA M. SAMIMI

20                                    Attorneys for Plaintiffs
                                      THE PEOPLE OF THE STATE OF
21                                    CALIFORNIA and THE COUNTY OF
                                      LOS ANGELES
22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL
EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs the People of the State of California, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and Plaintiff the County of Los Angeles, certifies that this brief contains 2,123 words, which:

☒ complies with the word limit of L.R. 11-6.1.

☐ complies with the word limit set by court order dated _____.

DATED: August 14, 2025

/s/Jenny L. Riggs
_____
JENNY L. RIGGS
Attorneys for Plaintiffs
THE PEOPLE OF THE STATE OF
CALIFORNIA and THE COUNTY
OF LOS ANGELES

6260519

9

37

Dawyn R. Harrison, County Counsel (SBN: 173855)
Scott Kuhn, Assistant County Counsel, (SBN: 190517)
Dušan Pavlović, Senior Deputy County Counsel (SBN: 228509)
Caroline K. Castillo, Deputy County Counsel (SBN: 236987)
OFFICE OF THE COUNTY COUNSEL
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-1811
Facsimile: (213) 626-7446

Deborah J. Fox (SBN: 110929)
dfox@meyersnave.com
Jenny L. Riggs (SBN: 204417)
jriggs@meyersnave.com
Cristina L. Talley (SBN: 107298)
ctalley@meyersnave.com
Catherine L. Carlisle (SBN: 298316)
ccarlisle@meyersnave.com
Seena M. Samimi (SBN: 246335)
ssamimi@meyersnave.com
MEYERS NAVE
707 Wilshire Blvd., 24th Floor
Los Angeles, California 90017
Telephone: (213) 626-2906
Facsimile: (213) 626-0215

Attorneys for Plaintiffs
THE PEOPLE OF THE STATE OF
CALIFORNIA and THE COUNTY OF
LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES,<br><br>Plaintiffs,<br><br>v.<br><br>CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; WASTE CONNECTIONS US, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 2:24-cv-10819-MEMF (MARx)<br>Related Case: 2:23-cv-08380-MEMF (MARx)<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF COUNTY PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Action Filed:    December 16, 2024<br>Trial Date:        None Set |

38

Plaintiffs THE PEOPLE OF THE STATE OF CALIFORNIA and COUNTY OF LOS ANGELES, by and through their attorneys of record, hereby request the Court take judicial notice of the following documents, pursuant to Federal Rule of Evidence 201:

**Exhibit A**    United States Environmental Protection Agency Order dated July 24, 2025 to Mr. Steve Cassulo, District Manager, Chiquita Canyon, LLC, retrieved August 13, 2025 at https://www.epa.gov/system/files/documents/2025-07/rcra-7003-09-2024-0001-cercla-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-05-chiquita-canyon-llc-epa-additional-work-letter-2025-07-24.pdf

**Exhibit B**    Certified copy of Transcript of Proceedings of Evidentiary Hearing, Day 1, dated July 14, 2025 before the Honorable Maame Ewusi-Mensah Frimpong

County Plaintiffs respectfully submit that a public document (Exhibit A) is proper for judicial notice as well as for consideration by this Court with the County Plaintiffs' concurrently-filed Opposition to Defendants' Ex Parte Application for Leave to File Supplemental Evidence. Courts may take judicial notice of "a fact that is not subject to reasonable dispute because it… can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Pac. Gas & Elec. Co. v. Lynch*, No. CV 01-1083RSWLSHX, 2001 WL 840611, at *6 (C.D. Cal. May 2, 2001) (taking judicial notice of California Governor Gray Davis's January 17, 2001, Proclamation of a State of Emergency); *U.S. ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014) ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies."); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 (N.D. Cal. 2017) (taking judicial notice of proclamations made

1  by the U.S. Attorney General Jeff Sessions); *Merced Irrigation Dist. v. Cnty. of*
2  *Mariposa*, 941 F. Supp. 2d 1237, 1261–62 (E.D. Cal. 2013) (taking judicial notice
3  of Board of Supervisors' resolution as matter of public record); *Catholic League for*
4  *Religious & Civil Rights v. City & Cnty. of San Francisco*, 567 F.3d 595, 606 (9th
5  Cir. 2009), on reh'g en banc, 624 F.3d 1043 (9th Cir. 2010) (judicial notice of
6  county board of supervisors' actions according to its public resolution); *Elena Selk*
7  *v. Pioneers Mem'l Healthcare Dist.*, No. 13CV0244 DMS (BGS), 2014 WL
8  12729166, at *2 (S.D. Cal. Apr. 7, 2014) (taking judicial notice of date entity was
9  established according to board of supervisors' resolution).
10      Here, Exhibit A is publicly available government record whose authenticity is
11  not reasonably questionable and judicial notice is requested of the fact that the
12  United States Environmental Protection Agency issued the subject Order.  As a
13  result, County Plaintiffs ask that this Court take judicial notice of this document.
14  / / /
15  / / /
16  / / /
17  / / /
18  / / /
19  / / /
20  / / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANTS' EX PARTE
APPLICATION FOR LEAVE

40

1    County Plaintiffs submit that Exhibit B is also proper for judicial notice as

2    well as for consideration by this Court with the County Plaintiffs' concurrently-filed

3    Opposition to Defendants' Ex Parte Application for Leave to File Supplemental

4    Evidence.  A Court may take judicial notice of a transcript of its own proceedings.

5    *See GemCap Lending, LLC v. Quarles & Brady, LLP*, 259 F. Supp. 3d 1007, 1020

6    (C.D. Cal. 2017) ("[I]t is well established that a court can take judicial notice of its

7    own files and records under Rule 201."); *see also, e.g.*, *Engine Mfrs. Ass'n v. S.*

8    *Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 n.2 (9th Cir. 2007) (taking

9    judicial notice of transcript of court proceedings); *Arrington v. City of Los Angeles*,

10   No. CV 15-03759-BRO (RAOx), 2017 WL 10543403, at *7 (C.D. Cal. Jun. 30,

11   2017) (same).  County Plaintiffs ask that this Court take judicial notice of Exhibit B.

12

13   DATED:  August 14, 2025        MEYERS NAVE

14

15

16                        By:      /s/Jenny L. Riggs

17                                 DEBORAH J. FOX
                                   JENNY L. RIGGS

18                                 CRISTINA L. TALLEY
                                   CATHERINE L. CARLISLE

19                                 SEENA M. SAMIMI

20                                 Attorneys for Plaintiffs
                                   THE PEOPLE OF THE STATE OF

21                                 CALIFORNIA and THE COUNTY OF
                                   LOS ANGELES

22

23   6261924

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANTS' EX PARTE
APPLICATION FOR LEAVE

# EXHIBIT A



**REGION 9**

SAN FRANCISCO, CA  94105

July 24, 2025

Mr. Steve Cassulo
District Manager
Chiquita Canyon, LLC
29201 Henry Mayo Drive
Castaic, CA 91384-2705

    RE: Additional Work required under UAO for Geomembrane Cover Expansion

Dear Steve Cassulo:

This letter directs Chiquita Canyon LLC ("CCL") to implement additional work under Paragraph 90 of the Unilateral Administrative Order, EPA Docket No. RCRA 7003-09-2024-0001 and CERCLA 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-05, In the Matter of Chiquita Canyon, LLC, issued February 21, 2024 (the "UAO"), the U.S. Environmental Protection Agency ("EPA").  Paragraph 90 allows EPA to direct additional work consistent with the objectives of the UAO.

The overall objectives of the UAO are set forth in Paragraph 1 of the UAO as the performance of response actions to address off-site impacts and ongoing subsurface reactions causing off-site impacts, in connection with the Chiquita Canyon Landfill ("Landfill") in Castaic, California, including identifying, investigating, remedying, and/or preventing the potential endangerment to human health or the environment from activities involving solid and hazardous waste.  The objectives of the UAO specifically include the objectives of the Master Work Plan (as defined in the UAO) set forth in Paragraph 22 of the UAO as:

    (1) remedy[ing] and prevent[ing] off-Site impacts caused by odors, emissions, leachate or other waste streams; and

    (2) deploy[ing] measures to delineate, fully characterize, prevent the expansion of, contain, and reduce the smoldering or the subsurface reaction occurring at the Landfill.

    A.  Additional Work

EPA has determined that the following additional work ("Additional Work") is necessary to meet the foregoing objectives:

    1.  CCL shall install an EPA-approved landfill cover on all areas of the Landfill which are not presently covered by a geomembrane and to which the reaction area has expanded or has the

potential to expand. The Additional Work shall be consistent with the California's Department of Toxic Substances Control ("DTSC's") Imminent and Substantial Endangerment Determination and Order, Docket No. HAS-FY24/25-082, dated April 1, 2025 ("DTSC ISE Order") and the Los Angeles County Department of Public Health, Solid Waste Management Program, acting as the Local Enforcement Agency ("LEA") Compliance Order, dated May 1, 2025 ("LEA Compliance Order").[1] Consistent with the LEA Compliance Order, the additional geomembrane cover must be installed over at least 100 acres outside the existing geomembrane cover. In no event shall installation of the cover be conditioned upon findings of the Reaction Committee.[2]

B.    Basis for Determination

EPA has determined, based on temperature monitoring data showing the migration of the reaction at the Landfill, findings regarding the potential for the reaction to expand to the entire main canyon of the Landfill, and the continued issuance of notices of violation based on odor complaints from community members, as described below, that the Additional Work is necessary to meet the objectives of the UAO.

State and local agencies have found, based on extensive analysis of temperature monitoring data, that the reaction has migrated beyond the portion of the Landfill currently covered with geomembrane cover. DTSC determined that "[u]nderground temperatures recorded at "[the Landfill] between January 9, 2025 and February 19, 2025 demonstrate the SET event has expanded beyond the original 30 acres in the northwestern portion of the landfill in Cell 1/2A, Module 2B/3, Module 4, and Module 2B/3/4 P2," and, as of April 1, 2025, encompassed "approximately 90 acres of [the Landfill]." *See* **Enclosure A** at pp. 5-6. Similarly, the LEA concluded that the reaction was continuing to expand as of May 1, 2025: "Contrary to CCL's stated belief that the reaction has not expanded, new temperature data from the recently installed TMPs . . . indicates that the reaction is expanding." *See* **Enclosure B** at p. 5. These statements were consistent with the findings of Dr. Timothy Stark, a leading landfill expert, based on a review of Waste Borehole Maximum Temperature Profiles Over 6 Weeks from January 9, 2025 to

---

[1] The DTSC ISE Order and the LEA Compliance Order contain specific requirements for the work to expand the geomembrane cover and for the geomembrane cover, which are hereby incorporated by reference. These requirements include, without limitation: "The geomembrane cover shall accommodate landfill settlement/subsidence, sufficiently limit the transmission of gases (e.g. methane permeance less than 2.5x10-13 m/s using ASTM D1434), and provide durability from foot traffic, exposure to ultraviolet radiation, and inclement weather, or motorized equipment, if any. In addition, the cover shall have material properties to address site-specific conditions, including but not limited to, elevated landfill temperatures, settlement, and harmful landfill gas/odor emissions. This work shall be conducted with appropriate air monitoring, use Construction Quality Assurance techniques, and be consistent with South Coast AQMD's order and other applicable requirements. The geomembrane thickness shall be adequate to withstand the activities and conditions at the facility, but no less thick than 40 mil, with material consistent to prevent heat degradation and control odors and emissions as documented in the Stark Memo, Exhibit 6," and "Install a 40- to 60-mil thick tan or green HDPE-EVOH textured geomembrane underlain by a minimum 6 oz/sy nonwoven geotextile over approximately 100 acres outside the existing geomembrane cover. This new barrier must be welded to the existing 30-mil-thick white HDPE geomembrane or placed in a suitable anchor trench. A construction and quality assurance/quality control (QA/QC) plan must be submitted for approval." *See* **Enclosure A** at pp. 11-12; **Enclosure B** at p. 2.)

[2] The Reaction Committee was formed in response to the South Coast Air Quality Management District ("SCAQMD") Stipulated Order of Abatement (Case No. 6177-4) to review applicable data, estimate the extent of the reaction, and determine the reaction area. The findings of the Reaction Committee have been disputed by regulatory agencies, such as CalRecycle, which has asserted that the "Reaction Committee has taken a conservative approach in determining the reaction area," disregarding critical data such as carbon monoxide results. *See* **Enclosure C** at pp. 6-7.

2

February 19, 2025, that CCL's contractor "believes the SET Event covers about 28 acres as of February 20, 2025 whereas [Dr. Stark's] extent of the SET Event covers about 90 acres." *See* **Enclosure** A, Exhibit 6 at p. 6. Analysis of temperature monitoring probe data demonstrates that the reaction has migrated beyond the area of the Landfill covered with geomembrane cover.

Further, various statements of state and local agencies, based on analyses of temperature monitoring and other data, confirm that the reaction at the Landfill has the potential to expand to the entire main canyon of the Landfill. On March 28, 2025, CalRecycle issued a letter ("CalRecycle Letter") to the LEA stating, "The reaction area is expanding, and the current containment strategy has failed." *See* **Enclosure C**, CalRecycle Letter at pp. 18-19. CalRecycle based its conclusion on an analysis of various reaction metrics, including temperature, landfill gas levels, settlement, cover fissures, leachate outbreaks, damage to the Landfill's gas collection and control system, and emissions and odors, among other metrics. *See* **Enclosure C,** CalRecycle Letter at p. 5. Similarly, DTSC found that, "Without additional action, the SET event may consume the entire waste fill in the Main Canyon, which could threaten the stability of the southern toe of the waste fill in Cell 8A." *See* **Enclosure A** at p. 6.

The potential for the reaction to affect the entire main canyon of the Landfill warrants expansion of the geomembrane cover over the remaining uncovered portion of the Landfill. Indeed, Dr. Stark has confirmed that given the lack of containment strategy for the reaction, that "the only option for controlling odors and emissions is to cover the area with a geomembrane . . . over which the temperature monitoring probes (TPs) have been installed." *See* **Enclosure A** at Exhibit 6, p. 4. Dr. Stark specifically recommended extending the cover to "cover about 183 acres and leave only about 13 acres at the southern end of the [Landfill] uncovered for current disposal operations." *See* **Enclosure A** at Exhibit 6, p. 5. CalRecycle also recommended installing geomembrane cover "over the approximately 100 acres outside of the current geomembrane cover." *See* **Enclosure C**, CalRecyle Letter at p. 19.

CCL reported to the LEA that it completed the installation of 30-mil HDPE geosynthetic cover over approximately 44.6 acres of the reaction area and over approximately 1.3 acres over the disposal area in accordance with the west toe drain workplan, as of January 17, 2025. *See* **Enclosure D**. CCL has reported that "[t]he cover has contributed to the substantial decrease of odors at the Landfill." *See* **Enclosure E** at p. 4.

Notwithstanding completion of the initial geomembrane cover, members of the community surrounding the Landfill continue to report odors from the Landfill. According to CCL's Notice of Violation Log, available at https://chiquitacanyon.com/reports/notice-of-violation-log/, SCAQMD has issued approximately 50 Notices of Violation to CCL for discharging air contaminants from the Landfill, based on odor complaints from the community, between February 2025 and July 8, 2025.

State and local regulatory agencies agree that expanding the geomembrane cover will address the ongoing odor issues. DTSC stated: "Extending the area covered by a geomembrane is necessary to adequately control infiltration of oxygen and water into the landfill waste, and to control production of gas emissions, odors, and leachate." *See* **Enclosure A** at p. 11. CCL has even acknowledged that the geomembrane cover can effectively mitigate odors: "Chiquita agrees that installation of additional cover may be an appropriate method for mitigating potential odor impacts." *See* **Enclosure E** at p. 4.

EPA concurs with the state and local regulatory agencies that covering the remaining uncovered portion of the Landfill with geomembrane cover is a necessary and appropriate measure to control the Landfill reaction and related odors. Expanding and improving the geomembrane cover will, among other things, control the migration of odors from the Landfill and, therefore, mitigate off-site impacts from odors or emissions.

Further, extending the geomembrane cover will control infiltration of oxygen and water into the landfill mass, which can help prevent the expansion of the smoldering or subsurface reaction occurring at the Landfill.

The Additional Work, therefore, serves the dual objectives of the Master Work Plan and the UAO, as set forth above.

Moreover, the Additional Work is necessary to meet the broader objective of the UAO to address the imminent and substantial endangerment to the public health or welfare from the Landfill resulting from the release or threatened release of a hazardous substance.

C.   Submittal of Work Plan and Opportunity to Meet and Confer

EPA directs CCL to submit a Work Plan for the Additional Work within fifteen (15) days of this letter to EPA for approval, in accordance with Paragraph 90 of the UAO. Within five (5) days after the receipt of this letter, CCL shall have the opportunity to meet or confer with EPA to discuss the Additional Work. On approval of the Work Plan for the Additional Work, Respondent shall implement the Work Plan in accordance with the schedule and provisions contained therein, and the Work Plan for the Additional Work shall be incorporated by reference into the UAO.

If you have any questions or comments regarding this letter, or if you wish to exercise the opportunity to meet and confer, please contact Laura Friedli, EPA Attorney Advisor, at (415) 972-3325 or Friedli.Laura@epa.gov.

Sincerely,

/s/ Amy C. Miller-Bowen, 07/23/2025

Amy C. Miller-Bowen
Enforcement and Compliance Assurance Division Director
U.S. Environmental Protection Agency, Region 9

/s/ Michael Montgomery, 07/24/2025

Michael Montgomery
Superfund and Emergency Management Division Director
U.S. Environmental Protection Agency, Region 9

4

46

Enclosures
**Enclosure A – DTSC ISE Order**
**Enclosure B – LEA Compliance Order**
**Enclosure C – LEA March 2025 Letter attaching CalRecycle March 2025 Letter**
**Enclosure D – Cover Completion Report**
**Enclosure E – CCL Notice of Intent to Comply with DTSC ISE Order**


cc: John Perkey, Waste Connections
    Jim Little, Waste Connections
    Kurt Shaner, Waste Connections
    Sarah Phillips, Waste Connections
    Megan Morgan, Beverage & Diamond
    Nicole Weinstein, Beverage & Diamond
    Allyn Stern, Beverage & Diamond
    Todd Sax, California Environmental Protection Agency
    Joel Jones, United States Environmental Protection Agency
    Roshni Brahmbhatt, United States Environmental Protection Agency
    Kaoru Morimoto, United States Environmental Protection Agency
    Rick Sakow, United States Environmental Protection Agency
    Tyler Holybee, United States Environmental Protection Agency
    Mark Anthony Relon, United States Environmental Protection Agency
    Tara Frost, United States Environmental Protection Agency
    Laura Friedli, United States Environmental Protection Agency

# EXHIBIT B

1

1                     UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
2               WESTERN DIVISION - LOS ANGELES

3

4  THE PEOPLE OF THE STATE    ) Case No. CV 24-10819 MEMF (MARx)
  OF CALIFORNIA, et al.,     )
5                          ) Los Angeles, California
       Plaintiffs,     ) Monday, July 14, 2025
6                          ) 8:38 A.M. to 10:45 A.M.
         v.          ) 11:08 A.M. to 12:22 P.M.
7                          ) 1:26 P.M. to 2:27 P.M.
  CHIQUITA CANYON, LLC,      ) 3:12 P.M. to 4:49 P.M.
8  et al.,                    )
                          ) Evidentiary Hearing
9       Defendants.     ) Day 1
  _____)

10

11

12

13                  TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG
14             UNITED STATES DISTRICT JUDGE

15

16  Appearances:             See Page 2

17  Deputy Clerk:           Damon Berry

18  Court Reporter:        Recorded; CourtSmart

19  Transcription Service:    JAMS Certified Transcription
                       16000 Ventura Boulevard #1010
20                      Encino, California  91436
                       (661) 609-4528

21

22

23

24

25  Proceedings recorded by electronic sound recording;
  transcript produced by transcription service.

2

```
 1   APPEARANCES:

 2   For the Plaintiffs:     Meyers Nave
                             By:  CRISTINA L. TALLEY
 3                                DEBORAH J. FOX
                                  SEENA SAMIMI
 4                                JENNIFER L. RIGGS
                             707 Wilshire Boulevard, 24th Floor
 5                           Los Angeles, California  90017
                             (213) 626-2906
 6                           ctalley@meyersnave.com
                             dfox@meyersnave.com
 7                           ssamimi@meyersnave.com
                             jriggs@meyersnave.com
 8
                             Los Angeles County Counsel
 9                           By:  CAROLINE K. CASTILLO
                             648 Kenneth Hahn Hall of Administration
10                           500 West Temple Street
                             Los Angeles, California  90012
11                           (213) 972-5769
                             ccastillo@counsel.lacounty.gov
12
                             PAUL KIESEL
13                           (No contact information available.)

14                           RYAN HOFFMAN
                             (No contact information available.)
15
                             MICHAEL PARKS
16                           (No contact information available.)

17                           BLAINE MCPHILLIPS
                             (No contact information available.)
18
                             OSHEA ORCHID
19                           (No contact information available.)

20                           BENJAMIN GRIMES
                             (No contact information available.)
21
22   For the Defendants:     Beveridge and Diamond, P.C.
                             By:  MEGAN R. BRILLAULT
23                           825 Third Avenue, 16th Floor
                             New York, New York  10022
24                           (212) 702-5400
                             mbrillault@bdlaw.com
25
```

50

3

```
1   APPEARANCES (Con't.):

2   For the Defendants:    Beveridge and Diamond, P.C.
                           By:  LOUIS J. MANZO
3                          1900 N Street NW, Suite 100
                           Washington, D.C.  20036-1661
4                          (202) 789-6030
                           lmanzo@bdlaw.com
5
                           Beveridge and Diamond, P.C.
6                          By:  MEGAN L. MARZEC MORGAN
                           201 North Charles Street, Suite 2210
7                          Baltimore, Maryland  21201
                           (410) 230-1300
8                          mmorgan@bdlaw.com

9                          Bird Marella Rhow Lincenberg Drooks and
                           Nessim LLP
10                         By:  PAUL S. CHAN
                                ARIEL A. NEUMAN
11                         1875 Century Park East, 23rd Floor
                           Los Angeles, California  90067
12                         (310) 201-2100
                           pchan@birdmarella.com
13                         aneuman@birdmarella.com

14

15

16

17

18

19

20

21

22

23

24

25
```

51

4

1     LOS ANGELES, CALIFORNIA, MONDAY, JULY 14, 2025, 8:38 A.M.

2         (Call to Order of the Court.)

3             THE CLERK:  You may be seated.

4             Now calling item No. 1, Case No. L.A. CV 24-10819,

5     *The People of the State of California, et al., v.*

6     *Chiquita Canyon, LLC, et al.*

7             Counsel, please stand and state your appearances.

8             DEBORAH J. FOX:  Good morning, Your Honor.

9     Deborah Fox of Meyers Nave for the Plaintiffs The People of

10    the State of California and the County of Los Angeles.

11            SEENA SAMIMI:  Good morning, Your Honor.

12    Seena Samimi also for the plaintiffs.

13            CRISTINA L. TALLEY:  Good morning, Your Honor.

14    Cristina Talley on behalf of the plaintiffs.

15            JENNIFER L. RIGGS:  Good morning, Your Honor.

16    Jenny Riggs for the plaintiffs.

17            CAROLINE K. CASTILLO:  Good morning, Your Honor.

18    Caroline Castillo, deputy county counsel, on behalf of the

19    plaintiffs.

20            PAUL KIESEL:  And good morning, Your Honor.

21    Paul Kiesel also on behalf of the plaintiffs.  I'll be

22    Mr. Suggs' -- one of the witnesses -- counsel at the time of

23    his examination.

24            THE COURT:  You're -- just so the record is clear,

25    you're on behalf of the plaintiffs in the individual matters;

52

5

```
1    correct?
2            MR. KIESEL:  That is correct, Your Honor.
3            THE COURT:  Okay.
4            MR. KIESEL:  I am private plaintiff's co-lead
5    counsel.
6            THE COURT:  Thank you.
7            Thank you.
8            MEGAN L. MARZEC MORGAN:  Good morning, Your Honor.
9    Megan Morgan on behalf of defendants.
10           MEGAN R. BRILLAULT:  Good morning, Your Honor.
11   Megan Brillault on behalf of the defendants.
12           LOUIS J. MANZO:  And good morning, Your Honor.
13   Lou Manzo on behalf of the defendants.
14           PAUL S. CHAN:  Good morning, Your Honor.  Paul Chan
15   for defendants.
16           ARIEL A. NEWMAN:  And good morning, Your Honor.
17   Ariel Neuman on behalf of the defendants.  I'm sitting in the
18   back for the beginning of the hearing.
19           THE COURT:  Okay.  And joining the plaintiffs at
20   counsel table is?
21           MS. FOX:  This is Mr. Tony Kay (phonetic).  He is
22   our trial technologist, Your Honor.
23           THE COURT:  Okay.  Good morning, Mr. Kay.
24           Okay.  Good morning to all counsel.  Good morning
25   to everybody in the gallery.
```

6

```
 1          We have a number of logistical matters to address
 2  before we get started.  I will run through the ones that I am
 3  aware of, and the parties can let me know  if there's
 4  anything missing.  We have the -- I need to address something
 5  regarding the remote testimony, we have the request for the
 6  surreply, we have the motions in limine and the ex parte
 7  request to shorten time on the motions in limine, we have
 8  disputes regarding whether the defendants should be permitted
 9  to direct examine their witnesses, who should be excluded
10  from the courtroom, and we have a request -- a dispute
11  regarding the defendants' supplemental declarations that were
12  filed when the briefing closed, and a dispute regarding
13  whether opening and closing should be permitted.
14          Let me ask the plaintiffs if there's anything else
15  that they are aware of that needs to address -- be addressed
16  at this time.
17          MS. TALLEY:  The only other thing, Your Honor, is
18  the confidentiality of certain exhibits that might be
19  introduced.
20          THE COURT:  Okay.  The issue being closing the
21  courtroom or --
22          MS. TALLEY:  Yeah, well, the issue being that some
23  of the documents have been deemed confidential pursuant to a
24  protective order.  So we wanted to make sure that we could
25  maintain that confidentiality during the proceedings.
```

54

7

```
 1          THE COURT:  Okay.  Have you met and conferred with
 2   the defendants about this?  Is everyone in agreement on what
 3   the documents are?
 4          MS. TALLEY:  Well, the documents that we're
 5   speaking of are the documents that were submitted by AQMD --
 6          THE COURT:  Okay.
 7          MS. TALLEY:  -- their data.
 8          THE COURT:  Okay.  I would just ask you to -- I'll
 9   hear from the defendants, but I would just ask you to raise
10   that with the Court when those documents are about to come
11   into evidence.
12          Any additional issues from the defense that need to
13   be addressed?
14          MS. MORGAN:  Your Honor, we only ask that any
15   witnesses that are in the courtroom be -- or on Zoom have the
16   Zoom muted, have the witnesses removed from the courtroom
17   while we discuss any of those particular issues.
18          THE COURT:  Okay.  Thank you.
19          Okay.  So let's start with that, The exclusion of
20   witnesses.  The Court is inclined to exclude all witnesses
21   except for expert witnesses prior to their testimony.  I
22   understand that the plaintiffs, maybe, object to that.  Let
23   me hear briefly from the plaintiffs as to why.  It's a
24   standard order that this Court makes.
25          MS. TALLEY:  Thank you, Your Honor.
```

8

```
 1           We are asking that all witnesses be excluded from
 2   testimony in this matter because -- except for, I believe,
 3   one or two of the citizens that might be testifying on behalf
 4   of the defendants, all of their witnesses are experts.
 5   They've all had their declarations submitted in court,
 6   Your Honor, and we believe it would be appropriate for them
 7   to be excluded while the testimony of the County's witnesses
 8   comes in because they're going to be responding directly to
 9   that testimony.
10           THE COURT:  And -- okay.  That's what normally
11   happens.  So the objection is well taken but overruled.  The
12   Court will exclude all witnesses expert witnesses.  I don't
13   know if the County has a party representative that they want
14   to designate that is going to remain in the courtroom?
15           MS. CASTILLO:  Your Honor, I'm also the party
16   representative for the County.
17           THE COURT:  Okay.  Okay.  Thank you.
18           Okay.  So in light of that Court's ruling, is there
19   anybody that needs to leave or that we need to take off of
20   the Zoom at this time?
21           (Pause.)
22           MS. TALLEY:  I'm sorry, Your Honor.  Can you repeat
23   the question?  I'm sorry.
24           THE COURT:  Yeah.  I am ordering that all witnesses
25   except for expert witnesses are excluded from the courtroom
```

56

9

1    prior to their testimony.  So I wanted to give you a moment,

2    if any of those people are here for them to leave the

3    courtroom, or if any of those people are on Zoom for you to

4    advise us so we can take them off of the Zoom.

5            MS. TALLEY:  Well, we do have one witness on Zoom,

6    and she is going to be testifying on behalf of the

7    plaintiffs, and she is one of the agency witnesses so we

8    don't believe she's an expert, and I think it would be

9    appropriate to exclude her, but as I say, she's going to be

10   testifying first.

11           THE COURT:  Okay.  That's who?  Ms. Berg?

12           MS. TALLEY:  That's correct.

13           THE COURT:  Okay.

14           MS. FOX:  Your Honor, if I might add to that?

15           THE COURT:  Yes?

16           MS. FOX:  I'm not sure if Mr. Cassulo, the manager

17   of the Chiquita Canyon Landfill -- I'm not sure if he's

18   sitting in the courtroom.

19           THE COURT:  Okay.

20           MS. FOX:  But if so, he should be excluded.

21           THE COURT:  Okay.

22           MS. MORGAN:  He is not.  If there are any other

23   County fact witnesses in the gallery, though, we would ask

24   that they be removed as well.

25           THE COURT:  I think we're clear on the Court's

10

1  order.  Nobody seems to be moving.  So we will go with that.

2           And then let me just confirm with Mr. Berry who we

3  have identified on the Zoom right now.

4           (Court confers with the clerk.)

5           THE COURT:  Okay.  So I will just advise Ms. Berg

6  -- hold on one moment.

7           (Pause.)

8           THE COURT:  Okay.  We're back on the record.

9           So, Ms. Berg, you are going to be excluded from the

10 courtroom prior to your testimony, and so I'm going to ask

11 you to jump off of the Zoom, and I believe that your attorney

12 is still on the Zoom, and your attorney will let you know

13 when you should get back on the Zoom.

14          And Mr. Berry will just let me know when she's off,

15 and then we'll proceed.

16          Okay.  Okay.  Mr. Berry has advised that Ms. Berg

17 is off of the Zoom.  Again, I don't know who all these people

18 are.  You know who all these people are.  So if any of them

19 should be excluded from the courtroom based upon the Court's

20 order, you will ask them to leave.

21          Okay.  There was a request for remote testimony,

22 and I just want to reiterate for the parties the Court's

23 order at ECF 127, and that is to avoid logistical problems

24 that I've had in other matters where we've had remote

25 testimony.  So I'm not going to ask for a declaration or

58

11

1    anything of that nature.  I'm going to trust that the parties

2    complied with the Court's order, and we will proceed in that

3    fashion.  It's the Court's understanding that there's at

4    least one attorney that is appearing via Zoom.  I don't know

5    that that request was actually made.  So just going forward,

6    I need the parties to be very specific in their requests

7    about who's going to be appearing remotely.

8            For now, let me have whoever the attorneys are that

9    are on Zoom make their appearances.

10           RYAN HOFFMAN:  Good morning, Your Honor.  I don't

11   know if there's anyone else.  This is Ryan Hoffman with the

12   California Department of Justice.  I'm appearing here to

13   represent Ms. Elizabeth Anne Berg.

14           THE COURT:  Thank you.

15           Okay.  There have been -- there -- as I mentioned,

16   a number of requests that the Court is going to address.

17           The request to file a surreply at ECF 92 is denied.

18   The motions in limine and ex parte to shorten time on the

19   motions in limine are denied.  The -- ECF 92 was the

20   surreply.  The motions in limine and the request to shorten

21   are 99, 100, and 101.

22           The request by the defendants to present direct

23   testimony is denied.  That's found in ECF 103.

24           The post-briefing -- the issue regarding the post-

25   briefing supplements -- any request by the defendants to

12

1    submit that and -- is denied.  The Court will not consider

2    declarations that were filed after the close of briefing.

3            With respect to an opening and closing, the Court's

4    going to give the parties a six-hour time limit each -- each

5    side six hours. The Court will keep track with its chess

6    clock, and so you can use the time however you wish.  I don't

7    think it's a great use of your time to do opening and closing

8    since, I believe, this is still scheduled for oral argument

9    on Thursday, but if you think that something brief would be

10   helpful to orient the Court, that's fine.  That's going to be

11   taken out of your six hours.  Every time you're standing at

12   the podium, I'm taking it out of your time, and with sidebars

13   I'll use my discretion to determine whether the sidebars, if

14   any, come out of your time.

15           Any questions from the plaintiffs about the time

16   limits and the issue of the opening and the closing?

17           MS. FOX:  Yes, Your Honor.  So the time limit does

18   not apply to the argument on the 17th?

19           THE COURT:  Right.  But they will -- there will be

20   time limits for that too.

21           MS. FOX:  I anticipated that.  Thank you,

22   Your Honor.

23           THE COURT:  Thank you.

24           MS. FOX:  And I wanted to make sure that I was

25   following along.  Has the Court at this point taken up the

13

    1    issue about the request for direct exam?

    2            THE COURT:  Yes.  I denied it.

    3            MS. FOX:  Okay.  Thank you.

    4            THE COURT:  Anything -- any questions from the

    5    defendants?

    6            MS. MORGAN:  Yes, Your Honor.  May we be heard

    7    briefly on the issues of direct examination and the

    8    supplemental declarations?

    9            THE COURT:  No.  The briefing closed -- unless I am

   10    -- unless my understanding of the facts is incorrect that

   11    there's additional information that was submitted after the

   12    briefing closed, which is what the parties -- what the

   13    defense wants to include.

   14            MS. MORGAN:  Well, Your Honor, there was additional

   15    evidence submitted, but the reason for that is because the

   16    data was not made available to the defendants until after the

   17    close of briefing.  So the supplemental declarations,

   18    particularly declaration of the expert Marais, includes

   19    analysis of the Campbell data, data provided by the County

   20    that was within the County's possession that Chiquita did not

   21    receive until seven days after we filed our opposition.  That

   22    analysis is crucial to Your Honor's determination and

   23    understanding of the weaknesses of the data presented by the

   24    County, and without the supplemental declarations or the

   25    ability to have direct examination, Chiquita is being boxed

14

```
 1   in and unable to present a full and fair presentation of the
 2   facts to Your Honor.
 3            THE COURT:  Thank you.
 4            Let me hear from plaintiffs' counsel about that.
 5            MS. TALLEY:  Thank you, Your Honor.
 6            It's our position that the purpose of allowing
 7   cross-examination under Rule 7.8 --
 8            THE COURT:  Let me short-circuit this.  I don't see
 9   why you need direct examination if the declarations are
10   coming in.  So I'm not hearing you on that.  But with respect
11   to whether these additional declarations should be permitted,
12   she says that they are based on evidence that was in the
13   County's possession that the County provided late.
14            MS. TALLEY:  That's -- Your Honor, that's correct.
15   That information was provided after the opposition was filed,
16   but that's only with respect to the supplemental declaration
17   of Mr. Marais.
18            THE COURT:  Okay.
19            MS. TALLEY:  The other two declarations are not
20   based on any information that was provided after the
21   briefing.
22            THE COURT:  Anything further on that, Ms. Morgan?
23            MS. MORGAN:  The other supplemental declarations,
24   Your Honor, one from Mr. Steve Cassulo, is memorializing the
25   judicial site visit, which is part of the record for the PI
```

62

15

1    hearing -- ECF No. 56.  Plaintiffs own request was a judicial

2    site visit in connection with County's motion for the

3    preliminary injunction.  As for the other supplemental

4    declaration, it's a declaration of our expert Mr. Patrick

5    Sullivan.  He analyzed both onsite and offsite data trends

6    and extended his analysis through the end of June, which is

7    highly relevant for prospective relief and what the current

8    conditions are.

9            THE COURT:  Okay.  I will allow the supplemental

10   declaration of Mr. Marais but not the other two.  The Court

11   was at the site visit.  So, yeah, we don't need anything

12   further on that.

13           Okay.  Any other questions from defense counsel?

14   No direct examination is going to be permitted.  Anything

15   further?

16           MS. MORGAN:  Your Honor, we would just renew our

17   request for direct examination.  We do think it is crucial

18   because the expert --

19           THE COURT:  And I appreciate that you do.  Time is

20   ticking; so we need to move on.  Thank you.

21           Okay.  So with that, the parties are clear:

22   six-hour time limits and no direct examination.  In light of

23   the Court's comments, do the parties want -- sorry.

24           Did you have something you needed to add?

25           MS. TALLEY:  I did, Your Honor.

63

16

```
 1              THE COURT:  Yes?
 2              MS. TALLEY:  I apologize for the interruption.
 3              We did not see a ruling from the Court on the
 4    plaintiffs' request to do our direct examination under
 5    Rule 7.8, and so we wanted to make sure that we had that
 6    opportunity.
 7              THE COURT:  I'm sorry.  You also want to do direct
 8    examination?
 9              MS. TALLEY:  I'm sorry.  I misspoke.  Cross-
10    examination.  We did make a request for limited cross-
11    examination of the defendants' witnesses, and we did not
12    receive a ruling on that.
13              THE COURT:  Okay.  My understanding is that we are
14    here for both parties to do whatever cross-examination they
15    have requested.
16              MS. TALLEY:  Thank you, Your Honor.
17              THE COURT:  Is that clear?
18              MS. MORGAN:  Yes.  One question, Your Honor.
19              THE COURT:  Yes?
20              MS. MORGAN:  Plaintiff had initially requested
21    cross-examination of four of Chiquita's expert witnesses.
22    Without that -- they have withdrawn that request.  Without
23    the ability to provide direct examination, those witnesses
24    won't be able to provide rebuttal testimony.  So we do ask
25    that those witnesses still be provided a brief opportunity to
```

17

```
 1   rebut any of the County's case that's presented today.

 2               THE COURT:  Why can't you do that in redirect?

 3               MS. MORGAN:  If we have redirect, Your Honor, then

 4   we'd be able to do so.

 5               THE COURT:  Yeah.  It's cross and redirect.

 6               MS. MORGAN:  Well, they will not be cross-examining

 7   the witnesses.

 8               THE COURT:  Oh, I see.  Then no.  We'll just leave

 9   it at that.

10               Anything further?

11               MS. TALLEY:  Nothing on this side, Your Honor.

12               THE COURT:  Okay.  Wonderful.

13               Okay.  Does either party wish to provide opening

14   remarks?

15               MS. MORGAN:  Your Honor, we'll provide an opening.

16               THE COURT:  Okay.  Let me start my timer.

17               And the record should reflect I understand that

18   there is a court reporter here.  The parties are no doubt

19   aware, but I just need to make the record clear that the

20   official record is the record that is being provided by

21   electronic recording, and if the parties want a transcript

22   for any official purpose, they can speak with the electronic

23   court-reporting operator or reach out to the court-reporting

24   office to have a transcript made.  The Court doesn't have any

25   objection to having a court reporter here for the parties'
```

18

1   own purposes.  Just know that that's not an official record

2   for any purpose.

3            Okay.  With that, please proceed.

4            MS. MORGAN:  Thank you, Your Honor.

5            On July 1st Your Honor saw, smelled, and

6   experienced the Chiquita Canyon Landfill and the surrounding

7   community.  There were fleeting onsite odors at the landfill

8   but certainly not the catastrophic nuisance conditions in the

9   community that the County and the private plaintiffs have

10  portrayed.  Over the next two days, you will hear evidence

11  that offsite odors have decreased, Chiquita is applying

12  sophisticated engineering to control landfill emissions, and

13  that there is no factual or legal justification for a massive

14  mandatory injunction.  Instead, this case should follow its

15  normal course.  There is no basis for interim relief.  In the

16  parallel action, the private plaintiffs will have an

17  opportunity to seek damages as well.

18           My opening will preview the evidence, and on

19  Thursday Chiquita will present in detail its legal arguments

20  in opposition to the County's motion, but the evidence should

21  be heard while considering the County's daunting legal

22  burden.  Your Honor likely noted that, because of that burden

23  and the evidence Chiquita marshaled in its opposition brief,

24  the County's reply brief shifted positions.  The County has

25  pivoted from its faulty surveys and misunderstanding of the

19

1    ETLF to make the extraordinary arguments that it can receive

2    whatever injunctive relief it wants based on a nuisance

3    per se theory.  That is not the law.  A preliminary

4    injunction cannot be based solely on a notice of violation or

5    a statutory violation.  For the massive relief sought here,

6    the County needs compelling proof of irreparable, ongoing

7    damage affecting thousands of people.  The County's evidence

8    falls far short of that legal requirement, and this hearing

9    will confirm it.

10          So let's turn now to the evidence.  The County

11   relies on two sources of data, an unscientific online survey

12   prepared by the County Department of Public Health and

13   subjective odor complaints submitted to the South Coast AQMD.

14   The evidence will show that the County's data is subjective,

15   unreliable, and stale.  The data failed to support the

16   County's bold claim that 938 households must be relocated.

17          First, the focus of these self-reported issues is

18   historic and does not provide the basis for prospective

19   relief.  Second, the data is subjective and based on

20   problematic, unscientific methodologies.  The complaints

21   relied upon are largely unverified, and even those that are

22   verified follow a subjective process that fails to use

23   industry standard odor-monitoring tools.

24          The survey conducted by the Department of Public

25   Health is fundamentally flawed and deserves no weight

20

1   whatsoever.  It certainly cannot support a preliminary

2   injunction.  The evidence will show that Dr. Campbell did not

3   follow basic scientific methodologies and principles of good

4   survey design.  To cite just one disqualifying flaw, the

5   online survey suggests to respondents that there are odors

6   from the landfill and that those assumed odors are causing

7   health problems.  It's not surprising that the respondents'

8   answers match the prompts of the survey.

9           The faulty survey cannot be the basis for any

10  conclusions by the County, much less the Court, but the

11  County's presentation of the data offered to the Court also

12  fails on multiple grounds.  It does not support the requested

13  relocation, it is superficial, and it repeats the mistakes of

14  the survey.  This is not analysis.  It's simply a graphical

15  representation of everyone who has completed the survey and

16  complained about the landfill in the past two years.

17          The two days of testimony will also highlight for

18  the Court the objective data that the County now avoids and

19  deemphasizes.  The County has argued at times that the

20  underground reaction at Chiquita is expanding and therefore

21  the odors must be worse.  The County cannot support that

22  notion, and Chiquita's experts will and have rebutted it.

23  The County fails to support these statements with a witness

24  that's qualified to testify on elevated temperature landfill

25  events.  Instead, they parrot the statements of a CalRecycle

21

1  employee who is not before this Court.  In any event, the

2  County has retreated from its own position on the reaction

3  expansion, relying instead on nuisance at law.

4      The Court does need to know that the reaction is

5  under control and is being mitigated.  Mr. Steve Cassulo, the

6  district manager of Chiquita Canyon Landfill, will explain

7  Chiquita's massive infrastructure improvements that are

8  designed to mitigate the reaction.  Mr. Cassulo started his

9  career as a landfill operator over 30 years ago with the

10  U.S. Air Force.  Dr. Craig Benson, an ETLF expert, has

11  submitted a declaration for the Court's consideration

12  explaining the effectiveness of those efforts.  Dr. Benson's

13  analysis is entirely uncontested by the County, which has

14  neither filed objections nor asked to cross-examine him.

15      Chiquita's third witness, Mr. Patrick Sullivan, is

16  a landfill gas systems and air quality expert, who has

17  decades of experience with landfills and air emissions.

18  Mr. Sullivan submitted a declaration that explains trends in

19  onsite emissions over the past two years show clear and

20  significant reduction in landfill gas surface emissions,

21  reducing the potential for offsite odors.  This data is

22  reported to Chiquita's regulators.  Much of that data,

23  including the offsite air quality data that Mr. Sullivan will

24  -- has testified about, is publicly available.  The County

25  fails to mention this data whatsoever, and it has withdrawn

22

1   its request to cross-examine Mr. Sullivan, providing no

2   evidence counter to Mr. Sullivan's analysis of objective

3   emissions and offsite air quality monitoring data.

4        And despite the County's claims and rhetoric about

5   health impacts caused by odors from Chiquita, the County

6   fails to present any toxicologist to opine on potential

7   health impacts.  Chiquita does.  Dr. Angela Perez, a well-

8   published Ph.D. toxicologist, has reviewed the data and all

9   analysis conducted to date.  Dr. Perez submitted a

10  declaration that explains there are no short-term or long-

11  term health-impact risks from the reaction.  In fact,

12  Dr. Perez relies in part on the County Department of Public

13  Health's own independent toxicologist's report, which

14  concluded that there were no such risks.  The County also

15  withdrew its request to cross-examine Dr. Perez.  It no

16  longer believes it needs to prove health impacts to support

17  its requested relocation.

18       Dr. Richard Pleus, a leading odor scientist and

19  neurotoxicologist, has also submitted a declaration

20  explaining that objective methodologies exist for collecting

21  odor data.  Chiquita's regulators have failed to follow these

22  methodologies.  The County also fails to acknowledge the

23  results of such studies using those objective methodologies

24  that have been conducted by Dr. Pleus and others.  Again, the

25  County withdrew its request to cross-examine Dr. Pleus

70

23

1    claiming now that the actual objective odor data is

2    irrelevant to its claims.  The County asks the Court to make

3    an unprecedented finding that any level of odors at any time,

4    regardless of whether the odors occurred in the past are

5    supported by objective data, is sufficient to force Chiquita

6    to spend $20 million pretrial to relocate 938 households.

7           Finally, you will hear from Dr. Laurentius Marais,

8    an expert statistician.  Unlike the County, he has performed

9    a detailed analysis of the County's data.  It's no surprise

10   why.  The County now downplays and ignores this data.

11   Dr. Marais will explain that 50 percent of the complaints

12   made to the South Coast Air Quality Management District since

13   2023 that have led to notices of violation have come from

14   only 13 households.  This is an extraordinary fact that

15   eviscerates the County's case, which seeks to relocate nearly

16   1,000 households.  You will also hear from Dr. Marais that

17   the County's alleged hot spots cannot be recreated using the

18   data provided and that the slightest adjustment, like

19   removing two allegedly verified complaints that occurred

20   7 miles away from the landfill, result in the removal of over

21   500 households from the hot spots.

22          Based on the County's requests and Your Honor's

23   ruling, four of Chiquita's witnesses will not be able to

24   present direct testimony and, because they will not be cross-

25   examined, will not be here before the Court today, but should

71

1  Your Honor have any questions about the declarations or wish

2  to make credibility determinations based on the witnesses,

3  they are all here and able to testify and answer questions

4  from Your Honor.

5           It is the County's burden when seeking a

6  preliminary injunction to show how the requested relief is

7  narrowly tailored to the alleged irreparable harm.  The

8  County hasn't even tried to meet its burden.  We will show

9  that the 938 households are arbitrarily selected.  There is

10  no indication that the households want to be relocated or

11  that a six-month relocation is necessary.

12          Chiquita welcomes this evidentiary hearing and is

13  glad to present the Court an objective, scientific record of

14  the conditions at the landfill and in the surrounding

15  communities.  We believe this will verify what the Court

16  experienced with its own senses on July 1st.  The County is

17  trying to overcome Ninth Circuit precedent on the burden it

18  has here by asking the Court to create new law.  It wants to

19  relocate nearly 1,000 homes simply because it issued notices

20  of violation to Chiquita, no evidentiary proof of damage or

21  irreparable harm necessary.  The Court should apply existing

22  law on the strong evidentiary record and deny the preliminary

23  injunction.

24          Thank you.

25          THE COURT:  Thank you.

25

```
 1              Okay.  So I trust that plaintiffs want to begin,
 2    and did you want to begin with Ms. Berg?
 3              MS. RIGGS:  Yes, Your Honor.
 4              THE COURT:  Okay.  And Ms. Berg is your witness.
 5    So we'll start with her cross-examination?  Is that it?
 6              MS. RIGGS:  That's correct.
 7              THE COURT:  Okay.
 8              MS. RIGGS:  Because there's no direct --
 9              THE COURT:  Okay.
10              MS. RIGGS:  -- begin with defendants.
11              THE COURT:  Okay.  Defendants are ready to cross
12    Ms. Berg?
13              MR. MANZO:  Yes, Your Honor.
14              THE COURT:  Okay.  I will ask Ms. Berg's counsel to
15    get Ms. Berg back on the Zoom.  Mr. Berry will open the Zoom
16    for her to join, and he will let us know when she's ready to
17    go.
18              MS. FOX:  And, Your Honor --
19              MR. HOFFMAN:  Okay.  Thank you, Your Honor.  I'm
20    contacting her now.
21              THE COURT:  Okay.  Thank you.
22              MS. FOX:  And with the Court's permission, we would
23    excuse Ms. Talley.  She's going to orchestrate the witnesses
24    for the morning session.
25              THE COURT:  Okay.  Thank you.  You are excused.
```

26

```
 1            MS. TALLEY:  Thank you, Your Honor.

 2            (Pause.)

 3            MR. HOFFMAN:  Your Honor, Ms. Berg will be on again

 4   in just a moment.

 5            THE COURT:  Okay.  Thank you.

 6            (Pause.)

 7            THE COURT:  He was just advising you that there's a

 8   button to the right of the microphone if you need to raise

 9   the podium.

10            MR. MANZO:  It's a beautiful courthouse.  Thank

11   you.

12            (Pause.)

13            (Court steps off the bench while the clerk

14   coordinates witness on Zoom.)

15            THE COURT:  Okay.  Good morning, Ms. Berg.  Good to

16   see you.

17            (Pause.)

18            THE COURT:  Oh, no.  We can't hear you.

19            THE CLERK:  You're muted, Ms. Berg.

20            ELIZABETH ANNE BERG:  Good morning.

21            THE COURT:  Good morning.  Okay.  So Mr. Berry will

22   put you under oath right now.

23            THE CLERK:  Please raise your right hand.

24   ///

25   ///
```

74

BERG - CROSS                          27

1           ELIZABETH ANNE BERG, PLAINTIFFS' WITNESS, SWORN

2               THE CLERK:  Thank you.

3               THE COURT:  Okay.  With that, you may proceed.

4               Ms. Berg, I would just ask that you speak loudly

5    and audibly.  If you hear an objection from either side, then

6    just stop speaking until I tell you how to proceed.  And I

7    would just ask that you speak slowly.  There's something

8    about the way that the Zoom works that the faster people

9    speak, the more muffled sounds.  So we'll let you know if we

10   need you to slow down any further, but just be mindful of

11   that.  And please let the attorneys finish their questions

12   before you start your answer.  I'll remind them they need to

13   let you finish your answers before they ask another question.

14              Okay.  With that -- and we have Mr. Manzo?

15              MR. MANZO:  Yes, Your Honor.

16              THE COURT:  Okay.  Please proceed.

17              MR. MANZO:  Good morning, Ms. Berg.  Can you hear

18   me okay?

19              THE WITNESS:  Yes, I can.

20              MR. MANZO:  I'm going to try and be respectful of

21   your time and the Court's time today and keep this fairly

22   brief.

23                        CROSS-EXAMINATION

24   BY MR. MANZO:

25   Q    Congratulations on the new position of deputy director

```
                              BERG - CROSS                       28
```

```
 1   at DTSC.  Is that your current role?

 2   A    That is correct.

 3   Q    You're a lawyer, ma'am?

 4   A    Yes, I am.

 5   Q    You've been a lawyer for 20-plus years?

 6   A    That is correct.

 7   Q    You're not an engineer?

 8   A    I am not an engineer.

 9   Q    Have you ever been responsible for managing landfill

10   operations?

11   A    Personally I've not been responsible for managing

12   landfill operations.

13   Q    Have you ever designed or implemented landfill gas or

14   leachate control systems?

15   A    I have not personally operated or designed landfill

16   operations for leachate or air emissions.

17   Q    And you don't have any certifications in landfill

18   design, gas systems, or subsurface analysis; correct?

19   A    That is correct.

20   Q    Have you ever received any formal training or education

21   specific to "ETLFs", elevated temperature landfills?

22   A    No, I have not.

23   Q    In your work in your previous role at DTSC, have you

24   reviewed analyses by Dr. Timothy Stark and Todd Thalhamer?

25   A    Yes, I have.
```

BERG - CROSS                                    29

1    Q    They conducted analyses of these reactions; correct?

2    A    That is correct.

3    Q    And Mr. Thalhamer and Dr. Stark conducted an analysis of

4    a SET event; is that correct?

5    A    That is correct.

6    Q    Do you understand what a SET event is -- subsurface

7    event -- compared to an ETLF?

8    A    The event that is referred to as a "subsurface elevated

9    temperature event" or an "ELTF" [sic] or a "smoldering" --

10   these are all generally referred to as the same thing that's

11   happening subsurface at the Chiquita Canyon Landfill.

12   Q    Okay.  But as an attorney, just like all of us here in

13   this room, you don't have the technical engineering

14   experience to scientifically test the reliability of

15   Mr. Thalhamer or Dr. Stark's analysis, do you?

16   A    No.  That's -- that is why I had my staff -- who are

17   toxicologists, engineers, and geologists -- to help me do

18   that.

19   Q    Understood.

20        And, Your Honor, at this point we'd briefly renew,

21   understanding your previous ruling, our (indecipherable) two

22   objections regarding the reliability of the reports and why

23   Mr. Stark -- or Dr. Stark or Tim Thalhamer -- or

24   Todd Thalhamer not testifying here in court.  The County

25   seems to be trying to backdoor expert testimony and by having

BERG - CROSS                        30

1  witnesses who are not able to test the reliability of the

2  scientific analysis and prohibits -- prejudices the defense

3  because we're not able to test the reliability of the

4  analysis here in court as well.

5          THE COURT:  The request is denied.

6  BY MR. MANZO:

7  Q    Ms. Berg, I'd like to ask you a couple statements in

8  your declaration.  Is that okay?

9  A    Sure.

10 Q    One of the statements you made -- and this is in

11 paragraph 18 -- and do you have your declaration in front of

12 you?

13 A    I do.

14 Q    And the statement is (reading): The most common

15 contributor to SET events is when ambient air is pulled into

16 the landfill mass by the gas extraction system, which creates

17 an environment where oxidation can occur.

18          What led you to that conclusion?

19          MS. RIGGS:  Objection, Your Honor.  That misstates

20 the declaration.  The declaration --

21          THE COURT:  Okay.  Let me turn to it.  Just a

22 moment.

23          MS. RIGGS:  Thank you.

24          MR. MANZO:  And we can pull it up, Your Honor, on

25 the screen if you like.

                              BERG - CROSS                         31

1              THE COURT:  Hold on just a moment.

2              (Pause.)

3              THE COURT:  Can the parties advise: What's the ECF

4    number of this declaration?

5              MS. RIGGS:  62-1, Your Honor.

6              THE COURT:  Thank you.

7              (Pause.)

8              THE COURT:  I'm having a problem with my computer

9    mouse; so I'm a little limited.

10             What paragraph did you reference, Counsel?

11             MR. MANZO:  We can bring it up.  It's Exhibit 112,

12   page 5, paragraph 18.

13             MS. RIGGS:  Your Honor, it's ID No. 3004.

14             THE COURT:  Sorry.  What's the ECF number of -- is

15   it -- your concern, Counsel, is that Mr. Manzo

16   mischaracterized what was in the report or what was in her

17   declaration?

18             MS. RIGGS:  Counsel has mischaracterized the

19   declaration.  The declaration is quoting the Imminent and

20   Substantial Endangerment Order.

21             THE COURT:  Okay.  So I'm looking at the

22   declaration.  So what paragraph of the declaration are we

23   talking about?

24             MR. MANZO:  18, Your Honor.

25             (Pause.)

BERG - CROSS                                    32

1              THE COURT:  Okay.  What was the

2   mischaracterization?  He didn't read that paragraph

3   accurately?

4              MS. RIGGS:  The objection is that the Imminent and

5   Substantial Endangerment Order which was issued by the

6   Department of Toxic Substances Control has those -- that

7   language in there.  While Ms. Berg, as the person who signed

8   the order, likely agrees with it, it is the statement of the

9   Department, not a personal statement.

10             THE COURT:  I see.  And -- yeah, again, because I

11  am having a problem with my mouse, I'm not able to look at

12  the question.  Let me ask -- let you ask the question again,

13  and then I can rule on the objection.

14  BY MR. MANZO:

15  Q    Ms. Berg, in your declaration you have the sentence

16  (reading): The most common contributor to SET events is when

17  ambient air is pulled into the landfill mass by the gas

18  extraction system, which creates an environmental --

19  environment where oxidation can occur.

20             THE COURT:  And sorry.  Is the objection withdrawn

21  now that he's reworded the question?

22             MS. RIGGS:  Yes, Your Honor.

23             THE COURT:  Okay.  Thank you.

24             You may answer, Ms. Berg.  Does your declaration

25  contain the language that counsel just read?

BERG - CROSS                              33

1          THE WITNESS:  It does, and it quotes directly from

2  the Imminent and Substantial Endangerment Order that the

3  Department issued on April 1st.

4          THE COURT:  Thank you.

5          Please proceed, Counsel.

6  BY MR. MANZO:

7  Q    Ms. Berg, is this your conclusion as well?

8  A    Yes.  As the individual that authorized and issued the

9  order on behalf of the Department of Toxic Substances

10  Control, that is correct.

11  Q    Do you have any evidence that Chiquita overpulled on

12  gas?

13          THE COURT:  I didn't hear the word?  "Hung" gas?

14  BY MR. MANZO:

15  Q    "Overpulled" gas from the landfill?

16  A    I don't have it right before me, but I am sure that

17  there is information within our files and administrative

18  record to substantiate that claim.

19  Q    But you didn't put that information in your declaration?

20  A    We -- I quoted from the order.  I did not pull different

21  information in other than what was in the order, and the

22  administrative record supporting the order stands on its own.

23  Q    So this is -- for the first time, I believe, DTSC is

24  making this assertion that Chiquita -- or Chiquita overpulled

25  gas that caused the ETLF?  Is that your testimony here today?

BERG - CROSS                                          34

1  A    I -- what I'm saying today is that in directly quoting

2  from what was in the order that the Department made a

3  determination on, the cause of the ETLF or the SET event --

4  or whatever you want to call this reaction that is causing

5  this horrific situation -- was led -- caused by many things,

6  and one of the main ones was overpulling oxygen, which led to

7  the spread of the elevated temperature event.

8  Q    You're aware that no expert -- neither Dr. Timothy Stark

9  or Mr. Todd Thalhamer has made that claim before?

10           MS. RIGGS:  Objection.  Vague, Your Honor.  Before

11 what?

12           MR. MANZO:  Before her testimony in court today.

13           THE COURT:  Thank you.

14           THE WITNESS:  I'm not sure I understand the basis

15 of your question.  I had conversations with Dr. Stark and

16 Mr. Thalhamer on multiple occasions, and this is something

17 that we spoke about multiple times.

18 BY MR. MANZO:

19 Q    Okay.  So it's your testimony that you've had private

20 conversations with Dr. Stark and Mr. Todd Thalhamer where

21 they've alleged that Chiquita has overpulled on gas wells and

22 has caused the ETLF; is that correct?

23           MS. RIGGS:  Objection, Your Honor.  I don't mean to

24 be pedantic, but "private" conversations versus her role as

25 the deputy director.

```
                              BERG - CROSS                          35
```

 1          THE COURT:  He asked the question.  She can answer

 2   it if that's correct or not correct.

 3          You may answer the question.  Do you need it

 4   repeated?

 5          THE WITNESS:  Please.

 6          THE COURT:  Okay.  Repeat the question, Counsel.

 7   BY MR. MANZO:

 8   Q    Ms. Berg, so you've had private conversations with

 9   Mr. Thalhamer and Dr. Stark where they've alleged that

10   Chiquita caused the ETLF by overpulling on gas wells; is that

11   correct?

12          THE COURT:  And I need my own clarification of what

13   you mean by "private."

14          MR. MANZO:  Conversations -- we'll make it even

15   broader.  Any conversation anywhere.

16          THE COURT:  Okay.

17          THE WITNESS:  I've had multiple conversations with

18   both Dr. Stark and Mr. Todd Thalhamer, many meetings that --

19   and it wasn't just private, as in with me.  It was with me,

20   my staff, counsel -- conversations about the Chiquita Canyon

21   Landfill.  And there are a lot of things that contribute to

22   the event that is occurring at the landfill.  One of them is

23   overdrawing of oxygen.

24   BY MR. MANZO:

25   Q    Okay.  But you're aware that they've never put any of

BERG – CROSS                          36

1  that information in a report; is that correct?

2  A    I cannot say specifically whether or not they've put

3  that specific statement in a report or not.  I'd have to go

4  back and look at all the reports that they've drafted.

5  Q    Okay.  Let's turn to your declaration again.  And you

6  make a number of statements beginning in paragraph 28 about

7  -- forward-looking statements about what could happen at the

8  landfill if the reaction is not checked.  Is that fair to

9  say?

10  A    That is fair to say.

11  Q    And your declaration specifically speculates that in the

12  future there could be release of leachate into local

13  groundwater in paragraph 28; is that correct?

14  A    Yes.

15  Q    But that hasn't happened to date; correct?

16  A    We do not know if that has happened or not.  We are

17  taking samples of groundwater in different places, and right

18  now we do not know that has happened.

19  Q    Well, let me put it more simply.  DTS [sic] has not

20  proven that any leachate has gone into groundwater; correct?

21  A    That is correct.

22  Q    And you've said that the reaction could endanger tank

23  farms if the reaction goes unchecked; is that correct?

24  A    Yes.

25  Q    And to date, no tank farm has ever been harmed by the

BERG - CROSS                                    37

1   reaction; correct?

2   A    That is correct.

3   Q    And you're aware that Chiquita has been trying to get

4   regulatory approval to move the tank -- to move Tank Farm 9

5   for over a year now?

6   A    I'm roughly aware of that, yes.

7   Q    Okay.  I want to move to some of your other assertions

8   in paragraph 28.

9          Your declaration speculates that the expanding

10  reaction could block the entrance to the facility; right?

11  A    Yes.

12  Q    And you're aware that this Court visited the site on

13  July 1?

14  A    I am now.

15  Q    Okay.  And you're aware that there's never been a single

16  moment where the landfill has been closed because the ETLF

17  somehow blocked the entrance?  Is that fair to say?

18  A    That is correct.

19  Q    Let's talk briefly about the April 1, 2025, ISE order

20  that's referenced in paragraph 30 of your declaration.  Are

21  you aware that Chiquita submitted work plans in response to

22  the DTSC order on May 9, May 16, and July 1?

23  A    Yes, I'm aware of that.

24  Q    You're aware that Chiquita is waiting for a response

25  from DTSC on those work plans?

BERG - CROSS                                    38

1   A     Yes, I'm aware of that.

2   Q     And you're aware it's now been 74 days since Chiquita

3   submitted and has not heard any response?

4   A     I don't think that's an absolutely -- I don't think

5   that's an accurate response because we've been meeting with

6   Chiquita Canyon on a weekly basis to discuss these work

7   plans.

8   Q     Okay.  Well, Chiquita hasn't received any written

9   correspondence; is that correct?

10  A     That is correct.

11  Q     I want to turn briefly now to the barrier that's

12  described in paragraph 30, and the ISE order proposes a

13  vertical soil barrier to be installed at Chiquita Canyon; is

14  that correct?

15  A     Yes, a vertical barrier.

16  Q     Can you point me to the thermodynamic analysis that's

17  been completed regarding this project?

18  A     I can't at this moment, no.

19  Q     Have you ever seen one?

20  A     I have not seen one personally.  I'm not sure if --

21  Q     Um.

22  A     -- (indecipherable).

23  Q     Can you point me to any engineering analysis describing

24  whether this will increase or decrease slope stability?

25  A     Excuse me?  Are you saying -- are you asking me if

BERG – CROSS                          39

1   there's a study of whether or not a soil barrier would

2   increase or decrease soil stability?

3   Q    Correct.  Is there an engineering analysis that's been

4   completed?

5   A    I don't have -- I don't know.

6   Q    Have you completed an analysis regarding how gas

7   collection will be affected by the proposed project?

8   A    I have not personally, no.

9   Q    Have you ever seen one?

10  A    I have not.

11  Q    Have you ever completed or seen a feasibility study on

12  this project?

13  A    No.  Because it's not required by the order.

14  Q    All right.  So this is just a "Trust me.  This will

15  work" project?

16          THE COURT:  Counsel, I'm going to interpose my own

17  objection.

18      And this is for all counsel to just be mindful of their

19  tone.  This is not a jury trial.  No histrionics or dramatics

20  are needed.  Just ask the question to get to the point.

21  Thank you.

22          MR. MANZO:  Thank you, Your Honor.

23  BY MR. MANZO:

24  Q    Well, Ms. Berg, there's been no analysis or engineering

25  study of any kind regarding the thermodynamics or the

BERG - CROSS                              40

1   engineering on this proposed project; correct?

2   A    To my knowledge, no.  However, we have received a

3   proposed plan from Chiquita, and I don't believe those --

4   those components exist within the proposed plan that they

5   gave us.

6   Q    Okay.  I want to go to the one last line of questioning

7   here, the final paragraph of your declaration, paragraph 32,

8   and you state at paragraph 32 (reading): Given the continued

9   expansion of the SET event, it is highly likely that the

10  related impacts to the nearby communities discussed above

11  will persist.

12          Is that correct?

13  A    That is correct.

14  Q    And your claim that the SET event is expanding is based

15  on an analysis by someone who's not here in court today;

16  correct?

17          MS. RIGGS:  I'm going to object, Your Honor, on --

18          THE COURT:  Yes?

19          MS. RIGGS:  -- foundation.  I don't know that

20  Ms. Berg knows who's in court today.

21          THE COURT:  Thank you.

22          You may answer if you know.

23          THE WITNESS:  I don't know who's in court --

24  BY MR. MANZO:

25  Q    Well, you --

BERG - CROSS                                      41

1  A    -- but I -- you know, the information that was presented

2  -- that -- reviewed by my staff I also reviewed.  So the fact

3  that we believe that it is expanding is based on a couple --

4  a few different things.  One, temperatures around 185 to 190

5  around Tank Farm 9, cracks underneath the tank farm both

6  indicate that the reaction is expanding beyond the initial

7  30 acres.

8  Q    But again, your analysis is informed by technical

9  experts, Dr. Timothy Stark and Mr. Todd Thalhamer; correct?

10 A    Informed by them, but I also reviewed -- I reviewed the

11 information that was submitted by Chiquita Landfill to the

12 regulatory agency regarding temperature probes and the

13 temperatures -- where they're located -- also with the

14 pictures of cracking and fissures and a sinkhole.  So there

15 -- yes, I have recommendations based on my staff.  I also

16 looked in evaluating those myself.

17 Q    But again, respectfully, ma'am, you're not an engineer

18 and have no training on landfill engineering or

19 certifications of that kind; is that correct?

20 A    That is correct.  That's why I have staff to give me

21 recommendations, which I can also independently review the

22 evidence underlying it.

23 Q    Ma'am, have you reviewed the flux chamber analysis that

24 was ordered by AQMD?

25 A    I have not.

BERG - CROSS                                    42

1   Q    So you have not reviewed the study by the regulator that

2   shows dramatic decreases in onsite emissions in the past

3   year?

4   A    I cannot speak on behalf of AQMD or their orders or

5   their reports.

6   Q    Would you agree that odors have decreased substantially

7   in the last year?

8   A    No.

9   Q    You believe that odors are increasing?

10  A    I do not have the information in front of me right now

11  to make that assessment.  They have not gone away.

12              MR. MANZO:  Court's indulgence?

13              THE COURT:  Could I see the parties at sidebar, as

14  well, off the record.

15      (Sidebar off the record.)

16              THE COURT:  Okay, Counsel.  You may proceed.

17  BY MR. MANZO:

18  Q    Ms. Berg, you said that you've not reviewed the flux

19  chamber analysis ordered by AQMD; is that correct?

20  A    That is correct.

21  Q    Have you reviewed the complaint data submitted by AQMD?

22              MS. RIGGS:  Objection, Your Honor.  I think this

23  witness has already testified that she hasn't reviewed any of

24  the orders or information --

25              THE COURT:  And I'll just ask counsel to keep your

BERG - CROSS                                43

```
 1   objections short and sweet.

 2            Is this an "asked and answered" objection?

 3            MS. RIGGS:  Thank you, Your Honor.  It's foundation

 4   and asked and answered.

 5            THE COURT:  Okay.  I will overrule it.

 6            You may proceed.

 7   BY MR. MANZO:

 8   Q    Have you reviewed the odor complaint data from AQMD?

 9   A    I'm not sure I understand exactly what you mean by

10   "complaint data."  Do you mean an Excel spreadsheet-type data

11   that has all the different complaints being made by

12   individuals in the community?

13   Q    Have you seen the substantial trend -- I should say,

14   drop off in complaint data from 2025 compared to previous

15   years?

16            MS. RIGGS:  Objection.  Lacks foundation.  Asked

17   and answered.

18            THE COURT:  I'll let counsel attempt to lay the

19   foundation.

20   BY MR. MANZO:

21   Q    Have you reviewed the AQMD complaint data in detail?

22            THE COURT:  And sorry, Counsel.  I think she asked

23   for clarification as to what you're referring to by

24   "complaint data."  I'm not sure if you provided that

25   clarification so she can answer the question.
```

BERG – REDIRECT                    44

1  BY MR. MANZO:

2  Q    Have you reviewed the AQMD complaint data regarding the

3  landfill?  The spreadsheets?

4  A    I have reviewed spreadsheets not recently, probably over

5  a year ago.  So I cannot say what their current spreadsheet

6  looks like.

7  Q    Okay.  So before your testimony here today, you didn't

8  look at complaint data in the last year at the landfill?

9  A    I did not.

10 Q    Okay.

11        Thank you.  No further questions.

12        THE COURT:  Thank you.

13        Any redirect?

14        MS. RIGGS:  Yes, Your Honor, briefly.

15        THE COURT:  Thank you.

16        MS. RIGGS:  And with all apologies to Mr. Manzo, I

17 will lower the podium significantly.

18        MS. RIGGS:  Okay.  Good morning, Ms. Berg.

19        THE WITNESS:  Good morning.

20                REDIRECT EXAMINATION

21 BY MS. RIGGS:

22 Q    Are you currently the deputy director of California's

23 Department of Toxic Substances Control?

24 A    I've been appointed by the governor and I'll be sworn in

25 next Monday.  Correct.

BERG – REDIRECT                              45

1   Q    Thank you.  Is it fair to say there was a period of time

2   where your contract lapsed and then you were reappointed?

3   A    Correct.

4   Q    Are you testifying here today on behalf of the

5   Department of Toxic Substances Control?

6   A    Correct.

7   Q    Is the Department of Toxic Substances Control part of

8   the California EPA?

9   A    Correct.

10  Q    What is your role within the Department of Toxic

11  Substances Control?

12  A    I am deputy director of site mitigation and restoration

13  program, and this is a program that cleans up -- in very

14  general terms, cleans up hazardous waste dumps.  It could be

15  very large sites, like national (indecipherable) sites, or it

16  could be smaller pieces of property where there is a

17  proponent trying to redevelop it.  I manage toxicologists,

18  engineers, geologists, and we are all -- we, as a program,

19  evaluate how to best clean up releases of hazardous

20  substances in order to make pieces of property safe to live

21  and work on.

22  Q    What are the tools that you have in your arsenal to

23  accomplish the Department's mission of protecting the public

24  from hazardous substances?

25  A    By "tools" do you mean legal tools, do you mean

BERG – REDIRECT                          46

1  technical tools, or all the above?

2  Q    Thank you for that.  To clarify, what are the things

3  that the Department can do to investigate issues relating to

4  hazardous substances?

5  A    Yes.  So we have the ability to require parties who are

6  responsible to do investigations, to evaluate how to best

7  clean up the site, how to characterize it, evaluate the

8  extent of contamination, come up with a plan in order to do

9  the cleanup, and then long-term operation and maintenance to

10 ensure that any residual contamination left on site is

11 maintained in such a way that the public is not harmed.

12 Q    Uh.

13 A    We also have the -- I'm sorry.

14       We also have the ability to issue imminent

15 substantial endangerment orders, and the purpose of these

16 orders is to address imminent substantial endangerment to

17 human health and the environment caused by the release or

18 threatened release of hazardous substances, and that is the

19 basis of the order that we issued to Chiquita Canyon on

20 April 1st.

21 Q    Ms. Berg, you just spoke about releases of "hazardous

22 substances" and "threatened releases of hazardous

23 substances."  So I'm going to take those in turn.

24       Has there been a release of hazardous substances at

25 the Chiquita Canyon Landfill in the last couple of years?

BERG - REDIRECT                              47

1   A    Yes.  Multiple times.

2   Q    What are the hazardous substances that have been

3   released from the landfill?

4   A    The leachate that the landfill is producing in mass

5   quantities is contaminated with benzene and methyl ethyl

6   ketone, which are two hazardous substances.  And because of

7   that, when the leachate has seeped out of the landfill and

8   gone into (indecipherable) drains as it has come out of gas

9   wells -- exploding out of gas wells because the leachate was

10  boiling underneath the landfill, that also was release of a

11  hazardous substance.

12  Q    Was the Imminent and Substantial Endangerment Order

13  issued solely because of past releases of hazardous waste, or

14  were there concerns about threatened releases in the future?

15  A    The order is focused on averting a catastrophe.

16  Everything is to avoid the threatened release that could

17  happen going forward.

18  Q    What is the catastrophe that the -- that you're

19  envisioning with regard to Chiquita Canyon Landfill?

20  A    There's three main things that we are trying to avoid.

21  One, since the reaction is expanding, we want to put a

22  geosynthetic cover on top of the landfill that -- where the

23  reaction has expanded or has a potential to expand, and that

24  is to reduce offsite emissions of odors and hazardous

25  substances.

                          BERG - REDIRECT                    48

1            Two -- the second part of what we're trying to
2    accomplish is there's a tank farm located on top of the
3    landfill.  We know that the reaction is expanding underneath
4    that tank farm, and we're concerned that the tank farm will
5    collapse because the landfill will subside up to 20 to 30
6    feet as demonstrated at another part of the landfill subject
7    to the reaction.
8            The third part that we're very concerned about,
9    we're trying to avert is to stabilize the southern point of
10   the landfill through a vertical barrier, and we want to do
11   that in order to maintain slope stability and to allow
12   ingress and egress from the facility in case there is an
13   emergency situation and to allow operations and operators of
14   the landfill to be able to have access to the landfill going
15   forward, as well as emergency responders.
16   Q    Thank you, Ms. Berg.
17           Mr. Kay, if I could ask you to put up a page from
18   Exhibit 44, ID No. 3048.
19   BY MS. RIGGS:
20   Q    Ms. Berg, this is a page from the Imminent and
21   Substantial Endangerment Order.
22           (Pause.)
23           THE COURT:  Just a moment, Counsel.
24           MS. RIGGS:  Yes.  Thank you.
25           (Court speaks with the clerk.)

96

BERG - REDIRECT                           49

1          THE COURT:  Okay.  We're back on the record again.

2          The exhibit that you referenced, Counsel -- can you

3   give me the exhibit number again?

4          MS. RIGGS:  It is Exhibit 44, which was attached to

5   Ms. Berg's declaration.  It is the Imminent and Substantial

6   Endangerment Order.

7          THE COURT:  And this is Exhibit 44 on your joint

8   preliminary injunction exhibit list?

9          MS. RIGGS:  Yes, Your Honor.

10         THE COURT:  Okay.  And have the parties stipulated

11  that these exhibits are admitted, or they're going to

12  individually be admitted?

13         MS. RIGGS:  Your Honor, I believe there has been

14  some meet and confer, but there has not been an agreement to

15  date from --

16         THE COURT:  Okay.  Because -- okay.  So then you

17  can go ahead and proceed --

18         MS. RIGGS:  Thank you, Your Honor.

19         THE COURT:  -- and seek to admit this.

20         MS. RIGGS:  Well, then let's start with the first

21  page of the Imminent and Substantial Endangerment Order.

22         Mr. Berry, would it be possible for us to --

23         THE COURT:  So I'm just going to interrupt --

24         MS. RIGGS:  Uh-huh.

25         THE COURT:  -- and Mr. Berry can correct me if I'm

97

BERG - REDIRECT                    50

```
 1    wrong.  Our technology is great, but it is somewhat limited
 2    when we're trying to have a Zoom and use the functionality
 3    that permits us to show exhibits.  So again, Mr. Berry can
 4    correct me if I'm wrong, but I think the best way to proceed
 5    is for the parties to use the paper exhibits.  So I assume I
 6    have all the exhibits here -- well, okay.  So I will go to
 7    them, and I assume that your witness has the exhibits with
 8    her?
 9              MS. RIGGS:  Yes.
10              THE COURT:  Okay.  So give me a moment to pull out
11    Exhibit 44, and then we'll go from there.
12              MS. RIGGS:  Thank you.
13              And, Ms. Berg, if you could pull up the --
14    Exhibit 44, the Imminent and Substantial Endangerment Order
15    that you signed.
16              THE WITNESS:  Okay.
17              MS. RIGGS:  And we'll take a moment to make sure
18    that everybody has that in front of them in paper.
19              THE COURT:  Okay.  I have it.
20              MS. RIGGS:  Thank you.
21    BY MS. RIGGS:
22    Q    So starting with page ID 3011, that is the imminent --
23    the first page of the Imminent and Substantial Endangerment
24    Determination and Order.  Do you have that in front of you,
25    Ms. Berg?
```

Case 2:24-cv-10819-MEMF-MAR    Document 152-1    Filed 08/14/25    Page 62 of 281
Page ID #:17426

BERG - REDIRECT                              51

1   A     Yes.

2   Q     Do you recognize that document?

3   A     Yes.

4   Q     What is Exhibit 44?

5   A     It is the Imminent and Substantial Endangerment Order

6   that I signed and issued to -- on behalf of the Department of

7   Toxic Substances Control and we issued to the landfill

8   operators.

9   Q     Thank you.  Could I ask you to turn to page -- ID page

10  3048.  If you look at the top of the page, there should be

11  blue numbers.

12          THE COURT:  What was the page number again?

13          MS. RIGGS:  Page ID 3048.

14          THE COURT:  Thank you.

15  BY MS. RIGGS:

16  Q     Ms. Berg, do you have that page in front of you?  The

17  map of the landfill?

18  A     Yes.

19  Q     You mentioned a moment ago a concern about a tank farm

20  that is unstable because the reaction is underneath it.

21  A     Correct.

22  Q     Is that Tank Farm 9?

23  A     That's correct.

24  Q     Do you see Tank Farm 9 on the map at page ID 3048?

25  A     Yes.

BERG - REDIRECT                          52

1  Q    Can you describe for the Court where Tank Form No. 9 is

2  in relation to the geosynthetic cover?

3  A    It is located to the east of the geosynthetic cover.  It

4  is not located on top of the existing geosynthetic cover.

5  Q    Could I ask you now to turn to ID 3063 of the same

6  document.

7  A    Okay.

8  Q    Do you have that in front of you, Ms. Berg?

9  A    I think so.

10 Q    And is there a photograph on that page?

11 A    Yes.

12 Q    What is that a photograph of?

13 A    It's a photograph taken of the -- you can see the top

14 half has the -- one of the tanks for the Tank Farm 9, but on

15 the bottom half of the photograph, you see a large tension

16 crack of fissure, where the landfill is breaking apart.

17 Q    Why is a tension crack or fissure near a tank farm a

18 matter of concern to the Department of Toxic Substances

19 Control?

20 A    The fissure is an indication that the landfill is

21 subsiding, and the fear is that the landfill will completely

22 subside underneath the tank farm and all the tanks -- that

23 they will disconnect from each other, they'll be spilled of

24 hazardous substances, and so that's a great risk and concern

25 for the Department.

```
                           BERG - REDIRECT                      53
 1  Q    What happens if the tank farm splits apart?
 2  A    There will be a release of hazardous substances.  There
 3  was roughly several dozen to a hundred tanks located in
 4  Tank Farm 9 when we issued this order.  It would be a release
 5  of a hazardous substance.  Normally we would -- what would
 6  happen -- or should happen is that they treat this hazardous
 7  substance and then send it offsite for disposal.
 8           Also, a main concern is that if you're disrupting
 9  the existing tank farm operations -- this landfill is
10  producing enormous amounts of leachate on a daily basis, and
11  the fact that you would have a hundred tanks taken out of
12  commission -- it would then disrupt their ability to actually
13  deal with the ongoing problem of a generation of large
14  amounts of leachate.  For example, in February this past
15  year, 8 million gallons of leachate was produced by this
16  landfill.
17           So we have a huge fear that the tanks will come
18  apart, release a large quantity of hazardous substances, but
19  also substantially undermine the ability to deal with the
20  ongoing problem.
21  Q    To your knowledge, is Chiquita Canyon Landfill
22  relocating Tank Farm 9?
23  A    Yes.  They have agreed to comply with the order, and
24  they are taking efforts to relocate the tank farm.
25  Q    To your knowledge, is Chiquita Canyon Landfill taking
```

BERG – REDIRECT                                 54

1   steps to expand the geosynthetic cover over the reaction

2   area?

3   A    Yes.  Also, a requirement of the order, they have --

4   they are complying with that requirement as of the date

5   today.

6   Q    The third measure identified in the Imminent and

7   Substantial Endangerment Order is a physical barrier between

8   the waste mass that's experiencing the reaction and the part

9   of the landfill that is currently not experiencing the

10  reaction; is that correct?

11  A    That is correct.

12  Q    Counsel asked you some questions about whether

13  feasibility studies or engineering studies or thermodynamic

14  studies had been done.  Would that be Chiquita Canyon's

15  responsibility to do those studies with the submission of its

16  plan for the barrier?

17  A    With the work plan we would expect that Chiquita Canyon

18  would have the proper evaluation and plans in place in order

19  to implement the final action.  So, yes.  It may be called a

20  different thing, but, yes, that would be part of the work

21  plan expectations.

22  Q    And then, finally, Ms. Berg, counsel asked you some

23  questions about your training in landfill management and

24  operations.  How long have you worked in environmental

25  protection?

BERG - RECROSS                          55

1   A     Over 28 years.

2   Q     Do you have on your staff people with expertise in the

3   areas that you need in order to do your job properly?

4   A     Yes.

5   Q     How many people do you supervise?

6   A     400.

7           MS. RIGGS:  A moment, Your Honor, if I may?

8           (Pause.)

9           MS. RIGGS:  Thank you, Ms. Berg.  I have nothing

10  further.

11          THE COURT:  Thank you.

12          Any recross?

13          MR. MANZO:  Briefly, Your Honor.

14          THE COURT:  Thank you.

15          MS. RIGGS:  Warning to counsel: You'll need to

16  elevate it again.

17          MR. MANZO:  Thank you.

18                    RECROSS-EXAMINATION

19  BY MR. MANZO:

20  Q     Thank you, Ms. Berg.  Very briefly here, you spoke about

21  a crack near Tank Farm 9; is that correct?

22  A     Correct.

23  Q     You're aware that cracks can have many different reasons

24  in a landfill aside from an underground reaction; is that

25  correct?

BERG - RECROSS                            56

1    A    Yes and no.  Yes, there could be many reasons for a

2    crack, but considering the factual situation that we find

3    ourselves in and the fact that another part of the landfill

4    subsided by 25 to 30 feet in the course of 18 months leads --

5    would lead me to believe that the fear is substantiated, and

6    we can't let -- the point of this order is to avert an

7    emergency.

8    Q    Thank you, ma'am.  And you're aware that the crack was

9    repaired and has not reemerged in any way?

10   A    I am not personally aware of that.  However, it still

11   speaks to the concern about stability of the overall landfill

12   that is plagued by this reaction.

13   Q    And you're aware that Chiquita Canyon has slope

14   stability experts and has to make monthly reports on cracks

15   and fissures at the landfill?

16   A    Yes.  I review them.

17   Q    And finally, I just want to confirm here: You don't have

18   any current information about odors at the landfill, do you?

19   A    I'm not sure I understand what you mean by that.

20   Q    Well, you said that you have not reviewed the AQMD odor

21   complaint data in the last year nor the AQMD flux chamber

22   analysis; is that correct?

23   A    I have not.

24   Q    Okay.

25        No further questions.

57

```
 1   A     But I would think --
 2              MR. MANZO:  Thank you.
 3              THE COURT:  Thank you.
 4              Okay.  May this witness be excused?
 5              MS. RIGGS:  Yes, Your Honor.
 6              THE COURT:  Okay.  And who's the next witness?
 7              MS. RIGGS:  Dr. Muntu Davis.
 8              THE COURT:  Okay.  Thank you.
 9              MS. RIGGS:  He'll be in, in just a moment.
10              THE COURT:  Okay.  Thanks.
11              (Pause.)
12              MS. BRILLAULT:  And, Your Honor, we prepared a
13   witness binder with the declaration and certain exhibits I
14   may review with him if --
15              THE COURT:  Okay.
16              MS. BRILLAULT:  -- I may approach.
17              THE COURT:  Make sure opposing counsel has a copy.
18              (Pause.)
19              THE CLERK:  Please raise your right hand.
20          MUNTU DAVIS, M.D., PLAINTIFFS' WITNESS, SWORN
21              THE CLERK:  Please be seated.
22              MS. RIGGS:  Your Honor, we do have some objections
23   to the exhibits --
24              (Pause.)
25              THE WITNESS:  That's interesting.
```

58

```
 1              THE COURT:  You'll have to let us know if that's an
 2    appropriate way to handle the issue.
 3              THE WITNESS:  It works.
 4              THE COURT:  Thank you.
 5              THE CLERK:  Please state and spell your full name
 6    for the record, and please speak clearly into the microphone.
 7              THE WITNESS:  My name is Muntu Davis.  First name
 8    M-u-n-t-u.  Last name Davis, D-a-v-i-s.
 9              THE COURT:  Okay.  Good morning.  Thank you for
10    coming in.  I will just advise you that the -- your testimony
11    is being recorded; so we need to make sure that you speak
12    loudly and audibly into the microphone.  I would ask that you
13    let each attorney finish each question before you start to
14    answer the question, and I'll remind them to let you finish
15    your answers before they ask another question.  If you hear
16    anybody say "objection," then just stop speaking until I --
17    until I tell you how to proceed.  Understood?
18              THE WITNESS:  Understood.  Thank you.
19              THE COURT:  Okay.  Defense counsel had an objection
20    you needed to raise at this time?
21              MS. BRILLAULT:  Plaintiffs had an objection.
22              THE COURT:  Oh, plaintiffs.  Yes?
23              MS. RIGGS:  Thank you, Your Honor.
24              The exhibits are --
25              THE COURT:  And just make sure that you're speaking
```

59

1    into the microphone.

2          MS. RIGGS:  I promise, when we're done, I will have

3    this down.

4          THE COURT:  Okay.

5          MS. RIGGS:  The concern that I have is that these

6    are disconnected from the declaration they came from.  It's

7    hard to tell what they are, how they came in.  There's no

8    declaration attaching them and --

9          THE COURT:  Okay.  So I trust that defense counsel

10   will advise the Court and the parties of where these

11   different exhibits come from.

12         MS. BRILLAULT:  Yes, Your Honor.  And his

13   declaration is included.  It's Exhibit 104.  So it's at the

14   end.  So as -- again, I may not show him all of these.  I

15   think it depends on what his testimony is, and I will walk

16   through.

17         THE COURT:  Okay.  We just want the record to be

18   clear.  If one of these exhibits is an exhibit to his

19   declaration, make clear what exhibit it is.

20         That's what you're talking about; right?

21         MS. RIGGS:  Two things.

22         THE COURT:  Yes?

23         MS. RIGGS:  That, number one.  But number two,

24   these -- several of them appear to come from other witnesses,

25   and because they aren't attached or identified by the witness

DAVIS - CROSS                        60

1    they came in with, I don't know that Dr. Davis has seen them,

2    is aware of them, or is aware of the context.

3              THE COURT:  Okay.  So counsel will make that clear

4    when she asks about them.

5              MS. BRILLAULT:  Absolutely, Your Honor.

6              THE COURT:  Please proceed.

7              MS. BRILLAULT:  Good morning, Dr. Davis.

8              THE WITNESS:  Good morning.

9                        CROSS-EXAMINATION

10   BY MS. BRILLAULT:

11   Q    You're currently the health officer for the County

12   Department of Public Health?

13   A    Yes.

14   Q    Okay.  And how long have you been in that position?

15   A    Since the end of July 2018.

16   Q    And do you have a medical degree?

17   A    Yes, I do.

18   Q    A master in public health?

19   A    Yes.

20   Q    Do you hold any other degrees?

21   A    You mean beyond master's or beyond bachelor's?

22   Q    Correct.  Do you have another master's or another

23   doctorate degree?

24   A    No.

25   Q    Okay.  So you don't have a degree in chemistry?

```
                         DAVIS - CROSS                        61

 1   A    No.

 2   Q    Okay.  And you don't have a degree in physics?

 3   A    No.

 4   Q    And you're not an engineer?

 5   A    No.

 6   Q    You're not a toxicologist?

 7   A    No.

 8   Q    You're not an epidemiologist?

 9   A    No.

10   Q    Do you hold any academic or professional qualifications

11   specifically in the area of odor science?

12   A    No.

13   Q    Have you ever operated a landfill?

14   A    No.

15   Q    Have you ever operated any components of a landfill,

16   such as a landfill gas collection system?

17   A    No.

18   Q    Do you have any formal training in "ETLFs," elevated

19   temperature in landfills?

20   A    I do not.

21   Q    And you're not a statistician?

22   A    No.

23   Q    You haven't received any formal training in survey

24   design?

25   A    In my training for a master's of public health, yes,
```

DAVIS - CROSS                              62

1   there were classes in that.

2   Q    Okay.  So let's talk about your role as a -- the health

3   officer.  You're charged with protecting and promoting the

4   health and wellness of all county residents?

5   A    That's a question?

6   Q    That is a question.  Correct?

7   A    Yes.

8   Q    Okay.  So you also provide guidance and direction to the

9   Department of Public Health leadership on matters concerning

10  public health; correct?

11  A    That is correct.

12  Q    So when you're making decisions in order to protect and

13  promote the public's health, would you agree that basing the

14  decision on full and complete record as possible is the

15  preferred way?

16  A    Yes.

17  Q    In other words, more information is better when you're

18  making decisions?

19  A    As much as you have in terms of what possible -- you

20  have to deal with what information you have at that time, and

21  typically you're always collecting additional information.

22  Q    Agreed.  And that just helps to make sure that decision

23  you're making is reliable and is accurate as possible;

24  correct?

25  A    It helps you understand the situation and what may be

110

DAVIS - CROSS                               63

 1   needed.  Yes.

 2   Q    Okay.  For purposes of today's hearing, you submitted a

 3   declaration in this action; is that correct?

 4   A    Yes.

 5   Q    And you did so in your capacity as a public health

 6   officer, not as an expert witness in this case; correct?

 7   A    Yes.

 8   Q    And to the extent your declaration was based on personal

 9   knowledge, you said so, and to the extent it wasn't, you

10   based it on information that was told to you by others; is

11   that correct?

12        MS. RIGGS:  Objection, Your Honor.  This isn't

13   connected -- she's asking him what his declaration says.

14        THE COURT:  What's the objection?

15        MS. RIGGS:  Lacks foundation.

16        THE COURT:  Overruled.

17        Do you need the question repeated?

18        THE WITNESS:  Yes, please.

19        THE COURT:  Please repeat the question.

20   BY MS. BRILLAULT:

21   Q    The declaration you prepared for today is based on both

22   your personal knowledge -- and you said as much in your

23   declaration -- or if it wasn't, it was based on information

24   that was provided to you by others.  Is that an accurate

25   representation?

111

DAVIS - CROSS                          64

 1   A    Yes.

 2   Q    Okay.  Have you ever been to the Chiquita Canyon

 3   Landfill?

 4   A    I have.

 5   Q    When was the last time you were onsite at the Chiquita

 6   Canyon Landfill?

 7   A    I've been outside of the landfill, not onsite.

 8   Q    So you've never been onsite at the landfill?

 9   A    If you mean on the actual landfill and where trash is

10   dumped, no.

11   Q    Okay.  When was the last time you were outside of the

12   Chiquita Canyon Landfill?

13   A    I cannot recall exactly.  It was sometime after

14   complaints were coming in and we understood that there was an

15   issue, but I don't recall the exact time.

16   Q    Was it in the year 2025?

17   A    No.

18   Q    Was it in the year 2024?

19   A    I don't recall for certain, but I don't think so.

20   Q    In your declaration you state that the landfill is still

21   emitting odors that are adversely affecting the health of

22   nearby residents on a continuing and pervasive basis.  Do you

23   recall that?

24           (Pause.)

25   BY MS. BRILLAULT:

DAVIS - CROSS                           65

1  Q    Would you like me to pull up your declaration to help --

2  A    Yeah.

3         MS. BRILLAULT:  Okay.  If we could pull up

4  Exhibit 104, please.

5         THE COURT:  So it's my understanding that no one is

6  on the Zoom right now; so I asked Mr. Berry to take the Zoom

7  off so we can use our presentation software.  The parties

8  will need to advise the Court if we have another Zoom witness

9  so that Mr. Berry can get the Zoom back up, and if you don't

10 tell us at a break, then it's going to come out of your time.

11 Okay.

12         (Pause.)

13         MS. BRILLAULT:  I don't know what I'm doing.  It's

14 too high tech for me.  Sorry, Your Honor.

15         We also have a hard copy if that's -- Mr. Berry,

16 the courtesy copy that was there, could you provide that to

17 the witness so he can follow along in hard copy, please.  So

18 there should have been two binders -- duplicate copies.

19 Great.

20         THE COURT:  The witness has a copy of the binder,

21 as does the Court.  Where did you want him to turn to?

22         MS. BRILLAULT:  So Exhibit 104, please.

23 BY MS. BRILLAULT:

24 Q    And if you turn -- I'll ask you this question: Is that

25 the declaration you submitted for purposes of today's

DAVIS - CROSS                          66

 1   hearing?

 2   A    It appears to be.

 3   Q    Okay.

 4          THE COURT:  And, Counsel, my understanding is with

 5   respect to the declarations, which I understand were of the

 6   various witnesses which were submitted as part of the

 7   briefing, you don't necessarily need to admit those -- or lay

 8   the foundation to admit those; correct?

 9          MS. BRILLAULT:  Correct, Your Honor.  I'm not

10   trying to admit it.

11          THE COURT:  Okay.

12          MS. BRILLAULT:  I'm just trying to refresh his

13   recollection.

14          THE COURT:  Understood.

15          MS. BRILLAULT:  Thank you.

16          (Pause.)

17          MS. BRILLAULT:  All right.  Well --

18          THE COURT:  Please proceed.

19          MS. BRILLAULT:  Okay.  Thank you.

20   BY MS. BRILLAULT:

21   Q    So, Dr. Davis, if we turn to paragraph 15 --

22   A    Sorry.  Just a second.  This keeps flashing.

23          THE COURT:  Yeah.  We're trying to fix it.

24          MS. BRILLAULT:  Yeah.  So in the hard copy, if you

25   turn to paragraph 15 of your declaration, please.

                              DAVIS - CROSS                        67

 1              THE COURT:  Unless that is a problem for you and
 2    you can't proceed with that flashing in your eyes.
 3              THE WITNESS:  It stopped at the moment.  It --
 4              THE COURT:  Okay.
 5              THE WITNESS:  It goes off and on.  So sometimes
 6    it's a bit distracting.
 7              THE COURT:  Okay.
 8              THE WITNESS:  So we'll see.
 9              THE COURT:  We can also --
10              MS. BRILLAULT:  Should we take a quick pause?
11              THE COURT:  There's a way to -- if you just take
12    the screen and put it down?  Does that work?  No?
13              THE WITNESS:  Let's not worry about it for them
14    moment.  If it interrupts, I'll let you know.
15              THE COURT:  Okay.  Thank you.
16              THE WITNESS:  It stopped for now.
17              THE COURT:  Okay.  Thank you.
18              THE WITNESS:  Thank you.
19              I'm sorry.  Which --
20              THE COURT:  Okay.  So I believe she asked you to
21    turn to paragraph 15 of Exhibit 104.
22              THE WITNESS:  On what page?  Oh, paragraph 15.
23    BY MS. BRILLAULT:
24    Q    Page 5.
25    A    Yes.

DAVIS - CROSS                          68

1    Q    Okay.  And in paragraph 15 you state that -- your

2    opinion is because the landfill is still emitting odors that

3    are adversely affecting the health of nearby residents on a

4    continuing and pervasive basis; correct?  That's your

5    statement?

6    A    The reaction at the landfill, yes, still emitting odors

7    adversely affecting -- yes.

8    Q    And for purposes of your conclusion that it's being

9    caused by the reaction, you're relying on others?  This isn't

10   your independent knowledge?

11   A    Based on all of the information received, yes.

12   Q    Okay.  So for this opinion that odors are continuing to

13   be -- are continuing and are pervasive, for purposes of your

14   declaration that you made, you're relying on survey responses

15   from the Department of Public Health survey and odor

16   complaints that were submitted to the "AQMD," Air Quality

17   Management District for South Coast; is that correct?  And

18   you can look through your declaration if it helps refresh

19   your recollection, but those are two sources of data that

20   you're relying on; correct?

21   A    Those are two sources, but they're not the only sources.

22   There were inspectors who were in the field and on the

23   landfill site and around in the area that also had reports.

24   Q    I'd like to talk about the Department of Public Health

25   survey that you discuss in this declaration.  Did you create

DAVIS - CROSS                                69

1   the Department of Public Health survey?

2   A    I was part of the team that created and reviewed it,

3   yes.

4   Q    Who else was on the team?

5   A    We spoke with our consultant Adam Love.  We spoke with

6   our environmental health specialist.  I can't remember who

7   else in our department who also looks at surveys.

8   Q    And -- I'm sorry.  Continue.  I did not mean to

9   interrupt you.

10  A    Go ahead.

11  Q    The survey was first launched in October of 2024; is

12  that correct?

13  A    I believe that's correct.

14  Q    Did you specifically provide any input on the survey

15  questions?

16  A    Yes, I reviewed the survey.

17  Q    And I'm asking about the questions themselves.  You

18  provided input on the questions in the survey?

19  A    Yes.

20  Q    And did you provide any input on the response options

21  for those questions in the survey?

22  A    Yes.  Those response options and the questions from the

23  survey.  Much of it was based on what already existed from

24  the Agency of [sic] Toxic Substances Disease Registry related

25  to order evaluations.

DAVIS - CROSS                           70

1   Q    Did you provide any input on how the survey was going to

2   be distributed?

3   A    Meaning how people got -- saw it and responded to it?

4   Q    Correct.

5   A    Yes.

6   Q    The survey was only available online?

7   A    Yes.

8   Q    And that's on the Department of Public Health's website?

9   A    I don't recall exactly what website it's on.  I mean,

10  you -- it's linked to -- you can get to it from a number of

11  different agency websites.

12  Q    This type of survey is called the "self-select survey";

13  is that accurate?

14  A    I'm not sure.  I'd be guessing.  I don't --

15  Q    You don't know what a "self-select survey" is?

16  A    I'm not sure exactly what you mean.

17  Q    Okay.  "Self-select survey," meaning that people decide

18  for themselves whether to take part in the survey.

19  A    You mean is the survey voluntary?

20  Q    That's another way to say "self-select survey," sure.

21  A    The survey is voluntary, yes.

22  Q    Okay.  So people who are taking the survey have to go to

23  the website themselves -- decide that they're going to go to

24  the website, click on the survey, and begin taking it;

25  correct?

DAVIS - CROSS                          71

1   A    Yes.

2   Q    Okay.  Do you understand that a self-select survey does

3   not represent the whole population of the community?

4   A    Yes.

5   Q    And that wasn't the intention of the survey when you

6   designed it in October of 2024; correct?

7            THE COURT:  I'm going to interpose my own

8   objection.  I don't know what -- vague.

9            MS. BRILLAULT:  Okay.  Let me rephrase that.  Thank

10  you, Your Honor.

11  BY MS. BRILLAULT:

12  Q    When you designed the -- when you helped design the

13  survey in October of 2024, it was not designed to represent

14  the entire population of the community surrounding the

15  landfill; correct?

16  A    I don't understand that question.  When the survey is

17  designed -- so let me answer this way: The survey is designed

18  to be available for anybody who wanted to respond, for them

19  to be able to respond.  In the way that you phrased the

20  question, I'm not sure I understand what you mean.

21  Q    Well, you said you took classes in survey design?

22           Did you?  Sorry.  Let me ask that question.  I

23  probably didn't ask it before.

24           Did you take any classes in survey design?

25  A    Yes, I did.

DAVIS - CROSS                          72

1  Q    Okay.  And in survey design did you understand -- did

2  you learn that a self-select survey does not obtain results

3  that are representative of an entire population based on the

4  fact that it's a self-select survey?

5          MS. RIGGS:  Objection.  Asked and answered.

6          THE COURT:  Overruled.

7          You may answer if you know.

8          THE WITNESS:  I'm sorry.  Repeat the question.

9  BY MS. BRILLAULT:

10 Q    You agree that a self-select survey does not obtain

11 results that are representative of the entire population --

12 correct? -- that you're looking at?

13 A    Potentially.

14 Q    So at the time you designed this survey, which was a

15 voluntary survey, it was not designed to obtain results that

16 would be representative of the population surrounding the

17 landfill; correct?

18         MS. RIGGS:  Objection, Your Honor.  Lacks

19 foundation as to "representative."

20         THE COURT:  Overruled.

21         You may answer if you know.

22         THE WITNESS:  I don't know.  It seems to -- what

23 you appear to be getting at is a study, which is different

24 from a survey.  I think in this instance there's the

25 potential that it could represent and maybe it won't

120

DAVIS - CROSS                                73

1   represent.  It just depends on what people respond to.  The

2   hope is that it does represent, but it depends on voluntary

3   responses.

4   BY MS. BRILLAULT:

5   Q    Correct.  And that people who are participating are the

6   people who want to provide responses about landfill odors?

7   A    Yes.

8   Q    Okay.  So you don't have an independent basis to state

9   whether the survey was a fair and impartial method to

10  determine the extent of odor impacts from the landfill across

11  the community surrounding the landfill?

12  A    I'm not sure I understand what you mean by "fair and

13  impartial."

14  Q    You can't say if it represents the entire community

15  surrounding the landfill?

16  A    We could potentially look at the data for those who

17  provided demographic information and then see whether it does

18  or doesn't, but.

19  Q    Did you do so for purposes of rendering your -- of

20  preparing your declaration for this case?

21  A    No.  This was not a study in that way, in terms of

22  thinking about it in that fashion.  This was merely something

23  to get a sense of what people were experiencing related to

24  the odors that they experienced and how often, how

25  frequently.

DAVIS - CROSS                                    74

 1  Q    Dr. Davis, have you taken the Department of Public

 2  Health survey?

 3  A    No.

 4          MS. BRILLAULT:  Do we have an ability to pull up a

 5  demonstrative?

 6          UNIDENTIFIED SPEAKER:  We can try.

 7          MS. BRILLAULT:  Sorry for the technical

 8  difficulties.

 9          (Counsel confer.)

10          MS. BRILLAULT:  We also have a copy in the binders

11  of the demonstrative if that's easier.

12          THE COURT:  Okay.

13          (Counsel confer.)

14          THE COURT:  Is that D1?

15          MS. BRILLAULT:  Correct, Your Honor.

16          THE COURT:  Okay.

17          MS. BRILLAULT:  Just confirming before I said it.

18          THE COURT:  Okay.

19          MS. BRILLAULT:  Great.

20  BY MS. BRILLAULT:

21  Q    All right.  Dr. Davis, this is being referred to as

22  "Demonstrative 1," and I will represent that we obtained this

23  from the Department of Public Health website -- the link for

24  their survey.  If you want to flip through, does this look

25  familiar to you as the Department of Public Health survey?

DAVIS - CROSS                                    75

1        THE COURT:  Counsel, do you have another copy of

2   this binder?

3        MS. BRILLAULT:  Yes.  I provided Mr. Berry with two

4   copies.

5        THE COURT:  Yeah.  Do you have another copy?

6        MS. BRILLAULT:  Oh.  No.

7        THE COURT:  Okay.  Please proceed.

8        (Counsel confer.)

9        (Court speaks with the clerk.)

10       THE COURT:  And this --

11       MS. BRILLAULT:  I have another copy of the D1 if

12  that would be helpful.

13       THE COURT:  Okay.  Hand that to Mr. Berry.

14       And I'll ask Mr. Berry if Mr. -- the screens are

15  flashing again.  So let's just turn that system off for now,

16  and we'll let AV deal with it at the lunch break.  Thank you.

17       (Counsel confer.)

18       MS. BRILLAULT:  Sorry, Your Honor.  I just --

19       (Pause.)

20       MS. BRILLAULT:  Just give me one second so I can

21  pull it up electronically, Your Honor.

22       THE COURT:  Okay.

23       (Pause.)

24       MS. BRILLAULT:  Okay.

25       THE COURT:  Okay.  So, Dr. Davis, you're looking at

```
                          DAVIS - CROSS                          76

 1  Tab D1 in the binder?

 2              THE WITNESS:  I am.

 3              THE COURT:  Okay.  Please proceed, Counsel.

 4              MS. BRILLAULT:  Thank you, Your Honor.

 5  BY MS. BRILLAULT:

 6  Q    Dr. Davis, does this look familiar as the Department of

 7  Public Health survey that's available online?

 8  A    It looks familiar, but it looks incomplete.

 9  Q    And when you say "incomplete," what do you mean?

10  A    The last thing I have is "Next Page," when it says,

11  "When today did you notice the odor in that location?" and I

12  believe there are additional questions that were asked after

13  that.

14  Q    Is there not 17 pages?

15  A    I don't have page numbers.

16  Q    Okay.

17              THE COURT:  I will note that the bottom of the page

18  I'm looking at has a box that says "Next Page," which

19  suggests that it's not the end.

20              And I guess I would ask: You've identified this as

21  a demonstrative, but you seem to be asking substantive

22  questions about it?

23              MS. BRILLAULT:  You know what, Your Honor?  We can

24  also use a different exhibit if that's going to be helpful.

25              THE COURT:  Okay.  Great.
```

124

DAVIS - CROSS                          77

1           MS. BRILLAULT:  Okay.  All right.

2    BY MS. BRILLAULT:

3    Q   Dr. Davis, did you -- in -- as part of your input -- we

4    can put the demonstrative away for now.

5           As part of the input on the survey, did you help

6    draft the language on the landing page for the survey?  So

7    the first page that a participant would go to?

8    A   Yes, I was part of the team that drafted that.

9    Q   And you're aware that the survey states that there's a

10   subsurface reaction in an inactive area of the landfill on

11   that landing page?

12   A   Are you talking about the landing page for the survey

13   itself or the landing page for the summary --

14   Q   Correct.  When the participant goes to the landing page

15   -- sorry.  So when I'm speaking of "landing page," I'll --

16   I'm referring to the page that the participant goes to access

17   the survey.

18          THE COURT:  And just so that the record is clear

19   for the Court, is this an exhibit, and where can I find it?

20          MS. BRILLAULT:  So the record is clear, it's a --

21   the text printout of this web page --

22          THE COURT:  Yes.

23          MS. BRILLAULT:  -- is attached as an exhibit to

24   Dr. Campbell's declaration.

25          THE COURT:  Okay.  So what's the exhibit number?

125

                              DAVIS - CROSS                        78

 1              MS. BRILLAULT:  Let's see.  That's a good question.

 2   Dr. Campbell's declaration --

 3              (Counsel confer.)

 4              MS. BRILLAULT:  Okay.  So exhibit -- let's see.

 5              (Pause.)

 6              MS. BRILLAULT:  4.

 7              THE COURT:  Okay.

 8              MS. BRILLAULT:  Exhibit No. 4.

 9              THE COURT:  Give me a moment.

10              (Pause.)

11              THE COURT:  But you don't have an exhibit that is

12   the website that you're asking Dr. Davis about?  The landing

13   page?

14              MS. BRILLAULT:  I have the demonstrative.

15              THE COURT:  Okay.  Okay.  Well, I guess we can

16   start with page 1 of the demonstrative.  We'll have to

17   address later whether or how you get this in.  But you're

18   asking him about the first page of D1?

19              MS. BRILLAULT:  Correct.

20              THE COURT:  Okay.  Repeat the question.

21   BY MS. BRILLAULT:

22   Q   Dr. Davis, does this look like the first page of the --

23   the landing page for the survey?

24              (Pause.)

25   BY MS. BRILLAULT:

DAVIS - CROSS                              79

1   Q    Do you have any reason to believe that it's not the

2   landing page for the survey?

3           MS. RIGGS:  And, Your Honor, could I inquire?  Does

4   --

5           THE COURT:  Yes.

6           MS. RIGGS:  -- Dr. Davis have whatever counsel is

7   referring to in front of him?

8           MS. BRILLAULT:  We're talking about D1.

9           THE COURT:  Yeah, I think he does.

10          MS. RIGGS:  Okay.  Thank you, Your Honor.

11          THE WITNESS:  So again, I think they're two

12  separate pages.  I think this is a landing page that talks

13  about the survey and gives the summary.  There may be a link

14  that goes to the survey on this page, but the actual survey

15  intro, that's on a different website.  That's why I'm pausing

16  with your question.

17  BY MS. BRILLAULT:

18  Q    So to access the survey, is this the page that a

19  participant would go to, to access the survey?

20          MS. RIGGS:  Objection.  Asked and answered.

21          THE COURT:  Overruled.

22          You may answer.

23          THE WITNESS:  There are a few ways they can get to

24  it.  It's not just this way.  And some links I'm aware go

25  directly to the survey itself.

127

```
                         DAVIS - CROSS                    80

 1   BY MS. BRILLAULT:

 2   Q    So if we turn to page 4 of the demonstrative, is that

 3   the landing page -- does that look familiar as the landing

 4   page --

 5            MS. RIGGS:  Objection.

 6            MS. BRILLAULT: -- page 4 of the Demonstrative 1?

 7            MS. RIGGS:  Apologies, Counsel.

 8            Objection, Your Honor.  There's no page numbers on

 9   the exhibit; so I don't know that we're looking at the same

10   thing.

11            THE COURT:  Right.  So you're talking about the

12   page that says "Community Experiences" -- colon --

13            MS. BRILLAULT:  Correct, Your Honor.

14            THE COURT:  -- "Survey on Odors and Health

15   Impacts"?  Is that what you're asking about?

16            MS. BRILLAULT:   Correct, Your Honor.

17            THE COURT:  Okay.

18            Dr. Davis, can you turn to that page.

19            Okay.  Wonderful.

20            Go ahead, Counsel.

21   BY MS. BRILLAULT:

22   Q    Is this -- the landing -- the first page of the survey,

23   as you understand it, based on your experience?

24   A    This appears to be, yes.

25   Q    Okay.  And on the first page of the survey, the
```

DAVIS - CROSS                                81

1   participant is told that the Chiquita Canyon Landfill is

2   experiencing a subsurface reaction?

3   A    Yes.

4   Q    And that, as a result, there's unpleasant odors being

5   released?

6   A    That includes that.

7   Q    That's what it says?

8   A    (Reading) These include unpleasant odors being released.

9   Q    Okay.  And you testified earlier that you're not an odor

10  scientist?

11  A    Correct.

12  Q    So is it safe to assume that you haven't studied how

13  information that is told to somebody impacts odor perception

14  and interpretation?

15  A    I'm sorry.  Repeat that?

16  Q    You haven't studied how information that is told to an

17  individual impacts their odor perception and interpretation

18  of the odor?

19  A    No, I have not.

20  Q    So you have not studied the common phenomena of

21  misattribution of symptoms due to odor characterizations?

22  A    No, I have not.

23  Q    And you're also not familiar with studies demonstrating

24  how an odor -- that depending on how an odor is labeled can

25  strongly bias how an individual perceives the odor?

129

DAVIS - CROSS                              82

1   A    I'm sorry.  Say that again.

2   Q    You're not familiar with studies demonstrating that how

3   an odor is labeled can strongly bias how an individual

4   perceives that particular odor?

5   A    No, I have not.

6   Q    I'd like to turn -- I'd like you to turn two more pages

7   down, where the survey actually begins.  We'll walk through

8   questions.  The --

9            THE COURT:  And so at this point you're --

10            MS. BRILLAULT:  Well --

11            THE COURT:  -- seem to be introducing this exhibit,

12   which is incomplete.  So first of all, let me find out if the

13   defense -- excuse me -- plaintiffs' counsel has any

14   objections to this exhibit being admitted.

15            MS. RIGGS:  Your Honor, if this is going to be

16   admitted as an exhibit, it needs to have page numbers.  So we

17   don't object assuming that Dr. Davis could lay a foundation

18   for these pronounced and that we're given the opportunity to

19   go through and compare these to the website and there's page

20   numbers added, I think that's fine.

21            THE COURT:  Okay.

22            MS. BRILLAULT:  Your Honor --

23            THE COURT:  Yes?

24            MS. BRILLAULT:  -- we can skip this, and I'll just

25   have him refer to Exhibit 4, which was, again, attached to

DAVIS - CROSS                              83

1   Dr. Campbell's declaration.

2          THE COURT:  Okay.  Okay.  So, Dr. Davis, we will

3   have you close up this binder and put it to the side --

4          MS. BRILLAULT:  There is a set of binders behind

5   you, Dr. Davis, that are the --

6          THE COURT:  Counsel --

7          MS. BRILLAULT:  I'm sorry.

8          THE COURT:  -- I'm handling it.

9          MS. BRILLAULT:  Sorry.

10          THE COURT:  Close the binder that you have.  Put it

11   to the side.  There's another set of binders to your left,

12   and you're going to look for the binder -- it should be, I

13   guess, the first one that has -- Volume 1.  And if you open

14   up that binder to Tab 4.

15          THE WITNESS:  Okay.

16          THE COURT:  Okay, Counsel.  Please proceed.

17          MS. BRILLAULT:  Thank you, Your Honor.  I

18   apologize.

19   BY MS. BRILLAULT:

20   Q    So, Dr. Davis, this was attached to Dr. Campbell's

21   declaration.  You're familiar with who Dr. Harold Campbell

22   is?

23   A    Harold Campbell?

24   Q    Yeah.  Sorry.

25          MS. RIGGS:  Your Honor, for the record,

131

DAVIS - CROSS                              84

1   Dr. Campbell goes by "Jake."

2           THE COURT:  Jake.  Okay.

3           Do the parties stipulate to the admission of

4   Exhibit 4?

5           MS. BRILLAULT:  Yes.  I --

6           THE COURT:  Do the plaintiffs?

7           MS. BRILLAULT:  I think they're offering it; so

8   yes.

9           MS. RIGGS:  Yes, Your Honor.

10          THE COURT:  Okay.  So Exhibit 4 is admitted.

11      (Plaintiffs' Exhibit 4 is admitted into evidence.)

12          And the other exhibit that we talked about with

13  Ms. Berg -- I'm not sure -- it was identified, but I'm not

14  sure if it was formally admitted.  Any objection to it being

15  admitted?

16          MR. MANZO:  Your Honor, we'd have continuing

17  objections under 702.  It's just the declarant's declaration.

18          THE COURT:  I thought 44 was the ISE order?

19          MS. RIGGS:  It is.

20          MR. MANZO:  Oh.  No objection to that.

21          THE COURT:  Okay.  It's admitted.

22      (Plaintiffs' Exhibit 44 is admitted into evidence.)

23          MS. RIGGS:  Thank you.

24          THE COURT:  Thank you.

25          Okay.  Please proceed, Counsel.

DAVIS - CROSS                            85

1              MS. BRILLAULT:  Thank you, Your Honor.

2    BY MS. BRILLAULT:

3    Q    So, Dr. Davis, the first page of Exhibit 4 states

4    "Chiquita Canyon Landfill Incident Survey Flow," and it's a

5    several-page document.  Have you seen this document before?

6              THE COURT:  Just for the record -- because this may

7    be adding confusion for the witness.  The actual first page

8    that he's looking at is the -- has the exhibit tab on it.

9              THE WITNESS:  Right.

10             THE COURT:  So ignore that.  That's just our label.

11   And now turn to the page that at the bottom says "Page 1 of

12   14."

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.  Go ahead with your question,

15   Counsel.

16             MS. BRILLAULT:  Thank you, Your Honor.

17   BY MS. BRILLAULT:

18   Q    Have you seen this survey flow before?

19   A    No.

20   Q    Okay.  If you turn to page 4 -- and you'll want to look

21   in the lower right-hand corner of the document for the right

22   part -- page number, 4 of 14 -- it says, "Introduction

23   Community Experiences Survey on Odors and Health Impacts Near

24   the Chiquita Canyon Landfill Incident"?

25   A    Yes.

DAVIS - CROSS                                    86

 1  Q    Okay.  Is -- if you read this, is this the landing --

 2  similar to the landing page that you were reviewing before?

 3  So this is an introduction to the survey?

 4  A    It appears to be.

 5  Q    Okay.  And it has the same language about the Chiquita

 6  Canyon Landfill experiencing reaction and that unpleasant

 7  odors are being released?

 8  A    Yes.

 9  Q    Okay.  And if you turn to page 6 and 7, that is where

10  the survey questions begin?

11          (Pause.)

12  BY MS. BRILLAULT:

13  Q    Is that -- sorry.  Is that correct?

14  A    Yes.

15  Q    Okay.  The third question on -- the third question which

16  appears on page 7 asks about the symptoms that the

17  participant had when the odor was present?

18          MS. RIGGS:  Objection, Your Honor.  My page 7 only

19  has two questions -- one question.  I apologize.

20          MS. BRILLAULT:  I was referring to the third

21  question of the survey.  Apologize for any confusions.

22          THE COURT:  So we're on page 7; right?

23          MS. BRILLAULT:  Yeah.  We're on page 7.  That

24  question on page 7.

25          THE COURT:  Okay.  Great.  Ask your question for

                    DAVIS - CROSS                            87

1    the witness again.

2    BY MS. BRILLAULT:

3    Q    The question on page 7 asks about symptoms the

4    individual that is filling out the survey had when the odor

5    was present; is that accurate?

6    A    Yes.

7    Q    Okay.  Did you help prepare this question and the

8    response options?

9    A    Again, I believe this question is based on the odor

10   evaluation survey put out -- tool that's put out by the

11   Agency of Toxic Substances Disease Registry.

12   Q    My question was slightly different.  Did you have input

13   on this question and the response options for the question?

14   A    I reviewed them.  And did I have the ability to change

15   them?  Yes.

16   Q    Okay.  Dr. Campbell, is it your opinion that whenever an

17   odor is present, there is going to be health symptoms?

18           MS. RIGGS:  Your Honor, "Dr. Davis."

19           MS. BRILLAULT:  Sorry.  Thank you.  Apologies,

20   Dr. Davis.

21   BY MS. BRILLAULT:

22   Q    Is it your opinion that whenever an odor is present, the

23   individual will have some type of symptom?

24   A    Not always.

25   Q    So would it have been more accurate to allow the

                        DAVIS - CROSS                          88

 1   respondent to provide a response of "no symptom"?

 2   A    There appear to be questions missing if I'm going from

 3   page 6 to page 7.  So I don't know the context and -- before

 4   this question.

 5   Q    Okay.  Let's just focus on page 7, and I apologize if

 6   there's questions missing.  I can ask Dr. Campbell those

 7   questions.  But as far as the question on page 7, there does

 8   not appear to be an option for a participant to say "no

 9   symptom"; correct?

10   A    Not on this page.  However, I think there probably is a

11   question before that that relates to symptoms or not, but I'd

12   have to go back and see.

13   Q    But based on this exhibit, there's no question --

14   correct? -- that includes that?

15   A    That's correct.

16   Q    Okay.  If you turn to page 8 -- asks the survey

17   respondent to talk about -- to describe how the odor impacted

18   the daily activities; correct?

19   A    I'm sorry.  Say that again.

20   Q    The question on page 8 asks the survey respondent to

21   respond how the odor impacted their daily activities?

22   A    How much the odor affect your daily activities today --

23   yes.

24   Q    Okay.  And there, there was an option for the

25   participant to say the odor did not impact their daily

DAVIS - CROSS                                89

1    activities?

2    A    There is.

3            THE COURT:  I'm sorry.  The answer is what?

4            THE WITNESS:  Yes, there is.

5    BY MS. BRILLAULT:

6    Q    If we turn to page 11, that question -- let me know when

7    you're there, Dr. Davis.

8            That question is asking the odor -- sorry -- the

9    respondent to describe the odor that they noticed; is that

10   accurate?

11   A    Yes.

12   Q    And there's ten different options for the participant to

13   select?

14   A    Yes, there are.

15   Q    Okay.  Are any of these options described to the

16   participant as being "highly offensive," "offensive,"

17   "unpleasant," or "not unpleasant"?

18   A    Repeat the question, please.

19   Q    Are any of these options describing the odor as "highly

20   offensive," "offensive," "unpleasant," or "not unpleasant"?

21           THE COURT:  I have to interpose my own objection.

22   You're asking are they described in this question that way?

23           MS. BRILLAULT:  Correct.  Are there those words --

24   not the type of odor, the -- let me ask it this way.  I'll

25   clarify.  Thank you, Your Honor.

137

Case 2:24-cv-10819-MEMF-MAR   Document 152-1   Filed 08/14/25   Page 101 of 281
Page ID #:17465

DAVIS – CROSS                                    90

 1  BY MS. BRILLAULT:

 2  Q    The descriptions in the response options -- they include

 3  "fragrant," "pungent," "putrid," "fecal," et cetera; correct?

 4  A    Yes.

 5  Q    Okay.  They don't use the words "highly offensive,"

 6  "offensive," "unpleasant, or "not unpleasant" in the response

 7  options?

 8  A    Not this question, no.

 9  Q    Okay.  If you flip through Exhibit 4, the rest of the

10  questions, do any of those questions ask the respondent to

11  characterize the odor as "highly offensive," "offensive,"

12  "unpleasant," or "not unpleasant"?

13  A    No.

14  Q    Okay.

15        THE COURT:  And can I ask a question for

16  clarification.  Do the parties stipulate that this exhibit

17  represents the complete survey?  Does plaintiffs' counsel

18  agree with that?

19        MS. FOX:  Exhibit 4 does, Your Honor.

20        THE COURT:  Okay.  Thank you.

21        Please proceed, Counsel.

22  BY MS. BRILLAULT:

23  Q    Do any of the questions in the survey, which is

24  represented in Exhibit 4, ask the respondent to identify the

25  source of the odors they are experiencing?

DAVIS - CROSS                           91

1   A      No, I don't believe so.

2   Q      I'd like to go back to Exhibit 104, which is your

3   declaration.

4           THE COURT:  And the parties stipulate that this is

5   admitted along with all the other declarations that were

6   submitted?

7           MS. BRILLAULT:  I would agree to Exhibit 4,

8   Your Honor.

9           THE COURT:  We already dealt with Exhibit 4, I

10  think.  I'm now talking about Exhibit 104.

11          MS. BRILLAULT:  No, Your Honor.  I think we're

12  still -- we'd like to renew our -- we'd like to make an

13  objection to the statements, which I plan to do at the end of

14  the testimony.

15          THE COURT:  Okay.

16          MS. BRILLAULT:  I'm just using it to refresh his

17  recollection as to the statements he made.

18          THE COURT:  Okay.  I'm just going to pause your

19  time for a moment.

20          MS. BRILLAULT:  Okay.

21          THE COURT:  As I understand it, these witnesses are

22  testifying on cross-examination based upon their declarations

23  coming in as direct testimony.  You may have objections to

24  some of the substance, which you can address in your

25  argument, concerning the granting of the preliminary

DAVIS - CROSS                                92

1   injunction, but I think it's confusing to now object to the

2   declaration even coming in because presumably even you want

3   the Court to consider it in determining whether to disregard

4   the statements therein.  Am I correct about that?

5           MS. BRILLAULT:  Yes, Your Honor.

6           THE COURT:  Okay.  So 104 is --

7           MS. BRILLAULT:  Normally I'd be making objections

8   during -- sorry.  I normally would be making objections

9   during trial as he's testifying to this.

10          THE COURT:  Agreed.  So you're going to address in

11  your argument which parts of his declaration should be

12  excluded; correct?

13          MS. BRILLAULT:  Correct.

14          THE COURT:  Okay.  And I've already ruled on the

15  request to exclude some of the declarations in their

16  entirety; so we don't need to do that.  So the record should

17  reflect that all of the declarations for the witnesses who

18  are testifying -- the Court finds that they are admitted, and

19  the parties will remind me if I don't admit any given one of

20  them.

21          So 104 is admitted per the Court's order.

22      (Defendants' Exhibit 104 is admitted into evidence.)

23          And then the declaration of Ms. Berg -- was that

24  ever identified?

25          MS. RIGGS:  Yes, Your Honor.  We have an exhibit

```
                              DAVIS - CROSS                        93

  1  number if I can prevail upon Mr. Kay.

  2                 THE COURT:  Okay.

  3                 MS. RIGGS:  112.

  4                 THE COURT:  Okay.  So 112 is admitted.

  5        (Defendants' Exhibit 112 is admitted into evidence.)

  6                 Okay.  Going forward, we'll do that at the

  7  beginning of each witness's testimony.  Obviously, this is

  8  without prejudice to the objections that the parties have to

  9  the substance of any given declaration.

 10                 Okay.  I'm restarting your time.

 11                 MS. BRILLAULT:  Thank you.

 12                 THE COURT:  We are turning to 104, which has been

 13  admitted.  And would you like Mr. -- excuse me -- Dr. Davis

 14  to be looking at this?

 15                 MS. BRILLAULT:  Yes.

 16                 THE COURT:  Okay.  So, Dr. Davis, if you could

 17  close the exhibit -- the binder that you currently have, put

 18  that to the side, and you need to go to Volume 10 and

 19  Exhibit 104 in Volume 10.  Thank you.

 20                 THE WITNESS:  104?

 21                 MS. BRILLAULT:  Yes, please --

 22                 THE COURT:  Yes.

 23                 THE WITNESS:  Okay.

 24                 THE COURT:  Oh, I guess you could have looked at it

 25  in -- are all the other exhibits that you're going to talk to
```

141

DAVIS - CROSS                                        94

1    him about with --

2            MS. BRILLAULT:  Yes, Your Honor.

3            THE COURT:  -- leaving aside the debacle concerning

4    D1, they're in the small binder that you gave him?

5            MS. BRILLAULT:  Correct.

6            THE COURT:  Okay.  So, Dr. Davis, apologies.  You

7    can take Volume 10 and put it to the side, put it back where

8    it came from, and then take this little binder that you put

9    on the shelf here, and we'll work from that.  Thank you.

10           And we're going to Tab 104, which should be your

11   declaration again, which has now been admitted.

12           Thank you, Counsel.

13           MS. BRILLAULT:  Thank you, Your Honor.

14   BY MS. BRILLAULT:

15   Q    Dr. Davis, I'll direct you to paragraph 12, please.  So

16   for purposes of your declaration, you stated that you

17   periodically review the survey results; is that correct?

18   A    Yes.

19   Q    And the survey results being the Department of Public

20   Health survey?  The questions we just walked through?

21   A    Yes.

22   Q    Okay.  Do you know how those survey results are

23   calculated that you review?

24   A    In terms of the summary?

25   Q    Correct.

DAVIS - CROSS                         95

1  A    They're done by, I believe, Jake's team.

2  Q    "Jake" being Dr. Campbell?

3  A    Dr. Campbell, yes.

4  Q    Okay.  You don't have -- you're not participating in the

5  calculation of those results?  You're relying on his team?

6  A    Exactly.

7  Q    Okay.  Have you done any independent analysis of the

8  results to ensure their accuracy?

9  A    You mean accurate in terms of what people reported?  If

10 somebody reported exactly what they reported?  No.

11 Q    You're just -- you're relying on Dr. Campbell's team to

12 report the results and ensure the accuracy?

13 A    Are you --

14        THE COURT:  I guess I need to interpose my own

15 objection.  When you say the "accuracy," are you talking

16 about the accuracy as in "Mr. James Smith did say yes to this

17 question, four to this question, putrid to this question"?

18 Is that what you mean by accuracy?

19        MS. BRILLAULT:  Well, I can -- I think it's broader

20 than that.  It's both that and the summary results that

21 Dr. Campbell's --

22        THE COURT:  Okay.  So then I'll ask you to rephrase

23 --

24        MS. BRILLAULT:  Correct.  Okay.

25        THE COURT:  -- certainly for the witness and for

143

DAVIS - CROSS                                    96

1  the Court as well.  Thank you.

2  BY MS. BRILLAULT:

3  Q    So, Dr. Davis, when you're reviewing the results, are

4  you reviewing the actual responses that a participant

5  submitted, or are you reviewing a summary of those responses

6  provided by Dr. Campbell and his team?

7  A    I'm reviewing a summary, and my presumption it's by

8  Dr. Campbell and his team, but I don't know for certain.

9  Q    And are you taking any steps to determine whether the

10 summary of those results are accurate in how it reflects the

11 responses actually submitted?

12 A    If you're asking whether or not I'm double-checking

13 their summary data with the raw data, no.

14 Q    Okay.  Do you know if the summary -- the summary of the

15 results that you're reviewing include only complete responses

16 from a participant?

17 A    I'm not certain.  You'd have to ask Dr. Campbell.

18 Q    If we look at paragraph 12, in the second sentence you

19 state that many survey participants report noticing, quote,

20 "highly offensive" odors on a daily basis.  Do you see that?

21 A    Yes.

22 Q    Did the respondents actually have a question asking them

23 to characterize the odors as "highly offensive"?

24 A    No, they did not.

25 Q    So how did you come to the conclusion that many

DAVIS - CROSS                                    97

1   participants reported an odor that was "highly offensive"?

2            MS. RIGGS:  Objection, Your Honor.  Lacks

3   foundation.

4            THE COURT:  Overruled.

5            You may lay the foundation, Counsel.

6   BY MS. BRILLAULT:

7   Q    Dr. Davis, where did you base your statement that many

8   participants reported an odor that was "highly offensive"?

9   A    If I remember correctly, this is, again, based on the

10  odor evaluation from Agency of toxic Substances and Disease

11  Registry.  What they do is certain odors -- depending on the

12  type of odor, which is, I believe, why respondents aren't

13  asked whether or not it's offense or not -- to characterize

14  the odor.  Odors are characterized as "offensive," "highly

15  offensive," et cetera, based on the type of odor.  I believe

16  that's where it is, but I'd have to go back and refresh my

17  recollection.

18  Q    But the participant isn't told which descriptive odor

19  would be characterized as "highly offensive," "offensive,"

20  "unpleasant," or "not unpleasant"?

21  A    Correct.

22  Q    That's a decision that's being made on the back end for

23  them?

24  A    It is being made on the back end based on the

25  characteristic of the type of odor.

DAVIS - CROSS                                98

```
 1   Q    So if an individual selected pine, mint, and lemon and
 2   they really don't like the smell of pine, would they be able
 3   to say that that odor is "highly offensive" to them?
 4          (Pause.)
 5   BY MS. BRILLAULT:
 6   Q    Let me rephrase the question.
 7          When you say in your declaration that participants
 8   report noticing "highly offensive," they're actually
 9   reporting a odor description, not the category of "highly
10   offensive," "offensive," "unpleasant," and "not unpleasant";
11   correct?
12   A    That is correct.
13   Q    Okay.
14          THE COURT:  Counsel, would now be a good time for
15   our morning break?  I just realized how long we've been
16   going.
17          MS. BRILLAULT:  Sure, Your Honor.  I won't be too
18   much longer, but we can take a break now.  That's fine.
19          THE COURT:  Let's do that.  Thank you.
20          Okay.  Counsel, we will take a 15-minute break at
21   this time -- 15 minutes.  We'll see the parties in
22   15 minutes.
23          Dr. Davis, you are released for the 15 minutes.
24   Thank you.
25          (Recess from 10:45 a.m. to 11:08 a.m.)
```

DAVIS - CROSS                          99

1                      AFTER RECESS

2        (Call to Order of the Court.)

3             THE CLERK:  You may be seated.

4             THE COURT:  Okay, Counsel.  You may proceed.  Thank

5   you.

6             MS. BRILLAULT:  Thank you, Your Honor.

7                 CROSS-EXAMINATION (Resumed)

8   BY MS. BRILLAULT:

9   Q    Dr. Davis, just a few more questions about paragraph 12

10  in your declaration, which is Exhibit 104.  The last sentence

11  in that paragraph.  We got tech working too; so you can look

12  at either the hard copy or the electronic.

13  A    Thank you.

14  Q    The last sentence states (reading): Residents also

15  report that they suffer from fatigue, anxiety, irritability,

16  difficulty sleeping, stress, and depression as a result of

17  the odors.

18          That's your statement?

19  A    Yes.

20  Q    Did the survey ask the participant to confirm that they

21  were a resident of the community before taking it?

22  A    I don't think so.

23  Q    Did the survey ask the participant to identify the

24  address in which they lived or worked as part of the survey?

25  A    I don't believe so.

DAVIS - CROSS                                    100

1   Q    So your statement that residents are also reporting that

2   they suffer these symptoms is an assumption that the

3   respondents are all residents?

4   A    No.  But as written, I can see how you might interpret

5   it as such.

6   Q    What data do you have to show that the respondents to

7   the survey are residents of the community?

8   A    I don't know at this time.

9   Q    Okay.

10          THE COURT:  I'm sorry.  I didn't hear the answer.

11          THE WITNESS:  I don't know at this time and --

12          THE COURT:  Thank --

13          THE WITNESS:  -- other than what I've heard from

14   residents who live in the community during public meetings.

15   BY MS. BRILLAULT:

16   Q    But with respect to the survey responses and the results

17   that you're citing in your declaration, there's no data to

18   show that those respondents are residents of the community;

19   is that correct?

20          MS. FOX:  Objection.  Misstates the testimony of

21   the witness.

22          THE COURT:  Overruled.

23          You may answer.

24          THE WITNESS:  Other than the location that they put

25   as potentially being their address, I -- yeah, I guess you

```
                         DAVIS - CROSS                          101
```

 1   could say so.

 2   BY MS. BRILLAULT:

 3   Q    And when you're referring "the location that they put",

 4   what are you referring to?

 5   A    The location where they experienced the odors.

 6   Q    Okay.

 7   A    Which could be a home.  It could be a park.  It could be

 8   anywhere in the community.

 9   Q    It could be just someone driving through the community;

10   correct?

11   A    Potentially.

12   Q    It could be someone in New York picking a point on the

13   map and identifying a location of the odor; correct?

14   A    Potentially.

15   Q    Okay.  So in your declaration you also discuss odor

16   complaints that were made to the AQMD; is that correct?

17   A    Yes.

18   Q    Okay.  One of the paragraphs is paragraph 13, where you

19   reference AQMD odor complaints.

20   A    That's a question?

21   Q    Correct.

22   A    Yes.

23   Q    AQMD is responsible for investigating odor complaints,

24   not you; is that accurate?

25   A    Primary responsibility.  There are times that we get

DAVIS - CROSS                                    102

1    involved as a public health department.

2    Q    Did you investigate any of the odor complaints received

3    by AQMD?

4    A    Not in the way that they do.

5    Q    So you're relying on AQMD's investigation and

6    verification process for this statement?

7    A    Yes.

8             MS. RIGGS:  Your Honor, I apologize.  I'm objecting

9    because the statement is that "I'm informed and believe that"

10   -- apologies, Your Honor.  Foundation.

11            THE COURT:  Overruled.

12   BY MS. BRILLAULT:

13   Q    Did you review the odor complaint data received by AQMD

14   and produced in this case?

15            MS. RIGGS:  Objection.  Foundation.

16            THE COURT:  Overruled.

17            THE WITNESS:  What do you mean by "review"?

18   BY MS. BRILLAULT:

19   Q    Did you look at the spreadsheets of odor complaints that

20   AQMD compiled from residents?

21   A    No, I did not.

22   Q    Okay.  So you would not have a basis to opine on whether

23   13 households were responsible for over 50 percent of the

24   odor complaints made between January 2023 and April of 2025

25   that led to an NOV?

DAVIS - CROSS                          103

1   A    Sorry.  Long question.  Say that again.

2   Q    You would not have a basis to provide -- let me

3   rephrase.

4        You could not confirm nor deny whether or not only

5   13 households were responsible for making over 50 percent of

6   the odor complaints that led to an NOV between January 2023

7   and April 2025?

8   A    I don't have information related to that.

9   Q    Okay.  Thank you.

10  A    Not that I recall at this time.

11  Q    In your declaration you also cite to a -- two letters

12  that you authored, one in July of 2023 and one in August of

13  2023; is that correct?  And if you want to look at paragraphs

14  7 through 9 to refresh your recollection.

15  A    July 26, 2023, yes, and it was August 8, 2023.  Yes.

16  Q    Okay.  And you attached those letters as exhibits to

17  your declaration?  Exhibit 1 and Exhibit 2?

18  A    If I recall correctly, yes.

19  Q    And those are also in your binder as Exhibits 1 and 2

20  for your reference.

21       And if you turn to Exhibit 1, Dr. Davis --

22  A    Okay.

23  Q    -- your letter concluded that odors from the landfill

24  were impacting the health of nearby residents.  That's what

25  you said in 2023; correct?

DAVIS - CROSS                               104

1           Is that --

2           THE COURT:  And are you seeking to admit this?

3           MS. BRILLAULT:  Yeah.  I think -- we would

4   stipulate that all three exhibits are attached to Dr. Davis's

5   declaration could be admitted into trial.

6           THE COURT:  Okay.  1, 2, and 3 are admitted.

7       (Plaintiffs' Exhibits 1, 2, and 3 are admitted into

8   evidence.)

9           THE WITNESS:  Sorry.  Ask your question again.  I'm

10  trying to see where you're referring.

11  BY MS. BRILLAULT:

12  Q    Well, the letter -- in the letter you state that odors

13  from the landfill were impacting the health of nearby

14  residents, and you relied on odor complaints that were made

15  to the AQMD from residents; is that correct?

16  A    In addition to our complaints received, yes.

17  Q    And again, you were relying on AQMD's odor investigation

18  and verification process for that statement?

19          THE COURT:  And if I could just ask: Do you mean

20  solely, or do you mean relying on whether or not it was

21  solely?

22          MS. BRILLAULT:  Let me rephrase.

23          THE COURT:  Okay.

24  BY MS. BRILLAULT:

25  Q    You were relying on the accuracy of -- you were relying

152

```
                              DAVIS - CROSS                            105
```

 1   on AQMD's investigation and verification process to determine

 2   whether or not there was odors traced back to the landfill

 3   based on the complaints made by residents; correct?

 4            THE COURT:  And I just -- for the Court, since I'm

 5   the fact finder, are you asking whether that was solely what

 6   he relied on, or are you saying did he rely on it or did he

 7   not rely on it amongst potentially other things?

 8            MS. BRILLAULT:  Did you rely on it?

 9            And I'll the second question after.

10            THE COURT:  Okay.  Thank you.

11            THE WITNESS:  That was taken into consideration,

12   yes.

13   BY MS. BRILLAULT:

14   Q    Okay.  Did you rely on any air-monitoring data in your

15   letter to come to the conclusion that the landfill was

16   causing odors and harming the health of nearby residents?

17   A    We looked at their air-monitoring data.

18   Q    Is that discussed in the letter?

19   A    No.

20   Q    All right.  If we turn to Exhibit 2, that's the

21   August 8, 2023, letter.  You sent this letter to

22   Chiquita Canyon Landfill?  And if you look through to the

23   bottom of the letter, you have bullet points directing the

24   landfill to take some actions?  Do you recall that?

25   A    Yes.

DAVIS - CROSS                                            106

1    Q    Some of those actions were to install additional air

2    monitoring throughout the community, referred to as the

3    "enhanced air-monitoring program"?

4    A    I'm not sure in terms of where your reference to the

5    term "enhanced air monitoring," but this does direct to -- in

6    terms of doing air sampling at residential locations and out

7    in the community.

8    Q    And point No. 1 says to expand its current air-

9    monitoring program?

10   A    Yes.

11   Q    Okay.  Are you familiar with the enhanced air-monitoring

12   program that Chiquita and its consultants installed

13   throughout the community?

14   A    I'm familiar with air monitoring being installed

15   throughout the community.

16   Q    And you're familiar with the reports of those air-

17   monitoring results being sent to you as the public health

18   officer?

19   A    Yes, I recall receiving reports from those.

20   Q    Okay.  And that air monitoring has been going on since

21   the fall of 2023 at least?

22   A    I can't say for certain how long at this time.

23   Q    At least if they were complying with this letter, it was

24   installed at some point at the end of 2023?

25   A    It may have been installed before that based on AQMD and

DAVIS - CROSS                          107

1   their actions.  I don't -- that piece I'm not sure.

2   Q    Okay.  And you receive monthly and quarterly reports of

3   those air-monitoring results?

4   A    I can't say at this time how frequent those are.

5   Q    But you do receive reports?

6   A    Yes, I have seen reports.

7   Q    Okay.  Did you address or discuss the air-monitoring

8   reports and results in the declaration you submitted in

9   support of the motion for preliminary injunction in this

10  case?

11  A    I'm sorry.  Repeat the question.

12  Q    Did you discuss or -- did you discuss any of the air-

13  monitoring results in your declaration in this hearing?

14          THE COURT:  And you're talking about Exhibit 104?

15          MS. BRILLAULT:  Correct.

16          THE WITNESS:  I don't -- no, I don't discuss

17  specific air-monitoring results, but we do talk about air

18  monitoring in there -- or I do.

19  BY MS. BRILLAULT:

20  Q    You didn't discuss any of the air-monitoring results,

21  though; correct?

22  A    I'm sorry.  Repeat that.  Unless --

23  Q    You didn't discuss the air-monitoring results?

24  A    In the letter or --

25  Q    In the Declaration 104.

DAVIS - CROSS                                    108

1   A    The declaration does not specifically discuss the air-

2   monitoring reports received.

3   Q    Are you aware that sometime after your August 2023

4   report the County retained a consultant Roux Associates?  Are

5   you aware of that?

6   A    Yes, I'm aware of Roux Associates being retained.

7   Q    And Roux Associates was retained to investigate the

8   outdoor air quality and evaluate potential health risks to

9   individuals in the community surrounding the Chiquita Canyon

10  Landfill?

11  A    I believe that's correct.

12  Q    And those are the communities that include Val Verde and

13  Castaic?

14  A    There may have been more, but I don't remember

15  specifically which.

16  Q    But they at least included Val Verde and Castaic?

17  A    I believe so, yes.

18  Q    And the County's consultant, Roux, conducted sampling in

19  the fall of 2023 pursuant to this project?

20  A    I'd have to go back and confirm the timeframe, but they

21  did conduct sampling.

22  Q    And that was air sampling? air monitoring?  Is that the

23  type of sampling they were doing?

24  A    They would have done -- I believe they would have done

25  air samples in addition to looking at existing data.

DAVIS - CROSS                           109

 1  Q    And the County's consultant issued its findings in a

 2  report in early 2024?

 3  A    I'd have to go back and confirm the time.

 4        MS. BRILLAULT:  Okay.  I'd like to pull up

 5  Exhibit 162, please.

 6        THE COURT:  And for the sake of the record and the

 7  transcript, Roux is R-o-u-x; correct?

 8        MS. BRILLAULT:  Correct.

 9  BY MS. BRILLAULT:

10  Q   So, Dr. Davis, is this the County's consultant report --

11  Roux's findings based on the community air sampling and

12  health risk screening evaluation?

13  A    Yes.

14  Q    And as a public health officer for the County, you would

15  have received and reviewed this report?

16  A    Among others, yes.

17  Q    And if we turn to page 19 of the report.

18        THE COURT:  The parties stipulate to 162 being

19  admitted?

20        MS. FOX:  Yes.

21        THE COURT:  162 is admitted.

22     (Defendants' Exhibit 162 is admitted into evidence.)

23        THE WITNESS:  I'm sorry.  What did you want me to

24  turn to?

25  BY MS. BRILLAULT:

```
                              DAVIS - CROSS                           110
  1   Q     Page 19.

  2            THE COURT:  And you're talking about page 19 within

  3   the document, at the bottom; correct?

  4            MS. BRILLAULT:  Yes.

  5            THE COURT:  Okay.  It has two charts?  Thank you.

  6            MS. BRILLAULT:  Okay.  Maybe not page 19.

  7            Sorry, Your Honor.  That was the wrong page number.

  8   I apologize.

  9            THE COURT:  Okay.

 10            The ECF pages -- is that what you're referring to?

 11            MS. BRILLAULT:  I can do ECF as well.  It's page --

 12            THE COURT:  No, you don't have to.  I just --

 13            MS. BRILLAULT:  Okay.

 14            THE COURT:  I wasn't sure what you were talking

 15   about.

 16            MS. BRILLAULT:  Yes.  Page 39.

 17            THE COURT:  39.  Thank you.

 18            MS. BRILLAULT:  There we go.

 19            THE COURT:  39 of the internal pagination?

 20            MS. BRILLAULT:  Correct.  It was -- right next to

 21   the word "Roux" on the lower right.  It will say "39."

 22            THE COURT:  The page says "Conclusions and

 23   Recommendations"?

 24            MS. BRILLAULT:  Correct.

 25            THE COURT:  Thank you.
```

DAVIS - CROSS                           111

1              THE WITNESS:  Okay.

2    BY MS. BRILLAULT:

3    Q    One of the conclusions -- let me put this away -- in the

4    middle paragraph the sentence (reading): The air quality

5    impact to community ambient air and any potentially

6    attributable health risks appears to be at least primarily

7    the result of a larger scale ambient air quality issue --

8    issues in Los Angeles County.

9              Correct?

10   A    That is correct.

11   Q    And in the declaration, Exhibit 104, you did not discuss

12   the Roux report or the conclusions of Roux for purposes of

13   making your declaration?

14   A    It wouldn't have been because this came out in 2024.

15   Q    Your declaration was prepared in 2025?

16   A    Oh, you're talking -- not the letter.  Sorry.

17            No.  And this reference that you're referring to, I

18   believe, goes to cancer rates -- in the document in the

19   conclusion.

20   Q    The sentence before says (reading): Health protective

21   calculations of the potential human health risk associated

22   with VOCs in community ambient air, assuming they breathe

23   ambient air 100 percent of the time, suggest excess cancer

24   rates above the 1-in-a-million threshold mostly attributable

25   to benzene and carbon tetrachloride concentrations.

                              DAVIS - CROSS                    112

 1              Is that what you're referring to?

 2   A    Yes.

 3   Q    Okay.  In any event, Roux was saying they could not

 4   attribute benzene -- increased benzene levels to the

 5   landfill?

 6              MS. RIGGS:  Objection, Your Honor.  Misstates the

 7   document.

 8              THE COURT:  Overruled.

 9              You may answer.

10              THE WITNESS:  I don't believe that that's what that

11   says.

12   BY MS. BRILLAULT:

13   Q    In the sentence following the highlights (reading):

14   While the data collected indicates that on some days there

15   may be an incremental contribution of benzene above

16   background levels to the ambient air that may originate from

17   the Chiquita, the community levels of benzene and carbon

18   tetrachloride in ambient air are not material different than

19   the ambient air background locations that were expected to be

20   unaffected by Chiquita.

21              That's what the County's own consultant concluded;

22   correct?

23   A    Got it.  Yes.

24   Q    Okay.  And again, you didn't disclose the report or the

25   findings of the County's consultant in your declaration

DAVIS - REDIRECT                          113

1   listed as Exhibit 104 here; correct?

2   A    That is correct.

3   Q    Earlier you agreed that, when making decisions

4   concerning the public's health, having more information is

5   better to ensure the best decision you can make; correct?

6   A    Yes.

7   Q    But for purposes of your declaration in this case, you

8   did not disclose the County's own toxicology and health

9   impacts report or the monthly or quarterly air-monitoring

10  reports that your department receives?

11  A    Correct.

12        MS. BRILLAULT:  Thank you.  No further questions,

13  Your Honor.

14        THE COURT:  Thank you.

15        Any redirect?

16        MS. RIGGS:  Briefly, Your Honor.

17                  REDIRECT EXAMINATION

18  BY MS. RIGGS:

19  Q    Dr. Davis -- can you hear me?

20  A    Yes.

21  Q    I'm going to work on getting in front of the microphone.

22        Counsel talked to you a fair amount about the

23  online Department of Public Health survey.  What was the

24  purpose of launching that survey?

25  A    The purpose of launching that survey was to get feedback

DAVIS - REDIRECT                          114

1   from the community that was experiencing odors, what impact

2   those odors had in terms of their health, their daily

3   activities, et cetera.

4   Q    Was it intended to be a scientific study?

5   A    No.  It was just a monitoring to get a sense from -- get

6   feedback from the community in terms of what they were

7   experiencing -- those that were experiencing the odors.

8   Q    Why not develop a scientific study rather than just get

9   feedback from the community?

10  A    Way more involved, way more -- it's -- and in this

11  instance we're talking about a nuisance and trying to

12  understand what impact that nuisance is having.  But a

13  scientific study -- when I think of it in that way, it's more

14  of, you know, health studies and blood samples and all of

15  that, which in this instance that wasn't something that, you

16  know, would be considered when trying to deal with this at

17  the moment.

18  Q    As the public health officer for the County of

19  Los Angeles, what kinds of things can become a nuisance, in

20  your view?

21  A    It's pretty broad.  Anything that offends the senses is,

22  really, the definition, and usually it's for a larger

23  community or neighborhood at the same time.  And it can be

24  unequal, meaning some people can be offended by something and

25  others not.  So it could be anything related to sounds.  It

```
                            DAVIS - REDIRECT                      115
```

 1  could be related to smells.  It could be related to a number

 2  of things.  I mean, if you think about all of our senses, it

 3  could be anything that impacts those but for a number of

 4  people, a larger group at the same time.

 5  Q    When you say the definition of a nuisance is offending

 6  the senses, where are your drawing that from?

 7  A    County code.

 8  Q    I'm going to draw your attention to Exhibit 1 to your

 9  declaration at -- and if you look at the top, there are blue

10  letters and words across the top, and I'm looking at

11  No. 2535.  Do you see that?

12  A    I do.

13  Q    Okay.  If you go to the last paragraph on page 2535 of

14  Exhibit 1, take a moment to look at that, and let me know

15  when you've looked at that first sentence.

16  A    On 2535 you said; correct?

17  Q    Correct.

18  A    Okay.

19        THE COURT:  The paragraph that begins "As the odors

20  currently being emitted"?

21        MS. RIGGS:  Correct.  Thank you, Your Honor.

22        THE COURT:  Okay.  Thank you.

23        (Pause.)

24        THE WITNESS:  Okay.

25  BY MS. RIGGS:

DAVIS - REDIRECT                            116

1    Q    Dr. Davis, is it your view as the health officer that

2    Exhibit 1 establishes that the County has found that

3    Chiquita Canyon Landfill is a public nuisance?

4             MS. BRILLAULT:  Objection, Your Honor.

5             THE COURT:  What's the objection?

6             MS. BRILLAULT:  Calls for a legal conclusion.

7             THE COURT:  Overruled.

8             You may answer.

9             THE WITNESS:  I'm sorry.  Restate the question

10   again.  Sorry.

11   BY MS. RIGGS:

12   Q    Dr. Davis, as the health officer for the County of

13   Los Angeles, is it your opinion as set forth in Exhibit 1

14   that Chiquita Canyon Landfill is a public nuisance?

15   A    That what was currently happening at the landfill, yes.

16   Q    As the health officer for the County of Los Angeles, has

17   your opinion that Chiquita Canyon Landfill is a public

18   nuisance changed since this letter was issued?

19   A    It has not.

20   Q    Is it your opinion today as the health officer for the

21   County of Los Angeles that Chiquita Canyon Landfill is a

22   public nuisance?

23   A    It is.

24   Q    Are you empowered by law to make that determination?

25   A    Yes.

DAVIS - REDIRECT                          117

1    Q    What law allows you to do that?

2    A    It's the second one listed.  Also, as the health

3    officer, health and safety codes.  I can't pull the specific

4    one at the moment.  But 11.02.190, I believe, also states

5    that we can direct for things to happen to abate that

6    nuisance as well.

7    Q    Dr. Davis, I want to follow up on a couple of other

8    issues.  As the health officer, how many people do you

9    supervise at the County of Los Angeles?

10   A    (Chuckles.)

11   Q    And for our purposes we're okay with an estimate.

12   A    Well, it's a complicated question.  There's direct

13   supervision, and then I have over a thousand assistant health

14   officers who assist as well.  So direct supervision for me --

15   before budget cuts -- I believe 6.

16   Q    But indirectly -- thousand?

17   A    Yes.

18   Q    Or more than a thousand?

19   A    Yes.

20   Q    I want to follow up quickly on the Roux Associates study

21   that counsel discussed with you.  Who is Adam Love?

22   A    Adam Love was our point person and consultant for --

23   with Roux.

24   Q    Do you understand him to be the principal scientist for

25   Roux?

DAVIS - REDIRECT                                    118

1   A     Yes.  One of them, I believe.

2   Q     Okay.  Do you happen to know his background?

3   A     Not specifically, but I do understand that he's been

4   trained in medical toxicology and environmental science, and

5   that's what they focus in on, and that's what he oversees.

6   Q     As the health officer is your focus solely on big-ticket

7   items, like cancer?

8   A     No.

9   Q     Does your focus include short-term health effects, like

10  a headache?

11  A     It can depending on the cause.

12  Q     Can your focus as the health officer include concerns

13  about mental health issues?

14  A     It can.

15  Q     You mentioned that you have attended public meetings

16  relating to Chiquita Canyon Landfill.  Is that -- am I

17  remembering your testimony correctly?

18  A     That is correct.

19  Q     How many meetings would you estimate you attended?

20  A     Oh, I'd be guessing.  It's -- I'd say it's been more

21  than a handful, but I don't have an accurate count at this

22  time.

23  Q     Fair enough.  You said that you'd heard from residents

24  at those public meetings.  What did you hear from the

25  residents about Chiquita Canyon Landfill at those public

```
                         DAVIS - REDIRECT                         119
```

 1  meetings you attended?

 2          MS. BRILLAULT:  Objection, Your Honor.  Hearsay.

 3          THE COURT:  Hearsay -- is there a hearsay exception

 4  in place?

 5          MS. RIGGS:  This is for what he was told.

 6          THE COURT:  For the effect on the listener only?

 7          MS. RIGGS:  Correct.

 8          THE COURT:  Okay.  You may answer.

 9          Objection is overruled.  It's not coming in for the

10  truth.

11          THE WITNESS:  Okay.  Sorry.  Repeat the question.

12  BY MS. RIGGS:

13  Q    What did residents tell you about what they were

14  experiencing from Chiquita Canyon Landfill?

15  A    That there were increased odors from what they had been

16  used to previously, that they were experiencing many of the

17  symptoms that were reported in our summary of survey results

18  as well, and that it impacted many of them in terms of

19  enjoying even their backyards.

20          MS. RIGGS:  Your Honor, we have an exhibit that is

21  not on the list.  Dr. Davis referenced it.  If I may show it

22  to counsel?

23          And may I provide a copy to the Court?

24          THE COURT:  Yes.  And are we just going to number

25  this next in line?

167

DAVIS - REDIRECT                                    120

1          MS. RIGGS:  Exhibit 56 for now.

2          THE COURT:  Okay.  One of these copies is for the

3   witness?

4          MS. RIGGS:  One for the witness and one for the

5   Court, Your Honor.

6          THE COURT:  Okay.  Because this -- sorry.  This is

7   not in the binder for some reason?  Or it's replacing what's

8   in the binder?

9          MS. RIGGS:  It is not in the binder.

10          THE COURT:  Okay.  The binder doesn't -- sorry to

11   be pedantic.  The binder has nothing for 56?

12          MS. RIGGS:  That is correct.

13          THE COURT:  Okay.

14          MS. RIGGS:  This is an exhibit that relates to

15   questions that counsel asked Dr. Davis, and so we're

16   providing it to add to his testimony.

17          THE COURT:  Okay.  Let me give it to Dr. Davis.

18   BY MS. RIGGS:

19   Q    And, Dr. Davis, do you have what we've marked for

20   identification Exhibit 56?  Do you have that in front of you?

21   It's the "Community Member Assessment of Environmental

22   Odors."

23   A    I do.

24   Q    And at the bottom do you see that it's says "Agency for

25   Toxic Substances and Disease Registry"?

```
                         DAVIS - REDIRECT                    121
```

 1   A    I do.

 2   Q    When you were talking about the categorization of odors

 3   in the Department of Public Health survey, you mentioned a

 4   registry.  Is this the document that you were referring to?

 5   A    It is.

 6   Q    And if I could draw your attention --

 7            THE COURT:  So, Counsel, are you seeking to admit

 8   this at this time?

 9            MS. RIGGS:  If we can do it now, yes, I would like

10   to.  I can also --

11            THE COURT:  You don't have to.  Were you going

12   there?

13            MS. RIGGS:  I was.

14            THE COURT:  Okay.

15            MS. RIGGS:  I was going to illicit a little bit

16   more from him --

17            THE COURT:  Great.

18            MS. RIGGS:  -- for foundation.

19            THE COURT:  Great.  Please do so.

20            MS. RIGGS:  Thank you.

21   BY MS. RIGGS:

22   Q    So, Dr. Davis, if I could have you -- and I apologize

23   this does not have the beautiful blue numbers on it.  So, if

24   I could have you look at the bottom right-hand corner, the

25   No. 4, and the first words you'll see on that page is

DAVIS - REDIRECT                          122

1   "not unpleasant."

2   A    Yes.

3   Q    Do you have that page in front of you?

4   A    I do.

5   Q    Have you seen this page before?

6   A    I have.

7   Q    To your understanding, what does this page describe?

8   A    This page describes how particular types of odors are

9   categorized in terms of offensiveness and pleasantness.

10  Q    So, for example, a piney -- pine and minty smells --

11  that's No. 7 -- is listed under "not unpleasant"; is that

12  correct?

13  A    Correct.

14  Q    Do you have an understanding as why -- as to why pine

15  and minty smells would be described as "not unpleasant"?

16           MS. BRILLAULT:  Objection, Your Honor.

17           THE COURT:  What's the objection?

18           MS. BRILLAULT:  Lack of knowledge -- personal

19  knowledge.

20           THE COURT:  Foundation?

21           MS. BRILLAULT:  We'll go with that too.  Yes,

22  foundation.

23           THE COURT:  Okay.  Because she asked him if he has

24  an understanding as to this.  So the knowledge objection is

25  overruled.

170

DAVIS - REDIRECT                    123

1            Counsel, I'll let you lay the foundation.

2            MS. RIGGS:  Okay.

3  BY MS. RIGGS:

4  Q    Dr. Davis, do you have an understanding as to why pine

5  and minty smells would be listed as "not unpleasant"?

6  A    My presumption is that, for the most part, they're not

7  offensive.

8  Q    Meaning that most people find them not unpleasant?

9  A    Yes.  Not unpleasant, in terms of characterization, yes.

10 Q    Okay.  Do you have an understanding, moving to the

11 fourth column, why putrid smells would be considered "highly

12 offensive"?

13           MS. BRILLAULT:  Your Honor, again, I'm going to

14 lodge an objection.  He didn't create the study.

15           THE COURT:  Okay.  We don't need any speaking

16 objections.

17           The objection with respect to foundation is

18 sustained, and I'll -- but I'll let counsel attempt to lay

19 the foundation as to Dr. Davis's knowledge of why these odors

20 are characterized this way in this document.

21           MS. RIGGS:  Thank you, Your Honor.

22 BY MS. RIGGS:

23 Q    Dr. Davis, as the health officer, what do you use the

24 "Community Member Assessment of Environmental Odors," marked

25 for identification as Exhibit 56 -- what do you use this

171

DAVIS - REDIRECT                                  124

1   categorization of odors for?

2   A    To classify the odors experienced as being of this

3   nature, either "highly offensive," "offensive," "unpleasant,"

4   or "not unpleasant" -- or -- "not unpleasant," yes.

5   Q    And, Dr. -- Dr. Davis, if I could have you turn now to

6   Exhibit 4, and we are now at -- looking at the blue numbers

7   at the top, ID No. 2568.  Do you have that page beginning

8   "Description"?

9   A    Yes.

10  Q    And comparing page 2568 to the page we were looking at

11  on what's been marked for identification as Exhibit 56, do

12  you see the same categories listed on both documents?

13  A    Generally, yes.

14  Q    Dr. Davis, is it your testimony that in developing the

15  Department of Public Health community survey about odors in

16  which odors were classified in various levels of

17  offensiveness, you relied on the CDC's -- strike that -- on

18  the Agency for Toxic Substances and Disease Registry's

19  "Community Member Assessment of Environmental Odors," which

20  we've marked for identification as Exhibit 56?

21  A    That is correct.

22        MS. RIGGS:  Your Honor, we'd like to move 56 into

23  evidence.

24        THE COURT:  Any objection?

25        MS. BRILLAULT:  Yes, Your Honor.  We still object.

DAVIS - RECROSS                        125

 1  Lack of foundation.

 2           THE COURT:  Lack of foundation -- that he can't lay

 3  the foundation for this document?

 4           MS. BRILLAULT:  Apologize.  For his personal

 5  knowledge based on the questions she was asking him about the

 6  categorization and how those specific odors --

 7           THE COURT:  We've moved on from those questions.

 8  She's seeking to admit this.  What's your objection to

 9  admitting this?

10           MS. BRILLAULT:  It's never been disclosed before.

11  It wasn't talked about in his declaration.  It's not

12  discussed on the odor survey.  None of the other declarants

13  have ever cited to this document.

14           THE COURT:  Okay.  Overruled for now.  This is

15  admitted.  You can, of course, address in your argument why

16  the Court shouldn't consider it.  Thank you.

17       (Plaintiff's Exhibit 56 is admitted into evidence.)

18           MS. RIGGS:  With that, Your Honor, thank you,

19  Dr. Davis, I have nothing further.

20           THE COURT:  Thank you.

21           Any recross?

22           MS. BRILLAULT:  Bear with me, Your Honor.

23                     RECROSS-EXAMINATION

24  BY MS. BRILLAULT:

25  Q    Dr. Davis, looking at Exhibit 56, this wasn't attached

173

DAVIS - RECROSS                              126

1    to the survey when a survey participant would fill out --

2    complete the online Department of Public Health survey;

3    correct?  This document?

4    A    No, it was not attached.

5    Q    And there wasn't a link in the survey to direct the

6    participant to the ATSDR document?

7    A    I don't believe so.

8    Q    So the participant filling out the survey, once again,

9    would not understand that when they're characterizing -- or

10   when they're describing an odor and one of the ten categories

11   that it was going to be characterized by the County in a

12   certain way?

13   A    Correct.

14         MS. BRILLAULT:  Thank you.

15         THE COURT:  Okay.  May this witness be excused?

16         MS. RIGGS:  Yes, Your Honor.

17         THE COURT:  Is he subject to recall?

18         MS. BRILLAULT:  Not at this point, Your Honor, no.

19         THE COURT:  Okay.  Thank you, Dr. Davis.  We will

20   just ask you -- although you can tell us if this is what we

21   should be doing -- to remove the microphone cover and throw

22   it in the trash.

23         THE WITNESS:  Will do.  Yes.

24         THE COURT:  Thank you.  Is what we're doing up here

25   -- does that seem compliant?

127

```
 1            THE WITNESS:  It does.  You got the hand sanitizer.
 2    You're good.
 3            THE COURT:  Okay.  Okay.  We appreciate it.  Thank
 4    you.  Since you were here, I thought I would get your free
 5    advice on our COVID-19 protocols.  Recently I had everyone
 6    wearing masks -- I would like everyone to know that -- but I
 7    only recently changed that.
 8            You can leave that exhibit right there.  Thank you.
 9    Okay.
10            THE WITNESS:  Thank you.
11            THE COURT:  Okay.  You are excused.
12            Okay.  With that, I will have the plaintiffs call
13    their next witness.  Let's see about time, because we will
14    want to take a lunch break, but who's the next witness that
15    you were planning on calling?
16            MS. RIGGS:  Your Honor, we have discussed briefly
17    -- we have discussed with counsel bringing in one of the
18    individuals --
19            THE COURT:  Okay.
20            MS. RIGGS:  -- who may be here.  They may have some
21    concerns, but it seems to me we have 11 minutes before the
22    break?
23            THE COURT:  We don't have to take a lunch break at
24    noon necessarily.  So it's just a matter of how long we think
25    this will be.
```

128

1           MS. RIGGS:  If we were to call John Suggs?

2           MR. CHAN:  I think it would be 15 to 20 minutes.

3           THE COURT:  Okay.  Let's do that, then.  Thank you.

4           MS. RIGGS:  Okay.

5           Mr. Kiesel, I believe, is fetching Mr. Suggs.  And,

6  Your Honor, Mr. Kiesel is Mr. Suggs's attorney.  We'd ask

7  permission for Mr. Kiesel to sit at counsel table while his

8  client is testifying.

9           THE COURT:  That's fine.

10           THE CLERK:  Please raise your right hand.

11            JOHN SUGGS II, PLAINTIFFS' WITNESS, SWORN

12           THE CLERK:  Please state and spell your full name

13  for the record, and please speak clearly into the microphone.

14           THE WITNESS:  John Suggs.  J-o-h-n.  Last name

15  Suggs, S-u-g-g-s.

16           THE COURT:  Okay.  Good morning, Mr. Suggs.  Thank

17  you for coming in.

18           THE WITNESS:  Thank you, Your Honor.

19           THE COURT:  Your testimony is being recorded.  So

20  it'll be important that you speak loudly and audibly into the

21  microphone.  And when you're asked questions, it'll be

22  important to let the attorney finish the question completely

23  before you start to answer it.

24           And I'm going to remind counsel to let Mr. Suggs

25  complete each answer before you ask another question.

SUGGS - CROSS                          129

1          Mr. Suggs, if you hear anybody say "objection,"

2    then just stop speaking until I tell you how to proceed.

3    Understood?

4               THE WITNESS:  Understood.

5               THE COURT:  Okay.  Thank you.

6               With that, Counsel, you may proceed.

7               MR. CHAN:  All right.

8               Good morning, Mr. Suggs.

9               THE WITNESS:  Good morning, sir.

10                        CROSS-EXAMINATION

11   BY MR. CHAN:

12   Q    You are the lead plaintiff in one of the private

13   lawsuits against Chiquita Landfill.  Yes?

14   A    Yes, sir.

15   Q    And in that case you are seeking money damages in that

16   lawsuit separate from whatever relief the County is seeking

17   in its lawsuit; correct?

18   A    Yes, sir.

19   Q    All right.  And in connection with the County's motion,

20   you've provided a declaration in this case in connection with

21   their request for relief.  Yes?

22   A    Yes, sir.

23               MR. CHAN:  All right.  I'd like to pull up

24   Exhibit 103, which is Mr. Suggs's declaration.

25   BY MR. CHAN:

SUGGS - CROSS                               130

1  Q    All right.  I'd like to ask you some questions,

2  Mr. Suggs, about your residence.  All right?  If we can look

3  at paragraph 2 of your declaration, you state (reading): I'm

4  a resident that has lived in Val Verde since 1985, nearly

5  39 years, and I have lived in the same house throughout that

6  time.

7          Mr. Suggs, is it safe to say, since you've lived in

8  the same house for 39 years, it's your primary residence?

9  A    Yes, sir.

10 Q    And you also say in your declaration the house is about

11 1.3 miles from the landfill; is that accurate?

12 A    Yes, sir.

13 Q    Okay.  If we could look at paragraph 3, you then say,

14 Mr. Suggs (reading): This very house houses three generations

15 of the Suggs Family, my mother, father, wife, and 11-year-old

16 daughter.

17          Just for the record, so we have the names, what is

18 the name of your father, sir?

19 A    Same as mine.  John Suggs, Sr.

20 Q    Okay.  And so, because of that, do you sometimes go by

21 "John Suggs II"?

22 A    The II.  Correct, sir.

23 Q    All right.  And just so -- well, and since he resides in

24 the same house, I assume the house is also the primary

25 residence of your father?

SUGGS - CROSS                                    131

1   A    Correct, sir.

2   Q    And just so we have it for the record, what is the name

3   of your mother?

4   A    Tiny.

5   Q    And what is the name of your daughter who you

6   referenced?

7   A    Scarlett.

8            THE COURT:  I'm sorry.  I think we've been

9   referring to the minor children by their --

10           MR. CHAN:  I can pass on the --

11           THE COURT:  -- initials; correct?

12           I'm looking to Mr. Kiesel.  I don't know if you --

13           MR. KIESEL:  Your Honor, I would have no objection

14  to use her first name.  It would be fine.

15           THE COURT:  Okay.

16           Sorry.  Go ahead, Mr. Suggs.  You can say the name

17  of your daughter.

18           THE WITNESS:  Scarlett.

19  BY MR. CHAN:

20  Q    And just so we have it for the record, what is the address

21  of this house in Val Verde where you've lived for 39 years

22  with your father?

23  A    Correct.  That's 29293 Val Verde Road, Castaic,

24  California 91384.

25  Q    All right.  On Val Verde Road?

SUGGS - CROSS                               132

1  A    Correct, sir.

2  Q    Now, this declaration you submitted in this case -- it's

3  signed under penalty of perjury.  Yes, Mr. Suggs?

4  A    Yes, sir.

5  Q    All right.  Now, before you submitted your declaration

6  in this case about the Val Verde Road residence, you also

7  applied for money from the Chiquita Community Relief fund.

8  Yes?

9  A    Correct, sir.

10         THE COURT:  And, Counsel, I'm just going to

11 interrupt to confirm that 103 is admitted at this time;

12 correct?

13         MR. CHAN:  It's --

14         MR. KIESEL:  I have no objection, Your Honor.

15         THE COURT:  Okay.  103 is admitted.  Thank you.

16     (Defendants' Exhibit 103 is admitted into evidence.)

17         MR. CHAN:  Thank you.

18 BY MR. CHAN:

19 Q    We were talking now, Mr. Suggs, about you applying for

20 money from the Chiquita Community Relief Fund.  In order to

21 do that, you had to fill out an online application.  Remember

22 that?

23 A    Yes, sir.

24 Q    I'd like to show exhibit -- well, actually, let me just

25 ask you first, Mr. Suggs: Do you recall that as part of that

SUGGS - CROSS                                    133

1    application you had to put down your address?

2    A    Correct, sir.

3    Q    And do you recall that as part of that application it

4    also told you that there would only be one application per

5    household accepted?

6    A    Correct, sir.

7    Q    And you also swore under penalty of perjury that all

8    information in that application was truthful and accurate?

9    A    Correct, sir.

10   Q    All right.

11        Can I pull up Exhibit 261, which is just a blank

12   form of the application.  I just want to ask if this the form

13   of the application --

14        THE COURT:  What was the exhibit?

15        MR. CHAN:  261.

16        THE COURT:  Parties have -- any objection to 261

17   being admitted?

18        MS. RIGGS:  Your Honor, we don't have that.

19        THE COURT:  Okay.

20        MR. CHAN:  I apologize, Your Honor.  Let me show it

21   to counsel first.

22        THE COURT:  Okay.  And then we'll need a copy up

23   here as well, the official copy and --

24        MR. CHAN:  May I approach, Your Honor?

25        THE COURT:  Yes -- and a copy for the Court.

SUGGS - CROSS                                      134

1          Thank you.

2          And, Mr. Suggs, I'm just going to ask you: There's

3  a document on the desk.  You can just turn it over.  Yes.

4  Yes.  So you don't need to look at that.  And you will look

5  at the -- can you see on your screen the document that we're

6  now talking about?

7          THE WITNESS:  Yes, ma'am.

8          THE COURT:  Okay.  So opposing counsel has now seen

9  this document, which defense is seeking to identify as

10 exhibit what?

11         MR. CHAN:  261.

12         THE COURT:  Okay.  Thank you.  Please proceed.

13 BY MR. CHAN:

14 Q   All right.  Mr. Suggs, you already testified -- if we

15 could look at exhibit -- I'm sorry -- page 3 of the

16 application.  The online application that you filled out, you

17 had to put in your address.  Yes?

18         THE COURT:  And sorry, Counsel.  I'm not sure what

19 you're doing.  Are you laying a foundation to admit this?

20 Are you using this to refresh recollection?  What are you

21 doing with this document?

22         MR. CHAN:  I'm trying to lay the foundation to

23 admit this form of the application document.

24         THE COURT:  Okay.  And so the question is about the

25 document, or is the question about the application that he

SUGGS - CROSS                                           135

1  completed?

2          MR. CHAN:  It's both, but I can be more specific,

3  Your Honor.

4          THE COURT:  Thank you.

5  BY MR. CHAN:

6  Q    Do you recall that the application you filled out, like

7  this form, called for you to fill in the address?

8  A    Correct.  It looks familiar.

9  Q    All right.  And if we just go to page 2 of Exhibit 261,

10 about two thirds of the way down in all caps, do you recall

11 that the application you filled out, Mr. Suggs, like this

12 form, said only one application per household will be

13 accepted?

14 A    Correct.

15 Q    And if we go to page 8 of this form --

16         THE COURT:  And, Counsel, this is not proper what

17 you're doing.  So if you want to lay the foundation regarding

18 this exhibit, you can ask questions that lay the foundation

19 regarding this exhibit.  Now you're asking him substantive

20 questions about the application.  Is this your way of asking

21 him if this is a true and correct copy of the application he

22 completed?

23         MR. CHAN:  I was getting there because we don't

24 have the filled-in form, and so I'm going to ask him if this

25 form --

183

SUGGS - CROSS                                136

1          THE COURT:  Let me do it this way, and let's see if

2    this works.

3          Mr. Suggs, please flip through 261 -- this document

4    -- look through all pages of it, and then I'm going to find

5    out from you: Is this a true and correct copy of the form you

6    remember filling out?

7          THE WITNESS:  Yes, ma'am.

8          THE COURT:  Okay?  Have a look at it, and then let

9    us know.

10          THE WITNESS:  This document --

11          THE COURT:  Oh, sorry.  Because you don't have a

12    copy of it.  Let me give you a hard copy.

13          THE WITNESS:  Yeah, it looks familiar, Judge.

14          THE COURT:  Okay.  Thank you.  And is it a true and

15    correct copy, to your knowledge, of the application you

16    completed?

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Okay.  Thank you.

19          MR. CHAN:  Thank you, Your Honor.

20          THE COURT:  Any objection to 261 being admitted?

21          MR. KIESEL:  No objection, Your Honor.

22          THE COURT:  261 is admitted.  Thank you.

23       (Defendants' Exhibit 261 is admitted into evidence.)

24          MS. RIGGS:  Your Honor, for the record, plaintiffs

25    do not object.

SUGGS - CROSS                              137

1           THE COURT:  Okay.  Thank you.  I wasn't listening

2    to who was objecting.  Okay.  So neither Mr. Suggs's attorney

3    nor plaintiffs object.  251 -- 261 -- sorry -- is admitted.

4           MR. CHAN:  All right.

5           THE COURT:  You can proceed, Counsel.

6           MR. CHAN:  Thank you, Your Honor.

7    BY MR. CHAN:

8    Q    And I think you stated earlier, Mr. Suggs, but just to

9    be clear, you do recall when you filled out and submitted

10   your form for Community Relief funds, you did sign it under

11   penalty of perjury that all information was correct.  Do you

12   recall doing that?

13   A    I recall.

14   Q    All right.  When you applied for Community Relief funds,

15   you provided a different address to get the fund money than

16   the Val Verde Road address that you just gave testimony about

17   five minutes ago.  True, sir?

18   A    Repeat your question?

19   Q    When you applied to receive funds from the Chiquita

20   Community Relief fund, you provided a different residence

21   address than the Val Verde Road address you just gave

22   testimony about previously; correct?

23           MS. RIGGS:  Objection.  Vague as to time.

24           MR. KIESEL:  And lacks foundation, Your Honor.

25           THE COURT:  Objection is overruled.  Both

```
                              SUGGS - CROSS                        138
```

 1  objections are overruled.

 2          You may answer the question.

 3          THE WITNESS:  Sir, I don't know what you're

 4  speaking of.

 5  BY MR. CHAN:

 6  Q    In order to obtain money from the Chiquita Community

 7  Relief fund, you provided a different residence address than

 8  the Val Verde Road address; is that correct?

 9  A    Incorrect.

10  Q    Do you recall receiving checks --

11  A    Yes, sir.

12  Q    -- from the Community Relief fund?

13  A    Yes, sir.

14  Q    If you'd go to Exhibit 268, please.

15          MS. RIGGS:  Your Honor, there is no Exhibit 268.

16          MR. CHAN:  I apologize, Your Honor.  We didn't

17  include in the binder certain exhibits.  I do apologize.

18          MS. RIGGS:  And to be clear, the joint exhibit list

19  ends at 211.  So for a 268, 261, it appears that we are

20  missing 50 to unknown quantity of exhibits from defendants.

21          THE COURT:  Thank you.

22          MR. CHAN:  May I approach, Your Honor?

23          THE COURT:  Yes.

24          Thank you.  Okay.  So the witness should look at

25  this?

SUGGS - CROSS                           139

```
 1              MR. CHAN:  Yes.
 2              THE COURT:  I've handed the witness what has been
 3   marked as Exhibit 268.
 4              THE WITNESS:  Thank you, Judge.
 5   BY MR. CHAN:
 6   Q    Mr. Suggs, do you have Exhibit 268 in front of you?
 7   A    Yes, sir.
 8   Q    And do you see that for -- first of all, let me ask you:
 9   Do you recognize this as a check in the amount of $4500 that
10   you received from the Chiquita Community Relief fund?
11   A    Yes, sir.
12   Q    You see the address listed as not Val Verde but
13   30040 Rainbow Road?
14   A    Correct.
15   Q    Does that refresh your recollection --
16   A    Yeah, that's my second home.
17   Q    So let me get there.
18              Your testimony now is that you have a second home?
19   A    Yeah.  I have multiple homes.  Yes, sir.
20   Q    I'm sorry?
21   A    Yes, sir.  That's a second home.
22   Q    Okay.  So your primary residence is at Val Verde Road?
23   A    Correct.
24   Q    And you have lived there continuously for 39 years?
25   A    Correct.
```

SUGGS - CROSS                                    140

```
 1   Q    And you -- but you also have a second home?

 2   A    Yes, sir.  It's down the street.

 3   Q    A second home is on Rainbow Drive?

 4   A    Uh-huh.

 5   Q    Is that a yes?

 6   A    Yes, sir.

 7   Q    And that is -- the Rainbow Drive address is the address

 8   that you provided to Chiquita to receive checks from the

 9   Community Relief fund?

10   A    Yes, sir.

11   Q    Do you actually live at the Rainbow Drive address?

12   A    Yes.  Both of those are occupied.  Correct.

13   Q    All right.  So I just want to be clear.  You testified

14   earlier and in your declaration that you have lived

15   continuously at the Val Verde Road address for 39 years.

16   Yes?

17   A    Yes, sir.

18            MS. RIGGS:  Objection, Your Honor.  Misstates the

19   declaration.

20            THE COURT:  Overruled.

21   BY MR. CHAN:

22   Q    Are you now saying, Mr. Suggs, you also live at

23   Rainbow Road?

24   A    Correct.  I have multiple properties, sir.  Yes, sir.

25   Q    Val Verde Road is your primary residence.  Yes?
```

SUGGS - CROSS                                     141

1   A      Yes, sir.

2   Q      Do you recall that to receive Community Relief funds you

3   needed to provide something called a "recertification" form

4   to get additional months' checks?

5   A      Correct.

6            MR. CHAN:  I'd like to show -- hold

7            THE COURT:  Are you seeking to admit 268?  The

8   checks?

9            MR. CHAN:  Oh, yes.  I'm sorry.

10           THE COURT:  Any objection?

11           MS. RIGGS:  None from the County plaintiffs.

12           MR. KIESEL:  I'm okay with it too, Your Honor.

13           THE COURT:  Okay.  Seven -- 268 is admitted.  Thank

14   you.

15       (Defendants' Exhibit 268 is admitted into evidence.)

16           THE COURT:  And, Mr. Suggs, you can give it back to

17   me.  Thank you.

18           MR. CHAN:  Your Honor, may I approach?

19           THE COURT:  Yes.

20           Perhaps at a break we can discuss why we have so

21   many exhibits that were not previously identified.

22           MR. CHAN:  Yes, Your Honor.

23           THE COURT:  What's the number of this one?

24           MR. CHAN:  267.

25           THE COURT:  Okay.  I will just note for the parties

SUGGS - CROSS                                142

```
 1  this is -- I'm the trier of fact.  So making it easy for the
 2  Court is in the parties' best interest.  Now we've got
 3  exhibits floating around that are not in a binder, and
 4  they're not listed, which is not ideal.
 5           Okay.  You wanted the witness to look at this?
 6           MR. CHAN:  Yes.
 7           THE COURT:  And because they're not in a binder, I
 8  am the one who's having to pass them -- my clerk and I are
 9  having to pass them to the witness, which is really not how
10  we like to operate.
11           MR. CHAN:  Apologies, Your Honor.  We'll figure out
12  a better system.
13           THE COURT:  Thank you.
14           Okay.  What's your question for the witness?
15  BY MR. CHAN:
16  Q   Mr. Suggs, does this appear to be a true and correct
17  copy of the recertification form that you would have filled
18  out online to continue to get checks each month?
19  A   Yes, sir.
20  Q   If you look down at number two --
21           THE COURT:  Are you seeking to admit at this time?
22           MR. CHAN:  Yes, Your Honor.  Can we move 267?
23           THE COURT:  Any objection?
24           MS. RIGGS:  No objection from County plaintiffs.
25           MR. KIESEL:  No objection, Your Honor, for the
```

SUGGS - CROSS                                          143

1   plaintiffs.

2           THE COURT:  267 is admitted.  Thank you.

3       (Defendants' Exhibit 267 is admitted into evidence.)

4   BY MR. CHAN:

5   Q    On page 2, point 2, do you see there's a paragraph that

6   says "Proof of Residence"?

7   A    Yes, sir.

8   Q    And on the form it says (reading): By submitting this

9   form, you affirm that the affected property is still your

10  primary residence.

11          Do you see that?

12  A    Yes, sir.

13  Q    So does that refresh your recollection, sir, that in

14  order to get money from the Chiquita relief fund, you said

15  your primary residence was on Rainbow Road?

16  A    Correct, sir.

17  Q    You testified earlier, about ten minutes ago, your

18  primary residence was on Val Verde Road.  Do you recall that?

19  A    Yes, sir.

20  Q    Which is it, Mr. Suggs?

21  A    Yeah.  So --

22  Q    Is your primary residence on Val Verde Road, or is it on

23  Rainbow Road?

24  A    They're inherited homes.  I'm at both of them equal

25  time.

SUGGS - CROSS                                    144

1    Q    So your position is that they are both your primary

2    residence?

3    A    Correct.  Yes.

4    Q    Okay.  Now, we saw earlier -- I'm sorry.  If we can go

5    back --

6             Mitch, if you could show 261 again.  Go to page 2.

7    BY MR. CHAN:

8    Q    We saw earlier, Mr. Suggs, the language in all capitals

9    about two thirds down that says (reading): ONLY ONE

10   APPLICATION PER HOUSEHOLD WILL BE ACCEPTED.

11            Do you see that?

12   A    Correct.

13   Q    You put in an application to the Chiquita relief fund

14   for money.  Yes?

15   A    Correct.

16   Q    Okay.  Do you recall that your father, Mr. Suggs, Sr.,

17   also put in an application for money from the Community

18   Relief fund?

19   A    Correct.

20   Q    And are you aware, Mr. Suggs, that your father, when he

21   put in the application for money from the relief fund, used

22   the Val Verde Road address?

23   A    I'm not aware what he did.

24   Q    But you used the Rainbow Road address?

25   A    Correct, sir.

SUGGS - CROSS                              145

1          MR. CHAN:  I apologize, Your Honor.  We have

2   another loose exhibit.  I'll --

3          THE COURT:  Okay.

4          MR. CHAN:  -- deal with this over lunch.

5          THE COURT:  Okay.

6          And, Mr. Suggs, you can give me the last exhibit.

7          MR. CHAN:  May I approach, Your Honor?

8          THE COURT:  And this is -- give me the number

9   again?

10          MR. CHAN:  270.

11          THE COURT:  Thank you.

12          270 is identified.  You may proceed with your

13   questions.

14   BY MR. CHAN:

15   Q   Do you see Exhibit 270 appears to be a check in the

16   amount of $4500 made out to "John Suggs" at a Val Verde Road

17   address?

18   A   Yes, sir.

19   Q   Okay.  Does that refresh your recollection at all,

20   Mr. Suggs, that your father used the Val Verde Road address

21   to get money from the Chiquita relief fund?

22   A   Most likely.

23   Q   All right.  So we just saw on the application -- well,

24   let me back up.

25          Let's go back to your declaration.  I just want to

SUGGS - CROSS                                    146

 1   be clear.  Declaration Exhibit 103 in paragraph 2 stated you

 2   have lived in the same house in Val Verde for 39 years.  You

 3   recall that?

 4   A    Yes, sir.

 5   Q    You are now telling us that this statement is false and

 6   you have lived at two different houses; correct?

 7   A    No, sir.

 8   Q    You've lived at one house continuously for 39 years?

 9   A    Correct.  I'm still living there.  I still have a room

10   there.  I still have my Rainbow Drive.

11   Q    You've lived in one house continuously for 39 years, but

12   you also live in a second house?

13          MR. KIESEL:  Argumentative.  Asked and answered,

14   Your Honor.

15          THE COURT:  Overruled.

16          You may answer the question.

17          THE WITNESS:  Yes, sir.

18   BY MR. CHAN:

19   Q    All right.  If we look at paragraph 3, you told us at

20   the beginning of the exam, Mr. Suggs, that that same house on

21   Rainbow Road houses your father, Mr. Suggs, Sr.  Yes?

22   A    Uh-huh.  Yes, sir.

23   Q    But it appears that for purposes of getting money --

24          THE COURT:  I'm sorry.  I thought we were talking

25   about the Val Verde Road?  You said "Rainbow Road."

SUGGS - CROSS                                147

1              MR. CHAN:  I apologize.

2              THE COURT:  Okay.

3    BY MR. CHAN:

4    Q    Your declaration referred to living in the same house on

5    Val Verde Road with your father, Mr. Suggs, Sr.  Yes?

6    A     Correct.

7    Q    And you both, however, submitted applications for money

8    from the Chiquita relief fund.  Yes?

9    A     Yes, sir.

10   Q    And the application said that there would only be one

11   application per household accepted.  Yes?

12   A     Correct.

13   Q    And we just saw, it appears, that you and your father

14   used different households -- different addresses in order to

15   get funds from the Chiquita relief fund.

16             THE COURT:  And, Counsel, just for the sake of

17   efficiency, 270 is not admitted, and I believe the witness

18   testified he doesn't know what his father -- he's not aware

19   of how his father filled out the application.

20             MR. CHAN:  Then I won't move, Your Honor.

21             THE COURT:  Okay.

22   BY MR. CHAN:

23   Q    My question -- if I could just back up, you and your

24   father appear to have used different addresses to get money

25   from the Community Relief fund.

SUGGS - CROSS                          148

1           THE COURT:  And that's what I'm saying.  That's not

2    a proper question because that hasn't been established, that

3    his father used a different address.

4    BY MR. CHAN:

5    Q    Let me just ask the question: If you know, Mr. Suggs,

6    did you and your father use different addresses to apply for

7    money from the Chiquita Relief fund in order to get more

8    money from the fund?

9    A    Again, I don't know what he did.  I filled out for

10   Rainbow, which is my home that I have, and I still live at

11   29293.   I go back and forth.

12   Q    Okay.  And you don't know what address he used?

13   A    No.

14   Q    Okay.  Let me ask you this: Is it true, as you say in

15   your declaration, that your father resides with you in the

16   same house?

17   A    Correct.  He still lives there.

18   Q    And which house is that?

19   A    That's Val Verde.

20   Q    Not the Rainbow Road house where you also live; correct?

21   A    It's -- if he goes over there, yes.

22   Q    So he resides with you in two houses?

23   A    If he's with me at that other house, yes, he will reside

24   with me.

25   Q    Let me change subjects briefly, Mr. Suggs.

                                      SUGGS - CROSS                                149

 1              THE COURT:  And I'll ask the witness to give me the

 2    exhibit back.  Thank you.

 3    BY MR. CHAN:

 4    Q    Do you recall that you received approximately $27,000

 5    from the Community Relief fund?

 6    A    No, do not recall.

 7    Q    Do you have an estimate of how much you received?

 8    A    13- -- 13,500.

 9    Q    You believe it's 13,500?

10    A    Yes, sir.

11    Q    And as you testified previously, you've continued to

12    live in the house in Val Verde?

13    A    When I'm there, yes.

14    Q    All right.  So you did not use the Community Relief fund

15    money to relocate out of the area; correct?

16    A    It's impossible to relocate off of that.

17    Q    You did not use the money to relocate; correct?

18    A    Correct.

19    Q    Do you know how much money your father received from the

20    Community Relief fund?

21    A    No, sir.

22    Q    But your father did not use the money he received to

23    relocate out of the house either; correct?

24    A    Correct.

25    Q    Let me change subjects again, Mr. Suggs, and just talk

SUGGS - CROSS                              150

```
 1   briefly about a section of your declaration talking about

 2   health effects.  There's a statement in your declaration to

 3   the effect that the odors have caused you to experience

 4   certain health symptoms, like headaches, shortness of breath,

 5   et cetera.  Do you recall making a statement along those

 6   lines?

 7   A    Yes, sir.

 8   Q    Just to be clear, you have not included with your

 9   declaration any written opinion or written diagnosis from any

10   doctor indicating that the landfill odors are the cause of

11   those symptoms; correct?

12   A    Correct.

13   Q    So other than the statements in your declaration,

14   there's nothing in writing before the Court indicating that

15   the landfill odors are the cause of your symptoms; correct?

16   A    Can you repeat that or --

17   Q    Sure.  You're not aware of anything before the Court in

18   writing, other than what you put in your declaration, that

19   actually establishes that the landfill odors are the cause of

20   these symptoms you talked about; correct?

21   A    Correct.

22             MR. CHAN:  No further questions.

23             THE COURT:  Thank you.

24             Any redirect?

25             MR. KIESEL:  Just briefly, Your Honor.
```

SUGGS - REDIRECT                          151

1          Sorry.

2          MS. RIGGS:  Mr. Kiesel, would you mind if I asked a

3    few questions before you?

4          MR. KIESEL:  It's up to the Court.  (Inaudible.)

5          THE COURT:  Thank you.  I guess I wasn't

6    anticipating, Mr. Kiesel, that you would be asking any

7    questions.

8          MR. KIESEL:  Then I'll be doing none.  I'll --

9          THE COURT:  Okay.  So go ahead, Counsel for the

10   County.

11         MS. RIGGS:  Hi, Mr. Suggs.

12         THE WITNESS:  Good morning, ma'am.

13         MS. RIGGS:  Couple of questions very quickly.

14         THE WITNESS:  Thank you, ma'am.

15                   REDIRECT EXAMINATION

16   BY MS. RIGGS:

17   Q    How have the odors from the landfill affected how you

18   and your family use your home?

19   A    We're -- for lack of a better phrase, I mean, we're

20   prisoners of our home.  Like, we can't enjoy it.  We're out

21   there for the freedom.  I mean, I don't know if you've been

22   to Val Verde.  Everything is very open.  We go out there to

23   go outside.  We have a lot of property.  A lot of them are,

24   you know, ranch-style homes, you know, like ours, and we're

25   stuck indoors.  We don't have gas so -- everything is

SUGGS - REDIRECT                          152

1   electric; so that's driving up costs of everything.  You

2   cannot go outside, especially in the early mornings,

3   6:00 a.m. to around 9:00, and then late evenings are when

4   it's hot, I mean, the odors are -- I mean, they're

5   unbearable.  Like, not only is it the smell that's

6   unbearable.  When you smell it, it's the effect that's on

7   your body.  It's instant headaches, itching, shortness of

8   breath, and it just comes in waves.  It's terrible.

9   Q    You said a moment ago that there wasn't any "freedom."

10  What did you mean by that?

11  A    You can't enjoy the outdoors.  I mean, you're not free

12  to enjoy what we paid for as far as property.

13  Q    What are some of the things that you used to do at home

14  outside that you can't do anymore?

15  A    So I was a car builders, lot of bolt on.  I worked on

16  classic cars, inherited that hobby from my father.  My kid --

17  she's very outdoorsy: dirt bikes, loves playing soccer.  We

18  can't do those anymore.  Like, my kid does not want to get up

19  and go.  She doesn't -- she wants to stay indoors or go to

20  the mall.  I ended up selling all my cars because, you know,

21  when you're wrenching on a car underneath and smelling these

22  fumes, you physically -- you cannot do it.

23  Q    When was the last time you experienced odors from the

24  landfill?

25  A    This morning.

200

SUGGS - REDIRECT                           153

1   Q    What happened?

2   A    Just walked outside, and you get smacked in the face

3   with just chemical odor.  It makes your -- it made my head

4   hurt, made my heart race.  It's the same -- the same symptoms

5   every single day for years.

6   Q    Have any of your family members also told you that

7   they're still experiencing the impact of the odors from the

8   landfill?

9   A    Yes, ma'am.

10          MR. CHAN:  Sorry.  Objection, Your Honor.  I just

11  want clarification.  I think this is outside the scope of the

12  cross.  I'm just not sure what we're doing on redirect.

13          THE COURT:  It's not outside the scope of the

14  cross.  Overruled.

15          Please proceed.

16  BY MS. RIGGS:

17  Q    And I apologize, Mr. Suggs.  I think the question was:

18  Have your family members shared with you that they're also

19  experiencing odors from the landfill today?

20  A    Yes, ma'am.

21  Q    Who told you?

22  A    My grandmother.  My aunt that lives directly next to my

23  grandma.  My other aunt that's down the street from myself.

24  I mean, it's not only just family, I mean, community members

25  as well.  I mean, it's not going away.  It's not getting any

SUGGS - REDIRECT                        154

1   better.  It's getting worse.

2   Q    Mr. Chan asked you a question about living in Val Verde

3   for 39 years, and you've mentioned your grandmother and your

4   aunt.  Is it reasonable to believe that this is a family

5   community for you, Val Verde is a -- where your family --

6   A    Yes, ma'am.

7   Q    -- many generations live?

8   A    Yes, ma'am.

9          MS. RIGGS:  Mr. Suggs, thank you very much for your

10  time.

11         THE WITNESS:  Thank you, ma'am.

12         THE COURT:  Any recross?

13         MR. CHAN:  No, Your Honor.

14         THE COURT:  Thank you.  May Mr. Suggs be excused?

15         MR. CHAN:  Yes.

16         MS. RIGGS:  Yes, Your Honor.

17         THE COURT:  Okay.  So, Mr. Kiesel, no offense, but

18  it's the County's motion.  That's why I wasn't permitting you

19  to ask questions.  I'm sure the County got input from you as

20  to their questions.

21         Okay.  With that, Mr. Suggs, thank you very much

22  for coming in.  You are excused.  Okay.  If you wouldn't mind

23  just taking off that microphone cover -- great -- and

24  throwing it in the trash.  Greatly appreciated.

25         And thank you, Mr. Kiesel, for joining us.

155

 1              Okay.  So let's take our lunch recess at this time.

 2    We will take a one-hour lunch recess, and I will ask the

 3    parties to be back here at 1:20.

 4              Court stands in recess for one hour.  Thank you.

 5         (Recess from 12:22 p.m. to 1:26 p.m.)

 6

 7                           AFTER RECESS

 8         (Call to Order of the Court.)

 9              THE COURT:  Okay.  We are back on the record, and I

10    will ask the plaintiffs to call the next witness.

11              MS. RIGGS:  Your Honor, we're calling Mr. Perera.

12    May I fetch him?

13              THE COURT:  Yes, please.

14              And joining us at counsel table is?

15              MICHAEL PARKS:  Yes.  Good afternoon, Your Honor.

16    Michael Parks specially appearing for Mr. Perera as counsel.

17    Yeah.

18              THE COURT:  Okay.  Thank you.

19              THE CLERK:  Please raise your right hand.

20              STEPHEN PERERA, PLAINTIFFS' WITNESS, SWORN

21              THE CLERK:  Please state and spell your full name

22    for the record, and please speak directly into the

23    microphone.

24              THE WITNESS:  It's Stephen Dinash Philip Perera.

25    Stephen is S-t-e-p-h-e-n.  Dinash is D-i-n-a-s-h.

156

```
 1   P-h-i-l-i-p.  Last name Perera, P-e-r-e-r-a.

 2            THE COURT:  Good afternoon, Mr. Perera.  Thank you

 3   for coming in.

 4            THE WITNESS:  Good afternoon.

 5            THE COURT:  Okay.  So we are recording your

 6   testimony.  So we'll need you to speak loudly and audibly

 7   into the microphone.  And when the attorneys are asking you

 8   questions, let them finish the question before you start to

 9   answer it, and I'll remind them to let you finish your answer

10   before they ask you another question.

11            Mr. Perera, if you hear anybody say "objection,"

12   then just stop speaking until I tell you how to proceed.

13   Understood?

14            THE WITNESS:  Understood.

15            THE COURT:  Okay.  And then, Counsel, should I

16   provide Mr. Perera -- because now I'm your clerk, should I

17   provide Mr. Perera with the binder?

18            MR. CHAN:  Yes.  Thank you, Your Honor.

19            THE COURT:  Okay.  Thank you.

20            And you can just hand me that binder in the

21   (inaudible).  Yeah.  Thank you.

22            Okay.  With that -- and you can keep the binder

23   closed for now.  They'll let you know if you need to look at

24   anything in the binder.

25            Go ahead, Counsel.
```

204

PERERA - CROSS                            157

    1              MR. CHAN:  All right.

    2              Good afternoon, Mr. Perera.

    3              THE WITNESS:  Good afternoon.

    4                      CROSS-EXAMINATION

    5  BY MR. CHAN:

    6  Q    You provided a declaration in support of the County's

    7  motion in this proceeding.  Yes?

    8  A    Yes.

    9  Q    All right.  In addition to providing the declaration,

   10  you yourself are a plaintiff in one of the private lawsuits

   11  against Chiquita Landfill; correct?

   12  A    Yes.

   13  Q    And in that private lawsuit, you are seeking money

   14  damages separate and apart from whatever relief the County is

   15  seeking in its motion; correct?

   16  A    Whatever comes from it.

   17  Q    Okay.  You don't know?

   18  A    I don't know.

   19  Q    All right.  Fair enough.

   20              In your declaration, Mr. Perera, you said you

   21  purchased a new home in the Castaic area about a mile and a

   22  half from the landfill?

   23  A    Yes.

   24  Q    What is the address of your home?

   25  A    It's 28614 Wildflower Terrace, Castaic, California.

                            PERERA - CROSS                        158

 1   Q     All right.

 2   A     Zip code is 91384.

 3   Q     And when did you buy the home?

 4   A     2023, September 28.

 5   Q     And you've lived in that home continuously since

 6   purchasing it?

 7   A     Yes.

 8   Q     So you bought it end of September, moved in, perhaps,

 9   October 2023?

10   A     It's like the beginning of October.  I think it's the

11   first week.

12   Q     Mr. Perera, are you aware that the County alleges in

13   this case that the ETLF event at the landfill that led to the

14   alleged increase in odors started about six months prior, in

15   April 2023?

16           MR. PARKS:  Objection.  Calls for speculation.

17   Lacks foundation as phrased.

18           THE COURT:  You can -- he's asking --

19           MR. CHAN:  I'm just asking if he's --

20           THE COURT:  -- if he knows.  So that's the

21   foundation.

22           THE WITNESS:  I don't know anything about that.

23           THE COURT:  Thank you.

24   BY MR. CHAN:

25   Q     Okay.  Fair enough.

PERERA - CROSS                               159

 1              Just a few questions, Mr. Perera, on the location

 2   of your home.  Wildflower Terrace is in the Williams Ranch

 3   community?  Is that the development?

 4   A     Yeah.  That's correct.  That's the newest development.

 5   Q     That's a relatively new development in the area; right?

 6   A     Yes.

 7   Q     Okay.  I believe we do have a demonstrative.  I just

 8   want to locate your home on a map.

 9              If we could pull up Demonstrative 2, page 2.

10              THE COURT:  And sorry.  Where is this in the --

11              MR. CHAN:  It should be --

12              THE COURT:  It's in the binder?

13              MR. CHAN:  It should be Demonstrative 2, page 2.

14              THE WITNESS:  In this?

15              THE COURT:  You don't have to look at the binder

16   unless you can't see it clearly on the screen.

17              MR. CHAN:  I don't know if you're able to zoom in

18   at all.

19   BY MR. CHAN:

20   Q     But I just wanted to ask you, Mr. Perera, if the sort of

21   triangle we have marked here for 28614 Wildflower Terrace,

22   based upon sort of what the community looks like and the

23   rows, does that look like approximately where your home would

24   be located?

25              THE COURT:  Where --

PERERA - CROSS                              160

1              MR. PARKS:  Again, objection.

2              THE COURT:  Okay.  Before we get to your objection.

3         Are you -- we're at page 2 of the demonstrative?

4              MR. CHAN:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MR. CHAN:  It should be a map with a blue triangle

7    and then the --

8              THE COURT:  Okay.  Thank you.

9         What's the objection?

10             MR. PARKS:  The demonstrative lacks foundation.

11   Hearsay.  Calls for speculation.

12             THE COURT:  Thank you.

13        Where are you going with this demonstrative?

14   Because you seem to be asking him substantive question and

15   hence defense -- plaintiff's counsel's objections.

16             MR. CHAN:  My only question is whether this is

17   where his home is, and the point is that it's, frankly, not

18   among the homes that are the subject of this motion.

19             THE COURT:  I don't think this is the right witness

20   to get that in through.

21             MR. CHAN:  Well, can I at least establish where his

22   home is on this map, and then we can do the rest through

23   other folks?

24             THE COURT:  Well, I'm going to sustain the

25   foundation objection concerning the -- yeah, the question

PERERA - CROSS                         161

1    that you've asked thus far.  So you can attempt to lay the

2    foundation for this.

3              MR. CHAN:  Okay.

4    BY MR. CHAN:

5    Q    Mr. Perera, have you looked at maps of your neighborhood

6    and sort of where your home is relative to sort of a

7    Google Earth sort of picture of the neighborhood?

8    A    Yeah.  I know where my home is.

9    Q    Okay.  If I could just direct your attention to the map

10   on the screen, do you see the blue triangle?

11   A    Yes.

12   Q    Can you tell from having looked at maps like

13   Google Earth of the neighborhood whether that blue triangle

14   approximately identifies the location of your home in the

15   neighborhood?

16   A    Yes.

17   Q    Yes, it does?

18   A    Yes, it does.

19   Q    Okay.  Let me just ask: Are you aware, Mr. Perera, that

20   in this motion the County is seeking to relocate

21   approximately 900 homes that it says are most affected by the

22   odors?

23              MR. PARKS:  Objection, Your Honor.  That may get

24   into attorney-client privilege.  He's not a party to this

25   case and --

209

PERERA - CROSS                                    162

 1              THE COURT:  Overruled.  He can answer this

 2    question.

 3              Are you aware?

 4              THE WITNESS:  No.  I don't really know what this

 5    (indecipherable).

 6    BY MR. CHAN:

 7    Q    Okay.  Fair enough.

 8              Last points, Mr. Perera.  Do you recall that you

 9    previously applied for money from the Chiquita Community

10    Relief fund?

11    A    Not that I'm aware of.  I mean, I didn't personally.

12    Q    Do you know if someone from your household applied for

13    money from the Chiquita fund?

14    A    I think my wife applied for something, but I'm not

15    really sure what it was.

16    Q    Do you know if your household received money from the

17    Chiquita fund?

18    A    She got something, but I'm not really sure what it's

19    for.

20    Q    In any event, since you said you've lived continuously

21    in the house --

22    A    Yeah.

23    Q    -- you did not relocate out of the area; correct?

24    A    No, I didn't relocate out of the area.

25              MR. CHAN:  Okay.  Thank you, Mr. Perera.

                              PERERA - REDIRECT                        163

1              No further questions.

2              THE COURT:  Thank you.

3              Any redirect?

4              MS. RIGGS:  Yes, Your Honor.

5              Hi, Mr. Perera.

6              THE WITNESS:  Hello.

7                        REDIRECT EXAMINATION

8   BY MS. RIGGS:

9   Q    Counsel showed you a map and showed you where your home

10  was in relationship to Chiquita Canyon Landfill.  Do you

11  recall that?

12  A    Yes.

13  Q    Do you smell odors from the landfill at your home?

14  A    Yes.

15  Q    How have those odors affected your ability to use the

16  home that you and your family live in?

17             MR. CHAN:  Outside the scope.

18             THE COURT:  Give me just a moment.

19             (Pause.)

20             THE COURT:  The objection is sustained.

21             MS. RIGGS:  Your Honor, counsel asked if he was

22  aware that his home was not the subject of this motion, and

23  to the extent that we're discussing the odors from the

24  landfill and how it affects the community as a whole, even if

25  his home may not be one that was initially targeted for

PERERA - REDIRECT                    164

```
 1   relocation, the questions go to the nuisance issue before the

 2   County.

 3             THE COURT:  I see why you want to ask the question.

 4   It is outside of the scope of his cross-examination, and the

 5   witness said he didn't know anything about the relocation

 6   request.  Thank you.

 7             MS. RIGGS:  Thank you, Your Honor.

 8             THE COURT:  Okay.  Thank you.

 9             MS. RIGGS:  Thank you, Mr. Perera.

10             THE COURT:  Any recross?

11             MR. CHAN:  No, Your Honor.

12             THE COURT:  Okay.  May the witness be excused?

13             MS. RIGGS:  Yes.

14             MR. CHAN:  Yes.

15             THE COURT:  Okay.  Thank you.

16             Thank you for coming in, Mr. Perera.  If you

17   wouldn't mind just throwing away that -- the microphone cover

18   before you leave, we appreciate that.  Thank you.

19             MR. PARKS:  And also leave the binder.

20             THE COURT:  Oh, you can leave the binder, yes.  And

21   you can -- there's a trash there for you to throw away the

22   microphone cover.  Thank you, Mr. Perera.

23             Thank you, Mr. Parks.

24             MR. PARKS:  Thank you, Your Honor.

25             THE COURT:  Let me ask the plaintiffs to call their
```

165

```
 1   next witness.
 2              MS. RIGGS:  Your Honor, we would call
 3   Shikari Nakagawa-Ota.
 4              THE COURT:  Okay.
 5              MS. RIGGS:  And, Your Honor --
 6              THE COURT:  Yes?
 7              MS. RIGGS:  Apologies, Your Honor.  Ms. Nakagawa-
 8   Ota's counsel, Blaine McPhillips, will also be joining us at
 9   counsel table.
10              THE COURT:  Okay.
11              Are there any new exhibits we should be aware of
12   with respect to this witness?
13              MR. MANZO:  Your Honor, the only potential exhibit,
14   I would think, is Exhibit 113, which is the witness's
15   declaration.
16              THE COURT:  Okay.  Already in my binders.  Okay.
17              Any objection to this exhibit being admitted,
18   subject to the objections that were already raised by defense
19   counsel?
20              Hearing none, 113 is admitted.
21       (Defendants' Exhibit 113 is admitted into evidence.)
22              THE COURT:  Okay.  So stand right there.  Raise
23   your right hand.
24        SHIKARI NAKAGAWA-OTA, PLAINTIFFS' WITNESS, SWORN
25              THE COURT:  Okay.  If you could come around, take
```

166

1   the steps.  Just be careful going up the steps.  They're a
2   little funny.  And then, when you get here, if you can take
3   -- to your left there's a little bin of microphone covers.
4   So if you take one of those and put it on -- open it and then
5   put it on the microphone.
6           Thank you.  And then if you can state and spell
7   your first and last name for the record.
8           THE WITNESS:  Shikari Nakagawa-Ota.  S-h-i-k-a-r-i
9   N-a-k-a-g-a-w-a -- hyphen -- O-t-a.
10          THE COURT:  Thank you.
11          And let me just, for the record, let counsel make
12  his appearance.
13          BLAINE MCPHILLIPS:  Blaine McPhillips --
14  B-l-a-i-n-e M-c-P-h-i-l-l-i-p-s -- senior deputy county
15  counsel representing the Local Enforcement Agency,
16  Bar No. 266134.
17          THE COURT:  Thank you.
18          Okay.  Ms. Nakagawa-Ota, thank you for coming in.
19  Your testimony is being recorded.  So I'm just going to ask
20  that you speak loudly and audibly into the microphone, and as
21  the attorneys are asking you questions, please let them
22  finish each question completely before you start to answer
23  it, and I'll let -- I'll remind them to let you finish your
24  answer before they ask another question.
25          If you hear any attorney, or myself, say

214

NAKAGAWA-OTA - CROSS                    167

```
 1   "objection," then just stop speaking until I tell you how to
 2   proceed.  Understood?
 3            THE WITNESS:  Yes.
 4            THE COURT:  Okay.  With that, please proceed.
 5            MR. MANZO:  Good afternoon, ma'am.
 6            THE WITNESS:  Good afternoon.
 7   BY MR. MANZO:
 8   Q    Ma'am, you do not hold a degree in engineering, do you?
 9   A    No.
10   Q    And you've never been responsible for managing a
11   landfill?
12   A    No.
13   Q    And you don't have any certifications or programs that
14   you've attended regarding ETLFs?
15   A    No.
16   Q    And it's fair to say that your declaration relies in
17   large part upon Mr. Todd Thalhamer and Dr. Timothy Stark's
18   analysis?
19   A    Yes.
20   Q    And so if I wanted to ask you questions about those
21   analyses, I would have to talk to them, rather than you.  Is
22   that fair to say?
23            MS. RIGGS:  Objection.  Lacks foundation.
24            THE COURT:  Overruled.
25            I'm going to interpose my own objection.  Vague.
```

215

NAKAGAWA-OTA - CROSS                              168

1   BY MR. MANZO:

2   Q    If I wanted to challenge the assumptions of Mr. Stark --

3   or of Dr. Stark or Mr. Thalhamer, would I be able to question

4   you about that?

5   A    I don't think -- I'm not really clear what you're asking

6   me.  Would you please rephrase that.

7   Q    So your declaration references Dr. Tim Stark and

8   Mr. Todd Thalhamer.  If I wanted to ask questions about the

9   analysis that these two individuals provided, would you be

10  able to answer those questions?

11  A    No.

12  Q    I want to pull up in Exhibit 113, paragraph 55.

13            Do you recognize 113 as your declaration, and

14  paragraph 55 in the second sentence here, where it says

15  (reading): In fact, it has expanded to 90 acres is now over

16  three times larger than the 28-acre reaction area originally

17  reported by the landfill.

18            Do you recognize that sentence?

19  A    Yes.

20  Q    If I wanted to ask you questions about that conclusion,

21  would I be -- would you be able to answer them?

22            MS. RIGGS:  Objection.  Vague and calls for

23  speculation.

24            THE COURT:  Sustained.

25  BY MR. MANZO:

216

NAKAGAWA-OTA - CROSS                      169

1  Q    Ma'am, can you explain how the reaction has expanded to

2  90 acres?

3           MS. RIGGS:  Objection.  Vague.

4           THE COURT:  Sustained.

5  BY MR. MANZO:

6  Q    Ma'am, I'm directing you to the sentence highlighted

7  (reading): In fact, it has expanded 90 acres.

8           What do you mean by that?

9  A    So the subsurface reaction has progressed to other areas

10 than the original reaction area that has been defined at the

11 beginning, based on CalRecycle's technical review and

12 comments.

13 Q    And that's -- CalRecycle, as in Dr. Timothy Stark's

14 analysis or Mr. Todd Thalhamer's analysis?

15 A    Both.

16 Q    But that's those people's conclusions --

17 A    Uh-huh.

18 Q    -- not necessarily your conclusion.  Is that fair to

19 say?

20          MS. RIGGS:  Objection.  Foundation.

21          THE COURT:  Overruled.

22          You may answer.

23          THE WITNESS:  So the LEA uses the technical

24 analysis and comments when we issue a letter or directives to

25 the operator.

217

NAKAGAWA-OTA - CROSS                    170

 1   BY MR. MANZO:

 2   Q    Can you explain how the conclusion was reached that the

 3   landfill is now 90 acres -- that the reaction is now

 4   90 acres?

 5   A    Based on the temperature data provided by

 6   Chiquita Canyon Landfill at the newly installed temperature

 7   monitoring probe indicated elevated temperature.

 8   Q    And is that your analysis or Dr. Stark or

 9   Mr. Todd Thalhamer's analysis?

10   A    It is analysis of CalRecycle and Dr. Stark.

11   Q    And if I wanted to ask you specific questions about the

12   analysis that Dr. Stark did, I should ask him and not you.

13   Is that fair to say?

14   A    Correct.

15   Q    Would you agree that odors have dropped dramatically in

16   the last year?

17            MS. RIGGS:  Objection.  Foundation.

18            THE COURT:  I'll let counsel attempt to lay the

19   foundation.

20   BY MR. MANZO:

21   Q    Do you have any information about odors in the last year

22   at --

23   A    I am aware --

24   Q    -- at the landfill?

25   A    I am aware of the reports that have been issued by

NAKAGAWA-OTA - REDIRECT                    171

 1  South Coast Air Quality Management District, but I do not

 2  keep track of them or review their data.

 3  Q    Do you have any current information about odors at the

 4  landfill?

 5  A    Not current because I retired at the end of June.  So I

 6  do not have any current data regarding odor.

 7            MR. MANZO:  No further questions.

 8            THE COURT:  Thank you.

 9            Any redirect?

10            MS. RIGGS:  A moment briefly, Your Honor?

11            THE COURT:  Yes.

12            (Pause.)

13            MS. RIGGS:  Briefly, Your Honor.

14                      REDIRECT EXAMINATION

15  BY MS. RIGGS:

16  Q    Ms. Nakagawa-Ota, you talked about the role that

17  CalRecycle plays with regard to the LEA.  First of all, why

18  does the Local Enforcement Agency rely on technical

19  assistance from CalRecycle?

20  A    As required by state regulations, when LEA needs

21  technical assistance, we make request to CalRecycle to

22  provide us any review in technical nature where LEA does not

23  possess.

24  Q    When you say "regulations," are you referring to the

25  public resources code?

                          NAKAGAWA-OTA - REDIRECT                      172

 1    A    Yes.

 2    Q    Did you reach out to CalRecycle for technical assistance

 3    with regard to the Chiquita Canyon Landfill?

 4    A    Yes.

 5    Q    And has LEA issued compliance orders to Chiquita Canyon

 6    Landfill?

 7    A    Yes.

 8              MS. RIGGS:  Ms. Nakagawa-Ota, I don't believe I

 9    have anything further.

10              THE COURT:  Thank you.  Any recross?

11              MR. MANZO:  No, Your Honor.

12              THE COURT:  May the witness be excused?

13              MS. RIGGS:  Yes, Your Honor.

14              THE COURT:  Okay.  Ms. Nakagawa-Ota, thank you for

15    coming in.  If you wouldn't mind just throwing away that

16    microphone cover in the trashcan to your left.  Thank you.

17    And there's a sanitizer if you want to use a sanitizer.  And

18    then you're free to go.  Thank you so much.

19              Thank you, Mr. McPhillips.

20              I'll ask the plaintiff to call their next witness.

21              MS. RIGGS:  Your Honor, we would call Steven Howse.

22              THE COURT:  Which exhibit is Mr. Howse's

23    declaration?

24              MR. NEUMAN:  101, Your Honor.

25              THE COURT:  Okay.  Any new -- any -- the parties

173

1  already heard from me with respect to the objections to the

2  declarations.  So besides those objections, which have been

3  overruled, any additional objections to the admission of the

4  declaration of Mr. Howse?

5          MR. NEUMAN:  No.  Thank you.

6          THE COURT:  101 is admitted.

7      (Defendants' Exhibit 101 is admitted into evidence.)

8          THE CLERK:  Please raise your right hand.

9           STEVEN HOWSE, PLAINTIFFS' WITNESS, SWORN

10          THE COURT:  Just watch your step on the stairs.

11          MR. NEUMAN:  Your Honor, may I approach with a

12  binder for the witness and for the Court?

13          THE COURT:  Yes.

14          MS. RIGGS:  And, Counsel, may I inquire: Are there

15  any additional exhibits in --

16          MR. NEUMAN:  I'm about to hand (inaudible).

17          MS. RIGGS:  If I could have a look at those, that

18  would be helpful.

19          THE CLERK:  Please state and spell your full name

20  for the record.

21          THE COURT:  And --

22          THE CLERK:  Sorry.

23          THE COURT:  Yeah, yeah.  Go ahead.

24          THE CLERK:  Grab one of those microphone covers

25  (inaudible).

221

Case 2:24-cv-10819-MEMF-MAR   Document 152-1   Filed 08/14/25   Page 185 of 281
Page ID #:17549

174

```
 1           And now please state and spell your full name for
 2  the record, and please speak clearly into the microphone.
 3           THE WITNESS:  Steven Howse.  S-t-e-v-e-n.  Last
 4  name Howse, H-o-w-s-e.
 5           THE COURT:  Okay, Mr. Howse.  Thank you for coming
 6  in.  Good afternoon.  Your testimony is being recorded; so
 7  just speak loudly and audibly into the microphone.  When the
 8  attorneys are asking you questions, let them complete each
 9  question completely before you start to answer it, and I'll
10  remind them to let you finish your answers before they ask
11  another question.  If you hear anybody say "objection," then
12  just stop speaking until I tell you how to proceed.
13  Understood?
14           THE WITNESS:  Copy.
15           THE COURT:  Okay.  And then let me let your counsel
16  put her appearance on the record.
17           OSHEA ORCHID:  Oshea Orchid appearing on behalf of
18  plaintiff.
19           THE COURT:  Thank you.
20           Okay.  And with respect to the exhibits, I have the
21  binder for Mr. Howse.  Was there an issue that plaintiffs'
22  counsel needed to raise?
23           MS. FOX:  Thank you, Your Honor.  Yes, there is.
24           THE COURT:  Just make sure you're speaking into a
25  microphone.
```

222

175

```
 1              MS. FOX:  Yes.  Thank you, Your Honor.  There is.

 2              Exhibit -- thank you.  Exhibit 252, the second item

 3   in the binder, appears to be a portion of the South Coast Air

 4   Quality --

 5              THE COURT:  Just a moment.  Is this something that

 6   was not previously disclosed?  Is that the issue with it?

 7              MS. FOX:  I don't know if the -- well, I assume

 8   these are excerpts from a previously disclosed exhibit, but I

 9   don't --

10              THE COURT:  Okay.  So we can get to the substance

11   of it when we get there.

12              MS. FOX:  My concern, Your Honor --

13              THE COURT:  Yes?

14              MS. FOX:  -- is confidentiality.

15              THE COURT:  Oh.  Oh.  Okay.

16              MS. FOX:  Yes.  If I might.  Your Honor, these were

17   -- AQMD records -- these complaints --

18              THE COURT:  And so what are you asking?  For the

19   courtroom to be closed?

20              MS. FOX:  No.  Just for the records to be sealed

21   and not entered into the permanent record.

22              THE COURT:  Okay.

23              MR. NEUMAN:  I think counsel is mistaken as to what

24   they are.

25              THE COURT:  Okay.
```

223

HOWSE - CROSS                              176

```
 1              MR. NEUMAN:  I'm not sure we're going to get to
 2   them.  It's impeachment evidence, if necessary.
 3              THE COURT:  Okay.  Okay.  If we do get to it, then
 4   we can address it at that time.  Thank you.
 5              MS. FOX:  Thank you, Your Honor.
 6              THE COURT:  Okay.  So I'm going to hand the witness
 7   the binder, but he's going to keep the binder closed until
 8   you tell him what to talk about; right?
 9              MR. NEUMAN:  I appreciate that.  Thank you,
10   Your Honor.
11              THE COURT:  Okay.  Thanks.
12              THE WITNESS:  Thank you very much.
13              UNIDENTIFIED SPEAKER:  Counsel, do you have one
14   more copy of the binder for plaintiffs?
15              MR. NEUMAN:  No, I don't.  No.  She's not a party
16   to the case, so.
17              May I proceed, Your Honor?
18              THE COURT:  Yes.
19              MR. NEUMAN:  Okay.  Thank you.
20              Mr. Howse, good afternoon.
21                        CROSS-EXAMINATION
22   BY MR. NEUMAN:
23   Q    You are the lead plaintiff in one of the private
24   lawsuits filed against Chiquita; correct?
25   A    Correct.
```

224

HOWSE - CROSS                                    177

```
 1   Q    And you and your family moved to Val Verde in 1998; is
 2   that right?
 3   A    Correct.
 4   Q    You moved to a home that is about 1,000 feet away from
 5   the landfill; correct?
 6   A    Give or take.  I don't know the exact number.
 7   Q    It's one of the homes that's closest to the landfill;
 8   right?
 9   A    Correct.
10   Q    Just let me finish the question so the court reporter
11   can get it down, and we'll get through it.
12           You said "correct," though; right?
13           You said "yes" to it's one of the closest homes?
14   A    Correct.
15   Q    Thank you.
16           For the record, I have your address as
17   28517 Lincoln Avenue in Val Verde; is that accurate?
18   A    It is.
19   Q    Mr. Howse, you have been quite frustrated with the
20   landfill for many years; right?
21   A    I have.
22   Q    You've publicly spoken, you have volunteered for the
23   community advisory committee, and taken other actions to
24   complain about the landfill and the odors coming from it;
25   right?
```

```
                        HOWSE - CROSS                        178
```

 1   A     Correct.

 2   Q     And your complaints predate the events -- the reaction

 3   that we're talking about in this case, don't they?

 4   A     Correct.

 5   Q     You, from 1998 basically through 2023, have complained

 6   about strong odors from the landfill; right?

 7   A     Correct.

 8   Q     You have at times -- well, for instance, you have in

 9   your declaration that the inspectors -- the AQMD inspectors

10   know some of your kids by names because they're out there so

11   often.  You said the same thing back in December 2020 when

12   you testified at an AQMD hearing; right?

13   A     Correct.

14   Q     And in fact you were in touch with various landfill

15   employees -- 2017, for instance -- sending text messages to a

16   Mike H. and a Tyler R. with complaints about the odors?

17   A     Correct.

18   Q     Some of those complaints were that you couldn't enjoy

19   the night air or you had to keep your windows closed;

20   correct?

21   A     Correct.

22   Q     The smells were so bad that they were making your wife

23   sick; right?

24   A     Correct.

25   Q     In fact, August 30, 2017, I think you texted (reading):

226

HOWSE - CROSS                                   179

 1   I can't put up with this -- and excuse me, Your Honor -- I

 2   can't put up with this shit for 30 more years.

 3           Does that sound like something you said?

 4   A    Possibly.

 5   Q    When you testified in December 2020, you said that the

 6   smells were horrible and you were sick and tired of smelling

 7   the landfill at your home; right?

 8   A    Correct.

 9   Q    And in your declaration you talk about some of the

10   symptoms that you have that you attribute to the landfill.

11   You talk about headaches, nausea, chest pain, sinus issues.

12   You recall that in your declaration?

13   A    I do.

14   Q    In 2015 you wrote an article for the SCV --

15   Santa Clarita Valley News, entitled "Cause for Concern."  Do

16   you recall that article?

17   A    Vaguely.

18   Q    All right.  Well, do you recall that in 2015 you blamed

19   the landfill for odors -- you blamed -- excuse me -- you

20   blamed the landfill odors for nausea, eye irritation,

21   respiratory ailments, and headaches?  Do you recall that?

22   A    I -- probably.  I don't -- I can't say "yes."

23   Q    All right.

24   A    You're talking a long time ago.

25   Q    If you want to just take a look -- this is to refresh

HOWSE - CROSS                              180

1   to refresh, Your Honor -- Exhibit 253 in that binder that the

2   Court handed you.

3              THE COURT:  Okay.

4              MR. NEUMAN:  And if you -- well, it doesn't even

5   need to be up on the screen, I don't think.  We're just --

6   we're not going to enter it.

7              THE COURT:  It's just for refreshing of

8   recollection; correct?

9              MR. NEUMAN:  That's right.

10             THE COURT:  Okay.

11  BY MR. NEUMAN:

12  Q    Mr. Howse, do you have that in front of you?  I think

13  that's a -- looks like a photograph of you; right?

14  A    Yep.

15  Q    And is that the article you wrote in January of 2015?

16  A    It is.

17  Q    And looking at the second page of that document, third

18  paragraph from the bottom, do you see that?

19  A    Yes, I do.

20  Q    And does that refresh your recollection that you wrote

21  an article in 2015 that the odors from the landfill were

22  causing nausea, eye irritation, respiratory ailments, and

23  headaches?

24  A    Yes.

25  Q    And do you recall -- or does this refresh your

228

HOWSE - CROSS                                    181

 1  recollection that in 2015 you said that your friends who

 2  visit the home have those same symptoms?

 3  A    Yes.

 4  Q    You can close that.

 5           Mr. Howse, you were an applicant to the

 6  Chiquita Community Relief fund; is that right?

 7  A    I was.

 8  Q    And you received from June 2024 through February 2025

 9  $3,420 a month from Chiquita; correct?

10  A    Correct.

11  Q    By my calculation, that adds up over nine months to just

12  under $31,000.  Does that sound right?

13  A    With a calculator I'm sure you're correct.

14  Q    Fair enough.

15           Mr. Howse, during that time period from June

16  through February -- June '24 through February 2025, you

17  didn't use that $30,000 to move away from your home, did you?

18  A    I did not.

19           MR. NEUMAN:  Nothing further.  Thank you,

20  Your Honor.

21           THE COURT:  Thank you.

22           Any redirect?

23           MS. RIGGS:  Briefly, Your Honor.

24           Hi, Mr. Howse.

25           THE WITNESS:  Hello.

HOWSE - REDIRECT                        182

                          REDIRECT EXAMINATION

2   BY MS. RIGGS:

3   Q    Counsel asked you some questions about your experience

4   of landfill odors over the last 20-or-so years.  Have those

5   odors changed in the last few years?

6   A    Yes.  They changed significantly in 2023.

7   Q    How so?

8   A    The symptoms were much, much more severe, where it would

9   cause severe --

10          MR. NEUMAN:  Your Honor, I'm going to object.

11   Beyond the scope.

12          THE COURT:  Overruled.

13          You may answer.

14          THE WITNESS:  It would cause severe reactions.  So

15   where previously had been more minor -- still irritations but

16   more minor to where this were much more serious, much more

17   severe.

18   BY MS. RIGGS:

19   Q    Did the smells themselves change?

20   A    Yes, the smells changed.

21   Q    How so?

22   A    Different types of odors, and with the odors you would

23   immediately get reactions, like immediately.  Whereas in the

24   past the reactions would be kind of cumulative.  You know,

25   you would have headaches, you would have, you know, nausea --

HOWSE - REDIRECT                                183

1    or whatever (indecipherable) that -- but it wouldn't be

2    immediate.  Here the odors would come through, and it would

3    be an immediate reaction.

4    Q    And can you describe some of the ways that the odors

5    from 2023 on have impacted your family's ability to use your

6    home?

7    A    Yes.  It has impacted us where, you know, we basically

8    stay inside our house as much as we possibly can.  I used to

9    spend a lot of time outside.  I had a lot of things that I

10   work on around the house, as far as I like to work on cars; I

11   like to purchase equipment at auctions and repair them and

12   try to sell them -- it's done out of my garage; work in my

13   yard, have a garden, and things like that, and I'm not able

14   to do that.  My kids aren't able to spend a lot of time

15   outside.  We're not able to open our windows at night and

16   sleep with the cool night air or cool our house down using an

17   evaporative cooler.  We're, you know, basically prisoners

18   keeping the doors and windows shut all the time, relying on

19   our medical-grade air fresheners just to, you know, live.

20   Q    Mr. Howse, you said "air fresheners."  Did you mean air

21   filters?

22   A    I did.  I misspoke.  Yes.  They're air filters.

23   Q    Thank you for that.

24        I have no other questions, Mr. Howse.

25        THE COURT:  Thank you.

                          HOWSE - RECROSS                    184

1              Any recross?

2              MR. NEUMAN:  Very briefly, Your Honor.

3              THE COURT:  Thank you.

4                      RECROSS-EXAMINATION

5   BY MR. NEUMAN:

6   Q    Mr. Howse, your inability to -- or your -- the fact that

7   the odors are causing you to stay inside, as you just

8   testified -- you testified under oath in 2021 that the odors

9   were causing you to stay inside; right?  At the AQMD hearing?

10  A    Correct.

11  Q    And the fact that it is affecting your quality of life

12  -- you testified to the same thing in August 2021 under oath.

13  Do you recall that?

14  A    Correct.

15  Q    And the effect on your ability to make a living -- you

16  said the same thing in 2021; right?

17  A    Correct.

18             MR. NEUMAN:  Nothing further.

19             THE COURT:  Thank you.  May the witness be excused.

20             MS. RIGGS:  Yes, Your Honor.

21             MR. NEUMAN:  Yes.  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             Okay, Mr. Howse.  Thank you for coming in.  It's

24  rare that I get to see the name that's on the actual

25  pleadings; so it's a pleasure to meet you.  Welcome to my

185

1    courtroom.

2              THE WITNESS:  Likewise.

3              THE COURT:  If you wouldn't mind just throwing away

4    the microphone cover and the little package that it came in.

5    There's a trashcan right to your left.

6              THE WITNESS:  (Inaudible.)

7              THE COURT:  You can leave it there.  Thank you.

8    There's a trashcan to your left.  Oh, careful there.

9              Okay.  Thank you.

10             And thank you, Counsel, for coming in as well.

11             Let me ask the plaintiffs to call their next

12    witness.

13             MS. RIGGS:  Your Honor, we call Mark de Bie.

14             THE COURT:  Thank you.

15             MS. FOX:  Your Honor, if I might.  I just wanted to

16    let the Court know I think it would be important to make sure

17    that we can hear Mr. de Bie and he can hear counsel.  He's

18    expressed some concerns in that regard to me.

19             THE COURT:  Okay.  I'm not sure that I know what

20    you're talking about.

21             (Pause.)

22             THE COURT:  I'm not sure what -- I know what you're

23    talking about.

24             MS. FOX:  Your Honor, I just wanted to make sure --

25    the witness has said he has some hearing issues.  So I just

233

186

1    want to make sure that the microphones are sufficiently loud

2    so that everyone can hear the questions that we have.

3              THE COURT:  Okay.  The microphones are loud.  The

4    problem is counsel not speaking into them, like just now.

5              MS. FOX:  So noted, Your Honor.

6              THE COURT:  Okay.  Thank you.

7              THE CLERK:  Please raise your right hand.

8               MARK DE BIE, PLAINTIFFS' WITNESS, SWORN

9              THE CLERK:  And watch your step.

10             THE COURT:  Just watch your step as you're coming

11   up the stairs.  They're a little funny.  Okay.  Thank you.

12             So we've got the microphone covers to your left --

13   the microphone covers.  Yes.  Thank you.  So if you put one

14   of those on the microphone, and then once you've done so, if

15   you could state and spell your name for the record.

16             Are you able to hear me fine?

17             THE WITNESS:  Yep.

18             THE COURT:  Yes?  Okay.

19             THE WITNESS:  It's a bit of origami.

20             THE COURT:  Yes, it is.

21             Okay.  Wonderful.  If you could state and spell

22   your name for the record, that would be greatly appreciated.

23             THE WITNESS:  Thank you, Your Honor.  Mark de Bie,

24   M-a-r-k d-e-B-i-e.

25             THE COURT:  Thank you.  And, Mr. de Bie, I would

234

Case 2:24-cv-10819-MEMF-MAR    Document 152-1    Filed 08/14/25    Page 198 of 281
Page ID #:17562

DE BIE - CROSS                        187

 1   just ask that you make sure that you're speaking into the

 2   microphone so that we can capture your testimony on our

 3   recording, and I'll remind counsel to make sure they're

 4   speaking into the microphones as well.  And, Mr. de Bie,

 5   please let counsel completely finish the question before you

 6   start to answer it.

 7           And if you hear anybody say "objection," then just

 8   stop speaking until I tell you how to proceed, and obviously,

 9   if you're having trouble hearing counsel, you will let us

10   know, and I'll remind them to speak into the microphone.

11   Okay.  Thank you.

12           Please proceed, Counsel.

13           MR. MANZO:  Thank you, Your Honor.

14           Good afternoon, sir.

15           THE WITNESS:  Good afternoon.

16                   CROSS-EXAMINATION

17   BY MR. MANZO:

18   Q    Sir, you're not an engineer; correct?

19   A    That is correct.

20   Q    And you've never worked at a landfill?

21   A    I have inspected landfills, but I've not worked at them.

22   Q    You never operated a landfill, I should say?

23   A    Could you repeat that?

24   Q    You've never operated a landfill; correct?

25   A    I have not operated a landfill.

DE BIE - CROSS                                              188

1  Q    And you don't have any specific training or

2  certifications in ETLF management?

3  A    I do not.

4  Q    Is it fair to say that your declaration relies on the

5  technical analysis of other people?

6  A    Yes.

7  Q    Who would that be?

8  A    Todd Thalhamer, Tim Stark, and Wes Mindermann.

9  Q    So if I asked you a series of questions about the

10 analysis of those individuals, would you be able to answer

11 technical issues that they presented?

12        MS. FOX:  Objection.  Lacks foundation.  Calls for

13 speculation.

14        THE COURT:  Sustained.  Calls for speculation.

15 BY MR. MANZO:

16 Q    Okay.  Why does Mr. Thalhamer use 145 degrees as the

17 temperature threshold in his analysis?

18 A    I believe the temperature 145 degrees Fahrenheit is one

19 of the temperatures he uses in his analysis.

20 Q    And would you be able to answer questions about how he

21 incorporates 145 degree temperature threshold into his sizing

22 of the reaction area?

23 A    I wouldn't be able to provide a technical assessment of

24 why he does that.

25 Q    Okay.  It's fair to say you're not an expert in landfill

DE BIE - CROSS                                    189

1   management or ETLFs; correct?

2   A     Correct.

3   Q     Okay.  I'm going to refer now to your declaration, which

4   is marked as Exhibit 105.

5          THE COURT:  Any objection to the declaration being

6   admitted at this time?

7          MS. FOX:  No objection.

8          MR. MANZO:  And can we turn to --

9          THE COURT:  Okay.  So 105 is admitted.  Thank you.

10     (Defendants' Exhibit 105 is admitted into evidence.)

11         MR. MANZO:  Sorry, Your Honor.

12  BY MR. MANZO:

13  Q    Can we turn to paragraph 23, which is on page 6.

14         Sir, do you recognize paragraph 23 of your

15  declaration?

16  A    I do.

17  Q    And I'll just read it briefly here, the first sentence

18  (reading): Specific causes of SET events vary and are

19  generally categorized as sources of heat generation which can

20  be caused by biological decomposition or reactions associated

21  with the presence of large amounts of specific wastes -- e.g,

22  biosolids, industrial waste, et cetera -- previously taken at

23  facilities.

24         Is that correct?

25  A    You've read it correctly, yes.

DE BIE - CROSS                                190

1   Q    What's the source of your knowledge on this issue?

2   A    The source is from my technical experts and additional

3   reading that I've undertaken to better understand this type

4   of issue.

5   Q    Are you aware that Chiquita has never accepted

6   biosolids?

7   A    I'm not aware of that.

8   Q    And are you aware that Chiquita has never accepted

9   industrial waste?

10  A    I am not aware of that.

11  Q    Can we turn to paragraph 42 now, which is on pages 9 and

12  10.  And the bottom of page 9 just says (reading): The

13  March 28, 2025, CalRecycle report made several findings,

14  including that the landfill is experiencing the following

15  conditions.

16       Then can we go to the next page.  (Reading)

17  Significant emissions and odors that have impacted the

18  community of Val Verde and the surrounding areas from '23 to

19  '25, the report notes that, according to the South Coast

20  AQMD, the landfill has received a total of 1,493 complaints

21  and 16 notices of violation in 2025.

22       Do you see that?

23  A    I do.

24  Q    Did you compare the complaints and NOVs from 2025

25  against '23 and '24?

DE BIE - CROSS                                191

```
 1   A    I did not.

 2   Q    Are you aware that complaints have dropped 70 percent in

 3   2025?

 4            (Pause.)

 5            THE WITNESS:  I'm struggling to answer that because

 6   2025 is not complete as yet --

 7   BY MR. MANZO:

 8   Q    Well month over month.

 9   A    -- so it would be hard to make a comparison between two

10   full years and a partial year.

11   Q    Let me be more precise.  Are you aware that complaints

12   month over month have dropped 70 percent?

13            MS. FOX:  Objection.  Vague as to time.

14            THE COURT:  Sustained.

15   BY MR. MANZO:

16   Q    Are you aware that complaints from 2025 compared to 2024

17   month over month have dropped 70 percent?

18   A    I am not.

19   Q    If complaints have dropped, is it fair to say that

20   mitigation efforts that have come online in the last year are

21   working?

22            MS. FOX:  Objection.  Lacks foundation.

23            THE COURT:  I'll let counsel attempt to lay the

24   foundation for this question.

25   BY MR. MANZO:
```

DE BIE - CROSS                              192

1   Q    Are you aware of mitigation efforts at Chiquita in the

2   last -- that have come online in the last year?

3   A    Yes.

4   Q    And that includes a cover?

5   A    It does.

6   Q    Additional gas wells?

7   A    Yes.

8   Q    And a number of other issues, like additional leachate

9   extraction?

10  A    Yes.

11  Q    Is it fair to say that those mitigation efforts -- if

12  you know the answer -- have caused a drop in odors in the

13  last year?

14          MS. FOX:  Objection.  Lacks foundation.

15          THE COURT:  Overruled.

16          You may answer if you know.

17          THE WITNESS:  I do not know.

18  BY MR. MANZO:

19  Q    Have you reviewed the -- are you familiar with the AQMD

20  flux chamber -- with the flux chamber analysis that was

21  ordered by AQMD?

22  A    No.

23  Q    It's not something you reviewed prior to your testimony

24  here today?

25  A    I did not review the specifics on their sampling.

DE BIE - REDIRECT                          193

1   Q    And so you don't have any current information on

2   emissions at the landfill?

3   A    I understand that they have undertaken such sampling,

4   but I don't have details.

5            MR. MANZO:  Thank you.  No further questions.

6            THE COURT:  Thank you.

7            Any redirect?

8            MS. FOX:  Yes, Your Honor.

9            Oh, and, Your Honor, I need to introduce counsel

10  for CalRecycle.

11           THE COURT:  Okay.

12           BENJAMIN GRIMES:  Benjamin Grimes, senior staff

13  counsel, CalRecycle.

14           THE COURT:  Thank you.

15           MS. FOX:  Good afternoon, Mr. de Bie.

16           THE WITNESS:  Good afternoon.

17                   REDIRECT EXAMINATION

18  BY MS. FOX:

19  Q    Can you explain, sir, how CalRecycle works with the LEA

20  here as it relates to the Chiquita Canyon Landfill?

21  A    I'll try to be brief on that.  The LEA, as other LEAs

22  have in the past, requested our guidance and technical

23  assistance in addressing the evolving situation at Chiquita,

24  and so we've been providing that guidance and technical

25  assistance per their request.

DE BIE - REDIRECT                           194

 1  Q    And "LEA" stands for what, sir?

 2  A    Local Enforcement Agency.

 3  Q    So is it correct to characterize CalRecycle as offering

 4  the technical expertise, in this instance, to LEA?

 5  A    Per their request we have been providing that

 6  assistance, yes.

 7  Q    And is CalRecycle a department of CalEPA?

 8  A    It is.

 9  Q    And what is your current role at CalRecycle?

10  A    I am the deputy director for the Waste Permitting,

11  Compliance, Mitigation Division.

12  Q    How long, sir, have you worked in this area relating to

13  the regulation of landfills?

14  A    34-plus years.

15  Q    And how many folks currently at CalRecycle report to

16  you?

17  A    Approximately 220, not directly but indirectly.

18  Q    Does that include Todd Thalhamer?

19  A    Todd reports to Wes Mindermann, who reports to me.

20  Q    What is Todd --

21            THE COURT:  And I'm so sorry.  Can you spell

22  Mindermann for the record?

23            THE WITNESS:  M-i-n-d-e-r-m-a-n-n.

24            THE COURT:  Thank you.

25  BY MS. FOX:

DE BIE - REDIRECT                          195

1  Q   And Todd Thalhamer -- do you know what his title is,
2  Mr. de Bie?
3  A   He's a senior waste management engineer.
4  Q   Do you have any prior working years -- let me rephrase
5  that.
6           How long have you worked in any capacity with
7  Mr. Thalhamer?
8  A   He's been within my reporting structure for over
9  15 years.  Prior to that we were working in separate programs
10 but in the same division.
11 Q   Do you have any impressions, based on your 15 years of
12 working with Mr. Thalhamer, about the quality of his work
13 product?
14 A   I've never had an issue with the quality of his work.
15 Q   Did you author the technical analysis that is provided
16 by CalRecycle?
17 A   Could you repeat that?
18 Q   The technical analysis that CalRecycle provides to the
19 LEA, did you personally author that?
20 A   I'm struggling with the word "offer."
21 Q   I'm sorry.  I -- it might be my Midwestern accent.  I
22 meant "author," like a-u-t-h-o-r.
23 A   Author.  Thank you for the clarification.
24           I did not personally author the technical guidance.
25 I acted as a reviewer, if that's the question.

243

DE BIE - REDIRECT                              196

1  Q    And that was actually my next question, Mr. de Bie.  Did

2  you review the technical analysis that was produced here by

3  Mr. Todd Thalhamer?

4  A    Yes.  After his supervisor reviewed it, then it came to

5  me for review and final approval.

6  Q    And you signed off on that analysis; is that correct,

7  sir?

8  A    I signed off on the analysis.  I did not sign the

9  guidance.  That was left to the engineer, Todd Thalhamer.

10 Q    Do you happen to recall, Mr. de Bie, when CalRecycle

11 received the original request to provide technical assistance

12 here related to the underground elevated temperature event at

13 the Chiquita Canyon Landfill?

14 A    It was August of 2023.

15 Q    Did CalRecycle confirm what was causing the odors that

16 the neighboring communities were experiencing?

17 A    My staff, Todd Thalhamer and others, determined that

18 there was a reaction that was responsible for odors and other

19 issues at the landfill.

20 Q    Dr. de Bie -- I'm sorry.  Mr. de Bie --

21        I'd like to place before the witness Exhibit 38.

22 I'm not sure if our technical capabilities are working here

23 today.  It's Exhibit 38, Document 62, ID 2672.

24        THE COURT:  Okay.  I'm going to try to pull it up

25 on my screen, and if not, we'll have him look in the binder.

244

DE BIE - REDIRECT                          197

1            And for the record, the Court will need to be in

2   recess a couple minutes before 2:30 for about 30 minutes.

3            MS. FOX:  I will need to provide the binder.

4   Apparently we're going old-school hard copies, Your Honor.

5            THE COURT:  Okay.  So, Mr. de Bie, I would ask you

6   to turn to the binders.  I think it would be Volume 4?

7            And the exhibit is 38; correct?

8            MS. FOX:  Yes.  And it does look, Your Honor, like

9   it is in Exhibit 4.

10           THE COURT:  In Volume 4.  Okay.

11           Okay.  Please proceed, Counsel.

12  BY MS. FOX:

13  Q    Can you identify, Mr. de Bie, what this is found at

14  Exhibit 38?

15           (Pause.)

16           THE WITNESS:  Sorry for the delay.  I was trying to

17  find the signature of this document.  It is a letter that

18  Todd Thalhamer sent to the Local Enforcement Agency on

19  October 16, 2023.

20  BY MS. FOX:

21  Q    And did you review this letter before it was sent to the

22  Local Enforcement Agency by CalRecycle?

23  A    I did.

24  Q    And in your declaration at paragraph 20 -- and I'm not

25  sure if that -- if you brought that with you today, sir, but

245

DE BIE - REDIRECT                           198

1   we have also added that into evidence.   And I apologize.   We

2   may need to get another binder before you.

3   A    I did bring a copy and left it with my counsel.

4   Q    All right.   Well, I think I can find it for you here,

5   sir.  It looks to be Exhibit 105, which is in Volume 10.

6           THE COURT:  Are you going to need him to go back to

7   Exhibit 38?

8           MS. FOX:  I do not, Your Honor.

9           THE COURT:  Okay.  Any objection to Exhibit 38

10  being admitted?

11          MR. MANZO:  No, Your Honor.

12          THE COURT:  Exhibit 38 is admitted.

13      (Plaintiffs' Exhibit 38 is admitted into evidence.)

14          THE WITNESS:  Sorry.  What tab was it?

15  BY MS. FOX:

16  Q    It is Tab 105, Exhibit 105, Volume 10.  And when you get

17  there, sir, if you would go to numbered paragraph 20, which

18  is on page 5 there.

19  A    I have it open.

20  Q    All right.  Here in your declaration you say (reading):

21  The October 16, 2023, technical analysis by CalRecycle was

22  the first time that the heat smoldering event was formally

23  confirmed as a major source of the additional odors that were

24  being experienced by the neighboring communities.

25           Do you see that, sir?

246

DE BIE - REDIRECT                          199

1   A    I do.

2   Q    Is that correct, sir?

3   A    Yes.

4   Q    Is that statement correct?

5   A    Yes.

6   Q    What terminology does CalRecycle use to describe the

7   elevated temperature that's occurring at the Chiquita Canyon

8   Landfill, Mr. de Bie?

9   A    We are using "subsurface elevated temperature."

10  Q    And, Mr. de Bie, has CalRecycle undertaken any more

11  recent technical review of the landfill and this subsurface

12  elevated temperature issue since the October 16, 2023,

13  analysis?

14  A    We have.  We've continued to receive requests from the

15  Local Enforcement Agency for review of technical information

16  and provided them our technical assistance relative to their

17  requests.

18  Q    And if you would look, please, sir, again at your

19  exhibit -- I'm sorry -- your declaration, which is

20  Exhibit 105, if you could go, please, sir, to numbered

21  paragraph 39, which is on page 9 -- and make that numbered

22  paragraph 49, Mr. de Bie.

23  A    I have it open.

24  Q    And is this referring again to an analysis that was

25  provided by CalRecycle in March of this year, 2025, authored

DE BIE - REDIRECT                                200

1  by Todd Thalhamer?

2  A    It is.

3  Q    And is this a report that you reviewed before it was

4  issued to the LEA?

5  A    Yes.

6  Q    And then just so the record is clear, your declaration

7  refers to Exhibit 42.

8           With the Court's indulgence, I think that takes us

9  back to Volume 10.  I need to double-check.

10          THE COURT:  We're in Volume 10 right now.

11  Exhibit 4?  I mean -- Volume 4, you mean?

12          MS. FOX:  One moment, Your Honor.

13          THE COURT:  Okay.

14          MS. FOX:  It ends up being in Volume 4 -- I

15  misspoke -- Exhibit 42.

16          THE COURT:  Is now a good time for a break?

17          MS. FOX:  Yes, it would be, Your Honor.

18          THE COURT:  Okay.  Okay.  Court stands in recess

19  for about 30 minutes.

20          And, Mr. de Bie, you are excused from the witness

21  stand for this recess.

22          Parties are excused.

23      (Recess from 2:27 p.m. to 3:12 p.m.)

24  ///

25  ///

DE BIE - REDIRECT                                            201

```
 1                          AFTER RECESS
 2          (Call to Order of the Court.)
 3              THE COURT:  Okay.  We are back on the record.
 4    Thank you for your patience, everyone.
 5              Mr. de Bie, you are still under oath.
 6              And please proceed, Counsel.
 7              MS. FOX:  Thank you, Your Honor.
 8                   REDIRECT EXAMINATION (RESUMED)
 9    BY MS. FOX:
10    Q    Mr. de Bie, when we broke, we were looking at Exhibit 42
11    that is in Volume 4.  Do you have that before you, sir?
12    A    Yes.  Yes.
13    Q    And I think you identified that as the CalRecycle
14    technical review of March 28, 2025; correct?
15    A    Correct.
16    Q    And you reviewed this analysis before it was sent out;
17    is that correct?
18    A    Yes.
19    Q    And in this analysis, sir, were there any conclusions as
20    to actions that needed to be taken by Chiquita Canyon
21    Landfill as it related to the underground event?
22    A    There were recommendations to the Local Enforcement
23    Agency on what they should consider requiring of the operator
24    of Chiquita Canyon Landfill, yes.
25    Q    In your declaration that you filed, sir -- and we
```

249

DE BIE - REDIRECT                                202

1   referred to that as Exhibit 105, and I think you told us

2   before the break that your counsel had your copy of that.  Do

3   you have your copy before you now?

4   A    I do.

5   Q    And I just provided that so that we don't have to toggle

6   between these large notebooks.

7           If you could go in your declaration, please,

8   Mr. de Bie --

9           THE COURT:  And just so I can confirm for the

10  record.

11          You don't have any notes or anything on the

12  declaration?  No?

13          MR. GRIMES:  None.

14          THE COURT:  Okay.  Proceed, Counsel.

15          MS. FOX:  Thank you, Your Honor.

16  BY MS. FOX:

17  Q    And if you would, please, Mr. di Bie, go to your

18  paragraph 41 found on page 9 of your exhibit.

19  A    I have it open.

20  Q    Can you read the first sentence of paragraph 1 to us,

21  sir?

22  A    (Reading) As described in the March 28, 2025, CalRecycle

23  report, contrary to recent --

24          THE COURT:  I'm so sorry.  I have lost where we

25  are.  Are we in -- we're not in his declaration?

DE BIE - REDIRECT                    203

1          MS. FOX:  We are in his declaration, Your Honor.

2          THE COURT:  In which paragraph?

3          MS. FOX:  We are on paragraph 41.

4          THE COURT:  41.

5          MS. FOX:  It's on -- I'm sorry -- page 9 of his

6    declaration.

7          THE COURT:  I gotcha.

8          Okay.  Please go ahead.

9          THE WITNESS:  And you wanted me to read the whole

10   paragraph; correct?

11   BY MS. FOX:

12   Q    Just the first sentence.

13   A    First sentence.  Thank you.

14          (Reading) As described in the March 28, 2025,

15   CalRecycle report, contrary to recent public statements that

16   landfill operators have made while announcing termination of

17   their Community Relief Program, the data show that the SET

18   event is not under control.

19   Q    And what support do you have, sir, for the statement

20   made in your declaration here that the underground elevated

21   temperature event is not under control?

22   A    Many of them are outlined in paragraph 42, and they

23   include the continuing significant emissions of odors, the

24   fact that the interim cover continues to experience

25   significant damage from settlement.  There are continued

DE BIE - REDIRECT                              204

1   leachate breaks.  There continue to be signs of slope

2   instability, and there are evident fissures in the cover.

3   The fact that leachate continues to be extracted in very high

4   rates per day and that the portions of the leachate are now

5   and have been showing hazardous levels for benzene.

6   Q    And these statements regarding the conditions that

7   CalRecycle was noting at the Chiquita Canyon Landfill at or

8   about March 28, 2025, are all contained in Exhibit 42, the

9   CalRecycle analysis; correct?

10  A    That is correct.

11  Q    And as well, sir, did CalRecycle suggest any conditions

12  that should move forward in order to deal with these noted

13  and significant issues?

14  A    Again, we had made recommendations to the LEA of what

15  should be taken to address the situation, yes.

16  Q    And can you take a look, please, sir, at Exhibit 42,

17  page 80, which is ID 2729.  So that's the Volume 4,

18  Exhibit 42 at page 80 that's found in the center on the

19  bottom of that document, sir.

20  A    Yes, I have it open.

21  Q    And can you tell us what the first recommendation was

22  from CalRecycle?

23  A    That's the first recommendation on page 80?

24  Q    Correct.  Down at the bottom of the page.

25  A    It was to submit a barrier plan -- or it indicated that

DE BIE - REDIRECT                                      205

 1    the submitted barrier plan does not contain or control the

 2    reaction and there is a -- is no proposed barrier to prevent

 3    the reaction from consuming the entire facility.

 4    Q    So am I correct in understanding that currently Cal --

 5    I'm sorry -- currently the Chiquita Canyon Landfill has not

 6    added a barrier to the landfill?

 7    A    Not to the specifications that we had recommended to the

 8    Local Enforcement Agency.

 9    Q    In your declaration as well, Mr. de Bie, you say that

10    the underground event has expanded to 90 acres.  Can you tell

11    us what support you have, sir, for that?

12    A    Data supplied to us through the LEA from Chiquita Canyon

13    Landfill indicating temperature monitoring probes that are

14    increasing in temperature in areas that hadn't seen increases

15    in temperature adjacent or at some distance from what had

16    been previously defined as the reaction area; increased

17    settlement -- rapid settlement, again, outside of what had

18    been previously defined as the reaction area, as well as

19    within the reaction area; fissures in the cover indicating

20    instability, more than likely, resulting from oxidation of

21    waste under the cover; the increase and continuing increase

22    in leachate being removed from the landfill indicating an

23    increase in the size -- volume, if you will, of the reaction.

24    I'll stop there.

25    Q    Thank you, Dr. -- Mr. de Bie.

DE BIE - RECROSS                              206

 1              One moment, please.

 2              Your Honor, nothing further.

 3              THE COURT:  Thank you.

 4              Any recross?

 5              MR. MANZO:  Yes, Your Honor.  Thank you.

 6              Good afternoon, sir.

 7              THE WITNESS:  Good afternoon.

 8                      RECROSS-EXAMINATION

 9  BY MR. MANZO:

10  Q    The data you spoke of -- did you personally review the

11  data?

12  A    I had seen --

13              THE COURT:  And sorry.  Just so the Court is clear,

14  the data he just spoke about in his last set of questions

15  with counsel?

16              MR. MANZO:  Correct, Your Honor.

17              THE COURT:  Okay.

18              THE WITNESS:  Well, I don't think I was referring

19  to data in what I just shared.  I was sharing observations

20  that resulted from the analysis of data.

21  BY MR. MANZO:

22  Q    Okay.  But you didn't look at the data yourself?

23  A    I have looked at the data.

24  Q    So let me just get -- make sure I understand it right.

25  You have looked at the underlying data?

DE BIE - RECROSS                                  207

1  A    I have looked at the underlying data.

2  Q    And you're able to personally draw conclusions, or are

3  you relying on others to draw conclusions?

4  A    I rely on others to draw those conclusions.

5  Q    And is that Mr. Todd Thalhamer?

6  A    It is.

7  Q    He is your direct report; correct?

8  A    No.

9  Q    He is your report?

10 A    Yes.

11 Q    Are you aware that Mr. Thalhamer does not have a

12 doctorate in engineering?

13 A    I believe he does not.

14 Q    Are you aware that he's not a member of the National

15 Academy of Sciences?

16 A    I have no knowledge on that.

17 Q    How many times do you believe he's been to the landfill?

18 A    To "a" landfill?

19 Q    No.  To Chiquita Canyon.

20 A    I know from what he's reported is at least twice.

21 Q    And are you aware that the last time he was at

22 Chiquita Canyon was November 2, 2024?

23 A    I'm not sure of the exact date, but that's approximately

24 my recollection, yes.

25 Q    And how many times have you been to the landfill, sir?

DE BIE - RECROSS                                    208

1    A    Chiquita Landfill?

2    Q    Correct.

3    A    Probably three times.

4    Q    Since November 2, 2024?

5    A    No.

6    Q    As Mr. Thalhamer's boss, although not a direct report,

7    have you done anything to prevent him from testifying today?

8    A    No.

9    Q    I want to turn briefly to Defense Exhibit 42 -- or no.

10   Sorry.  Plaintiff Exhibit 42 and the bottom two paragraphs of

11   page 4.

12          And actually can you go up to the top?

13   BY MR. MANZO:

14   Q    Do you recognize this letter as the letter from

15   Mr. Thalhamer to Karen Gork on March 28, 2025?

16   A    Yes.

17   Q    Okay.  Now going down to the bottom two paragraphs, can

18   you highlight the second part -- the second sentence of the

19   first paragraph, "A proper root cause"?  So, sir, do you --

20   I'm going to read these two sentences here.

21          (Reading) A proper root cause analysis would show

22   that the aforementioned scenario is the probable cause of the

23   SET event.  A root cause analysis for a SET event must be

24   based on the scientific investigation method.  The study

25   should employ a logic -- logical, step-by-step process that

DE BIE - RECROSS                              209

1   considers all possible mechanisms and utilizes measures --

2   measured parameters to eliminate mechanisms to determine the

3   cause or causes of the SET event.

4           Do you recognize that sentence?

5   A    I do.

6   Q    It's fair to say that there's been no step-by-step

7   evaluation so far?

8   A    Yes.

9   Q    And there's been no root cause analysis of the SET

10  event?

11  A    Correct.

12  Q    And there's been no finding from CalRecycle or any other

13  regulator that Chiquita has caused the SET event?

14  A    That Chiquita caused the SET event?

15  Q    Correct.

16  A    "Chiquita" meaning a landfill?

17  Q    The current owner of the landfill.

18  A    Thank you for clarifying.

19          No, no one has pursued a cause analysis even after

20  being asked several times.

21          MR. MANZO:  No further questions.

22          THE COURT:  Thank you.  May the witness be excused?

23          MS. FOX:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MS. FOX:  And if -- it might be appropriate to

210

 1  enter Exhibits, I believe, 42 and -- 42.

 2              THE COURT:  Thank you.

 3              Any objection to 42 being admitted?

 4              MR. MANZO:  No, Your Honor.

 5              THE COURT:  Okay.  42 is admitted.

 6       (Plaintiffs' Exhibit 42 is admitted into evidence.)

 7              THE COURT:  Thank you, Mr. de Bie.  I would just

 8  ask -- oh, thank you for replacing the binders.  If you could

 9  just take off the microphone cover and throw it in the trash,

10  and you're free to go.  We appreciate you.  Thank you.

11              Okay.  Thank you, Counsel, as well.

12              And let me ask plaintiff to call the next witness.

13              MS. FOX:  Thank you, Your Honor.  The plaintiffs

14  call Dr. Harold Campbell.

15              THE COURT:  Thank you.

16              MS. BRILLAULT:  Your Honor, I have exhibit binders

17  if it would be --

18              THE CLERK:  Please raise your right hand.

19          HAROLD CAMPBELL, IV, PLAINTIFF'S WITNESS, SWORN

20              THE CLERK:  Please be seated, and watch your step.

21              (Inaudible) microphone cover.

22              Please state and spell your full name for the

23  record, and please speak clearly into the microphone.

24              THE WITNESS:  It's Harold Campbell, H-a-r-o-l-d

25  C-a-m-p-b-e-l-l.

258

211

```
 1              THE COURT:  Okay.  Good afternoon, and thank you
 2   for coming in.  Your testimony is being recorded; so we just
 3   need you to speak loudly and audibly into the microphone.  As
 4   the attorneys are asking you questions, please let them
 5   completely finish their question before you start to answer
 6   the question.  If you hear anybody say "objection," then just
 7   stop speaking until I tell you how to proceed.  Understood?
 8              THE WITNESS:  Yes.
 9              THE COURT:  Okay.  And if I could ask the parties
10   if there's any objection to admitting at this time
11   Exhibit 107, which I understand to be the declaration of
12   Mr. Campbell?
13              MS. FOX:  No objection.
14              MS. BRILLAULT:  No objection, Your Honor.
15              THE COURT:  Okay.  107 is admitted at this time.
16        (Defendants' Exhibit 107 is admitted into evidence.)
17              THE COURT:  And I understand we have separate
18   binders.  I'll ask the clerk to pass those to me, and counsel
19   will let us -- I'll hand one to the witness.
20              So just leave the binder closed for now and counsel
21   will let you know if need to look at anything in there.
22              Please proceed.
23              MS. BRILLAULT:  Thank you, Your Honor.
24              Good afternoon, Dr. Campbell.
25   ///
```

CAMPBELL - CROSS                                     212

```
 1                       CROSS-EXAMINATION
 2   BY MS. BRILLAULT:
 3   Q    You're the chief data officer at the Department of
 4   Public Health for L.A. County?
 5   A    Yes.
 6   Q    Your degree is in political science?
 7   A    Yes.
 8   Q    You're not an epidemiologist?
 9   A    No.
10   Q    You're not a toxicologist?
11   A    No.
12   Q    You're not an odor scientist?
13   A    No.
14   Q    You're not an industrial hygienist?
15   A    No.
16   Q    You don't have degrees in any of those fields?
17   A    No.
18   Q    You don't have any expertise in human health risk
19   assessments?
20   A    No.
21   Q    You don't have any expertise in health impacts from
22   environmental exposures due to chemicals or odorants?
23   A    No.
24   Q    As a chief data officer for the Department of Public
25   Health, would you agree that, when you're analyzing data,
```

CAMPBELL - CROSS                         213

1    your analysis is only as good as the underlying data?

2    A    Yes.

3    Q    So if the underlying data is not reliable, then the

4    conclusions based on that data not going to be reliable

5    either?

6    A    Yes.

7    Q    Okay.  Now you submitted a declaration as part of this

8    motion for preliminary injunction hearing.  Do you recall

9    that?

10   A    Yes, I do.

11   Q    Okay.  And we can have you open to Exhibit 107.

12           THE COURT:  So you can look in the binder, Tab 107.

13   BY MS. BRILLAULT:

14   Q    In paragraph 4 you state that you're familiar with the

15   Chiquita Canyon Landfill.  Have you ever been to the Chiquita

16   Canyon Landfill before?

17   A    No.

18   Q    And so your statement that you are informed and believe

19   that the landfill was experiencing a subsurface chemical

20   reaction that was releasing noxious odors, that's based on

21   information others told you, not your personal understanding

22   and knowledge?

23   A    Yes.

24   Q    For purposes of the declaration, you provided an

25   analysis of two types of information, the Department of

CAMPBELL - CROSS                      214

1   Public Health survey responses and AQM [sic] odor complaints;

2   is that accurate?

3   A    Yes.

4   Q    You helped prepare the Department of Public Health

5   survey?

6   A    Yes.

7   Q    How many surveys have you prepared to evaluate odor in

8   -- odor impacts in a community prior to this survey?

9   A    This is the first.

10  Q    How many surveys have you prepared to evaluate impacts

11  in the community regardless of the source?  Or the -- sorry.

12  The type of impacts.  Let me phrase it that way.

13  A    Don't know the exact number, but this wasn't the first

14  time.

15  Q    But it was the first one for evaluating odor impacts?

16  A    Yes.

17  Q    The survey was available online?

18  A    Yes.

19  Q    And it was made available to the public 24 hours a day,

20  seven days a week?

21  A    Yes.

22  Q    And that was beginning in October 2024?

23  A    Yes.

24  Q    And there's no restrictions on who could take the

25  survey?  As long as they went to the website, they could take

CAMPBELL - CROSS                              215

1   the survey?

2   A      Correct.

3   Q      And there are no questions in the survey to confirm that

4   the respondent was a resident or worker in the community near

5   the landfill; is that accurate?

6   A      Yes.

7   Q      Participants aren't asked for their home or work

8   address?

9   A      No.

10  Q      And the respondent doesn't have to verify that they're a

11  community member?

12  A      Correct.

13  Q      There's no questions allowing the respondent to identify

14  their name?

15  A      No.

16  Q      So it's an anonymous survey?

17  A      Yes.

18  Q      Okay.  And a respondent can fill out the survey as many

19  times as they want?

20  A      Yes.

21  Q      In fact, the survey instructions tell the person to

22  complete the survey whenever they experience an odor?

23  A      Yes.

24  Q      Based on the data of the survey responses, are you able

25  to identify how many times a specific individual filled out

CAMPBELL - CROSS                              216

1    the survey?

2    A    No.

3    Q    If we can go to Exhibit 4 in your binder.

4           (Counsel confers with trial tech.)

5    BY MS. BRILLAULT:

6    Q    This states (reading): The Chiquita Canyon Landfill

7    Incident Survey Flow.  Is this essentially a text of the

8    survey that was exported?

9    A    Yes.

10   Q    Okay.  So if we go to page -- sorry -- a few pages

11   ahead.

12           That one.

13   BY MS. BRILLAULT:

14   Q    That would be --

15           Scroll down.  No.  Yes.

16   BY MS. BRILLAULT:

17   Q    Page 4 of the document.

18           To the top.

19   BY MS. BRILLAULT:

20   Q    This is the introduction.  So this would be what the

21   survey respondent sees when they first enter the survey?

22   A    Yes.

23   Q    And here the introduction page tells the potential

24   survey takers that the landfill is causing unpleasant odors

25   in the community, that there's thousands of complaints, and

                    CAMPBELL - CROSS                     217

1   that odors can have effects on an individual's health?

2   A    Most of that is correct.  I don't know that we say there

3   has been "thousands" of complaints in the sense of the

4   survey, but.

5   Q    In the sentence beginning (reading): These include

6   unpleasant odors being released which have resulted in

7   thousands of complaints?

8   A    Yes.

9   Q    Okay.  Is that standard practice in surveys?  To tell

10  the respondent the purpose of the survey?

11  A    It is --

12          MS. FOX:  Objection.  Vague and ambiguous as to

13  "surveys."

14          THE COURT:  I'll ask counsel to rephrase.

15  BY MS. BRILLAULT:

16  Q    You said you've prepared surveys before?

17  A    Yes.

18  Q    Do you typically tell the survey respondents the purpose

19  of the survey before they take it?

20  A    Yes.

21  Q    So, in your mind, that's -- it's typical to tell the

22  individual that there's -- the reason behind the survey?

23  A    Yes.

24  Q    Okay.  Prior to entering the survey, the individual can

25  view a summary of the survey results from prior respondents?

CAMPBELL - CROSS                            218

1    A    Yes.

2    Q    And in fact, they can even download a copy of the

3    cumulative results to date before they enter the survey?

4    A    Yes.  As of the start of the month's results.

5    Q    Is it your opinion that it's standard practice to tell

6    respondents the prior survey responses before they take a

7    survey?

8            MS. FOX:  Objection.  Vague and ambiguous as to

9    "standard practice."

10           THE COURT:  I'll ask counsel to rephrase.

11   BY MS. BRILLAULT:

12   Q    In prior surveys have you told respondents the summary

13   of results from other survey respondents before that person

14   took the survey?

15           MS. FOX:  Objection.  Lacks foundation.

16           THE COURT:  I believe this question is about this

17   witness's experience with surveys?

18           MS. BRILLAULT:  Correct.

19           THE COURT:  Okay.

20           Can you answer the question, or you need it

21   repeated?

22           THE WITNESS:  In my --

23   BY MS. BRILLAULT:

24   Q    I can rephrase if it's helpful.

25   A    Yes, please.

CAMPBELL - CROSS                    219

1    Q    Okay.  You testified earlier you've prepared surveys

2    before.  In those surveys did you tell the respondents before

3    they took the survey what other people -- how other people

4    responded to that survey?

5    A    Not in all scenarios, but it has been something we've

6    done in public health to inform respondents of what is being

7    captured in surveys, yes.

8             MS. BRILLAULT:  Can we move to the next page,

9    please.

10   BY MS. BRILLAULT:

11   Q    Sorry.  So we'll just continue on into page -- so this

12   is -- yeah.  Sorry.

13             This would be the first question that respondent is

14   faced with to answer for the survey; correct?

15   A    Yes.

16   Q    Okay.  So the next page would be the first question that

17   asks about the actual odors, their symptoms when -- that

18   they're experiencing when they are exposed to odors?  Sorry

19   about that.

20             THE COURT:  I'm sorry.  Is the question -- what is

21   the question?  Is the question "What symptoms did you have

22   today?" the next question after "What is your date of birth?"

23   in the actual survey?

24             MS. BRILLAULT:  Yes.

25   BY MS. BRILLAULT:

267

CAMPBELL - CROSS                             220

1   Q    Is this an accurate reflection of the survey that's

2   online?

3   A    These are the exact questions that are in the electronic

4   survey.

5   Q    Great.  Here the survey is asking about a symptom that

6   the individual's experiencing while there's an odor; correct?

7   A    Yes.

8   Q    It doesn't ask the respondent to indicate whether they

9   believe the symptom was caused by that odor; correct?

10  A    Yes.

11  Q    And it doesn't ask the respondent to indicate whether

12  that symptom was preexisting to the odor experience; correct?

13  A    Yes.

14          THE COURT:  Can I interpose my own question?

15          MS. BRILLAULT:  You may.  Of course.

16          THE COURT:  Okay.  So when someone is filling out

17  the survey -- so looking at page 6, it starts with "Are you

18  filling out this survey for your" -- that's the -- literally

19  the first question they answer is "Are you filling out this

20  survey for yourself?"

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  And then they ask -- depending

23  on, I guess, the answer, then they are asked, "Are you

24  completing this for someone that lives with you?"; correct?

25          THE WITNESS:  Yes.

CAMPBELL - CROSS                          221

1           THE COURT:  Okay.  And then after that, they're

2   asked, "What is your date of birth?"  Yes?

3           THE WITNESS:  Yes.

4           THE COURT:  And then they go immediately to "What

5   symptoms did you have today when the odor was present?"

6           (Pause.)

7           THE COURT:  I'm asking because at the top of page 7

8   in, like, faint letters, there's -- it says "End of block

9   odor exposure information" and then "Start of block odor

10  impact."  So I don't know if there's some other block of

11  questions before odor impact.

12          THE WITNESS:  Yes.  There are -- there should be a

13  question that is a map that asks where the respondent was

14  located at the time they experienced the odor --

15          THE COURT:  Okay.

16          THE WITNESS:  -- that is not shown.

17          THE COURT:  Okay.

18          MS. BRILLAULT:  Your Honor, if you would indulge --

19          THE COURT:  Yes?

20          MS. BRILLAULT:  -- me I could --

21          THE COURT:  Yes.

22          MS. BRILLAULT:  -- we could lead him through the

23  online website, if that would be helpful, to see the order of

24  the questions.

25          THE COURT:  Sure.

CAMPBELL - CROSS                      222

1              MS. BRILLAULT:  Okay.  So if we go to his

2   declaration, Exhibit 107, in paragraph 5 he provides a link

3   to the survey.

4              THE COURT:  Okay.

5              MS. BRILLAULT:  Is that correct, Dr. Campbell?

6              THE WITNESS:  Yes.

7              MS. BRILLAULT:  Okay.  Paragraph 7 --

8              (Pause.)

9              THE COURT:  And so, Counsel, just for the sake of

10  the record, Exhibit 4 doesn't represent all the questions

11  that are on the actual online survey?

12             MS. BRILLAULT:  My understanding is that it does --

13             THE COURT:  Oh, okay.

14             MS. BRILLAULT:  -- and that's --

15             THE COURT:  We're going to find out.

16             MS. BRILLAULT:  -- I want to compare to the actual

17  online survey --

18             THE COURT:  Okay.  Got it.  Thank you.

19             MS. BRILLAULT:  -- to remove any questions.

20             As my trial tech is doing that, I can continue with

21  a question --

22             THE COURT:  Sure.

23             MS. BRILLAULT:  -- or two if that's okay?

24             THE COURT:  Yeah.  Sure.

25             MS. BRILLAULT:  Okay.

CAMPBELL - CROSS                         223

1   BY MS. BRILLAULT:

2   Q    Dr. Campbell, are you familiar with the primacy and

3   immediacy effects?

4   A    No.

5   Q    Do you understand that when someone hears or reads

6   something first or last that tends to be -- can stand out to

7   the person?

8   A    Yes.

9   Q    Okay.  When you were preparing the questions and the

10  response options for the survey, did you vary them as

11  different respondents would enter into the survey, or did

12  they stay in the same -- did the response options always stay

13  in the same order?

14  A    All respondents received the same questions in the same

15  order.

16  Q    Okay.  So if I went in five times --

17          THE COURT:  Are you -- I'm sorry.  Are you asking

18  about the questions or the answers?  Like headaches,

19  lightheaded, dizzy?  I'm --

20          MS. BRILLAULT:  The response options.  So the

21  answers.

22          THE COURT:  Okay.  I'm not sure that's the --

23          MS. BRILLAULT:  Okay.

24          THE COURT:  -- the question he was answering.

25  BY MS. BRILLAULT:

CAMPBELL - CROSS                           224

 1   Q    Dr. Campbell, if I went into the survey five different

 2   times and went to the question "What health symptoms am I

 3   reporting?" would the order of the response options always be

 4   the same?

 5   A    I'm not certain off the top of my head without looking

 6   at the survey.

 7   Q    Are you saying that your survey would vary the order of

 8   the response options that I would -- that a respondent would

 9   see?

10   A    It is an option that we can choose when building the

11   survey.  I am not confident whether that is or is not

12   activated for that specific question.

13   Q    Okay.  Thank you.

14        So I think we have the website up using the link

15   that was in your declaration, Dr. Campbell.  Is this your

16   understanding of what the first page of the survey looks like

17   when you get to the Department of Public Health website?

18   A    This is the website that is a link to the survey, not

19   the first page of the survey itself.

20   Q    Okay.  So if we scroll down, is the "Click Here to Take

21   the Survey," how you would enter the survey?

22   A    That is one option, yes.

23   Q    Okay.

24        THE COURT:  And -- well, we've got the data

25   scientist here; so he can tell us.  Are we going to now --

CAMPBELL - CROSS                              225

1   we're going to be creating a survey response that's going to

2   complicate the data?

3   BY MS. BRILLAULT:

4   Q   Well, that's a question.  I -- if I enter the survey

5   without filling out any responses, are we able to X out

6   without it being considered a response?

7   A   It will be recorded as a partial, in-progress response

8   that I can remove after the fact today, as needed, for it to

9   not be included with the rest of the data.

10          THE COURT:  And how are you going to identify this

11  particular survey response.

12          THE WITNESS:  It would be the date and the time

13  that the survey was started.

14          THE COURT:  Okay.  Okay.  It's 3:45.

15          Please proceed.

16          MS. BRILLAULT:  Thank you, Your Honor.  Good --

17  great question.

18  BY MS. BRILLAULT:

19  Q   All right.  So if we "Click Here to Take the Survey,"

20  this is the introduction page we were looking at on

21  Exhibit 4; correct?

22  A   Yes.

23  Q   Okay.  So it's telling the survey respondent what the

24  purpose of the survey is?

25  A   Yes.

CAMPBELL - CROSS                           226

1  Q    And then you would hit "Next Page"?

2  A    Yes.

3  Q    Again, same text that was in Exhibit 4.  It's recording

4  the experience on a particular day, and then respondent would

5  hit "Next Page"?

6  A    Yes.

7  Q    Okay.  So the first question is "Are you filling out the

8  survey for your response?"

9         You don't have to enter.

10 BY MS. BRILLAULT:

11 Q    We can go ahead and skip it.  Hit "Next Page."  It cues

12 it.  So the very first question regarding the actual odors --

13 impacts would be the symptoms; is that correct?

14 A    Yes.

15 Q    Okay.

16        THE COURT:  Okay.  Thank you, Counsel.

17 BY MS. BRILLAULT:

18 Q    If we click forward, since we're in the survey, to the

19 question regarding the type of odors the person is

20 experiencing -- after we get through some background

21 information -- sorry.  This is the map you were talking

22 about, Dr. Campbell?

23 A    Yes.

24 Q    Okay.  And this isn't asking the address of the

25 resident.  It's asking the individual -- the participant to

274

CAMPBELL - CROSS                        227

1   identify a location on a map where they experienced an odor?

2   A    Yes.

3   Q    Okay.  The --

4             THE COURT:  And --

5   BY MS. BRILLAULT:

6   Q    -- next question after the map asks --

7             THE COURT:  Sorry.  For the record.  So that's not

8   -- that map is not in Exhibit 4?

9             MS. BRILLAULT:  It should be, Your Honor.  I --

10  well, actually, now I might be confusing.

11            So if you look at page 10 of Exhibit 4 --

12            THE COURT:  Yes.

13            MS. BRILLAULT:  -- it says, "Location.  Where were

14  you today when you noticed the odor?" but it doesn't provide

15  the Google Map image.

16            THE COURT:  Okay.  Got it.  Okay.

17            Okay.  We're back at the website.

18  BY MS. BRILLAULT:

19  Q    Okay.  So after they identify a location that -- they're

20  asked to describe the type of odor, and there's ten options;

21  correct?

22  A    Yes.

23  Q    Okay.  And the question says, "Please select all that

24  apply."  So a respondent can fill in more than one type of

25  odor.  They can check two, three, five, ten boxes; correct?

CAMPBELL - CROSS                            228

1   A    Yes.

2   Q    Okay.  After that question, the next question is "How

3   long did the odor last?" and they have to identify the length

4   of the odor; correct?

5   A    Yes.

6   Q    How does the survey results identify the length of time

7   of the odor if the participant identifies more than one odor

8   type?

9   A    The question about odor type is intended to describe

10  what the odor smells like to them and is independent of the

11  duration question.

12  Q    So if the participant is identifying --

13          Can you go to the types?

14  BY MS. BRILLAULT:

15  Q    -- fragrant, putrid, earthy -- three different types of

16  odor -- and then identifies the length of time as

17  4 to 12 hours, you are unable to identify what type of odor

18  is lasting 4 to 12 hours; is that correct?

19  A    Correct.

20  Q    And the same would be for the next question where they

21  were asked the strength of the odor.  If they answered more

22  than one type of odor description, you would be unable to

23  identify what strength is applying to which odor description?

24  A    Yes.

25  Q    And again, the same question about how often they notice

CAMPBELL - CROSS                          229

1   the odor.  If they identify more than one type of odor, you

2   are unable to identify which frequency that odor -- you're

3   unable to identify the frequency that would apply to the odor

4   type; is that accurate?

5   A    Yes.

6   Q    Okay.  So I'd like to -- we can go to the Exhibit 5 that

7   was attached to your declaration, Dr. Campbell.  And these

8   are the survey -- like, summaries of the survey results;

9   correct?

10  A    Yes.

11  Q    Okay.  And they're cumulative results.  So it's from the

12  onset of the survey in October of 2024 through the date at

13  the top, which would be May 21, 2025?

14  A    Yes.

15  Q    And here it indicates the frequent -- the number of

16  responses over time; is that accurate?

17  A    Yes.

18  Q    So looking at the number of total responses, there's

19  1,246 as of May 21, 2025; is that correct?

20  A    Yes.

21  Q    And a hundred percent of them were -- a hundred percent

22  complete responses totaled 754; is that accurate?

23  A    Yes.

24  Q    Okay.  And that goes back to what you were saying before

25  is people don't have to submit -- respond to all of the

CAMPBELL - CROSS                              230

1   questions?

2   A     Correct.

3   Q     Okay.  And if they don't hit "Submit" at the end, is

4   that response still getting accounted for in the total number

5   of responses in this chart?

6   A     Yes.  In the 1,246.

7   Q     Okay.  So if no one had submitted a response between

8   May 21st until now, that total number would now be 1,247

9   because we clicked into the survey?

10  A     Correct.

11  Q     Okay.  So this is indicating that out of the total

12  number of responses, which is 1,246, you would agree that

13  most of those actually came in the months of October,

14  November, and December of 2024; correct?

15  A     Yes.

16  Q     And less than 200 actually came in, in all of the months

17  of 2025 through May 21, 2025?

18            MS. FOX:  Objection.  Compound.

19            THE COURT:  I'll ask counsel to rephrase.

20  BY MS. BRILLAULT:

21  Q     If we added the numbers above the bar chart beginning on

22  January 6, 2025, through the end and I represented that was

23  less than 200, would that -- would you have a reason to

24  disagree?

25  A     Without adding them exactly, no, that sounds

CAMPBELL - CROSS                            231

1   approximately correct.

2   Q    Can we go to the next page, please.  This is another

3   summary of the survey results that you obtained from the

4   survey responses; correct?

5   A    Yes.

6   Q    Okay.  And here the odor category lists "highly

7   offensive," "offensive," "unpleasant," "not unpleasant," and

8   "no response"; is that accurate?

9   A    Yes.

10  Q    And those are categories where ones that were not asked

11  in the survey question itself but you categorized based on

12  the type of odor that a respondent might fill out?

13  A    Yes.

14  Q    How did you treat responses that had more than one type

15  of odor checkmarked in the survey response?

16  A    Each response to that question, if they choose multiple,

17  is counted as a submission on this bar chart.

18  Q    You also created a heat map of the odor survey results?

19  A    Yes.

20  Q    And you attached that as Exhibit 6?  Is this the heat

21  map that you created?

22  A    Yes.

23  Q    Okay.  The heat map isn't indicating anything other than

24  a response was submitted that can point --

25           THE COURT:  I'm sorry, Counsel.

Case 2:24-cv-10819-MEMF-MAR    Document 152-1    Filed 08/14/25    Page 243 of 281
Page ID #:17607

CAMPBELL - CROSS                          232

```
 1              MS. BRILLAULT:  Yeah.

 2              THE COURT:  Do the parties stipulate to the

 3   admission of Exhibit 5?

 4              MS. FOX:  Yes.

 5              MS. BRILLAULT:  Yes, Your Honor.

 6              THE COURT:  5 is admitted.

 7        (Plaintiffs' Exhibit 5 is admitted into evidence.)

 8              THE COURT:  Okay.  Sorry, Counsel.  Go ahead.

 9              MS. BRILLAULT:  Let me ask it this way.  It's a

10   good interruption.  The question was not going to be that

11   great.  So let me start again.

12   BY MS. BRILLAULT:

13   Q    The -- for purposes of creating this heat map, you

14   plotted the location of the survey respondent's pin drop?

15   That was it?

16   A    Yes.

17   Q    You didn't try to evaluate the odor type or the odor

18   strength or the odor frequency?

19   A    No.

20   Q    And the only question that's required to be responded in

21   order to fully submit the response is the location of the

22   odor pin drop; correct?

23   A    I'm not positive off the top of my head.

24   Q    Okay.  I think that's it for the odor surveys.  We're

25   going to turn to the next set of data that you reviewed.
```

CAMPBELL - CROSS                        233

1              For purposes of your declaration, Dr. Campbell, you

2    also looked at AQMD odor complaints; is that correct?

3    A     Yes.

4    Q     And you created a heat map based on those odor

5    complaints?

6    A     Yes.

7    Q     You were provided a spreadsheet of odor complaint data

8    from AQMD?

9    A     Yes.

10   Q     When were you provided that information?

11   A     It was provided to me by counsel earlier this year, I

12   believe, in the March-April timeframe.

13   Q     And those were compiled in Excel spreadsheets?

14   A     We received both a PDF version and an Excel spreadsheet

15   version of the data.

16   Q     And for purposes of your analysis of the odor complaint

17   data, you looked at odor complaints that led to an NOV that

18   was issued by the AQMD?

19   A     Yes.

20   Q     And it was not just those that were issued to the --

21   that led to an NOV, but they had to be sourced back to the

22   landfill -- the odors had to be sourced back to the landfill?

23   A     We were told the data we received about complaints was

24   only specific to the landfill, and those that did not result

25   in an NOV were excluded from our analysis.

CAMPBELL - CROSS                              234

1   Q    Did you or your team perform any quality control or

2   quality check of the complaint data to ensure that the odor

3   complaints were sourced -- properly sourced to the landfill?

4            MS. FOX:  Objection.  Vague and ambiguous as to

5   "properly sourced."

6            THE COURT:  I'll ask counsel to rephrase.

7   BY MS. BRILLAULT:

8   Q    You relied on AQMD's determination that the landfill was

9   the source of the odor for the odor complaints?

10  A    Yes.

11  Q    You didn't do any independent analysis?

12  A    No.

13  Q    In the spreadsheets you received from AQMD, are you

14  aware there's 2,476 verified complaints or complaints that

15  led to an NOV?

16  A    Approximately, yes.

17  Q    And that was for the time period January 2023 --

18  January 1, 2023, through April of 2025?

19  A    I believe that was the time period of the data we

20  received, yes.

21  Q    Did you conduct any analysis on the number of different

22  households that made those verified complaints?

23  A    No.

24           MS. FOX:  Objection.  Vague and ambiguous as to

25  "different households."

282

CAMPBELL - CROSS                           235

1              THE COURT:  I'll ask counsel to rephrase.

2    BY MS. BRILLAULT:

3    Q    Did you conduct any analysis to determine the number of

4    households that made the 2,476 odor complaints?

5    A    No.

6    Q    Are you aware that 13 households made up -- made over

7    50 percent of the 2,476 odor complaints?

8    A    Yes.

9    Q    For your hotspot analysis, as part of your declaration,

10   am I correct that your team took the addresses in the

11   spreadsheets that were provided by AQMD and plotted them on a

12   map?

13   A    Yes.

14   Q    Another way to say that -- and I think you said it in

15   your declaration -- was you geolocated them?

16   A    Geolocating and plotting them on the map are two

17   different processes.

18   Q    Okay.  So did you do both or just one?

19   A    Both.

20   Q    How did you geolocate the addresses?

21   A    We used the ESRI software, which is a GIS mapping tool,

22   to process them through a geocoding application that is built

23   into that tool.

24              THE COURT:  And ESRI is a -- that's an acronym?

25              THE WITNESS:  Yes.  E-S-R-I.

```
                         CAMPBELL - CROSS                       236
 1               THE COURT:  Thank you.
 2   BY MS. BRILLAULT:
 3   Q    Were you able to geolocate all of the addresses for
 4   those 2,476 complaints?
 5   A    No.
 6   Q    Do you recall how many you were unable to geolocate?
 7   A    10 were not geolocated appropriately that had some
 8   version of an address, not including points with no address
 9   information.
10   Q    What do you mean by not properly geolocated?
11   A    We used the area around the landfill to run the address
12   through the geocoder to identify longitude and latitude of
13   where the point location is, and some of the addresses that
14   were ran through that tool were not identified with a
15   location in that zone.
16   Q    And you disregarded those?
17   A    Yes.
18   Q    Okay.  Now, you said you didn't do any independent
19   analysis of the odor complaints.  You relied on AQMD's
20   assessment of that; is that accurate?
21   A    Yes.
22   Q    Are you aware that AQMD assigns an odor intensity to the
23   verified complaint on a scale of one to five?
24   A    No.
25
```

CAMPBELL - CROSS                    237

1  Q    So you didn't account for the odor intensities of any

2  complaints made that were in the chart?

3  A    No.

4          MS. FOX:  Objection.  Misstates the testimony of

5  the witness.

6          THE COURT:  Overruled.

7  BY MS. BRILLAULT:

8  Q    Now, once you geolocated the locations of the verified

9  complaints -- am I correct you used a tool called

10 "ArcGIS Pro" to create a hotspot map?

11 A    Yes.

12 Q    So if we go to Exhibit 7 -- we'll start with that one --

13 attached to your declaration, is this the map showing the

14 geolocations of most of the odor complaints, at least the

15 ones you were able to geolocate?

16 A    Yes.

17 Q    Am I correct there was two that were 30-plus miles away

18 that are not present on this map that were also geolocated?

19 A    There were 2 that are that distance away that were not

20 matched with our geolocation process of the 10 we did not end

21 up plotting.

22 Q    And we wouldn't see them on the map?  They just weren't

23 -- they weren't put on this exhibit?

24 A    Because they were not geocoded, they did not get

25 included in this exhibit.

CAMPBELL - CROSS                                238

1    Q    Okay.  And once you had geolocated the addresses -- so

2    Exhibit 7 -- you then used that tool to create a hotspot?

3    A    Yes.

4    Q    And that's what we see in Exhibit 8, if you want to turn

5    that; is that correct?

6    A    Yes.

7             THE COURT:  And the parties stipulate to the

8    admission of 7 and 8?

9             MS. FOX:  So stipulated.

10             MS. BRILLAULT:  Yes, Your Honor.

11             THE COURT:  7 and 8 are admitted.

12         (Plaintiffs' Exhibits 7 and 8 are admitted into

13    evidence.)

14    BY MS. BRILLAULT:

15    Q    To do this in as simplified terms as possible,

16    essentially you drew a boundary around the geolocated

17    complaints to get a minimum boundary geometry for the tool;

18    is that correct?

19    A    Yes.

20    Q    And that's what's reflected as the "study area" in

21    Exhibit 8?

22    A    Yes.

23    Q    Okay.  And from that, the tool spit out a statistically

24    significant area that you call the "hot spots"?

25    A    Yes.

CAMPBELL - CROSS                          239

1    Q    Okay.  And those are the ones shaded in red?

2    A    Yes.

3    Q    And in order to get the minimum bounding geometry, you

4    included, if we go back to Exhibit 7 --

5         Or put them side by side might be easier, please.

6    BY MS. BRILLAULT:

7    Q    -- you had -- include all of the dots that appeared on

8    Exhibit 7; correct?

9    A    Yes.

10   Q    And that would include the two dots to the southeast of

11   the landfill past Santa Clarita?

12   A    Yes.

13   Q    Are you aware of how far away those two locations are

14   from the landfill?

15   A    Not exactly, no.

16   Q    If I said they were approximately 7 miles away, would

17   you have a basis to disagree?

18   A    No.

19   Q    And by including those two spots, are you aware that the

20   size of the hot spots that ultimately came out of the ArcGIS

21   tool were larger?

22   A    I am aware that by changing the minimum bounding polygon

23   that hotspot computations would change.

24   Q    Did you perform any analysis to determine whether

25   including the two odor complaint locations southeast of

CAMPBELL - CROSS                                240

```
 1   Santa Clarita was a reliable method to determine the hotspot
 2   zones?
 3             MS. FOX:  Objection.  Vague and ambiguous to
 4   "reliable method."
 5             THE COURT:  I'll ask counsel to rephrase.
 6   BY MS. BRILLAULT:
 7   Q    Did you look at whether or not the AQMD's verification
 8   of the two locations southeast of Santa Clarita was an
 9   accurate tracing of odors back to the landfill?
10   A    No.
11   Q    And by including those two locations, you expanded the
12   area of the hotspot zones that you ultimately came up with?
13   A    By including those points, we expanded the minimum
14   bounding geometry.
15   Q    And conversely -- or relatedly, the size of the hotspot
16   zones also were larger?
17   A    With their inclusion the hotspot zones could change.  I
18   do not know that they would be larger.
19             THE COURT:  Can I interpose a question?
20             Counsel, are you asking about -- when you say the
21   two hot spots that are southeast of Santa Clarita, if you can
22   go back to, just, Exhibit 7, you're talking about the one
23   that is on the exhibit -- we see the words "Santa Clarita,"
24   and am I to assume that this map is -- it's north -- it's
25   north-south, east-west, up-down?  It's the map --
```

                      CAMPBELL - CROSS                          241

 1              MS. BRILLAULT:  That is my understanding.

 2              THE COURT:  Okay.

 3              MS. BRILLAULT:  And we highlighted the two that I

 4    was talking about.

 5              THE COURT:  Oh, okay.

 6              MS. BRILLAULT:  So I could always use "below and to

 7    the right of Santa Clarita on the map."

 8              THE COURT:  Of the words "Santa Clarita."  Okay.

 9              I'm not sure that I understand the -- maybe I don't

10    understand what you're getting at, or maybe I don't

11    understand what the answer is about how including those -- I

12    see how including those -- the witness has testified that

13    that increases the minimum bounding geometry.  I don't

14    understand its effect on -- and maybe the witness can answer

15    this or can't -- it's effect on the statistically significant

16    hot spots.

17              Are you able to describe why that would be?

18              THE WITNESS:  The statistical hot spots that are

19    computed will vary based a the number of parameters,

20    including the spatial area used to analyze within.  So the

21    inclusion or exclusion of those points can impact the result.

22    I cannot confirm what the result -- how the result would

23    change without redoing the analysis.

24              THE COURT:  Okay.  And perhaps you could describe:

25    What is it that the hot spots are meant to represent -- or

CAMPBELL - CROSS                              242

1   what do they represent statistically, if you know?

2           THE WITNESS:  Generally, a statistical significant

3   hotspot indicates a greater likelihood than chance occurrence

4   in the data presented.

5           THE COURT:  I see.  Thank you.

6           Please proceed, Counsel.

7           MS. BRILLAULT:  Thank you.

8   BY MS. BRILLAULT:

9   Q    Did you have a chance to review Dr. Marais's

10  supplemental declaration that was submitted in this action?

11  A    Yes.

12  Q    And he attempted to recreate your hotspot analysis using

13  the ArcGIS tool?

14  A    Yes.

15  Q    Okay.  And when he conducted that analysis and excluded

16  those two odor complaint locations that were to the southeast

17  or below and to the right of Santa Clarita, the resulting

18  hotspot zone resulted in a 58 percent reduction in area.  Are

19  you aware of that?

20          MS. FOX:  Objection.  Lacks foundation.  The

21  witness testified he didn't do that analysis.

22          MS. BRILLAULT:  And I'm asking if he reviewed

23  Dr. Marais's supplemental declaration, and he said he did.

24          THE COURT:  Objection is overruled.

25          You can answer.

CAMPBELL - CROSS                          243

1           THE WITNESS:  I'm aware that was stated in his

2    declaration, yes.

3    BY MS. BRILLAULT:

4    Q    And because you haven't conducted that analysis, you

5    don't have any reason to agree or disagree with it?

6    A    Correct.

7    Q    And your declaration and the exhibits attached --

8    apologies -- don't provide the reasoning of why you included

9    the two locations that we've been talking about to the

10   southeast or below and to the right of Santa Clarita?

11   A    Can you rephrase the question?

12   Q    Does your declaration or the attached exhibits provide

13   any reasoning for including or not including certain

14   locations when you performed the hotspot analysis?

15   A    No, other than the geocoded addresses that were excluded

16   because they could not be matched.

17   Q    Once you identified the hot zones in Exhibit 8 -- the

18   hot spots -- your team counted up the households that were

19   located in those areas; is that accurate?

20   A    We used parcel data on the number of residential parcels

21   to compute the number of households in those red hot spots.

22   Q    Did you compile a list of the addresses or the parcel

23   locations to do that?

24   A    We used L.A. County Assessor data of parcels to create

25   that.  I did not extract or deliver that list specifically.

CAMPBELL - CROSS                                        244

1    Q    And that list was not included in your declaration?

2    A    Correct.

3    Q    Did you look to see which parcels were multifamily homes

4    versus single-family homes?

5    A    We used whether the parcel was zoned as a residential,

6    and based off of the assessor data, if there were multiple

7    residences, they were each counted as unique households.

8    Q    Did you consider how many of those households submitted

9    odor complaints with the AQMD?

10   A    No.

11   Q    Did you consider whether any of those households wanted

12   to be relocated for purposes of this motion for preliminary

13   injunction?

14   A    No.

15   Q    Did you conduct any analysis or investigation to see how

16   many individuals in those parcels purport to suffer from

17   health impacts due to landfill odors?

18   A    No.

19   Q    Same question but with respect to impact on quality of

20   life.  Did you conduct any analysis or investigation to see

21   how many individuals living in those parcels claimed that

22   their day-to-day lives were impacted by landfill odors?

23   A    No.

24   Q    Going back to paragraph 15 of your declaration,

25   Exhibit 107, Dr. Campbell.

CAMPBELL - CROSS                                     245

1            Sorry.  I'm just trying to make sure I direct you

2    to the right language.

3            So in paragraph 15 you state (reading): Using the

4    optimized hotspot analysis tool in ArcGIS Pro, we identified

5    the hot spots -- the areas most affected by the landfill

6    odors -- in the data.

7            Do you see the language I'm referring to?

8    A    Yes.

9    Q    Okay.  Would you agree that your analysis did not look

10   at whether these locations were subject to the strongest

11   odors from the landfill?

12   A    Yes.

13   Q    And you would agree that your analysis did not look at

14   whether this -- these areas were subjected to odors of the

15   longest duration?

16   A    Yes.

17   Q    And you would agree that your analysis did not look at

18   whether these areas were subjected to odors prevalent on the

19   most number of days?

20   A    Yes.

21   Q    And you would agree that your analysis did not look at

22   whether these hot spots were subjected to odors of the most

23   offensive types?

24   A    Yes.

25   Q    And you would agree that your analysis of the locations

CAMPBELL - CROSS                                246

1   within these hot spots did not look to determine whether they

2   involved individuals suffering from the most severe health

3   impacts?

4   A    Yes.

5   Q    And it did not look at whether the individuals claimed

6   to be suffering from the most frequent health impacts;

7   correct?

8   A    Yes.

9   Q    Did your hot zone map on Exhibit 8 differentiate as to

10  when the complaints were made in terms of 2023 versus 2024

11  versus 2025?

12  A    No.

13  Q    You treated a complaint made in 2023 equal to a

14  complaint made in 2025; is that accurate?

15  A    Yes.

16  Q    We touched on this briefly, but, Dr. Campbell, your

17  declaration and the exhibits attached did not include any of

18  your underlying work product that was used to prepare your

19  heat map analysis; is that correct?

20          MS. FOX:  Objection.  Vague and ambiguous as to

21  "work product."

22          THE COURT:  Sustained.  I'll ask counsel to

23  rephrase.

24  BY MS. BRILLAULT:

25  Q    Dr. Campbell, in your declaration and the attachments,

CAMPBELL – REDIRECT                              247

 1  did you include any of the underlying analysis or data that

 2  was used to create the hot zone maps?

 3  A    No.

 4  Q    And in your declaration you did not explain your

 5  assumptions for using the size of the boundary area?

 6  A    Correct.

 7          MS. BRILLAULT:  Your Honor, I actually don't have

 8  any further questions, but at this time I do renew our motion

 9  to exclude Dr. Campbell's declaration and the exhibits under

10  Rules 701 and 702.  His opinions are not based on reliable

11  data, he did not follow generally accepted methodologies for

12  good survey design, and he did not provide the underlying

13  work product that would allow defendants the ability to

14  recreate his work and understand the full scope of the ways

15  that he failed to reliably apply the methodology.

16          THE COURT:  Okay.  Thank you.  You can address that

17  in argument.

18          Any redirect?

19          MS. FOX:  Yes, Your Honor.

20          Good afternoon, Dr. Campbell.

21          THE WITNESS:  Good afternoon.

22                      REDIRECT EXAMINATION

23  BY MS. FOX:

24  Q    Why did you select a survey of this type found in

25  Exhibit 4?

CAMPBELL - REDIRECT                    248

1   A    The survey questions that we used were adapted from a

2   odor-reporting diary template that was recommended by

3   Dr. Adam Love as part of the leadership team consulting and

4   advising the Department, and the questions follow a standard

5   type of question schema for these odor reports.

6   Q    And so when you designed the survey, who was part of

7   that team that designed the survey?

8   A    Myself; Dr. Davis, the health officer; Dr. Adam Love

9   from Roux Associates; and Dr. Nichole Quick, who is an

10  environmental health advisor for the Department.

11  Q    And what was the purpose of the survey?

12  A    To capture community feedback about their experiences

13  with the odors that they have experienced.

14  Q    And I think you mentioned that Dr. Love referenced the

15  Agency for Toxic Substance and Disease Registry?

16  A    Yes.

17  Q    And can you take a look at what was previously marked

18  and, I believe, admitted.  It's Exhibit 56.  It's in

19  Volume 7.

20        THE COURT:  So if this was one of the new ones, did

21  somebody add it to the binder?

22        MS. FOX:  Your Honor, I'm afraid, maybe, we did not

23  add it to the binder.

24        THE COURT:  Okay.  So -- it's empty; right?

25        THE WITNESS:  Correct.

CAMPBELL – REDIRECT                    249

1          THE COURT:  Okay.

2          I've handed the witness Exhibit 56.

3    BY MS. FOX:

4    Q    Dr. Campbell, can you tell us what this document is?

5    A    This is the ATSDR guidance on how to devise and

6    implement an odor diary and questions to use for that

7    purpose.

8    Q    And did you have this as part of your discussion with

9    Dr. Love, Dr. Quick, and Dr. Davis when you were designing

10   the survey and the survey questions?

11   A    Yes.

12   Q    And do you have an understanding what agency puts out

13   this document found in Exhibit 56?

14   A    Yes.

15   Q    And what agency is that, sir?

16   A    The Agency for Toxic Substances and Disease Registry,

17   which is part of the federal Department of Health and Human

18   Services.

19   Q    And in your Exhibit 4, which is your survey, you have

20   different types of odors that are called for, and let me find

21   that page and direct you to it, and Exhibit 4, page 18, at

22   the bottom in the center of the page, ID 2568.

23          Have you found your way there, Dr. Campbell?

24   A    Yes.

25   Q    And that says, "Which of the following best describes

CAMPBELL - REDIRECT                        250

1   the odors you noticed today?"  And these descriptions,

2   numbers one through ten, which starts with "fragrant, fruity,

3   sweet," where do these descriptions of particular odors come

4   from?

5   A    The environmental odor document by ATDSR.

6   Q    All right.  And if we go back to that document -- that

7   was Exhibit 56 -- we find those ten notices of -- I'm sorry

8   -- ten descriptors of odors at page 4 of Exhibit 56.

9           Can you find your way there, Dr. Campbell?

10  A    Yes.

11  Q    And here I note under the headings on the -- starting on

12  the left-hand side of the page, it says "not unpleasant," and

13  then it has underneath it "floral and herbal smells," and

14  then underneath that "pine and minty smells."  Do you see

15  that?

16  A    Yes.

17  Q    And so these characteristics of an odor of being either

18  "not pleasant" [sic}, "unpleasant," "offensive," or "highly

19  offensive" -- are those characteristics that you decided

20  upon, or were they drawn upon by the information provided

21  from the Agency for Toxic Substance [sic] and Disease

22  Registry?

23  A    They were drawn on by the Agency for Toxic Substances

24  and Disease Registry.

25  Q    So you didn't translate the smells based on your view of

CAMPBELL - REDIRECT                        251

1  whether or not flowers and perfume are offensive or

2  unpleasant but based on the characteristics of the smells

3  that are set forth in Exhibit 56?

4  A    Correct.

5  Q    Why didn't you tell the community or just have a survey

6  question and ask the community, "Do you find this smell

7  unpleasant" -- I want to make sure I get them right.  "Do you

8  find this smell unpleasant, not pleasant [sic}, offensive, or

9  highly offense?"  Why didn't you just ask them directly?

10 A    Given the sensitivity of community opposition to the

11 landfill odor they claimed, we did not want them to

12 inherently answer a particular way based on what they

13 perceived as their own offense but, rather, they tell us the

14 type of odor they experienced without knowing how it would be

15 classified.

16 Q    Do you think your survey is reliable, Dr. Campbell?

17 A    For its intended purpose, yes.

18 Q    And what is that intended purpose, again?

19 A    To capture feedback about the community's experiences

20 with odors they observe.

21 Q    Now, I understand that the survey is available online,

22 and we actually went there and clicked onto the link.  How

23 did the community learn that there was an online survey

24 available?

25 A    The Department put out a press release at one point, and

299

CAMPBELL - REDIRECT                               252

1   we did a web page, as well as field teams went into the

2   community to provide informational flyers about its release.

3   Q    The field teams that went into the community, do you

4   know what communities these field teams visited?

5   A    Yes.

6   Q    And what communities were they, sir?

7   A    Val Verde, Hasley Canyon, and Castaic.

8   Q    And do you know how many households were part of this

9   field survey?

10  A    I don't know the exact number of households that they

11  were asked to visit.

12  Q    Do you have any information -- that might be in your

13  declaration -- that indicates how many households would be

14  within those communities that you spoke of, of Castaic,

15  Hasley Canyon, and Val Verde?

16  A    I don't know.

17  Q    Do you recall, Dr. Campbell, how those communities were

18  selected?

19  A    Because of their proximity to the landfill area, they

20  were the ones chosen by Department of Public Health

21  leadership as the primary outreach areas for awareness.

22  Q    And when they reached out to people for awareness, do

23  you know how many total people they reached?

24  A    I know they visited approximately 1,150 households

25  during their outreach period.

300

CAMPBELL - REDIRECT                    253

1  Q    Dr. Campbell, we saw on one of your charts -- and I

2  believe it's Exhibit 5 -- that the numbers of response to the

3  surveys are the highest -- I believe that's in November of

4  2024.  Do you see that, sir, on Exhibit 5?

5  A    Yes.

6  Q    Do you have any concerns, Dr. Campbell, that while the

7  numbers are particularly high in November and December of

8  2023 that they are significantly diminished as we go into

9  2024?

10 A    Can you rephrase significant concern and its context?

11 Q    Are you concerned that your numbers from November and

12 December are higher than they are in 2024?  Does that

13 surprise you?

14          MS. BRILLAULT:  Objection, Your Honor.

15          THE COURT:  What's the objection.

16          MS. BRILLAULT:  What does she mean by "surprise"?

17 Vague.

18          THE COURT:  Thank you.

19          Counsel, please rephrase.

20 BY MS. FOX:

21 Q    You note, Dr. Campbell, on Exhibit 5 that the highest

22 response rates are in November and December of 2023; correct?

23 A    2024, yes.

24 Q    Thank you.  And do you have any explanation for why the

25 numbers are lower in the months following?

CAMPBELL - REDIRECT                    254

1              MS. BRILLAULT:  Objection, Your Honor.  Foundation.

2              THE COURT:  Overruled.

3          You may answer if you know.

4              THE WITNESS:  I can only speculate as to why that

5    would be the case, but I cannot say with certainty.

6              MS. BRILLAULT:  And I would object if he's going to

7    be speculating.

8              MS. FOX:  We don't want him to do so, Your Honor.

9    We'll move on.

10   BY MS. FOX:

11   Q    In your generation of the heat map, you use data from

12   the South Coast Air Quality Management District; correct?

13   A    Yes.

14   Q    And you used and received data from them that was the

15   notices of violation that that agency had issued and sourced

16   back to the Chiquita Canyon Landfill; is that correct?

17   A    Yes.

18   Q    Is a heat map survey considered a statistical survey?

19             MS. BRILLAULT:  Objection, Your Honor.  Vague.

20             THE COURT:  Let me ask counsel to rephrase.

21   BY MS. FOX:

22   Q    Can you tell us, Dr. Campbell, are you familiar with the

23   term a "CASPER" survey?

24   A    Yes.

25   Q    And what is a CASPER survey?

CAMPBELL - REDIRECT                          255

1  A    It's a more sophisticated environmental assessment of

2  health impact amongst the community.

3  Q    And why didn't you select to use a CASPER survey here,

4  sir?

5  A    They are very lengthy and complicated and require

6  specialized expertise to deploy, which at the time was not

7  our intention for the data collection effort we were

8  undertaking.

9  Q    If I might ask you, Dr. Campbell, to go to Exhibit 8.

10 That was the polygon boundary.

11        Oh, first, if I might back up.

12        Why did you use the notices of violation that had

13 actually been issued by South Coast Air Quality Management

14 District instead of using a larger set of all of the

15 complaints that the South Coast Air Quality Management

16 District had received?

17 A    Our understanding was that the NOV issuance was

18 associated with confirmation by AQMD that the complaint that

19 had been registered multiple times was validated, and to err

20 on a more conservative side of what data to use, we excluded

21 anything that didn't meet that criteria that seemed,

22 presumably, less valid.

23 Q    And I wanted to back up a little bit as well,

24 Dr. Campbell.  Your educational degree -- your Ph.D. is from

25 what university, sir?

303

CAMPBELL - REDIRECT                                        256

1   A     Claremont Graduate University.

2   Q     And what year was that?

3   A     2019.

4   Q     And did you have certain concentrations for obtaining

5   that doctorate?

6   A     Yes.

7   Q     And what were those in, sir?

8   A     Public policy analysis and research methodology.

9   Q     What is the role of the data officer for the County of

10  Los Angeles?

11  A     My job as chief data officer for the Department of

12  Public Health involves providing vision and strategy for how

13  the Department uses, collects, and analyzes data, and

14  supporting the organization's needs in meeting that goal.

15  Q     Thank you.  And, Dr. Campbell, then moving back to

16  Exhibit 8, this geometric figure shown there, is that

17  correctly referred to as a "polygon"?

18  A     Yes.

19  Q     Why use a polygon versus a circle or a square for this

20  analysis?

21  A     To clarify, you mean the hexagons that make up the

22  larger polygon?

23  Q     Well, tell me about the -- tell me about both, please,

24  sir.

25  A     The minimum bounding geometry area represented by the

304

CAMPBELL - REDIRECT                          257

 1   dash line would be like the areas within it all polygons.

 2   The small, hard-to-see equally sized shapes within that area

 3   are all hexagons.

 4   Q    So we have a disadvantage here in that, for some reason,

 5   our tech isn't working today, but if we're looking at

 6   Exhibit 8, there's this larger minimum boundary, and I think

 7   you called it the "dash line."  That's a polygon; is that

 8   correct?

 9   A    Yes.

10   Q    Why use a polygon there?

11           I think we put that up on the screen.

12           Thank you so much.

13   A    That area is based on the smallest size geographic

14   boundary represented by the outermost points where NOVs were

15   geocoded and identified.

16   Q    All right.  And then when you talk about the hexagon --

17   and it's actually great seeing it here on the computer screen

18   -- you're talking about the smaller hexagons within this

19   larger minimum boundary polygon?

20   A    Yes.

21   Q    Kind of looks like a honeycomb?

22   A    Yes.

23   Q    Thank you.  And the two areas that counsel asked you

24   about that are south of Santa Clarita, why didn't you exclude

25   those, sir, from your generation of this heat map?

CAMPBELL - REDIRECT                          258

1  A     Because they were located in the vicinity of the

2  Chiquita Canyon Landfill area where the other NOVs were

3  issued, we included anything geocoded and identified within

4  this area for the analysis.

5  Q     Were you trying to drive up the final number of the

6  number -- of the distinct number of assessor parcels that you

7  found in your heat map survey?

8  A     No.

9  Q     Can you tell us a little bit, Dr. Campbell, about other

10 public health surveys you've done?

11 A     We routinely get asked to either create or advise others

12 in the Department on how to collect data with surveys, how to

13 better phrase questions, and how to format those surveys.

14 Use cases for that vary from community feedback and

15 engagement activity, public health needs assessment to

16 understand health behaviors and conditions, customer

17 satisfaction surveys, training evaluation -- a range of other

18 applications like that.

19 Q     And, Dr. Campbell, going back to your Exhibit 4, after a

20 respondent lands into the survey and indicates that they're

21 filling it out for themselves or someone else, why do you

22 first ask them what symptoms they were experiencing before

23 you ask them to characterize the odor?

24 A     When devising the survey initially, the leadership from

25 Public Health was concerned that any health information was

306

CAMPBELL - RECROSS                    259

1   absent from how AQMD collects their information, and so it

2   was prioritized to be earlier in the survey so that it would

3   be one of the key items that was captured if someone chose to

4   cease answering questions later in the survey.

5           Thank you, Dr. Campbell.

6           If I might have a moment, Counsel.

7           Thank you.

8           THE COURT:  Any recross?

9           MS. BRILLAULT:  Yes.  Very shortly, Your Honor.

10          I'll try to be brief.

11                    RECROSS-EXAMINATION

12  BY MS. BRILLAULT:

13  Q   Dr. Campbell, was the original intent of the Department

14  of Public Health survey to gather data to create a heat map

15  of households that needed to be in need of relocating?

16  A   No.

17  Q   And was the original intent of the DPH survey to gather

18  data to create a heat map of households most in need of

19  financial assistance to pay for relocation?

20  A   No.

21  Q   You were asked questions about your reliance on

22  validated odor complaint data from AQMD, and you relied on

23  the validated versus all of the odor complaints that had been

24  called into AQMD.  Do you recall that?

25  A   Yes.

CAMPBELL - RECROSS                            260

1    Q    How does AQMD validate an odor complaint?

2    A    From my understanding, after multiple complaints that

3    they send someone into the field to affirm if the information

4    provided to them is accurate.

5    Q    Do they use any objective measuring tools when they go

6    into the field to confirm the odor complaint?

7    A    I do not know.

8    Q    Can we turn to Exhibit 56.

9         Well, I just need him to turn to it.  You don't

10   have to.

11   BY MS. BRILLAULT:

12   Q    On page 7 -- this is the document that you used -- you

13   testified that you used in -- for purposes of preparing the

14   odor survey?

15   A    Yes.

16   Q    Okay.  On page 7 in footnote 4, it says (reading): Many

17   agencies are using a field olfactometer, a machine that

18   objectively measures the amount of an odor or an odor

19   intensity.

20         Does AQMD use a field olfactometer when it goes

21   into the field to confirm an odor complaint?

22   A    I don't know.

23   Q    When asked about why you included those two odor

24   complaint locations on Exhibit 7 that were highlighted in

25   yellow to the southeast or below and right of Santa Clarita,

CAMPBELL - RECROSS                          261

1   you said because they were within the "vicinity" of the

2   Chiquita Canyon Landfill.  Do you recall that?

3   A    Yes.

4   Q    Is 7 miles, in your opinion, within the "vicinity" of

5   the landfill?

6   A    Can you rephrase the question?

7   Q    Is it your opinion that to be within the vicinity of

8   something you can be 7 miles away?

9   A    Yes.

10  Q    Okay.  And what's the basis for that opinion?

11  A    Because they were located within the community of

12  Santa Clarita, where other points were also located, we had

13  no logical reason to discard them.

14  Q    Do you see the odor complaint that is plotted just above

15  the Stevenson Ranch area?

16  A    Yes.

17  Q    What is the distance between the dot on Stevenson Ranch

18  and the one that is below Santa Clarita?

19  A    Based on the scaling of our map, approximately 4 miles.

20  Q    When you were conducting your analysis to determine the

21  hot zone maps, did you consider the distance between the

22  closest odor complaints and the two that are southeast of

23  Santa Clarita?

24  A    Can you rephrase the question?

25

309

CAMPBELL - RECROSS                                262

1   Q    You said you included the two locations that are

2   southeast of Santa Clarita because they were near other odor

3   complaints; correct?

4   A    Yes.  Based on the Santa Clarita community designation.

5   Q    And so it's your opinion that approximately 4-mile

6   distance is an odor complaint that's close to another one?

7   A    Not based off of the mileage of distance between points

8   but based on the community they fall within.

9   Q    But looking at the map, the distance is over 4 miles

10  between those two odor complaints?

11  A    Approximately, yes.

12  Q    And you still included the two that are southeast of

13  Santa Clarita for purposes of your hot zone map?

14  A    Yes.

15          MS. BRILLAULT:  Thank you.  No further questions.

16          THE COURT:  Thank you.

17          May the witness be excused?

18          Okay.  You are excused.  Thank you, Dr. Campbell.

19  You can leave all that there.  If you wouldn't mind just

20  throwing away the microphone cover -- the little trashcan to

21  the left.  Thank you.

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Okay.  I think that's it for witnesses

24  today?

25          MS. FOX:  I think so, Your Honor.

263

```
 1              And might we move Exhibit 6 into evidence?  I don't
 2  think we took care of that earlier.
 3              THE COURT:  Any objection?
 4              MS. BRILLAULT:  I don't believe so.  Those are all
 5  -- those are the ones that are attached to Dr. Campbell's --
 6  yeah.
 7              THE COURT:  Okay.
 8              MS. BRILLAULT:  All the exhibits that are attached
 9  are fine.
10              THE COURT:  Exhibit 6 is admitted.
11              Thank you, Counsel.
12      (Plaintiffs' Exhibit 6 is admitted into evidence.)
13              THE COURT:  Okay.  In terms of time, my -- by my
14  calculations, plaintiffs' counsel has 4 hours and 33 minutes
15  left, and defense counsel has 2 hours and 35 minutes left in
16  your time, and so hopefully we can get all that done
17  tomorrow.  I'm not really sure how that worked.  But anyway,
18  so we've got 7 hours.  Hopefully we can get it done tomorrow
19  or the parties will end earlier because we don't have a lot
20  of other days this week.
21              Okay.  Anything that plaintiffs need to raise with
22  the Court before we get started -- before we end for the day?
23              MS. FOX:  If I might have just one moment,
24  Your Honor?
25              THE COURT:  Yes.
```

264

```
 1              (Pause.)

 2              MS. FOX:  Your Honor, I'm advised that our witness

 3    Amanda Sanders isn't going to be here until 10:00.  So we'll

 4    need to confer with defendants' counsel to get someone on the

 5    stand earlier.

 6              THE COURT:  Okay.  Because she's your last witness?

 7              MS. FOX:  That's correct, Your Honor.

 8              THE COURT:  Okay.

 9              Anything that defense counsel needs to raise at

10    this time?

11              MS. MORGAN:  Yes, Your Honor.  We have two

12    questions -- or clarifications for Your Honor about

13    witnesses.  I'll ask my co-counsel to ask you about the

14    first.

15              MR. CHAN:  Yes, Your Honor.  With respect to the

16    community declarant that the Court had earlier authorized to

17    appear remotely, two questions: one, the community declarant,

18    just to be clear, would declare about his experiences with

19    odors or lack thereof in the neighborhood, but in light of

20    today's -- Your Honor's ruling today about no direct

21    examinations, this witness is not a -- he's a third-party.

22    He's not a Chiquita representative but it would be a direct

23    -- it'd be a very short direct, but it would be a direct,

24    essentially, about his experiences or lack thereof odors, and

25    so I did want to flag that to see if that would be --
```

312

265

 1          THE COURT:  Has this person already submitted a

 2   declaration?

 3          MR. CHAN:  He has.  Yes, and so he would provide

 4   testimony consistent with the declaration and also, frankly,

 5   state that it's still currently true given that it's --

 6          THE COURT:  I guess -- maybe I don't understand

 7   what you mean when you say a "third party."  Was this a

 8   declaration you found somewhere, or you were responsible for

 9   having it prepared and submitting it?

10          MR. CHAN:  We submitted it, Your Honor.  I just

11   mean he's not a Chiquita representative.

12          THE COURT:  Yes.  So --

13          MR. CHAN:  He's a third-party resident.  But we did

14   submit the declaration.

15          THE COURT:  Okay.  So I -- we don't really have

16   time to discuss this.  There will be no direct.

17          MR. CHAN:  That's my question.

18          THE COURT:  Does that answer it?  Okay.

19          MR. CHAN:  That was the question.

20          THE COURT:  Awesome.  Wonderful.

21          MS. MORGAN:  And --

22          THE COURT:  Any -- and the second question?

23          MS. MORGAN:  Yes.  One further question,

24   Your Honor.  We'd like to call Dr. Craig Benson as a rebuttal

25   witness to new testimony that was introduced for the first

313

266

```
 1   time today.  Dr. Craig Benson is professor emeritus at
 2   University of Wisconsin and an expert in elevated temperature
 3   landfill events.  Before the testimony this morning that we
 4   heard from --
 5              THE COURT:  Have you met and conferred with
 6   opposing counsel about this?
 7              MS. MORGAN:  We have not yet, Your Honor.
 8              THE COURT:  Okay.  Then do that overnight, and we
 9   can talk about it in the morning.
10              Anything else?
11              MS. MORGAN:  No, Your Honor.
12              THE COURT:  Okay.  Thank you.
13              Okay.  Well, thanks everyone.  We moved pretty
14   efficiently today, and we will see everyone tomorrow morning
15   at 8:00.  Before you leave, please gather with Mr. Berry to
16   confirm that we have the right exhibits having been admitted,
17   and then I trust that tomorrow things will move a little bit
18   more efficiently with the exhibits.  As stated, it's not the
19   Court's preference for me and Mr. Berry to be working for the
20   parties.  We have our own work to do.  So -- but I'm sure
21   you'll make it a little bit more smooth tomorrow.
22              Let me just check with Mr. Berry if there's
23   anything else I need to advise the parties of.
24              (Court speaks with the clerk.)
25              THE COURT:  The other thing is that we have witness
```

314

267

1   lists in a couple of different documents.  It would be

2   helpful to have one joint exhibit -- joint witness list.  I

3   understand the defense has a lot of objections to the

4   different witnesses -- et cetera, et cetera -- but just for

5   purposes of us keeping track, one joint list with all of the

6   witnesses who are -- who have testified or who are expected

7   to testify would be helpful for the Court's recordkeeping --

8   without waiving any of your objections to their actual

9   testimony.

10           And with that, we will close for the day.  Thank

11  you to everyone in the gallery.  We appreciate your presence

12  as well.  And court is adjourned for the evening.

13           The parties -- we don't have something in here

14  between tonight and tomorrow.  So you can speak with

15  Mr. Berry about where you can leave your material overnight

16  if you wish to do so.  Thank you.

17           Court's adjourned.  Parties are excused.

18       (Proceedings adjourned at 4:49 p.m.)

19  ///

20  ///

21

22

23

24

25

315

268

```
 1                          I N D E X

 2     WITNESSES
       FOR PLAINTIFFS:        DIRECT    CROSS    REDIRECT    RECROSS
 3
       Elizabeth Anne Berg               27        44          55
 4
       Muntu Davis, M.D.                 60       113         125
 5
       John Suggs II           129       151
 6
       Stephen Danish          157       163
 7     Philip Perera

 8     Shikari Nakagawa-Ota    167       171

 9     Steven Howse            176       182         184

10     Mark de Bie             187       193         206

11     Harold Campbell IV      212       247         259

12                          E X H I B I T S

13                                         MARKED    ADMITTED
       PLAINTIFFS' EXHIBITS:
14
       4 - Chiquita Canyon Landfill Incident                    84
15          Survey Flow

16     44 - CalEPA Department of Toxic                          84
            Substance Control Imminent and
17          Substantial Endangerment
            Determination and Order
18
       1 - July 2023 Letter from Muntu Davis                   104
19         (DPH) to Steve Cassulo (CCL)

20     2 - August 2023 Letter from Dr. Muntu                   104
           Davis (DPH) to Steve Cassulo (CCL)
21
       3 - Chiquita Canyon Landfill Incident                   104
22         Survey Analytics and Insights

23     56 - Agency for Toxic Substances and        120         125
            Disease Registry "Community Member
24          Assessment of Environmental Odors"

25     38 - Letter from Todd Thalhamer                         198
            to Karen Gork of LA DPH re: Review
            of Odor Incident at Chiquita Canyon
```

269

EXHIBITS

PLAINTIFFS' EXHIBITS (Con't):

42 - Letter from Todd Thalhamer                          210
       to Karen Gork re: Review of the
       11/26/24 Revised Soil Break/Barrier
       Plan, et cetera

5 - Chiquita Canyon Landfill Incident                    232
      Survey Analytics and Insights

7 - Map of AQMD Complaints Resulting in                  238
      Notice of Violation

8 - Map of Hot Spot Analysis of AQMD                     238
      Complaints Resulting Notice of
      Violation

6 - CCL Survey Submissions as of                         263
      5/21/25 with Response Density

DEFENDANTS' EXHIBITS:

104 - Declaration of Muntu Davis                          92

112 - Declaration of Elizabeth Anne Berg                  93

162 - Roux Associates, Inc. Report                       109

103 - Declaration of John Suggs II                       132

261 - Chiquita Household Application        134          136

268 - Suggs Check II (Rainbow Drive)       139          141

267 - Chiquita Recertification Form        141          143

270 - Suggs Check (Val Verde Road)         145

113 - Declaration of Shikari Nakagawa-                   165
       Ota

101 - Declaration of Steven Howse                        173

105 - Declaration of Mark de Bie                         189

107 - Declaration of Harold Campbell IV                  211

317

270

1

2

3                              CERTIFICATE

4        I certify that the foregoing is a correct transcript

5    from the electronic sound recording of the proceedings in the

6    above-entitled matter.

7
     /s/ Julie Messa              July 18, 2025
8    Julie Messa, CET**D-403      Date
     Transcriber
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

318