## Docket No. 25-5754

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles and COUNTY OF LOS ANGELES,

*Plaintiffs-Appellees,*

v.

CHIQUITA CANYON, LLC, a Delaware limited liability company, CHIQUITA CANYON, INC., a Delaware corporation and WASTE CONNECTIONS US, INC.,

*Defendants-Appellants.*

*Appeal from a Decision of the United States District Court for the Central District of California, No. 2:24-cv-10819-MEMF-MAR · Honorable Maame Ewusi-Mensah Frimpong*

## EXCERPTS OF RECORD
## VOLUME 3 of 12 - Pages 319 to 603

PAUL S. CHAN
ARIEL A. NEUMAN
SHOSHANA E. BANNETT
BIRD, MARELLA, RHOW, LINCENBERG,
DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
(310) 201-2100

JACOB P. DUGINSKI
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
(415) 262-4000

KAITLYN D. SHANNON
MEGAN L. MORGAN
JAMES B. SLAUGHTER
MEGAN R. BRILLAULT
KATELYN E. CIOLINO
BEVERIDGE & DIAMOND P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036-1661
(202) 789-6000

*Attorneys for Defendants-Appellants Chiquita Canyon, LLC,*
*Chiquita Canyon, Inc., and Waste Connections US, Inc.*

 COUNSEL PRESS INC. (213) 680-2300     PRINTED ON RECYCLED PAPER 

Paul S. Chan (SBN 183406)
  pchan@birdmarella.com
Ariel A. Neuman (SBN 241594)
  aneuman@birdmarella.com
Shoshana E. Bannett (SBN 241977)
  sbannett@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS &
NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100

Jacob P. Duginski (SBN 316091)
  jduginski@bdlaw.com
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 262-4000

Kaitlyn D. Shannon (SBN 296735)
  kshannon@bdlaw.com
Megan L. Morgan *(pro hac vice)*
  mmorgan@bdlaw.com
Megan R. Brillault (*pro hac vice*)
  mbrillault@bdlaw.com
James B. Slaughter (*pro hac vice*)
  jslaughter@bdlaw.com
Katelyn E. Ciolino *(pro hac vice)*
  kciolino@bdlaw.com
Louis J. Manzo *(pro hac vice)*
  lmanzo@bdlaw.com
BEVERIDGE & DIAMOND P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036-1661
Telephone: (202) 789-6000

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> CHIQUITA CANYON, LLC, et al., <br><br> Defendants. | CASE NO. 2:24-cv-10819-MEMF-MAR <br><br> **DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Filed Concurrently with Proposed Order <br><br> Assigned to Hon. Maame Ewusi-Mensah Frimpong, Courtroom 8B <br><br> Date: NA <br> Time: NA <br> Dept. 8B |

4052448.2

320

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc, and Waste Connections US, Inc., apply *ex parte* to the Court for leave to file supplemental evidence in opposition to the County's Motion for a Preliminary Injunction ("PI Motion"). Specifically, Defendants request leave to file the August 11 Supplemental Declaration of Patrick Sullivan, BCES, CPP, REPA, whose previous testimony is before the Court, which sets forth newly-obtained evidence about three critical data points: flux chamber study data, South Coast Air Quality Management District ("South Coast AQMD") Rule 402 Notices of Violation ("NOVs"); and South Coast AQMD odor complaint data.

The Court considered earlier months of this data at the preliminary injunction hearing. These newly available data points show decreased surface emission rates, NOV counts, and odor complaint counts that are highly relevant to the Court's determination of the PI Motion but did not exist when Defendants filed their opposition on June 12, 2025 or during the July 14-15, 2025 hearing. Among other data points, dimethyl sulfide—a known reaction byproduct and likely driver of any potential odor complaints—has been reduced to a non-detect level, and benzene is down from 0.9 tons per year in March 2025 to just 0.14 tons per year in July. These levels are consistent with those that would be expected if there were no elevated temperature landfill event at the Landfill.

There is good cause for the requested relief. Among other factors, the Court must determine if current and anticipated conditions at the Landfill will cause "extreme or very serious damage" in the absence of the requested far-reaching mandatory preliminary injunction. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). Particularly in deciding a preliminary injunction of this magnitude, the Court needs the most current data

2

concerning status quo odor conditions. *Ex parte* relief is necessary because the PI Motion is under submission and this recent data showing improving conditions at the Landfill was only just obtained.

Pursuant to Local Rule 7-19 and as set forth more fully in the attached Declaration of Katelyn E. Ciolino during a telephonic meet-and-confer on August 11, 2025, Defendants gave notice of this *ex parte* application to counsel for the County, which objected to the application, as follows:

> Jenny L. Riggs
> Meyers Nave
> 707 Wilshire Blvd, 24th Floor
> Los Angeles, CA 90017
> Telephone: (213) 626-2906
> Email: jriggs@mayersnave.com

This *ex parte* application is based upon the accompanying Memorandum of Points and Authorities, the accompanying August 11 Supplemental Declaration of Patrick Sullivan, BCES, CPP, REPA, all the orders, records and pleadings on file with the Court in this action, and upon such further evidence and argument as may be presented to the Court.

DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

On May 29, 2025, Plaintiffs Los Angeles County and the People of the State of California (hereafter collectively, "the County") filed a motion seeking far-reaching, extraordinary relief: a mandatory injunction requiring Defendants to establish a fund of at least $20 million that the County proposes be used to relocate over 900 residents of Val Verde and Castaic. The most current evidence—the linchpin of deciding whether a preliminary injunction is necessary—now shows that key emissions, NOVs, and odor complaints are continuing to decrease, even amid typically unfavorable summer wind conditions. Emissions rates as measured by the flux chamber study are now consistent with those that would be expected if there were no elevated temperature landfill ("ETLF) event.

**A.    Consideration of Mr. Sullivan's Declaration is proper because it provides valuable, relevant evidence concerning the status of odors at the Landfill.**

The County must show that area odor conditions caused by the Landfill are so serious that extreme or very serious harm will occur if the Court does not order Defendants to establish a relocation fund. ECF 58-1 at 20. The County's evidentiary burden is not to show that harm occurred at some time in the past, but to show, as the U.S. Supreme Court explained in *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), a "real or immediate threat that the plaintiff will be wronged again" absent a preliminary injunction. At the preliminary injunction hearing, the Court considered evidence concerning odor conditions presented by both parties. This included analytical measurements presented by Defendants, like the South Coast AQMD-ordered flux chamber analyses that measure on-site emission rates of a wide variety of constituents, ECF 82-6. It also included subjective odor evidence presented by the County, like the number of odor complaints and Rule 402 NOVs issued by South Coast AQMD staff members, ECF 63. This data was discussed by multiple witnesses presented by both the County and Defendants.

Mr. Sullivan's August 11 Declaration brings these data sources up to date

through July 2025 (or July 15 for the complaint data) and amplifies the trend identified by him and other witnesses of decreasing emissions.[1] This data set was not yet complete during the hearing. In the month since that hearing, both the objective and subjective data have continued to show improvement due to Defendants' extraordinary mitigation measures, including a continued increase in the amount of landfill gas extracted. Ex. 1 ¶ 12. In particular, dimethyl sulfide (a likely driver of any potential odor complaints) has now decreased to a non-detect level, benzene levels have been significantly reduced (by more than 80% percent since the March 2025 study), and Rule 402 NOVs have been reduced to just 5 NOVs in July (down from 12 in June). *Id.* ¶¶ 3, 5, 7. 8. The emission rates, as measured by the July flux chamber study, are at or near rates expected if there were no ETLF event. *Id* ¶¶ 1, 12.

As the Court weighs evidence concerning the irreparability of any alleged harm and odor conditions, it should consider the most recent evidence before granting the enormous relief sought by the County. Ninth Circuit precedent favors supplementation of the record, finding error when courts fail to allow supplementation of a preliminary injunction record with "highly relevant" evidence like Mr. Sullivan's August 11 Declaration. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 696, fn. 14 (9th Cir. 2023) (internal citation omitted) (error in failing to allow supplementation of record with declaration showing mootness); *see also Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, 611 F. App'x 385, 387 (9th Cir. 2015) (error in failing to allow supplementation with discovery responses).

### B.  *Ex parte* relief is appropriate.

*Ex parte* relief is appropriate where the moving party seeks relief that cannot

---

[1] The data contained in Mr. Sullivan's August 11 Declaration reflects the preliminary results of the July 2025 flux chamber study. If the PI Motion remains pending, Defendants will further supplement to reflect finalized quality assurance and quality control on the calculations and any updates to the data table contained in Mr. Sullivan's declaration as needed. Ex. 1 at ¶ 2.

be addressed by a regularly noticed motion, and will face prejudice if its application is denied, provided that the party is without fault in creating the need for *ex parte* relief. *See Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995). Here, Defendants would be prejudiced if the Court adjudicates the PI Motion without considering the timely, highly relevant evidence concerning status quo conditions in assessing the risk of imminent harm.

While the Court's ruling on the PI Motion remains pending, a properly noticed motion cannot be heard. Mr. Sullivan's August 11 Declaration provides the most recent and relevant data concerning potential odor conditions related to the Landfill. The exclusion of relevant evidence concerning the status quo and irreparable harm unfairly prejudices Defendants. It also denies Defendants the opportunity to create a record that accurately reflects conditions at the time of the order's issuance and increases the risk that the Court may issue an order based on conditions that have since been mooted.[2] No other opportunity exists, or has existed, for Defendants to submit this current data.

Further, Defendants played no role in the creating the need for *ex parte* relief—the evidentiary hearing occurred on July 14, this data is only newly available, and the Court has not yet ruled on the PI Motion. Within one business day of receiving this data, Defendants discussed this filing with the County and submitted the data to the Court. Courts in this district are apt to grant *ex parte* relief to allow supplemental evidence not available during briefing but made available before adjudication. *Nichia Am. Corp. v. Seoul Semiconductor Co.*, No. 07-cv-835-PA-CWX, 2008 WL 11342571, at *1 (C.D. Cal. Oct. 7, 2008) (granting *ex parte* application for leave to file supplemental evidence in opposition to summary judgment).

---

[2] Here, Defendants irreparable harm renders from the risk that the Court issues a preliminary injunction without a complete evidentiary record. Should the Court find *ex parte* relief to harm the County, Defendants request the Court instead hold in abeyance its decision on the PI Motion to first allow a fully noticed and briefed motion.

6

### C.    Conclusion.

In the month that has passed since the preliminary injunction hearing, objective emissions data and odor complaint data show continued improvement. "At this point, the flux chamber study data is showing emission rates consistent with rates expected if there were no ETLF event." Ex. 1 ¶ 12. Mr. Sullivan's August 11 Supplemental Declaration brings current the data already before the Court, reflecting continued improvement which "is even more impressive in light of the fact that July is typically one of the worst months . . . due to the unfavorable wind conditions that exist during the summer months." *Id*. at ¶ 11. The Court should inform its decision making with the most current data concerning area conditions and grant Defendants' Ex Parte Application.

DATED:  August 11, 2025          Respectfully submitted,

Paul S. Chan
Ariel A. Neuman
Shoshana E. Bannett
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

Jacob P. Duginski
Kaitlyn D. Shannon
Megan L. Morgan
Megan R. Brillault
James B. Slaughter
Katelyn E. Ciolino
Louis J. Manso
BEVERIDGE & DIAMOND, P.C.

By: _____
Paul S. Chan
Attorneys for Defendants Chiquita
Canyon, LLC, Chiquita Canyon, Inc. and
Waste Connections US, Inc.

7

Paul S. Chan (SBN 183406)
  pchan@birdmarella.com
Ariel A. Neuman (SBN 241594)
  aneuman@birdmarella.com
Shoshana E. Bannett (SBN 241977)
  sbannett@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS &
NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100

Jacob P. Duginski (SBN 316091)
  jduginski@bdlaw.com
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 262-4000

Kaitlyn D. Shannon (SBN 296735)
  kshannon@bdlaw.com
Megan L. Morgan *(pro hac vice)*
  mmorgan@bdlaw.com
Megan R. Brillault *(pro hac vice)*
  mbrillault@bdlaw.com
James B. Slaughter *(pro hac vice)*
  jslaughter@bdlaw.com
Katelyn E. Ciolino *(pro hac vice)*
  kciolino@bdlaw.com
Louis J. Manzo *(pro hac vice)*
  lmanzo@bdlaw.com
BEVERIDGE & DIAMOND P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036-1661
Telephone: (202) 789-6000

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES,

Plaintiffs,

vs.

CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; and WASTE CONNECTIONS US, INC., a Delaware corporation,

Defendants.

CASE NO. 2:24-cv-10819-MEMF-MAR

**DECLARATION OF KATELYN E. CIOLINO IN SUPPORT OF *EX PARTE* APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION**

Filed Concurrently with Ex Parte Motion and Proposed Order

Date:    N/A
Time:    N/A
Crtrm.:  8B

Assigned to Hon. Maame Ewusi-Mensah Frimpong, Courtroom 8B

---

### DECLARATION OF KATELYN E. CIOLINO

I, Katelyn E. Ciolino, declare as follows:

1.    I am an active member of the Bars of the States of New York and New Jersey and a principal at Beveridge & Diamond, PC, attorneys of record for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc. in this action.  I am admitted *pro hac vice* in this matter. I make this declaration in support of Defendants' *Ex Parte* Application for Leave to File Supplemental Evidence in Opposition to Plaintiffs' Motion for Preliminary Injunction.  Because I make this declaration for that limited purpose, it does not purport to set forth all of my knowledge about this matter.  Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.    On May 29, 2025, Plaintiffs in this case moved for a preliminary injunction ("PI Motion").

3.    Defendants opposed the motion and the Court held an evidentiary hearing and heard argument on the motion on July 14, 15, and 17.

4.    Defendants now seek to file newly-obtained evidence on three data points critical to the Court's consideration of the PI Motion. This includes flux chamber study data, South Coast Air Quality Management District ("South Coast AQMD") Rule 402 Notices of Violation ("NOVs"), and South Coast AQMD odor complaint data.  This data did not exist when Defendants filed their opposition to the PI Motion on June 12, 2025, or during the July 14-15, 2025 hearing.

5.    On August 11, 2025, I participated in a telephonic meet-and-confer with Plaintiffs' counsel regarding Defendants' intent to move *ex parte* for leave to file supplemental evidence in opposition to the PI Motion, including the date and substance of the application.

6.    Plaintiffs' counsel objects to Defendants' *ex parte* application.

I declare under penalty of perjury under the laws of the United States of

2

328

1   America that the foregoing is true and correct, and that I executed this declaration

2   on August 11, 2025, at New York, New York.

3

4   _____

5                       Katelyn E. Ciolino

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

DECLARATION OF KATELYN E. CIOLINO IN SUPPORT OF EX PARTE APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION

Paul S. Chan (SBN 183406)
  pchan@birdmarella.com
Ariel A. Neuman (SBN 241594)
  aneuman@birdmarella.com
Shoshana E. Bannett (SBN 241977)
  sbannett@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS &
NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100

Jacob P. Duginski (SBN 316091)
  jduginski@bdlaw.com
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 262-4000

Kaitlyn D. Shannon (SBN 296735)
  kshannon@bdlaw.com
Megan L. Morgan *(pro hac vice)*
  mmorgan@bdlaw.com
Megan R. Brillault *(pro hac vice)*
  mbrillault@bdlaw.com
James B. Slaughter *(pro hac vice)*
  jslaughter@bdlaw.com
Katelyn E. Ciolino *(pro hac vice)*
  kciolino@bdlaw.com
Louis J. Manzo *(pro hac vice)*
  lmanzo@bdlaw.com
BEVERIDGE & DIAMOND P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036-1661
Telephone: (202) 789-6000

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES,<br><br>Plaintiffs,<br><br>v.<br><br>CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; WASTE CONNECTIONS US, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 2:24-cv-10819-MEMF (MARx)<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA**<br><br>Date:    July 17<br>Time:   10:00 AM<br>Dept.:   8B<br><br>Action Filed:    December 16, 2024<br>Trial Date:      None Set |

## AUGUST 11 SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA

I, Patrick Sullivan, declare as follows:

1.  I am of sufficient age and am competent to testify in this proceeding. I make this supplemental declaration in support of the opposition of Defendants Chiquita Canyon, LLC ("Chiquita"), Chiquita Canyon, Inc., and Waste Connections US, Inc. (collectively, "Defendants") to Plaintiffs' motion for preliminary injunction. This declaration supplements my declarations submitted on June 12, 2025 (ECF 82-6) ("June 12 Declaration") and July 7, 2025 (ECF 113) ("July 7 Declaration"), also in support of Defendants' opposition to Plaintiffs' motion for preliminary injunction. My prior conclusions and opinions remain unchanged—this supplemental declaration simply updates and reinforces some of my prior analyses with more recently obtained and analyzed data with respect to the below-referenced exhibits. The most recent data show additional improvements in the reduction of emissions from the Chiquita Canyon Landfill, such that the current surface emission rates, as measured by the July flux chamber study, are at or near rates expected if there were no elevated temperature landfill ("ETLF") event. I am competent to testify to the facts and opinions set forth herein.

**Onsite data continues to show that the potential for offsite emissions is decreasing with substantial improvement noted in July 2025.**

2.  My June 12 and July 7 Declarations analyzed some of the key onsite data points that are measured and monitored to assess the status of the reaction and Chiquita's overall efforts to mitigate the ETLF event. This supplemental declaration updates the analysis in the June 12 Declaration with respect to the flux chamber data following the July 2025 flux chamber study. At this time, we have only preliminary results from the July study. This means we have not received carbon dioxide data from the laboratory and have not finalized our quality assurance and quality control

331

1    on the calculations or the written report that accompanies and summarizes the data.

2    Nevertheless, I have been asked to report the preliminary results and provide a

3    further update once the results are finalized.

4        3.    The preliminary July 2025 flux chamber study results continue to show

5    reductions in surface emissions across the Landfill, meaning that the potential for

6    offsite emissions and other impacts has further decreased and continues to decrease.

7    In particular, dimethyl sulfide ("DMS") has now decreased to a non-detect level.

8    DMS is a key constituent of concern and a likely driver of any potential odor

9    complaints. An increase in DMS in the landfill gas was first noticed in early 2023

10   and caused the Landfill to become out of compliance with its air permits and South

11   Coast Air Quality Management District ("South Coast AQMD") rules due to

12   exceedances of total sulfur levels, which include DMS. DMS is a known byproduct

13   of ETLF events and is known to be odorous at very low part per billion

14   concentrations (the approximate equivalent of 1 drop of water in an Olympic size

15   swimming pool).

16       4.    Paragraphs 21 and 22 of my June 12 Declaration described flux

17   chamber studies and summarized the four flux chamber studies conducted at the

18   Chiquita Canyon Landfill in 2023 through early 2025. Under the Stipulated Order

19   for Abatement with South Coast AQMD, beginning in Quarter Four 2024, Chiquita

20   must conduct a flux chamber study every four months. Chiquita conducted its most

21   recent study in July 2025.

22       5.    The results of each of the five flux chamber studies are summarized in

23   the table below. As shown by this table, DMS has now reached a non-detect level,

24   and hydrogen sulfide, another potentially odorous compound, has continued to

25   further decrease. Methane and total volatile organic compounds ("VOCs"), which

26   are common indicators of landfill gas emissions, show reductions of an order of

27   magnitude from the March 2025 study. There was also a significant reduction in

28   benzene, which has been another key constituent of concern for the reaction area

AUGUST 11 SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

gas, from March to July 2025. The November 2024, March 2025, and July 2025 studies continue to show a marked decrease in emissions for almost every compound measured.

| Compound | Units | Event | | | | |
|---|---|---|---|---|---|---|
| | | 1 (8/23) | 2 (3/24) | 3 (11/24) | 4 (3/25) | 5 (7/25) |
| Carbon dioxide | tons/yr | 41,312 | 327,049 | 216,177 | 100,526 | |
| Methane | tons/yr | 3,357 | 11,456 | 6,880 | 4,756 | 285 |
| Total VOC | tons/yr | 207 | 853 | 61 | 26.1 | 2.6 |
| Ethanol | tons/yr | 18.3 | NQ | 0.42 | 0.23 | 0.11 |
| Acetone | tons/yr | 17.6 | 51 | 1.30 | 1.38 | 0.54 |
| Dimethyl sulfide | tons/yr | 15.2 | 57.9 | 0.93 | 0.95 | ND |
| Tetrahydrofuran | tons/yr | 13.6 | 107 | 0.06 | 0.23 | 0.01 |
| Benzene | tons/yr | 9.33 | 104 | 0.27 | 0.90 | 0.14 |
| Methanol | tons/yr | 9.09 | NQ | 0.51 | 0.79 | 0.45 |
| Methyl ethyl ketone (MEK) | tons/yr | 9.06 | 51.2 | 0.24 | 0.30 | 0.07 |
| Propylene | tons/yr | 6.62 | 29.8 | 0.69 | 0.41 | 0.05 |
| Isopropyl alcohol (IPA) | tons/yr | 3.72 | 15.2 | 0.18 | 0.51 | ND |
| Isopropyl toluene | tons/yr | 3.25 | 13.7 | 0.25 | 0.42 | 0.11 |
| Toluene | tons/yr | 2.00 | 18.6 | 0.22 | 0.29 | 0.06 |
| Total Xylenes | tons/yr | 1.52 | 9.79 | 0.30 | 0.48 | 0.08 |
| Ethylbenzene | tons/yr | 1.14 | 10.1 | 0.16 | 0.20 | 0.03 |
| Hydrogen sulfide | tons/yr | 0.13 | 3.81 | 0.72 | 0.24 | 0.15 |
| Note: NQ = Not Quantified, ND = Not Detected | | | | | | |

6.    While many of the laboratory results from November 2024 and March 2025 already were close to or below the detection limits for most of the compounds tested as explained in Paragraph 22 of my June 12 Declaration, the results for nearly all of the compounds continued to decrease between March and July 2025, and some, including DMS, have now reached non-detect levels.

**Notice of violation and complaint data continue to show decreasing trends with substantial decreases between June and July 2025.**

7.    The Rule 402 notice of violation ("NOV") data continues to show a strong downward trend as compared with the 2024 NOV data. Exhibit 21 of my June 12 Declaration is a graph of the number of Rule 402 NOVs issued by South Coast AQMD from 2023 through May 2025. Exhibit 35 of my July 17 Declaration

4

333

is an updated graph showing Rule 402 NOVs received through June 2025. The below graph is further updated to include Rule 402 NOVs received through July 2025. The 2023 data is in blue, the 2024 data is in orange, and the 2025 data is in green.



8. This updated graph shows that the number of Rule 402 NOVs received between June and July 2025 has decreased significantly. Chiquita received 12 Rule 402 NOVs in June 2025 and 5 Rule 402 NOVs in July 2025.

9. This updated graph also shows that the number of Rule 402 NOVs received in 2025 continues to be significantly less than the number of Rule 402 NOVs received in the same months in past years. In July 2023, Chiquita received 21 NOVs. In July 2024, Chiquita received 17 NOVs. In July 2025, Chiquita received 5 NOVs.

334

10.    The 2025 South Coast AQMD odor complaint data also continues to show a downward trend as compared with the 2024 data. Exhibit 20 of my June 12 Declaration is a graph of the number of odor complaints received by South Coast AQMD from 2023 through May 2025. Below is an updated graph that includes odor complaints received by South Coast AQMD through July 15, 2025. The 2023 data is in blue, the 2024 data is in orange, and the 2025 data is in green.



11.    This updated graph shows that the number of odor complaints received by South Coast AQMD in 2025 continues to be significantly less than the number of odor complaints received in the same months in 2024. The total number of complaints received for the first half of July 2025 was 168. Scaling this through a full month, this would project to a total number of complaints for July 2025 of approximately 347. Compared to July 2024, during which 1,523 complaints were received, this is an almost 80% reduction in the number of complaints received. This

6

335

reduction is even more impressive in light of the fact that July is typically one of the worst months for odor complaints attributed to the Landfill due to the unfavorable wind conditions that exist during the summer months.

**Conclusion**

12. In conclusion, it is still my expert opinion that the objective data, including the flux chamber data, show that the onsite emissions and the potential for offsite impacts from the Landfill have decreased and continue to decrease. At this point, the flux chamber study data is showing emission rates consistent with rates expected if there were no ETLF event. In my expert opinion, this improvement, including the improvement between March and July 2025, can be attributed to Chiquita's mitigation efforts, which include increases in the amount of landfill gas being collected, which achieved its maximum level to date in July 2025. Even the subjective data, like the number of NOVs issued and the number of odor complaints made to South Coast AQMD, corroborates the objective data.

//
//
//
//
//
//
//
//
//
//
//
//
//

7

AUGUST 11 SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct to my personal knowledge.

3        Executed on this 11th day of August 2025, in Carmichael, California.

4

5

6

7

8

9        _____

         Patrick Sullivan

10        Senior Vice President
          SCS Engineers

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AUGUST 11 SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

1  Paul S. Chan (SBN 183406)              Kaitlyn D. Shannon (SBN 296735)
     pchan@birdmarella.com                    kshannon@bdlaw.com
2  Ariel A. Neuman (SBN 241594)          Megan L. Morgan (*pro hac vice*)
     aneuman@birdmarella.com                  mmorgan@bdlaw.com
3  Shoshana E. Bannett (SBN 241977)      Megan R. Brillault (*pro hac vice*)
     sbannett@birdmarella.com                 mbrillault@bdlaw.com
4  BIRD, MARELLA, RHOW, LINCENBERG,      James B. Slaughter (*pro hac vice*)
   DROOKS & NESSIM, LLP                     jslaughter@bdlaw.com
5  1875 Century Park East, 23rd Floor    Katelyn E. Ciolino (*pro hac vice*)
6  Los Angeles, California 90067-2561       kciolino@bdlaw.com
   Telephone: (310) 201-2100             Louis J. Manzo (*pro hac vice*)
7                                           lmanzo@bdlaw.com
8  Jacob P. Duginski (SBN 316091)        BEVERIDGE & DIAMOND P.C.
     jduginski@bdlaw.com                 1900 N Street, NW, Suite 100
9  BEVERIDGE & DIAMOND P.C.              Washington, DC 20036-1661
10 333 Bush Street, Suite 1500           Telephone: (202) 789-6000
   San Francisco, CA 94104
11 Telephone: (415) 262-4000

12 *Attorneys for Defendants Chiquita Canyon, LLC,*
13 *Chiquita Canyon, Inc. and Waste Connections*
   *US, Inc.*

14                    **UNITED STATES DISTRICT COURT**

15        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

16 | THE PEOPLE OF THE STATE OF | Case No. 2:24-cv-10819-MEMF (MARx) |
17 | CALIFORNIA, by and through Dawyn R. | Related Case: 2:23-cv-08380-MEMF (MARx) |
   | Harrison, County Counsel for the County of |  |
18 | Los Angeles, and THE COUNTY OF LOS | Hon. Maame Ewusi-Mensah Frimpong |
   | ANGELES, |  |
19 | | **DEFENDANTS' RESPONSE TO COUNTY** |
   | Plaintiffs, | **PLAINTIFFS' OBJECTIONS TO** |
20 | | **EVIDENCE PROFFERED BY** |
   | v. | **DEFENDANTS** |
21 | |  |
   | CHIQUITA CANYON, LLC, a Delaware | Date:     July 14 and 15 |
22 | limited liability company; CHIQUITA | Time:     8:00 am |
   | CANYON, INC., a Delaware corporation; | Dept.:    8B |
23 | WASTE CONNECTIONS US, INC., a |  |
   | Delaware corporation; and DOES 1-50, |  |
24 | inclusive, | Action Filed:     December 16, 2024 |
   | | Trial Date:       None Set |
25 | Defendants. |  |

26

27

28

---

338

## I. INTRODUCTION

On the eve of hearing, the County has made procedural objections to many items of evidence that are necessary and critical for Chiquita's defense of the mandatory preliminary injunction sought by the County. The County seeks to exclude Defendants' analysis of the historical odor complaint data on which their motion hinges and which data was only provided after Defendants filed their opposition. Simultaneously, the County seeks to prevent Defendants from presenting evidence of current on-site and off-site conditions and facts related to the judicial site visit—which the County requested in connection with this motion.

The Court has broad discretion over the evidentiary hearing and has already decided that the presentation of oral evidence will facilitate the resolution of this matter. Presentation of oral testimony from both sides is essential to ensuring a fair and complete factual record. Updated information about current conditions is relevant to a case about prospective relief. The Court is entitled to a full and fair presentation of the facts, and Chiquita is entitled to due process and the opportunity to present its defense. The objections are meritless and should be denied.

## II. ARGUMENT

### A. Supplemental Declarations for Marais, Sullivan, and Cassulo are properly before the Court and should be considered.

The supplemental declarations filed by M. Laurentius Marais, PhD (applied mathematics and statistics), Patrick Sullivan, BCES, CPP, REPA (air quality and landfill gas specialist), and Steven Cassulo (Chiquita Canyon Landfill District Manager) present facts, data, and opinions critical to the Court's consideration of the motion.

Dr. Marais submitted a supplemental declaration (ECF 121) critically analyzing the recently disclosed Los Angeles County, Department of Public Health ("DPH") Survey Data and South Coast Air Quality Management District ("SCAQMD") Complaint Data—datasets that form the sole foundation of Dr. Campbell's analysis and on which the County relies to justify both its request for relief and the scope of the proposed injunction. Notably, the County produced this key data seven days *after* Defendants filed their opposition—despite the fact that it should have been disclosed concurrently with the County's motion. *See* ECF 103 at 12–13. While the County now

claims to be surprised by Dr. Marais's declaration, it was filed a full week before the evidentiary hearing, and Chiquita notified the County well in advance that it would be filing supplemental declarations by July 7 (ECF 103 at 15), giving ample notice. The County also had access to this underlying data in advance of filing the preliminary injunction, and could have conducted similar analyses to what is presented by Dr. Marais. The County's request to now remove this evidence from the Court's consideration is simply an admission of how damaging it is to the County's case.

The County's contention that Chiquita should have simply sought this data earlier through a public records act request is factually and legally incorrect. Chiquita submitted a California Public Records Act request to the DPH on March 19, 2025, seeking, among other things, "analyses ... or data related to the elevated temperature event" at Chiquita, which includes the DPH Survey Data. Responsive records have not yet been produced. Chiquita also receives some odor complaint data from SCAQMD, but this data does not include specific address information (the same address information now used by the County to identify the locations it believes should be relocated), because complainant identifying information is claimed by SCAQMD to be exempted from disclosure. *See City of San Jose v. Superior Court,* 74 Cal.App.4th 1008, 1022-23 (1999) (upholding the decision not to disclose noise complainants' personal information). Analysis of these two critical datasets—which underly the entirety of the County's claim for relief—was impossible until the County produced it well after Defendants filed their opposition.

The County also seeks to exclude the supplemental declaration of Steve Cassulo (Chiquita Canyon Landfill District Manager) (ECF 114) and Patrick Sullivan (air quality and landfill gas specialist) (ECF 113). Steve Cassulo's supplemental declaration presents facts related to the judicial site visit—a visit that the County requested in connection with the preliminary injunction motion and which is part of the record of these proceedings. *See* ECF 56 (Plaintiffs' Request for Judicial Site Visit in Connection with County's Motion for a Preliminary Injunction). Patrick Sullivan's supplemental declaration updates several of the analyses presented in his original declaration to demonstrate more recently obtained on-site and off-site data—data that is directly relevant to the County's claim for prospective injunctive relief.

---

DEFENDANTS' RESPONSE TO COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE

1    Ninth Circuit courts routinely permit parties to supplement the record in connection with

2  motions for preliminary injunctions. *See, e.g., City of Tombstone v. United States*, No. CV 11-845-

3  TUC-FRZ, 2012 WL 12842260, at *1–2 (D. Ariz. Mar. 1, 2012); *Coalition on Homelessness v.*

4  *City and County of San Francisco*, 647 F. Supp. 3d 806, 826–27 (N.D. Cal. 2022), *aff'd in part,*

5  *vacated in part, remanded,* No. 23-15087, 2024 WL 3325655 (9th Cir. July 8, 2024). The

6  County's attempt to distinguish these two cases is unavailing. The County notes that in *City of*

7  *Tombstone*, "the plaintiff kept filing additional evidence . . . *after* it filed its preliminary injunction

8  motion, which resulted in defendants requiring additional time to present evidence to address the

9  plaintiff's new evidence" but the County claims "[t]hat did not happen here." ECF 126 at 4. Not

10  so. The County filed its Motion on May 29, 2025. *See* ECF 58. The County then provided

11  Defendants with the DPH survey and SCAQMD complaint data on June 19, 2025—twenty-one

12  days later and six days **after** Defendants' filed their Opposition papers. *See* ECF 82. Just like in

13  *City of Tombstone*, Defendants had to present new evidence—via their supplemental

14  declarations—to address the "additional evidence" the County provided "*after* it filed its

15  preliminary injunction motion." *City of Tombstone*, No. CV 11-845-TUC-FRZ, 2012 WL

16  12842260, at *1–2.

17    In *Coalition on Homelessness*, the Court determined a supplemental declaration was

18  necessary to "address[] the new data" provided by defendants "well after Plaintiffs filed the

19  motion for a preliminary injunction." *Coalition on Homelessness*, 647 F. Supp. at 826. The fact

20  that the moving party filed the supplemental declaration is a distinction without a difference. *See*

21  ECF 126 at 4.

22    **B.  Defendants should be permitted direct and redirect examination of their**

23      **witnesses.**

24    This Court has broad discretion to conduct the hearing in a manner that will be useful and

25  efficient. This Court ordered a two-day evidentiary hearing, making clear that the preliminary

26  injunction will not be decided on the papers. Having witness testimony—including direct and

27  redirect—allows witnesses to testify live, thereby allowing witnesses to highlight key points,

28

DEFENDANTS' RESPONSE TO COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE

1  clarify any questions from the Court, and permit the Court to judge the weight given to the

2  evidence.

3        The County's decision not to cross-examine four of Chiquita's witnesses should not

4  prevent Chiquita from calling these witnesses for direct examination.[1] Absent direct examination

5  from all of Chiquita's witnesses, the Court will only be hearing one side of the story. The Court

6  will hear from all of the County's witnesses, but would not hear from all of Chiquita's fact and

7  expert witnesses, truncating the evidentiary hearing to Chiquita's detriment. *See* § 2949 Procedure

8  on an Application for a Preliminary Injunction, 11A Fed. Prac. & Proc. Civ. § 2949 (3d ed.)

9  ("Trial of an issue of fact necessitates opportunity to present evidence and not by only one side to

10  the controversy.").

11        The County relies on Local Rules 7-8 and 7-9 to support its position, but the County

12  ignores Local Rule 7-6, which provides that "the Court may, in its discretion, require or allow oral

13  examination of any declarant or any other witness." Just as the local rule states, this Court has

14  discretion to allow testimony from witnesses to ensure there is a developed factual record. This

15  basic point is affirmed by courts in the Ninth Circuit. For example, in *Stanley v. Univ. of S. Cal.,*

16  13 F.3d 1313 (9th Cir. 1994), it was not an abuse of discretion to deny live testimony when "the

17  parties have a full opportunity to submit written testimony and to argue the matter." *Id.* But that is

18  the very opportunity the County is simultaneously seeking to deny Chiquita, arguing both that

19  supplemental declarations should be stricken and witnesses cannot provide direct testimony. The

20  other cited cases confirm that Courts have discretion to call witnesses and have live examination.

21  *See Kelly v. Primco Mgmt., Inc.,* No. 14-cv-07263, 2015 WL 10990368, *7-10 (C.D. Cal. Jan. 12,

22  2015) (subjecting declarants to questioning from the court and cross-examination); *Fed. Trade*

23  *Comm'n v. Digital Altitude, LLC,* No. 18-cv-00729, 2018 WL 1942392 (C.D. Cal. Mar. 9, 2018)

24  (allowing cross-examination and redirect).

25

26

27  _____
[1] The County withdrew its requests to cross-examine Angela Perez, Craig Benson, Rick Pleus, and

28  Patrick Sullivan.

DEFENDANTS' RESPONSE TO COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE

1    Further, direct testimony allows witnesses to provide updated information to this Court,

2    which is critical for a case about prospective, forward-looking relief (particularly when the data

3    relied upon by the County is months if not years old). For example, the judicial site visit occurred

4    after Chiquita filed its opposition brief. Chiquita's witnesses should not be excluded from

5    testifying to information relevant to the site visit, particularly when information about the site visit

6    is in the record. The filed declarations were prepared in only two weeks, so live testimony will

7    supplement and contextualize these declarations.

8    At bottom, this Court has ordered a two-day evidentiary hearing to ensure that both parties

9    are heard and the necessary evidence is before the Court to adjudicate the sweeping relief the

10   County seeks. Due process requires the opportunity to be heard and to present affirmative

11   evidence. *See e.g., United States v. Gila Valley Irr. Dist.,* 31 F.3d 1428, 1442 (9th Cir. 1994)

12   (reversing issue of preliminary injunction, criticizing lack of opportunity for party to present

13   evidence, and instructing that if another preliminary injunction hearing is held, "the court must

14   afford the parties the type of fair proceeding required before preliminary injunctions may be

15   issued."); *see also* Fed. R. Civ. P. 43(c) (allowing live testimony for motions). Live witness

16   testimony—including direct examination—is an appropriate part of that hearing. Preventing

17   witness testimony would truncate the already ordered evidentiary hearing.

18   **C.  Impeachment exhibits do not need to be disclosed in federal court.**

19   Citing nothing in support, the County argues that Defendants should not be permitted to

20   impeach, refresh the recollection of, or rebut the County's witnesses with documents not included

21   in a voluntary-exchanged exhibit list.[2] Instead of citing any authority, the County attempts to

22   distinguish cases that Defendants provided to the County via email as authority as to why such

23   exhibits need not be included on an exhibit list. *See* ECF 126 at 8. As the County aptly points out,

24   "*none of [these cases] involved a preliminary injunction hearing,*" *id.*, which makes sense given

25   there is no requirement for exhibit lists in connection with a preliminary injunction hearing in the

26

27   _____

[2]The County states that it "anticipates the Chiquita Defendants will attempt to offer into evidence new exhibits for impeachment." ECF 126 at 8. Defendants have never argued that they intend to

28   offer documents used ***solely*** for impeachment or to refresh a witness' recollection into evidence.

1   first place.

2       Here, the parties chose to exchange a joint exhibit list voluntarily to make the hearing

3   operate more smoothly. But that does not mean that Defendants are now required to disclose

4   exhibits they intend to use solely for impeachment or to refresh recollection, if necessary. And

5   Defendants' choice to omit those exhibits from the parties' voluntary exhibit list is supported by

6   the very cases the County attempts to distinguish. *See Ramachandran v. City of Los Altos*, No. 18-

7   cv-01223, 2021 WL 5206675, at *4 (N.D. Cal. Nov. 9, 2021) (documents used "*solely* for

8   impeachment" need not appear on exhibit list); *Strandquist v. Washington State Dep't of Soc. &*

9   *Health Servs.*, No. 23-cv-05071, 2025 WL 331032, at *4 (W.D. Wash. Jan. 29, 2025) (that

10   documents were not included on exhibit list "does not prevent [party] from using the documents

11   for rebuttal, impeachment, or to refresh recollection"); *Ramirez v. Zimmerman*, No. 18-cv-1062,

12   2019 WL 2179538, at *4 (S.D. Cal. May 20, 2019), *aff'd sub nom. Cervantes v. San Diego Police*

13   *Chief Shelley Zimmerman*, No. 17-cv-1230, 2019 WL 3072307 (S.D. Cal. July 15, 2019), *aff'd sub*

14   *nom. Ramirez v. Zimmerman*, No. 20-56117, 2021 WL 5104371 (9th Cir. Nov. 3, 2021)

15   ("Plaintiff's argument that further response is necessary to identify documents intended to be used

16   as 'pure impeachment' evidence contravenes the plain language of Rule 26.").

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' RESPONSE TO COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE

DATED:  July 11, 2025

Paul S. Chan
Ariel A. Neuman
Shoshana E. Bannett
BIRD, MARAELLA, RHOW, LINCENBERG,
DROOKS & NESSIM, LLP

Kaitlyn D. Shannon
Megan L. Morgan
Megan R. Brillault
James B. Slaughter
Louis J. Manzo
BEVERIDGE & DIAMOND, P.C.

By: _____
KAITLYN D. SHANNON
Attorneys for Defendants Chiquita Canyon, LLC,
Chiquita Canyon, Inc., and Waste Connections
US, Inc.

DEFENDANTS' RESPONSE TO COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE

345

| From: | cacd_ecfmail@cacd.uscourts.gov |
|---|---|
| Sent: | Friday, July 11, 2025 4:04 PM |
| To: | ecfnef@cacd.uscourts.gov |
| Subject: | Activity in Case 2:24-cv-10819-MEMF-MAR The People of the State of California et al v. Chiquita Canyon, LLC et al Text Only Scheduling Notice |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

#### Notice of Electronic Filing

The following transaction was entered on 7/11/2025 at 4:04 PM PDT and filed on 7/11/2025

| Case Name: | The People of the State of California et al v. Chiquita Canyon, LLC et al |
|---|---|
| **Case Number:** | 2:24-cv-10819-MEMF-MAR |
| **Filer:** | |
| **Document Number:** | 127(No document attached) |

**Docket Text:**

**(IN CHAMBERS) ORDER TEXT ONLY ENTRY by Judge Maame Ewusi-Mensah Frimpong: The Court is in receipt of Defendants' Supplemental Status Report Re: Preliminary Injunction Hearing. ECF No. [122]. Defendants request one to two nonparty community declarants be permitted to testify virtually. The Court GRANTS the request and permits the nonparty community declarants to appear via Zoom at the hearing, subject to the following requirements. The parties must represent that the remote witnesses (1) will have access to reliable audiovisual equipment, (2) will test the equipment and connection with a court reporter at the producing party's own expense and have the court reporter confirm that the audio is sufficient for transcription purposes, and (3) will have an IT professional available to help on-site with any technical issues the day of the testimony. The Zoom link is found on the Courts website: https://www.cacd.uscourts.gov/honorable-maame-ewusi-mensah-frimpong. Prior to the hearing, the parties must consult the "Guidelines for Zoom Courtroom Proceedings" found on the Courts website. Failure to comply with the Guidelines may result in future requests for Zoom appearances being denied. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dbe) TEXT ONLY ENTRY**

**2:24-cv-10819-MEMF-MAR Notice has been electronically mailed to:**

1

346

Ariel A Neuman    aneuman@birdmarella.com, brl@birdmarella.com, mlw@birdmarella.com, rec@birdmarella.com

Caroline Karabian Castillo    ccastillo@counsel.lacounty.gov

Catherine L Carlisle    ccarlisle@meyersnave.com, gduran@meyersnave.com, lgonzales@meyersnave.com

Cristina L Talley    ctalley@meyersnave.com, lcastro@meyersnave.com, tle@meyersnave.com

Dawyn Renae Harrison    dharrison@counsel.lacounty.gov

Deborah J Fox    dfox@meyersnave.com, calendardept@meyersnave.com, dmehretu@meyersnave.com, gduran@meyersnave.com, tkay@meyersnave.com

Dusan Pavlovic    dpavlovic@counsel.lacounty.gov

Grant Rigdon    grigdon@birdmarella.com, ssmall@birdmarella.com

Jacob P. Duginski    jduginski@bdlaw.com, arivas@bdlaw.com

James B. Slaughter    jslaughter@bdlaw.com

Jennifer Lauren Riggs    jriggs@meyersnave.com, lcastro@meyersnave.com

Jon Scott Kuhn    skuhn@counsel.lacounty.gov

Kaitlyn Day Shannon    kshannon@bdlaw.com, aahmed@bdlaw.com, hwebb@bdlaw.com, mmorgan@bdlaw.com, mvitris@bdlaw.com, vpodolsky@bdlaw.com

Katelyn E. Ciolino    kciolino@bdlaw.com

Louis J. Manzo    LManzo@bdlaw.com

Megan L. Marzec Morgan    mmorgan@bdlaw.com

Megan R. Brillault    MBrillault@bdlaw.com

Michael Lee Huggins    mhuggins@meyersnave.com, gduran@meyersnave.com, lgonzales@meyersnave.com

Paul S. Chan    pchan@birdmarella.com, docket@birdmarella.com, dthrockmorton@birdmarella.com

Seena Samimi    ssamimi@meyersnave.com, calendardept@meyersnave.com, scandy@meyersnave.com

Shoshana E Bannett    sbannett@birdmarella.com, karen-minutelli-9770@ecf.pacerpro.com,

kminutelli@birdmarella.com

**2:24-cv-10819-MEMF-MAR Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

Dawyn R. Harrison, County Counsel (SBN: 173855)
Scott Kuhn, Assistant County Counsel, (SBN: 190517)
Dušan Pavlović, Senior Deputy County Counsel (SBN: 228509)
Caroline K. Castillo, Deputy County Counsel (SBN: 236987)
OFFICE OF THE COUNTY COUNSEL
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012-2713
Telephone: (213) 974-1811
Facsimile: (213) 626-7446

Deborah J. Fox (SBN: 110929)
dfox@meyersnave.com
Jenny L. Riggs (SBN: 204417)
jriggs@meyersnave.com
Cristina L. Talley (SBN: 107298)
ctalley@meyersnave.com
Catherine L. Carlisle (SBN: 298316)
ccarlisle@meyersnave.com
Seena M. Samimi (SBN: 246335)
ssamimi@meyersnave.com
MEYERS NAVE
707 Wilshire Blvd., 24th Floor
Los Angeles, California 90017
Telephone: (213) 626-2906
Facsimile: (213) 626-0215

Attorneys for Plaintiffs
THE PEOPLE OF THE STATE OF
CALIFORNIA and THE COUNTY OF LOS
ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES,<br><br>            Plaintiffs,<br><br>      v.<br><br>CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; WASTE CONNECTIONS US, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>            Defendants. | Case No. 2:24-cv-10819-MEMF (MARx)<br>Related Case: 2:23-cv-08380-MEMF (MARx)<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      July 14, 2025<br>Time:     8:00 a.m.<br>Crtrm:   8B<br><br>Action Filed:      December 16, 2024<br>Trial Date:        None Set |

---

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

349

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................... 1

II.   ARGUMENT ........................................................................................................ 2

    A.    The Supplemental Declarations are Nothing More than an Improper Effort to Circumvent this Court's Ruling Denying Defendants' Request to Extend the Deadline for Defendants' Opposition to the PI Motion and Allow for Expedited Discovery .................................................................................. 2

    B.    Direct Examination of Chiquita Defendants' Declarants is Not Appropriate and Amounts to Extending Defendants' Opposition Deadline ........................ 5

    C.    Defendants' Have No Right to Conduct "Re-Direct" Examination of Witnesses Who are not Subject to Cross-Examination by the County Plaintiffs ................................................................................................... 7

    D.    Defendants Have No Right to Offer New Exhibits into the Record for Impeachment or Rebuttal Purposes ................................................................ 8

III.  CONCLUSION ..................................................................................................... 9

i

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

350

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*A.K. by and through Moyer v. Cherry Creek Sch. Dist.*
No. 5, No. 20-cv-00392-PAB-NRN, 2020 WL 2197920 (D. Colo. May 6, 2020) .................. 6

*Cervantes v. San Diego Police Chief Shelley Zimmerman*,
No. 17-cv-1230-BAS-NLS, 2019 WL 3072307 (S.D. Cal. July 15, 2019) ............................. 8

*City of Tombstone v. United States*,
No. CV 11-845-TUC-FRZ, 2012 WL 12842260 (D. Ariz. Mar. 1, 2012) ............................... 4

*Coal. on Homelessness v. City and Cnty. of San Francisco*,
647 F. Supp. 3d 806 (N.D. Cal. 2022) ................................................................. 4

*Coal. on Homelessness v. City and Cnty. of San Francisco*,
No. 23-15087, 2024 WL 3325655 (9th Cir. July 8, 2024) ........................................ 4

*Fed. Trade Comm'n v. Digital Altitude, LLC*,
No. LA CV18-00729, 2018 WL 1942392 (C.D. Cal. Mar. 9, 2018) ................................ 5, 6

*Kelly v. Primco Mgmt., Inc.*,
No. CV 14-07263 BRO, 2015 WL 10990368 (C.D. Cal. Jan. 12, 2015) ............................. 6

*Overhead Sols., Inc. v. A1 Garage Door Serv., L.L.C.*,
No. 19-cv-01741-PAB-NYW, 2021 WL 707721 (D. Colo. Jan. 28, 2021) ........................... 6

*Pashaie v. H77LA, LLC*,
No. 2:23-cv-06567-MEMF-AJR, 2024 WL 3510860 (C.D. Cal. July 22, 2024) .................... 6

*Ramachandran v. City of Los Altos*,
No. 18-cv-01223-VKD, 2021 WL 5206675 (N.D. Cal. Nov. 9, 2021) ................................. 8

*Ramirez v. Zimmerman*,
No. 18-cv1062-BAS-NLS, 2019 WL 2179538 (S.D. Cal. May 20, 2019) ............................ 8

*Ramirez v. Zimmerman*,
No. 20-56117, 2021 WL 5104371 (9th Cir. Nov. 3, 2021) ........................................... 8

*Stanley v. Univ. of S. Cal.*
13 F.3d 1313 (9th Cir. 1994) ......................................................................... 5

*Strandquist v. Washington State Dep't of Soc. & Health Servs.*,
No. 3:23-cv-05071-TMC, 2025 WL 331032 (W.D. Wash. Jan. 29, 2025) ............................. 8

ii

351

**Rules**

F.R.C.P.
    Rule 26 ................................................................................................................ 8

Local Rule
    7 ............................................................................................................................ 9
    7-8 ................................................................................................................ *passim*
    7-9 ............................................................................................................... 1, 4, 6

iii

352

Plaintiff the People of the State of California, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and Plaintiff the County of Los Angeles ("County Plaintiffs") hereby object to the following evidence proffered by Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connections US, Inc., (the " Chiquita Defendants") after the completion of briefing on the County Plaintiffs' Motion for Preliminary Injunction:

i) the supplemental declarations of Patrick Sullivan, Steven J. Cassulo and M. Laurentius Marais filed by Defendants on July 7, 2025 (ECF Nos. 113, 114, 115-1, and 116-1);

ii) direct examination of Defendants' declarants;

iii) "redirect" examination of Defendants' declarants whom the County Plaintiffs do not intend to cross-examine at the preliminary injunction evidentiary hearings; and

iv) undisclosed exhibits purportedly to be used for impeachment.

# I.   INTRODUCTION

In its relentless effort to convert the hearing on County Plaintiffs' motion for a preliminary injunction ("PI Motion") into a trial on the merits, and paper this case on the eve of the PI Motion evidentiary hearings, the Chiquita Defendants: (1) filed three supplemental declarations a week before the evidentiary hearings on the PI Motion with new exhibits; (2) improperly intend to conduct direct examination of their declarants, including "redirect" examination of several of their declarants whom County Defendants do not intend to cross-examine – a disguised form of direct examination; and (3) intend to offer undisclosed exhibits for impeachment purposes.  Defendants' tactics are a direct affront to this Court's previous ruling on Defendants' Ex Parte Application to Expedite Discovery, Continue the Preliminary Injunction Hearing and Continue Defendants' Response Deadline.  (ECF No. 71.)  Further, there is no authority to expand the record in this hearing, and to do so turns Local Rules 7-8 and 7-9 on their head.  This Court should exclude all such evidence.

1

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## II.     ARGUMENT

**A.     The Supplemental Declarations are Nothing More than an Improper Effort to Circumvent this Court's Ruling Denying Defendants' Request to Extend the Deadline for Defendants' Opposition to the PI Motion and Allow for Expedited Discovery**

The Supplemental Declaration of M. Laurentius Marais (ECF Nos. 115-1 and 116-1) purports to address County Department of Public Health survey ("DPH Survey") and South Coast Air Quality Management Board complaint data ("AQMD Data") provided to the Chiquita Defendants after they filed their Opposition.  The DPH Survey and AQMD Data was relied upon by Dr. Harold Campbell, and the Chiquita Defendants characterize this as "the heart of [County Plaintiffs'] case."  (Supplemental Joint Status Report re Preliminary Injunction Hearing, ECF No. 103, ID 15239.[1])  The Supplemental Declarations of Steven J. Cassulo and Patrick Sullivan offer new evidence independently obtained after Defendants filed their Opposition.  While Defendants assert that "[their] ability to supplement their analysis in writing and at hearing is…fundamental to their right to be fully heard in these proceedings" (*Id.*), these Supplemental Declarations effectively extend Defendants' deadline to file their Opposition to the PI Motion, in direct contravention of this Court's order denying such request.  (ECF No. 75.)[2]

Specifically, Defendants filed an Ex Parte Application to Expedite Discovery, Continue the Preliminary Injunction Hearing and Continue Defendants' Response Deadline on June 4, 2025. (ECF No. 71.)  In that application, the Chiquita Defendants make the same argument justifying the need to file the supplemental Marais Declaration as they do now:  they *expressly* relied on the fact that the DPH Survey and AQMD Data had not been provided to Defendants at the time the PI Motion was served, and argued that, "after Defendants receive the data, they and their experts

---

[1] The Chiquita Defendants plainly misapprehend the nature and strength of County Defendants' case.

[2] Defendants acknowledge they prepared supplemental declarations because they had a "short window during which [they] prepared their opposition papers, and the request for additional time was denied.  (ECF 75)."  (Supplemental Joint Status Report re Preliminary Injunction Hearing, ECF No. 103, ID 15239.)

2

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE
COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  need time to review it, and Defendants need to be able to question Campbell about his

2  conclusions." (ECF No. 71, ID 5611.)  This argument, however, was not persuasive.  In its ruling

3  denying Defendants' Ex Parte Application, this Court stated:

4  > Defendants have not explained to this Court what previously

5  > unknown or unreviewed facts Plaintiffs' declarants and exhibits

6  > have put forth such that prolonged research and preparation, whether

7  > by Defendants' counsel or the experts, are necessary to properly

8  > oppose the PI Motion. Rather, *the Court finds that many of the*

9  > *exhibits are documents prepared by or addressed to Defendants,*

10 > *public records, and screenshots of Defendants' own website—the*

11 > *types of documents that Defendants should have had access to or*

12 > *could have obtained without difficulty since the beginning of this*

13 > *case or the Lead Case.* Absent such a showing, the Court finds that

14 > there is no crisis that warrants the Application.[3]

15 (ECF No. 75, ID 5796; emphasis added.)

16      The argument advanced by Defendants to justify filing the Marais Declaration is no more

17 persuasive now.  Defendants were aware of the DPH survey and the AQMD data at least by

18 December, 2024, when County Plaintiffs filed their Complaint.  They could have requested those

19 documents under the California Public Records Act; they did not do so.  Moreover, as this Court

20 noted, there is no reason why cross-examination of Campbell to address the bases for his analysis

21 would be insufficient.  (*See id.*)  Defendants have even less justification for filing the Sullivan and

22 Cassulo Supplemental Declarations, both of which purport to offer new evidence acquired after

23 the Opposition was filed.  Allowing this after-the-fact evidence makes the Opposition filing

24 deadline a moving target up to and including the date of the hearing.

---

[3] The fact that this statement was made in the context of Defendants' request for expedited discovery is of no moment.  The Court made clear Defendants had ample opportunity to obtain the records upon which the County Plaintiffs' declarations were based and denied *both* the request for expedited discovery and an extension of the deadline to file an Opposition.  That same reasoning supports sustaining County Plaintiffs' objections here.

3

1    County Plaintiffs anticipate Defendants will rely on *City of Tombstone v. United States*,

2  No. CV 11-845-TUC-FRZ, 2012 WL 12842260 (D. Ariz. Mar. 1, 2012) and *Coal. on*

3  *Homelessness v. City and Cnty. of San Francisco*, 647 F. Supp. 3d 806 (N.D. Cal. 2022), *aff'd in*

4  *part, vacated in part, remanded, Coal. on Homelessness v. City and Cnty. of San Francisco,* No.

5  23-15087, 2024 WL 3325655 (9th Cir. July 8, 2024), to support their late filings.  Both of these

6  cases are easily distinguishable.  In *City of Tombstone*, the plaintiff kept filing additional evidence

7  and briefing *after* it filed its preliminary injunction motion, which resulted in defendants requiring

8  additional time to present evidence to address the plaintiff's new evidence.  That did not happen

9  here.  Significantly, the *City of Tombstone* court denied the preliminary injunction (because the

10  record on the motion was in a state of disarray), without prejudice to plaintiff filing a new motion,

11  but warned the plaintiff that further attempts to submit facts outside the briefing deadline would be

12  summarily denied.  2012 WL 12842260, at *3.  *Coalition on Homelessness* is also markedly

13  different from the facts here.  In *Coalition on Homelessness*, it was the moving party plaintiff that

14  filed a supplemental declaration in support of its preliminary injunction motion because the

15  defendant did not provide data to the plaintiff until long after its motion was filed.  Moreover, the

16  "objections" to the supplemental declaration were not based on the fact that the supplemental

17  declaration was filed with plaintiff's reply brief.  Rather, the objections addressed the substance of

18  the supplemental declaration.

19    Local Rule 7-9 sets forth the deadline for filing an opposition to a motion and provides that

20  a party opposing a motion shall file with the Clerk, "*the evidence* upon which the opposing party

21  will rely in opposition to the motion and a brief but complete memorandum which shall contain a

22  statement of all the reasons in opposition thereto and the points and authorities upon which the

23  opposing party will rely…"  (Emphasis added.)  Defendants requested but were denied an

24  extension to this deadline and, implicitly, the right to file evidence beyond that deadline.

25  Nevertheless, by filing the Supplemental Declarations, Defendants blatantly disregarded this

26  Court's ruling and effectively granted themselves an extension of the deadline to file their

27

28

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE
COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  Opposition to July 7, 2025, the date on which the Supplemental Declarations were filed.[4]  This

2  conduct should not be condoned, and the Supplemental Declarations should be excluded from

3  evidence.

4       **B.**     **Direct Examination of Chiquita Defendants' Declarants is Not Appropriate**

5              **and Amounts to Extending Defendants' Opposition Deadline**

6       Defendants indicated in the Joint Supplemental Report that they intend to conduct direct

7  examination of their declarant witnesses, which they unabashedly acknowledge is "the standard

8  procedure for trial proceedings."  (ECF No. 103ID 15239.)  Of course, the proceeding before this

9  Court is *not* a trial.  Neither the legal authority cited by Defendants nor their stated reasons for

10  requesting direct examination of their witnesses support deviating from Local Rule 7-8.

11       Defendants' citation to *Stanley v. Univ. of S. Cal.* 13 F.3d 1313 (9th Cir. 1994) simply does

12  not support allowing the Defendants to conduct direct examination of their witnesses.  In that case,

13  the plaintiff argued that the district court (C.D. Cal.) violated her right to due process by requiring

14  her to make offers of proof rather than permitting her witnesses to testify.  *Id.* at 1326.  The Court

15  rejected that argument, stating, "This contention is without merit. In this circuit, *the refusal to hear*

16  *oral testimony* at a preliminary injunction hearing is not an abuse of discretion if the parties have a

17  full opportunity to submit written testimony and to argue the matter."  *Id*., emphasis added.

18  Similarly, Defendants do not accurately represent the district court's ruling in *Fed. Trade Comm'n*

19  *v. Digital Altitude, LLC*, No. LA CV18-00729 JAK (MRWx), 2018 WL 1942392 (C.D. Cal. Mar.

20  9, 2018).  The court in that case did *not*, as Defendants assert, "[grant] requests to present live

21  testimony, including cross examination and re-direct examination."  (ECF No. 103, ID 15234.)  To

22  the contrary, in response to the parties' request to present live testimony at the preliminary

23  injunction hearing, the court asked the parties to submit declarations of the proposed witnesses to

24  determine whether such live testimony was necessary and appropriate.  *Fed. Trade Comm'n*, 2018

25  WL 1942392*,* at \*2.  Thereafter, the district court, "granted in part the requests to present live

26

27  _____

[4] Indeed, Defendants boldly assert they may be adding new evidence "up to the time of the hearing due to the time constraints" (ECF No. 103, ID 15239), apparently believing there are no opposition deadlines, or at least none that apply to them.

28

5

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE
COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

testimony, *permitting cross-examination and re-direct examination.*"  *Id.*, emphasis added.  This ruling is on all fours with the express terms of Local Rule 7-8 and undermines the Defendants' request for direct examination.

As with the *Digital Altitude, LLC* case, Defendants also present a tortured reading of *Kelly v. Primco Mgmt., Inc.*, No. CV 14-07263 BRO (SHx), 2015 WL 10990368 (C.D. Cal. Jan. 12, 2015) in an effort to bolster their argument that Local Rule 7-8 allows for direct examination. Nowhere in *Kelly* does the court state or even suggest that in applying Local Rule 7-8, direct examination of witnesses was permitted.  The court did, as the Defendants indicate, permit a declarant to testify that "indicated a desire to testify before the Court."  *Kelly*, 2015 WL 10990368, at *7.  What Defendants conveniently omit, however, is that this declarant indicated a desire to testify before the Court only *after* "the Court notified the parties of its intent to require Ms. Kelly to submit to a deposition, as permitted under the Local Rules, or present herself for cross-examination," (*id.*) which, again, is precisely what is allowed by Local Rule 7-8 and what the County Plaintiffs urge here.

Lastly, Defendants' reliance on *Pashaie v. H77LA, LLC*, No. 2:23-cv-06567-MEMF-AJR, 2024 WL 3510860 (C.D. Cal. July 22, 2024) is misplaced.  While, as Defendants note, Order to Show Cause hearings are governed by Local Rule 7-8, they are *not* governed by Local Rule 7-9 which sets forth the briefing deadline for Defendants' Opposition, which must include the evidence upon which Defendants rely – a deadline that this Court refused to extend.[5]

Defendants offer three reasons for requesting direct testimony, none of which have merit:

• "Voluminous" evidence was purportedly presented by the County Plaintiffs after the Defendants filed their opposition: This evidence consists of the DPH Survey and AQMD Data. For the reasons set forth is Section A, of this Objection, *supra*, this justification is an attempt to

---

[5] Defendants' reliance on *A.K. by and through Moyer v. Cherry Creek Sch. Dist.* No. 5, No. 20-cv-00392-PAB-NRN, 2020 WL 2197920 (D. Colo. May 6, 2020) and *Overhead Sols., Inc. v. A1 Garage Door Serv., L.L.C.*, No. 19-cv-01741-PAB-NYW, 2021 WL 707721 (D. Colo. Jan. 28, 2021) cited in a footnote in the Joint Supplemental Report (ECF No. 103, ID 15238) is misplaced. There is no indication those district courts have a local rule similar to Local Rule 7-8; additionally, these are out-of-district cases and, therefore, are not controlling in this Court.

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

rehash the arguments which Defendants made in support of their effort to obtain expedited discover and an extension of their Opposition deadline.  It carries no more weight now.

•  Defendants' declarants had limited availability during the period of time this Court granted Defendants to prepare their opposition.  In other words, according to Defendants, the need for direct testimony is the Court's fault, presumably because the Court denied their request for an extension of time to file their Opposition.  It is inappropriate to use direct examination to subvert this Court's prior ruling.

•  Direct examination is supposedly necessary to "contextualize the witness testimony for the Court."  In other words, Defendants argue that the Court will not be able to understand the cross-examination testimony without direct testimony.  Defendants underestimate this Court's abilities and preparation.  Additionally, Local Rule 7-8 contemplates cross-examination without direct examination, the implication being that contextualization through direct examination is not necessary.

Neither the law nor the facts support turning this preliminary injunction into a mini-trial by allowing direct examination. The Chiquita Defendants' request to conduct direct examination should be denied.[6]

### C.    Defendants' Have No Right to Conduct "Re-Direct" Examination of Witnesses Who are not Subject to Cross-Examination by the County Plaintiffs

Defendants have indicated they intend to conduct what they term "re-direct" examination of several of their declarants (ECF No. 103, ID 15241), notwithstanding the fact that the County Plaintiffs have no intention of cross-examining these declarants.[7]  (*Id.*)  By definition, however, there can be no "re-direct" without cross-examination.  Thus, as a practical matter, Defendants simply seek to tack on more direct examination, which County Plaintiffs strenuously oppose.  (*Id.*,

---

[6] If this Court should allow Defendants the ability to conduct direct examination of their declarants, County Plaintiffs reserve the right to conduct direct examination of their declarants.

[7] On July 10, 2025, County Plaintiffs filed their Notice of Withdrawal of Four Prior Requests to Cross-Examine Declarants Under LR 7-8, indicating they now request to cross-examine only two of Defendants' declarants.  (ECF No. 124.)

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ID 15233-15235.)  For all the reasons set forth is Section B of this Objection, *supra*, direct and re-direct examination of these declarants should be denied.

### D.    Defendants Have No Right to Offer New Exhibits into the Record for Impeachment or Rebuttal Purposes

Based on email communications between the parties, County Plaintiffs anticipate the Chiquita Defendants will attempt to offer into evidence new exhibits for impeachment.  There is absolutely no authority to allow Defendants to offer such evidence.  In fact, when asked for such authority, Defendants identified several cases, *none of which involved a preliminary injunction hearing*.

*Ramachandran v. City of Los Altos*, No. 18-cv-01223-VKD, 2021 WL 5206675 (N.D. Cal. Nov. 9, 2021) involved a motion to withdraw as counsel.  Remarkably, the Chiquita Defendants cited, not to anything in the decision, but to an *attachment* to the decision, which is the "Standing Order re Pretrial Preparation" for the magistrate, and addresses the "requirements, deadlines, and procedures" which apply "in all cases scheduled for *trial*."  (Emphasis added.)  *Strandquist v. Washington State Dep't of Soc. & Health Servs.*, No. 3:23-cv-05071-TMC, 2025 WL 331032 (W.D. Wash. Jan. 29, 2025) addressed motions in limine prior to trial.  The *Strandquist* court ruled that certain exhibits were excluded from plaintiff's case in chief for late disclosure, but added the documents could be used for rebuttal, impeachment, or to refresh recollection, if shown to be relevant.  Finally, *Ramirez v. Zimmerman*, No. 18-cv1062-BAS-NLS, 2019 WL 2179538 (S.D. Cal. May 20, 2019), *aff'd sub nom. Cervantes v. San Diego Police Chief Shelley Zimmerman*, No. 17-cv-1230-BAS-NLS, 2019 WL 3072307 (S.D. Cal. July 15, 2019), *aff'd sub nom. Ramirez v. Zimmerman*, No. 20-56117, 2021 WL 5104371 (9th Cir. Nov. 3, 2021) addressed motions to compel further discovery.  As usual, Defendants' cited language is taken completely out of context.  In *Ramirez*, the court properly concluded that Rule 26 *governing discovery* did not require the disclosure of evidence that is used solely for impeachment.  The inherent and substantive differences between a preliminary injunction hearing on the one hand, and pretrial procedures/motions and discovery rules on the other hand are clear, and citation to these cases is disingenuous, at best.

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    Of course, in the context of a trial, there is no question that the parties need not exchange

2  exhibits to be used for impeachment or rebuttal.  Despite Defendants' efforts to make it one, the

3  proceeding before this Court is *not* a trial.  It is a preliminary injunction hearing.  The record is

4  limited to evidence submitted by the parties in accordance with the briefing schedule in Local

5  Rule 7 and any cross-examination allowed under Local Rule 7-8.

6  **III.    CONCLUSION**

7    For all the foregoing reasons, this Court should:

8    1) exclude from evidence all supplemental declarations and exhibits not filed with

9  Defendants' Opposition;

10    2) preclude all direct examination; and

11    3) preclude the re-direct examination of any declarant which County Plaintiffs do not

12  cross-examine.

14  DATED:  July 11, 2025                    MEYERS NAVE

16                                      By: _____

17                                          DEBORAH J. FOX
                                           JENNY L. RIGGS
18                                          CRISTINA L. TALLEY
                                           CATHERINE L. CARLISLE
19                                          SEENA M. SAMIMI
                                           Attorneys for Plaintiffs
20                                          THE PEOPLE OF THE STATE OF
21                                          CALIFORNIA and THE COUNTY OF LOS
                                           ANGELES

22  6235964

9

COUNTY PLAINTIFFS' OBJECTIONS TO EVIDENCE PROFFERED BY DEFENDANTS AFTER THE
COMPLETION OF BRIEFING ON COUNTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Paul S. Chan (SBN 183406)
  pchan@birdmarella.com
Ariel A. Neuman (SBN 241594)
  aneuman@birdmarella.com
Shoshana E. Bannett (SBN 241977)
  sbannett@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS &
NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100

Jacob P. Duginski (SBN 316091)
  jduginski@bdlaw.com
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 262-4000

Kaitlyn D. Shannon (SBN 296735)
  kshannon@bdlaw.com
Megan L. Morgan (pro hac vice)
  mmorgan@bdlaw.com
Megan R. Brillault (pro hac vice)
  mbrillault@bdlaw.com
James B. Slaughter (pro hac vice)
  jslaughter@bdlaw.com
Katelyn E. Ciolino (pro hac vice)
  kciolino@bdlaw.com
Lou J. Manzo (pro hac vice)
  lmanzo@bdlaw.com
BEVERIDGE & DIAMOND P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036-1661
Telephone: (202) 789-6000

Attorneys for Defendants Chiquita
Canyon, LLC, Chiquita Canyon, Inc. and
Waste Connections US, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| THE PEOPLE OF THE STATE OF CALIFORNIA, et al., | CASE NO. 2:24-cv-10819-MEMF-MAR |
|---|---|
| Plaintiffs, | **AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.** |
| vs. | Date:      July 17, 2025 |
| CHIQUITA CANYON, LLC, et al., | Time:     10:00 a.m. |
| Defendants. | Assigned to Hon. Maame Ewusi-Mensah Frimpong, Courtroom 8B |

362

1

## <u>TABLE OF CONTENTS</u>

**Page**

I.  Introduction and Background ................................................................ 1

    A.  Qualifications and Assignment ............................................... 1

    B.  Summary of Opinions ............................................................. 1

II.  The Newly Produced DPH Survey Data in Dr. Campbell's June 19 Disclosure Reveals Additional Flaws in Dr. Campbell's Analyses ................. 3

    A.  The limitations of the DPH Survey render it impossible to determine how many distinct, individual respondents actually started or completed the DPH Survey ....................................... 3

    B.  The DPH Survey fails to focus effectively on residents of the area near the Landfill, thus violating the second condition for valid survey research ................................................................. 6

    C.  The validity of the DPH Survey is further impaired by its high non-completion rate ................................................................. 7

    D.  Dr. Campbell's subjective ranking of reported odor categories depends on additional undisclosed and unsupported assumptions for classifying respondents who reported more than one type of odor ......................................................................................... 8

    E.  The DPH Survey inappropriately primes respondents by displaying the cumulative results of previous responses to the survey before presenting them with the survey questions .................. 9

III.  The Newly-Produced AQMD Odor Complaint Data in Dr. Campbell's June 19 Disclosure Reveals Additional Flaws in Dr. Campbell's Analyses ........................................................................................... 10

    A.  Issues with the AQMD odor complaint data ......................... 10

    B.  Problems with Dr. Campbell's Hot Spot analysis ................. 12

    C.  The data Dr. Campbell relies upon documents a drastic reduction in odor complaints since early 2025 .................................... 21

IV.  Even After Dr. Campbell's Production of His June 19 Disclosure, His Cumulative Disclosures in Support of His Declaration Remain Grossly Inadequate ........................................................................................ 23

V.  Conclusion ........................................................................................ 24

i

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

# I.    Introduction and Background

## A. Qualifications and Assignment

1.    I am the same M. Laurentius Marais who submitted a previous declaration in this matter (my "Initial Declaration," dated June 12, 2025, and re-executed on June 25, 2025).[1] My qualifications and my professional publications are listed in Attachment A to my Initial Declaration.

2.    Counsel for Defendants have asked me to review the supporting data that Dr. Campbell produced on June 19, 2025,[2] (the "June 19 Disclosure" in light of my assessment in this Supplemental Declaration) and to assess, from the perspective of my areas of expertise, whether my conclusions from reviewing this June 19 Disclosure require any change to any of the opinions that I offered in my Initial Declaration in response to Dr. Campbell's opinions.[3]

## B. Summary of Opinions

3.    Based on my review and analysis to date of the June 19 Disclosure and other materials listed in Attachment A, I have reached the following opinions:

(a) Nothing in the June 19 Disclosure requires any change to any of the

---

[1] Declaration of M. Laurentius Marais, Ph.D., June 12, 2025 (re-executed on June 25, 2025) (ECF 82-8, 89).

[2] Dr. Campbell provided four Excel files without any additional information regarding the content: "CONFIDENTIAL - COUNTY-0000001.xlsx," "CONFIDENTIAL - COUNTY-0000002.xlsx," "CONFIDENTIAL - COUNTY-0000003.xlsx," and "CONFIDENTIAL - COUNTY-0000004.xlsx." I have been advised that the first file contains the DPH Survey data and the remaining three files appear to contain the AQMD odor complaint data for January 2023 through April 23, 2025 referenced by Dr. Campbell.

[3] This Amended Supplemental Declaration differs from my prior Supplemental Declaration executed on July 7, 2025, only in omitting prior Attachment B, which contained information designated as confidential by the County of Los Angeles. I understand that my work papers underlying my analysis and my prior Attachment B were provided to the County on July 7, 2025.

---

1

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

opinions I offered in my Initial Declaration including, in particular, my overarching opinion that Dr. Campbell's conclusions from his analyses of DPH Survey and AQMD odor complaint data are unsupported and unreliable.

(b) Because Dr. Campbell failed to ascertain and authenticate information about the identities and addresses of respondents to the DPH Survey, neither he nor I can determine whether every respondent actually resided near the Landfill, nor whether any individual respondent submitted multiple responses to the survey. As a result, Plaintiffs' contention that the DPH Survey is "germane because it shows that a large number of people experience the Landfill's odors, and that they are reporting impacts to the County"[4] rests on a leap of faith rather than a testable, verifiable foundation.

(c) The newly-produced DPH Survey and AQMD odor complaint data reveals additional flaws in Dr. Campbell's support for his purported conclusions. For example, more than half of the 2,486 AQMD complaints that resulted in a Notice of Violation ("NOV") between January 1, 2023 and April 23, 2025 are generated by fewer than 15 unique addresses.

(d) Dr. Campbell's identification of purported "hot spots" from the AQMD complaints resulting in NOVs cannot be relied upon as evidence because the hot-spot analysis is highly sensitive to reasonable, seemingly minor changes to his assumptions, which drastically change whether and where the alleged hot spots are identified.

(e) Dr. Campbell *still* has not produced the basic information needed to

---

[4] County Plaintiffs' Evidentiary Objections to Defendants' Evidence in Support of Opposition to Motion for a Preliminary Injunction, July 17, 2025 (ECF 87-1), p. 2.

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

fully replicate and properly evaluate his analyses.

4.    I hold these opinions to a reasonable degree of mathematical and statistical certainty. The materials I considered in forming the opinions I stated in my Initial Declaration were listed in Attachment B to that declaration. The materials I considered in forming the supplemental opinions I state here are listed in Attachment A to this declaration. I may revise or refine my opinions in light of additional information or analysis.

## II.    The Newly Produced DPH Survey Data in Dr. Campbell's June 19 Disclosure Reveals Additional Flaws in Dr. Campbell's Analyses

5.    Nothing in Dr. Campbell's June 19 Disclosure requires any change to my opinion (as set forth in Section II of my Initial Declaration) that the DPH Survey is incapable of providing unbiased, reliable information for the purposes for which Dr. Campbell proffers it. In my Initial Declaration, I outlined three necessary, generally accepted survey principles that must be followed for a survey to provide unbiased, reliable information about its subject matter and to allow statistically valid extrapolation of information from the sample of survey responses to any well-defined, broader population of interest. Due to the flaws in Dr. Campbell's survey design, he can provide no assurance that his survey meets these three necessary conditions. Dr. Campbell's cumulative production of data and information to date does not mitigate this basic defect. Instead, Dr. Campbell's June 19 Disclosure reveals *additional* flaws in the DPH Survey and related analysis, as explained below.

### A. The limitations of the DPH Survey render it impossible to determine how many distinct, individual respondents actually started or completed the DPH Survey

6.    Because Dr. Campbell failed to ascertain and authenticate survey respondents' identities and addresses, one can neither confirm that the respondents actually resided near the Landfill nor detect whether individual respondents

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

responded to the survey repeatedly. As discussed in the first of the three necessary conditions for valid survey research, a survey that fails to sample from the relevant population cannot generate valid estimates for that population. Diamond (2011) puts this as follows: "A survey that provides information about a wholly irrelevant population is itself irrelevant."[5] Dr. Campbell could have asked—but didn't— whether a respondent had previously taken the survey. While this would only flag repeated responses from participants who self-report previously taking the survey, it would at least provide a provisional filter for limiting the survey data to unique individual respondents. He also could have sought—but didn't—to identify and validate the location of the respondent's residence or workplace. Because how many unique individuals have responded to the DPH survey is unknowable, Plaintiffs' contention that the DPH Survey is "germane because it shows that a large number of people experience the Landfill's odors, and that they are reporting impacts to the County"[6] is unsupported by actual evidence.

7.    Dr. Campbell presents estimates of the number of "unique responses" to the DPH Survey by separately calculating the number of unique IP addresses and reported dates of birth across respondents (even though he present no additional analysis limited to these allegedly "unique responses").[7] However, neither of these values is a reliable proxy for unique individuals: the same individual may take the survey under multiple IP addresses by using different internet providers (such as through a VPN) or changing locations. And there is similarly no reason to expect

---

[5] Diamond, Shari S. "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition. Federal Judicial Center and National Research Council. Washington, DC, The National Academies Press, 2011, pp. 359– 423 ("Diamond (2011)"), p. 377.

[6] County Plaintiffs' Evidentiary Objections to Defendants' Evidence in Support of Opposition to Motion for a Preliminary Injunction, July 17, 2025 (ECF 87-1), p. 2.

[7] Campbell Declaration (ECF 60-1), Exhibit 5.

4

that respondent-provided dates of birth can effectively isolate unique respondents or prevent duplicate responses.

8.    Even though, as noted above, a unique IP address does not on its own mean that it is unique response, based on the June 19 Disclosure, I performed the following simple check on Dr. Campbell's analysis: if one accepts his assumption that a respondent's IP address—or the combination of IP address and date of birth—is a reasonable proxy for identifying unique individual respondents, then Dr. Campbell's newly produced DPH Survey data confirms that at least some individual respondents (or IP addresses) provided multiple survey responses. Specifically, among a total of 1,246 DPH Survey responses,[8] there are only 828 unique IP addresses and.  Of the total of 1,246 DPH Survey responses, only 940 responses include a non-missing date of birth.  Among those 940, there are only 748 unique IP and date-of-birth combinations. Among the 144 DPH Survey responses where the respondent started the survey in 2025, there are only 82 unique IP addresses or 68 unique IP and date-of-birth combinations (among those who provided a date of birth).[9]

---

[8] The DPH Survey response file that Dr. Campbell produced contains a total of 1,246+**28** rather than 1,246 responses. Upon deleting those 27 responses having a "Recorded Date" of May 21, 2025, or later as well as one additional response (a "Response ID" "R_6SrIifTJU8C4h3Y," provisionally identified through "reverse engineering" of charts in Dr. Campbell's Exhibit 5, although he has provided no basis for excluding it), I am able to replicate several of the analyses reported in Exhibit 5. Accordingly, for the purposes of my analysis here, I use the resulting subset of 1,246 responses. Because Dr. Campbell has produced no data dictionary or work papers that document his processing of the raw survey data, it is unclear whether these are the exact same 1,246 responses that Dr. Campbell analyzed. In fact, our results still differ on the following dimensions: odor duration, age group distribution, and total number of unique responses based on date-of-birth. (Note also that our odor category results match only after some additional reverse-engineered data cleaning.)

[9] *See* workpapers.

---

5

368

9.      In sum, because of the absence of minimal validation safeguards in the DPH Survey, one cannot determine whether any single IP address is associated with a single respondent or with multiple respondents, or whether multiple distinct IP addresses are associated with any single respondent (*e.g.*, a respondent could retake the survey using different devices and/or internet connections). While the survey did attempt to characterize respondents by collecting several demographic variables (*e.g.*, date of birth, race, and gender), the responses to these demographic questions are—as far as I am able to tell from my review of the limited information provided by Dr. Campbell—unverified and unvalidated by comparison to any external reference information. This inadequate approach contrasts starkly with the standard operating procedure for surveys used to gather evidence in the context of litigation, in which respondents are recruited via a survey panel vendor who has verified the demographic characteristics of panel members, thus allowing the researcher to target a predefined population and to authenticate responses from respondents who identify themselves as members of that population. Dr. Campbell has presented no evidence that his survey is truly *representative* of any target population that is defined to be relevant to this dispute.[10] In fact, Dr. Campbell's cumulative, inadequate disclosures to date cannot even exclude the extreme hypothesis that a single person provided all 1,246 survey responses.

**B. The DPH Survey fails to focus effectively on residents of the area near the Landfill, thus violating the second condition for valid survey research**

10.   I understand that the preliminary injunction would relate only to *residents* of the area near the Landfill and would thus not involve persons who *work* in the area but do not reside there. However, the introduction to the DPH Survey describes its intention as surveying "the experiences of those living and/*or working* in close

---

[10] Initial Declaration (ECF 82-8), ¶ 14.

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

proximity to the landfill [italics added]."[11] Based on my review to date, I have found no indication in Dr. Campbell's Declaration or his June 19 Disclosure of any viable method for distinguishing among respondents who *reside* in the area near the Landfill, or who work but do not reside there, or who neither reside nor work there. This flaw in Dr. Campbell's DPH Survey further impairs its validity as evidence in this proceeding, because it violates the second necessary condition for valid survey research: to select respondents who are representative of the population of interest.

## C. The validity of the DPH Survey is further impaired by its high non-completion rate

11.  The data that Dr. Campbell produced in his June 19 Disclosure confirms that for most of the analyses in his Exhibit 5 he included *all* the survey responses, even though 39.5% (= 492 / 1,246) of all respondents who started the DPH Survey failed to complete it.[12] Among responses where the respondent started the DPHS survey in 2025, 36.1% (= 52 / 144) failed to complete it. This high non-completion rate of the DPH Survey provides another indication that the survey fails to provide reliable evidence. It is common knowledge among survey researchers that non-completion and non-response can gravely impair the representativeness of survey data by introducing selection bias. Accordingly, survey researchers routinely evaluate the rates of non-completion and non-response and attempt to determine and mitigate the extent to which these issues threaten the validity of the survey results by inducing selection bias. Diamond (2011) describes steps commonly taken to ensure that non-response or non-completion rates are appropriately addressed.[13] As noted in my Initial Declaration, Dr. Campbell's defective survey design renders it impossible

---

[11] Campbell Declaration (ECF 60-1), Exhibit 4, p. 4 of 14.

[12] Campbell Declaration (ECF 60-1), Exhibit 5, p. 1; *See also* COUNTY-0000001.

[13] Diamond (2011), p. 384.

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

370

to analyze or mitigate these potentially fatal sources of bias. Unaccountably, Dr. Campbell neither discusses these issues nor describes any measures he took or safeguards he applied to ensure they do not impair the validity of the DPH Survey.

**D. Dr. Campbell's subjective ranking of reported odor categories depends on additional undisclosed and unsupported assumptions for classifying respondents who reported more than one type of odor**

12.   As I discussed in my Initial Declaration, Dr. Campbell fails to provide any objective basis for his subjective assignment of the ten kinds of odor experiences expressly identified in the DPH Survey questionnaire into "Highly Offensive" versus other categories, including "Offensive," "Unpleasant," and "Not Unpleasant."[14] Among those respondents who answered this question, 67.5% reported more than one kind of odor experience (including 8 responses in which the respondent selected all ten kinds). From my attempt to replicate Dr. Campbell's results, it appears that he used only the most "offensive" categorization for each respondent who selected more than odor. In other words, if a respondent selected both (i) "Putrid/Dead Animal (Rotten Meat, Decayed Fish, Roadkill)" which Dr. Campbell considered "Highly Offensive" and (ii) and "Medical/Disinfectant (Soap, Bleach, Rubbing Alcohol)," which Dr. Campbell considered "Unpleasant," that respondent was categorized as finding the odor experienced to be "Highly Offensive." But Dr. Campbell did not ask respondents to rank these categories or to describe which of them predominated or occurred most frequently. In his Declaration, Dr. Campbell neither disclosed nor provided any justification for this ranking method. He also appears to have performed no sensitivity analysis showing, for example, how the results would have changed had he selected the *least* offensive odor. In fact, based on the data produced in the June 19 Disclosure, when using the *least* offensive odor, only 25% of responses (including incomplete responses) found

---

[14] Campbell Declaration (ECF 60-1), Exhibit 4, pp. 2–3 of 14.

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

the odors to be "Highly Offensive" or "Offensive."[15]

**E. The DPH Survey inappropriately primes respondents by displaying the cumulative results of previous responses to the survey before presenting them with the survey questions**

13.   The DPH Survey also inappropriately reveals the results of prior respondents' answers before the survey begins, which violates a basic principle of survey design and is likely to seriously bias the survey results. As shown in the image below, when respondents reach the website to begin the survey, they are presented with a graphical summary of prior results, including what percentage of respondents "reported a highly offensive odor" and the percentage of respondents reporting symptoms. This means that even before beginning the survey, respondents are primed with information that others are experiencing highly offensive odors and symptoms. As noted in my Initial Declaration, when a survey signals the experimenter's interests to respondents, it can create "demand artifacts" as respondents choose responses they feel are likely to satisfy those interests. Informing respondents how others have answered questions before the survey begins is an extreme form of signaling intentions and threatens the legitimacy of any of the survey responses.

---

[13] *See* workpapers.

9

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

**Figure 1 – Screenshot of DPH Survey Landing Page[16]**



III.    **The Newly-Produced AQMD Odor Complaint Data in Dr. Campbell's June 19 Disclosure Reveals Additional Flaws in Dr. Campbell's Analyses**

14.    Based upon my own analysis of the AQMD odor complaint data produced in the June 19 Disclosure to date and my further review of the ArcGIS "optimized hot spot" tool Dr. Campbell relied upon, I have identified several issues with the data and additional flaws in Dr. Campbell's analysis.

**A. Issues with the AQMD odor complaint data**

15.    A majority of the AQMD odor complaints that led to an NOV appear to have been generated by a set of only 13 street addresses. Specifically, among the 2,486 AQMD complaints that led to an NOV, there are only 444 unique addresses,[17]

---

[16] http://publichealth.lacounty.gov/eh/cclsurvey.htm, last accessed July 7, 2025.

[17] There are a total of 612 unique addresses in the AQMD complaint odor data. For the purposes of my analyses herein, I standardized the addresses, including fixing typos in the addresses, and making the city consistent for the same address. After this standardization, I find that there are only 444 unique addresses. *See* workpapers.

10
AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

13 of which account for 50% of the complaints that resulted in an NOV. Upon sub-setting the data to complaints dated in or *after* January 2025, only 115 AQMD complaints resulted in an NOV. Those 115 were generated by 48 unique addresses, eight of which account for over 50% of complaints resulting in an NOV.

16.   Based on my review of the AQMD odor complaint data produced in the June 19 Disclosure, Dr. Campbell's claim that only *ten* of the 2,486 complaint addresses "could not be geocoded and were excluded from the map and further analysis"[18] appears to be incorrect. In fact, for eight of the 2,486 complaints, the address field is coded as "(Not provided)," and for an additional 72 complaints, the address field contains "(Not provided)" in place of the street address and only includes partial address information such as a street name (without house number) or even just a city name or zip code. As a result, at least 80 of these addresses cannot be reliably geocoded—far more than the claimed 10 locations—and at best they can be matched to a general location (such as the center point of a city), which is inadequate for an analysis purportedly reflecting the locations of *individual households*. Dr. Campbell's failure to report accurately how he assessed the reliability of the geocoding further calls into question the reliability of his analyses.

17.   In addition, I am unable to verify that the AQMD odor complaint data represents a complete and accurate list of all complaints that resulted in NOVs. I understand that NOVs are issued when there are six or more complaints from distinct households in a 24-hour period.[19] However, based on my review of the AQMD odor complaint data in the June 19 Disclosure, there appear to be NOVs issued on days with as few as three complaints. In fact, there are thirteen days on which NOVs were issued even though there were at most five unique addresses

---

[18] Campbell Declaration (ECF 60-1), ¶ 14.

[19] Sanders Declaration (ECF 63), ¶ 19. An NOV can be issued based on one complaint if (and only if) the complaint is made at a school. *Id.,* ¶ 20.

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

associated with those complaints in the data provided. It is not possible to determine whether this implies that the data provided are incomplete or that the NOVs were improperly issued. Regardless of the cause, this calls into question the basic reliability of the data underlying Dr. Campbell's analysis.

18.   Moreover, even with the underlying AQMD odor complaint data and the DPH Survey data produced in the June 19 Disclosure, it is still impossible to assess whether the AQMD complaints that resulted in NOVs correspond to individuals who also took the DPH Survey since Dr. Campbell failed to obtain such information from his DPH Survey respondents.

**B. Problems with Dr. Campbell's Hot Spot analysis**

19.   Dr. Campbell's use of the "Optimized Hot Spot Analysis tool"[20] does not provide a statistically reliable methodology for deciding on the number and identities of households to be relocated. Specifically, based on my review of the Optimized Hot Spot Analysis tool and my own sensitivity analysis of Dr. Campbell's results using the same tool, it is clear that the results are highly sensitive to the assumptions and inputs that the ArcGIS user chooses to provide. Yet, Dr. Campbell has not expressly justified any of the key assumptions he adopted, and changing one or more of these key assumptions can dramatically change the hot spot results, including whether and to what extent hot spots exist at all.

20.   Dr. Campbell's hot-spot analysis works by defining a geographical area for analysis, dividing that area into equally sized analytical hexagons, and then comparing the numbers of AQMD complaints within each hexagon. The analysis then applies statistical tests to determine whether the distribution of numbers of complaints within hexagons is compatible with a "null hypothesis" that the complaints are randomly distributed among hexagons with equal probabilities of being located in any of the hexagons in the analysis. In other words, his analysis

---

[20] Campbell Declaration (ECF 60-1), ¶¶ 15–17.

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

asks whether complaints are concentrated in specific hot spot areas as opposed to equally likely to come from each of the hexagons independently.

21.   However, the results of this analysis depend critically on a set of essentially arbitrary assumptions, including: the size of the geography used in the analysis (referred to as the "minimum bounding geometry" in Dr. Campbell's Exhibit 8); the treatment of outlier data points that are remote from the Landfill; the size of the hexagons used to define individual units of analysis; whether or not to account for additional factors like population, parcel type, the land use of the area being analyzed; and seasonality or time trends in the numbers of complaints. Changing just one of these key assumptions can dramatically alter the conclusions about whether or where there are hot spots.

22.   For example, changing the size of the "minimum bounding geometry" used in Dr. Campbell's analysis has a critical impact on the apparent intensity and locations of the hot spots it identifies. From my attempt to replicate Dr. Campbell's analysis (unaided by the basic documentation he has yet to produce), it appears that he chose to exclude from his analysis two complaints that resulted in NOVs that are located more than 30 miles from the Landfill (one with an address in Lancaster and another in Palmdale). Figure 2A below shows the locations of these excluded complaints compared to the complaints Dr. Campbell included.[21] While the Campbell Declaration makes no mention of these exclusions, it may be that he deemed them to be excludable as "outliers" due to their relatively remote locations. Thus, Dr. Campbell's claim that he included *all* complaints leading to NOVs is incorrect. In failing to disclose or justify this exclusion, he also fails to articulate any principled basis for his decision to *include* in his analysis *other* relatively remote complaints leading to NOVs.

---

[21] Based on my geocoding of the NOV locations, which generally aligns with those presented in Dr. Campbell's Exhibit 7.

13

376

**Figure 2A: Locations of 2023 – April 2025 AQMD Complaints**

**Resulting in Notices of Violation**



AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

**Figure 2B: Locations of Selected 2023 – April 2025 AQMD Complaints Resulting in Notices of Violation**



23.   In particular, Dr. Campbell does *not* omit the two additional relatively remote complaints that resulted in NOVs that are shown as blue triangles in Figure 2B. These locations are both more than 7 miles from the Landfill and on the opposite side of the city of Santa Clarita, and have the effect of significantly increasing the scope of the "minimum bounding geometry" in Dr. Campbell's hot-spot analysis. As shown below, simply omitting these two NOVs—while making *no* other changes to the Campbell methodology—materially ***reduces*** the geographical area (and the number of households) included in the minimum bounding geometry.

24.   Specifically, while Figure 3A shows my provisional attempt to replicate Dr. Campbell's analysis, Figure 3B shows the effect of omitting the two blue-triangle outliers. This single change results in significantly different hot spots of complaints with no significant hot spots at the 99% level for Castaic at all. My provisional replication of Dr. Campbell's analysis shown in Figure 3A identifies 887

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

households within the purported hot spots.[22] Upon omitting the two blue-triangle outliers, the resulting, modified hot spots in Figure 3B include only 373 households, representing a 58% reduction in the implied number of residential parcels located in hot spots. In other words, Dr. Campbell's inclusion of just two complaints from the other side of Santa Clarita results in him finding hundreds of *different* homes, far away from Santa Clarita, to be among the "most impacted" by Landfill odors (Figure 3A below). If the two complaints from the other side of Santa Clarita are omitted, the location and size of the hot spot analysis changes dramatically (Figure 3B below).

### Figure 3A: Replication of Campbell Hot Spots



---

[22] Dr. Campbell has not explained in detail his method for counting households. For my provisional attempt to replicate his figures, I counted households as the sum of the number of units on all parcels with a residential use code as reported in LA County Assessor data from the data vendor Regrid.

16
AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

**Figure 3B: Effect on Campbell Hot Spot Analysis**

**of Excluding Two Distant Points**



25.   Moreover, although Dr. Campbell's analysis depends critically on a baseline assumption that all of the hexagons within his minimum bounding geometry would be equally likely to generate complaints, he provides *no basis* for that critical assumption. Notably, his geography includes remote areas with no residential or commercial structures as well as the Landfill itself. Indeed, although Dr. Campbell purportedly aims specifically to identify severely affected individual residential households, Figure 4A below shows that the *bulk* of the geography encompassed by his chosen "minimum bounding geometry" consists of parcels of land that contain no residential households.[23] Figure 4B below contains aerial imagery that clearly demonstrates just how much of the potential area he included is

---

[23] This figure includes the portions of parcels that fall within Dr. Campbell's minimum bounding geometry categorized as described above.

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

actually vacant land. Dr. Campbell could have—but did not—select areas for the analysis that are plausible sources of complaints. Dr. Campbell's hot spots themselves notably include areas that have not generated any complaints that resulted in NOVs. As a result, Dr. Campbell's analysis fails to meaningfully address a relevant question and does not yield statistically valid evidence.

**Figure 4A: Dr. Campbell's Study Area for Detecting Residential Hot Spots Consists Largely of Non-Residential Land**



AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

**Figure 4B: Dr. Campbell's Study Area for Detecting Residential Hot Spots Consists Largely of Vacant Land**



26.   Dr. Campbell's analysis is also sensitive to other modeling choices and assumptions, such as the size of the underlying analytical hexagons: he chose to let the software he used set its default size, but could have chosen larger or smaller shapes intentionally.

27.   In fact, results from Dr. Campbell's software tool are well known to be highly sensitive to assumptions and inputs, to the extent that the identified hot spots can be changed dramatically depending upon the assumptions used. ESRI, the author and publisher of this software warns expressly that the results can vary significantly depending on how the tool is used to select or weight observations. For example, ESRI documentation[24] contains an illustrative demonstration of how hot-

---

[24] Lauren Scott and Nathan Warmerdam, "Extend Crime Analysis with ArcGIS Spatial Statistics Tools," available

19

spot analysis using identical vandalism crime data can yield almost completely

contradictory hot spot results—depending on whether the input data has been

"normalized" for other types of crime (for example, whether the analysis considers

vandalism incidents alone or, alternatively, vandalism incidents in relation to other

crimes), as shown in Figure 5:

**Figure 5: Different Assumptions Applied to the Same Data**

**May Yield Dramatically Different Hot Spots**

 

Crime hot spots generated from vandalism data for Lincoln, Nebraska, that have not been normalized. Hot spots are shown in bright red and located in downtown Lincoln, an area with a large population. Cold spots, or areas of low crime, are shown in dark blue and are located in suburban areas.

Hot spot analysis using vandalism data that was normalized with data from all crime incidents for Lincoln, Nebraska. Again, areas with high incidence of vandalism are shown in bright red and low vandalism areas are shown in dark blue.

28.   The map in the left-hand panel of the figure may simply reveal areas

where the incidence of *all* crime—including but not limited to vandalism—is high,

while the map on the right reveals areas where the *relative* incidence of vandalism is

high after controlling for other types of crime. The issue ESRI illustrates using the

crime data example highlights a basic flaw in Dr. Campbell's analysis of the AQMD

odor complaint data: he fails, apparently, even to account for differences in

_____

at:https://www.esri.com/news/arcuser/0405/ss_crimestats1of2.html.

20

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

population density among his analytical hexagons[25] (let alone factors such as objective data on air quality, likelihood of exposure, seasonality, and type of terrain). Consequently, it is not surprising that his results are both highly sensitive and unreliable.

29.   Based on my review of literature, the hot-spot tool appears to be used by data analysts to study geographic patterns and identify areas that may be subject to further review and investigation. For example, I have identified papers which use the tool to study topics such as urbanization in Mexico City,[26] detecting landslides in Italy,[27] and the outdoor habits of pre-school children.[28] I am not aware of any court relying upon expert testimony based on the optimized hot-spot tool used by Dr. Campbell as the basis for selecting populations subject to injunctive relief of this type.

**C. The data Dr. Campbell relies upon documents a drastic reduction in odor complaints since early 2025**

30.   The newly produced AQMD odor complaint data reveals that the

---

[25] Put differently, he fails to account for differences among hexagons in the number of residents who *could* choose to lodge a complaint: all else held constant, it would not be remarkable for a hexagon containing 100 residents to generate 10 times as many complaints as a hexagon containing 10 residents.

[26] Juan Miguel Rodriguez Lopez, Katharina Heider, Jürgen Scheffran, "Frontiers of urbanization: Identifying and explaining urbanization hot spots in the south of Mexico City using human and remote sensing," *Applied Geography*, Volume 79, 2017, pp. 1-10.

[27] Lu, Ping, et al., "Landslides detection through optimized hot spot analysis on persistent scatterers and distributed scatterers," *ISPRS Journal of Photogrammetry and Remote Sensing* 156 (2019), pp. 147-159.

[28] Bai, P., Schipperijn, J., Rosenberg, M., & Christian, H. (2022). Where are preschoolers active in childcare centers? A hot-spot analysis using GIS, GPS and accelerometry data. *Children's Geographies*, *21*(4), 660–676. https://doi.org/10.1080/14733285.2022.2104627.

21

384

frequency of complaints resulting in NOVs has declined substantially over time, especially in the most recent time period since early 2025. Figure 6 below shows the numbers of complaints that resulted in NOVs by month from May 2023 through April 2025. The figure shows that complaints resulting in NOVs peaked in August 2023 and have fallen consistently since February 2024. Figure 7 compares the first four months of 2024 and to those of 2025, and shows that the number of complaints resulting in NOVs in each month of 2025 is substantially lower than the levels observed in 2024. The *maximum* number of monthly complaints in January–April 2025 was 41, compared to a *minimum* number of 89 in 2025 (and a maximum of 241). Year-over-year, this data indicates that complaints have fallen by at least 67%. In sum, the most recent time periods actually reflect the ***fewest*** complaints resulting in NOVs:

**Figure 6: AQMD Odor Complaints Resulting in NOVs**

**By Month in May 2023 – April 2025**



AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.



**Figure 7: AQMD Odor Complaints Resulting in NOVs by Month in January–April 2024 and 2025**

31.   Finally, Dr. Campbell has yet to provide any affirmative evidence that the approximately 938 households to be relocated comprise (or even *include*) households that had experienced odors or alleged symptoms. The AQMD complaint data does not purport to systematically measure or identify the extent to which there are health impacts related to reported odors. Further, because the hexagonal regions underlying the hot-spot analysis are purely notional (rather than representing any relevant empirical facts), there is no basis for assuming that the boundaries of these regions can meaningfully distinguish between households that (the County asserts) *should* be moved and others that need *not* be moved. See also ECF 82-8, 89 at ¶ 39.

**IV.    Even After Dr. Campbell's Production of His June 19 Disclosure, His Cumulative Disclosures in Support of His Declaration Remain Grossly Inadequate**

32.   As I explained in my Initial Declaration, to allow me to perform a full replication and audit of the analysis that purportedly supports Dr. Campbell's opinion, I (or any other appropriately qualified expert in my field) would need certain basic information that Dr. Campbell has yet to produce. In addition to the

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

missing information already identified in Section IV of my Initial Declaration, this as-yet undisclosed information includes the following:[29]

(a) Data dictionary for the survey data produced on June 19, 2025, as "CONFIDENTIAL - COUNTY-0000001.xlsx"; and

(b) Identification of the approximate 938 "households" and data used to determine that these parcels are indeed *households*, as opposed to institutions such as business premises.

33.   Dr. Campbell's failure to produce the missing information outlined above prevents me from replicating his analysis or testing the robustness of his conclusions to reasonable alternative assumptions and analytical choices. For example, without this information, one cannot tell if Dr. Campbell's identification of purported hot spots in Val Verde and Castaic accounted appropriately for geographical differences in population density. Put differently, is the seeming clustering of odor complaints in these locations merely *commensurate* with the geographical clustering of the populations of these locations, or is the clustering of odor complaints truly *disproportionately* concentrated in the purported hot spots on a per capita basis? Without the basic supporting information Dr. Campbell has thus far failed to provide, it is impossible to make this determination—or to tell whether Dr. Campbell has attempted to do so.

**V.    Conclusion**

34.   The opinions I have reached in this case are based on my review of the materials listed in Attachment A and on my background knowledge and experience in applied mathematics and statistics. These opinions are based on information, data, and analyses of types typically and reasonably relied upon by experts in my areas of expertise, and I hold them to a reasonable degree of statistical certainty.

---

[29] This catalog of missing information is provisional; I may revise or refine it in light of further investigation.

24

35.  I may do additional work, and I may amend or supplement my opinions in light of new analysis or additional information, pursuant to any Court order, or for any other reason. In particular, I understand that I may be asked to assess and respond to opinions offered by other witnesses, and, from the perspective of my areas of expertise, to review and respond to any reports or other supplementation that may be produced by the parties' experts and to testimony and exhibits presented at preliminary injunction hearings by the parties or their experts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 10, 2025, in Jackson, Wyoming.


_M. L. Marais_
M. Laurentius Marais, PhD

---

25

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

388

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Attachment A:**

**Materials Considered**

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

**Materials Considered**

**Academic Documents and Books**

1. Bai, P., Schipperijn, J., Rosenberg, M., & Christian, H. (2022). Where are preschoolers active in childcare centers? A hot-spot analysis using GIS, GPS and accelerometry data. *Children's Geographies*, *21*(4), 660–676. https://doi.org/10.1080/14733285.2022.2104627

2. Lu, Ping, et al., "Landslides detection through optimized hot spot analysis on persistent scatterers and distributed scatterers," *ISPRS Journal of Photogrammetry and Remote Sensing* 156 (2019), pp. 147-159

3. *Reference Manual on Scientific Evidence*, Third Edition. Federal Judicial Center and National Research Council. Washington, DC, The National Academies Press, 2011

4. Juan Miguel Rodriguez Lopez, Katharina Heider, Jürgen Scheffran, "Frontiers of urbanization: Identifying and explaining urbanization hot spots in the south of Mexico City using human and remote sensing," *Applied Geography*, Volume 79, 2017, pp. 1-10.

**Court Documents**

1. Declaration of Air Quality Analysis & Compliance Supervisor Amanda Sanders of South Coast Air Quality Management District in Support of County's Motion for a Preliminary Injunction, May 28, 2025 (ECF 63)

2. Declaration of Harold Campbell IV, Ph.D, Chief Data Officer of the Los Angeles County Department of Public Health in Support of Plaintiff County of Los Angeles' Motion for a Preliminary Injunction, May 23, 2025 (ECF 60-1)

3. Declaration of M. Laurentius Marais, Ph.D., June 12, 2025 (re-executed on June 25, 2025) (ECF 82-8)

4. County Plaintiffs' Evidentiary Objections to Defendants' Evidence in Support of Opposition to Motion for a Preliminary Injunction, July 17, 2025 (ECF 87-1)

**Bates Stamped Documents**

1. COUNTY-0000001

2. COUNTY-0000002

1

AMENDED SUPPLEMENTAL DECLARATION OF M. LAURENTIUS MARAIS, PH.D.

3. COUNTY-0000003

4. COUNTY-0000004

**Websites**

1. http://publichealth.lacounty.gov/eh/cclsurvey.htm, last accessed July 7, 2025

2. https://portal.assessor.lacounty.gov/parceldetail

3. https://www.esri.com/news/arcuser/0405/ss_crimestats1of2.html

**Data Sources**

1. Geocodio

2. Regrid

# Miscellaneous Filings (Other Documents)

[2:24-cv-10819-MEMF-MAR The People of the State of California et al v. Chiquita Canyon, LLC et al](#)

ACCO,
(MARx),CONSOLS,DISCOVERY,MANADR,PROTORD,RELATED-
G,REOPENED

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered by Chan, Paul on 7/10/2025 at 12:58 PM PDT and filed on 7/10/2025

| | |
|---|---|
| **Case Name:** | The People of the State of California et al v. Chiquita Canyon, LLC et al |
| **Case Number:** | [2:24-cv-10819-MEMF-MAR](#) |
| **Filer:** | Chiquita Canyon, Inc. |
| | Chiquita Canyon, LLC |
| | Waste Connections US, Inc. |
| **Document Number:** | [121](#) |

**Docket Text:**
**DECLARATION of M. Laurentius Marais, Ph.D. re MEMORANDUM in Opposition to Motion,,, [82]** *(Amended Supplemental)* **filed by Defendants Chiquita Canyon, Inc., Chiquita Canyon, LLC, Waste Connections US, Inc.. (Chan, Paul)**

**2:24-cv-10819-MEMF-MAR Notice has been electronically mailed to:**

Ariel A Neuman      aneuman@birdmarella.com, brl@birdmarella.com, mlw@birdmarella.com, rec@birdmarella.com

Caroline Karabian Castillo      ccastillo@counsel.lacounty.gov

Catherine L Carlisle      ccarlisle@meyersnave.com, gduran@meyersnave.com, lgonzales@meyersnave.com

Cristina L Talley      ctalley@meyersnave.com, lcastro@meyersnave.com, tle@meyersnave.com

Dawyn Renae Harrison      dharrison@counsel.lacounty.gov

Deborah J Fox      dfox@meyersnave.com, calendardept@meyersnave.com, dmehretu@meyersnave.com, gduran@meyersnave.com, tkay@meyersnave.com

Dusan Pavlovic      dpavlovic@counsel.lacounty.gov

Jacob P. Duginski      jduginski@bdlaw.com, arivas@bdlaw.com

James B. Slaughter      jslaughter@bdlaw.com

Jennifer Lauren Riggs      jriggs@meyersnave.com, lcastro@meyersnave.com

Jon Scott Kuhn      skuhn@counsel.lacounty.gov

392

Kaitlyn Day Shannon    kshannon@bdlaw.com, aahmed@bdlaw.com, hwebb@bdlaw.com, mmorgan@bdlaw.com, mvitris@bdlaw.com, vpodolsky@bdlaw.com

Katelyn E. Ciolino    kciolino@bdlaw.com

Louis J. Manzo    LManzo@bdlaw.com

Megan L. Marzec Morgan    mmorgan@bdlaw.com

Megan R. Brillault    MBrillault@bdlaw.com

Michael Lee Huggins    mhuggins@meyersnave.com, gduran@meyersnave.com, lgonzales@meyersnave.com

Paul S. Chan    pchan@birdmarella.com, docket@birdmarella.com, dthrockmorton@birdmarella.com

Seena Samimi    ssamimi@meyersnave.com, calendardept@meyersnave.com, scandy@meyersnave.com

Shoshana E Bannett    sbannett@birdmarella.com, karen-minutelli-9770@ecf.pacerpro.com, kminutelli@birdmarella.com

**2:24-cv-10819-MEMF-MAR Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\Amended Supp Marais Declaration.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=7/10/2025] [FileNumber=40492353-0
] [0cbe8820b2ba306531f46997af25d9a86295fadc8e157bb1b626580eae01c6d23f9
33f33cd0efd4b9a3e6db6f76cdcdc45c9f2695522d82c5b5dcad5f81bb710]]



# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

THE PEOPLE OF THE STATE OF CALIFORNIA, et al.,

       Plaintiffs,

   vs.

CHIQUITA CANYON, LLC, et al.,

       Defendants.

CASE NO. 2:24-cv-10819-MEMF-MAR

**ORDER DENYING APPLICATION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF SUPPLEMENTAL DECLARATION OF LAURENTIUS MARAIS, PH.D. [ECF NO. 115]**

Assigned to Hon. Maame Ewusi-Mensah Frimpong, Courtroom 8B

394

1   On July 7, 2025, Defendants filed an Application for Leave to File Under Seal portions of

2   Supplemental Declaration of M. Laurentius Marais, Ph.D. ECF No. 115 ("Application".

3   Defendants also filed the Declaration of Shoshana E. Bannett, under seal, in support of the

4   Application. ECF No. 116.

5   The Court DENIES the Application. Defendants have not filed a declaration "establishing

6   good cause or demonstrating compelling reasons why the strong presumption of public access in

7   civil cases should be overcome, *with citations to the applicable legal standard*." C.D. Cal. L.R.

8   79-5.2.2 (emphasis added). Defendants have stated only that Attachment B to Dr. Marais's

9   Supplemental Declaration contains personally identifying information. ECF No. 116 ¶¶ 3, 5.

10

11   IT IS SO ORDERED.

12   Dated: July 8, 2025   _____

13   Maame Ewusi-Mensah Frimpong
     United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:24-cv-10819-MEMF-MAR                    Date: July 7, 2025

Title    _The People of the State of California et al v. Chiquita Canyon, LLC et al_

Present: The Honorable:   Maame Ewusi-Mensah Frimpong

| Damon Berry | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:  Order DENYING Ex Parte Application to Shorten Time for Rule 702 Motions [ECF No. 101] and Motions in Limine [ECF Nos. 99, 100]**

The Court is in receipt of Defendants' Ex Parte Application to Shorten Time for Rule 702 Motions. ECF No. 101 ("Ex Parte Application"). The Court is also in receipt of Defendants' Motion *in Limine* to Exclude Non-Expert Evidence (ECF No. 99 ("Non-Expert MIL")) and Motion *in Limine* to Exclude Expert Opinions (ECF No. 100 ("Expert MIL")).[1] For the foregoing reasons, the Court DENIES the Ex Parte Application, the Non-Expert, and the Expert MIL.

A court "may consider inadmissible evidence on a motion for preliminary injunction." *Pucicle, Inc. v. Church & Dwight Co., Inc.*, 568 F. Supp. 2d 1144, 1147 (C.D. Cal. 2008) (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm.")).

---

[1] The Court notes that the Ex Parte Application and the two motions *in limine* are not opposed. Despite Plaintiffs' July 1, 2025 email to Chambers that they intend to oppose the Ex Parte Application no later than end of the day Thursday July 3, 2025, Plaintiffs have not filed any oppositions as of the morning of July 7, 2025. The Court emphasizes to the parties that they should exercise precaution before representing to the Court that commitment to any action or deadline.

---

CV-90 (03/15)                     Civil Minutes – General                     Page **1** of 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.   2:24-cv-10819-MEMF-MAR                    Date: July 7, 2025

Title   _The People of the State of California et al v. Chiquita Canyon, LLC et al_

Defendants argue that some of the government official declarants[2] "offer expert opinions that go well beyond common lay knowledge and are not rationally based on their own perception"; that their testimony is based on irrelevant or unfairly prejudicial facts; and that the factual representations underlying their testimony are "not final decisions" of the relevant agencies. _See generally_ Non-Expert MIL. As to Dr. Harold Campbell, Defendants argue that his testimony is unreliable because (1) the Department of Public Health's survey on odors was not conducted in accordance with generally accepted statistical principles and (2) Dr. Campbell's opinions based on the South Coast Air Quality Management District's complaint maps are unreliable. _See generally_ Expert MIL.

The Court finds these arguments unavailing. As the Ninth Circuit in _Flynt Distributing_ instructs, when evidence is not presented in an admissible form at motion for preliminary injunction but could be later presented in an admissible form at trial, a court may still consider the evidence for the purposes of preliminary injunction motion. _See Flynt Distrib. Co._, 734 F.2d at 1394. Also, the Court finds Defendants' arguments in the Expert MIL go toward the weight, not admissibility, of Dr. Campbell's testimony. _See City of Pomona v. SQM N. Am. Corp._, 750 F.3d 1036, 1047 (9th Cir. 2014) ("_Daubert_, however, does not forbid admission of a report where the weight of the conclusions [is] subject to challenge.") (citation and internal quotation marks omitted). It is also noteworthy that the instant action is still in its early stages where discovery has not yet begun. Identification of any defect with respect to expert designation is premature. For these reasons, the Court DENIES the two _motions in limine_.

Because the Court finds the underlying motions _in limine_ unavailing, the Court FURTHER DENIES the Ex Parte Application.

In sum, the Court ORDERS as follows:

1. The Ex Parte Application (ECF No. 101) is DENIED.
2. The Non-Expert MIL (ECF No. 99) is DENIED.
3. The Expert MIL (ECF No. 100) is DENIED.

---

[2] These declarants are Mark deBie, Elizabeth Anne Berg, Alex Garcia, Amanda Sanders, and Shikari Nakagawa-Ota.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-10819-MEMF-MAR                    Date: July 7, 2025

Title   _The People of the State of California et al v. Chiquita Canyon, LLC et al_

**IT IS SO ORDERED.**

|                           | :      |
| Initials of Preparer      | DBE    |

398

| | |
|---|---|
| Paul S. Chan (SBN 183406) | Kaitlyn D. Shannon (SBN 296735) |
| pchan@birdmarella.com | kshannon@bdlaw.com |
| Ariel A. Neuman (SBN 241594) | Megan L. Morgan (pro hac vice) |
| aneuman@birdmarella.com | mmorgan@bdlaw.com |
| Shoshana E. Bannett (SBN 241977) | James B. Slaughter (pro hac vice) |
| sbannett@birdmarella.com | jslaughter@bdlaw.com |
| BIRD, MARELLA, RHOW, LINCENBERG, | BEVERIDGE & DIAMOND P.C. |
| DROOKS & NESSIM, LLP | 1900 N Street, NW, Suite 100 |
| 1875 Century Park East, 23rd Floor | Washington, DC 20036-1661 |
| Los Angeles, California 90067-2561 | Telephone: (202) 789-6000 |
| Telephone: (310) 201-2100 | |

Katelyn E. Ciolino (pro hac vice)
 kciolino@bdlaw.com

Jacob P. Duginski (SBN 316091)
 jduginski@bdlaw.com
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 262-4000

BEVERIDGE & DIAMOND P.C.
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 702-5428

*Attorneys for Defendants Chiquita Canyon, LLC,
Chiquita Canyon, Inc. and Waste Connections
US, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, et al., | CASE NOS. 2:24-cv-10819-MEMF-MAR, 23-cv-08380-MEMF-MAR |
| Plaintiffs, | **UPDATED JOINT STATEMENT RE JUDICIAL SITE VISIT PROTOCOL** |
| vs. | |
| CHIQUITA CANYON, LLC, et al., | Assigned to Hon. Maame Ewusi-Mensah Frimpong, Courtroom 8B |
| Defendants. | |

399

## I.    **INTRODUCTION**

Pursuant to the Court's order (ECF 66), and the Parties' Joint Status Report Re Judicial Site Visit (ECF 85), the Parties in the instant case and the Lead Case have met and conferred regarding the itinerary and detailed protocol for the site visit to the Chiquita Canyon Landfill (the "Landfill") and nearby communities for the Judicial Site Visit on July 1, 2025 at 7:00 a.m.

    **A.    Logistics for the site visit.**

    1.    Defendants agree that they will not undertake any odor mitigation measures on June 30 or July 1, 2025 that are not undertaken as part of normal reaction mitigation efforts or compliance obligations. Defendants shall disclose to the Court and the Parties any additional odor mitigation measures undertaken outside of normal reaction mitigation efforts or compliance obligations from the date of the County's request for judicial site visit (ECF 56) and June 30, 2025.

    2.    The site visit will accommodate a maximum of 25 attendees between the Parties and the Court (collectively the "Site Visit Attendees"). Each group will be permitted no more than 10, and the maximum number of attendees cannot exceed 25.

    3.    Site Visit Attendees must wear closed-toed tennis shoes to the site visit. It is recommended to wear long pants. It is further recommended that attendees not use scented products (such as perfume or lotion) the day of the site visit.

    4.    Court and court staff Site Visit Attendees will be transported to the Landfill. All other Site Visit Attendees are responsible for their own transportation to and from the site visit. Site Visit Attendees will enter the Landfill at the main gate off Henry Mayo Drive no later than 6:50 a.m. PT on July 1, 2025, and park near the scale house near the entrance of the Landfill.

    5.    All Site Visit Attendees will sign into the Landfill visitor log.

    6.    Site Visit Attendees will be in three vans for the duration of the site visit:

      a.    One vehicle for the Court and Court staff;

      b.    One vehicle for all Plaintiff attendees; and

      c.    One vehicle for all Defendant attendees.

    7.    Plaintiffs and Defendants will evenly split the cost of the three vans used for the

1   Site Visit.

2         8.     The Landfill staff will provide personal protective equipment ("PPE") to all Site

3   Visit Attendees, including safety vests and any other necessary protective gear. The Landfill will

4   also provide shade tents and water. No bathrooms are available on site.

5         9.     The Landfill is an active construction site. All Site Visit Attendees will attend a

6   safety briefing organized by the Landfill staff. The Site Visit Attendees will be required to listen to

7   the safety briefing and comply with all safety directions provided by the Landfill staff. All Site

8   Visit Attendees will further comply with any additional safety requirements conveyed by the

9   Landfill staff for the duration of the site visit, including any necessary relocation to accommodate

10  any work being conducted at the Landfill during the visit, and any particular safety requirements at

11  certain stops during the visit. Failure to comply with safety protocols and other instruction from

12  Landfill staff will be grounds for removal from the Landfill.

13        10.    All Site Visit Attendees will proceed to the designated stops at the Landfill with the

14  Landfill staff and will be accompanied by Landfill staff at all times during the on-site portion of

15  the visit. Site Visit Attendees will remain at the designated stops and will not separate from the

16  group.

17        11.    At the conclusion of the on-Landfill portion of the site visit, the Site Visit

18  Attendees will return all provided PPE equipment to the Landfill staff, will sign out on the

19  Landfill's visitor log, and will proceed out of the Landfill at the main entrance on Henry Mayo

20  Drive.

21        12.    Following the on-Landfill visit, the Site Visit Attendees will visit the below-

22  specified neighboring community locations. When the visit to community locations is complete,

23  the Site Visit Attendees will return to the Landfill only to return to the parked personal vehicles,

24  and the site visit will conclude.

25        13.    In accordance with the security considerations outlined in the Sealed Minute Order

26  dated June 23, 2025, the agenda and specific locations for the Site Visit will be shared exclusively

27  with counsel for the Parties, the Court, Judge Buckley, landfill personnel, County personnel, and

28  the third-party vendors identified herein, except as otherwise agreed to by the Parties. Plaintiffs

1  and Defendants confirm that they have not disclosed—and will not disclose—the date of the site

2  visit or the on-site or off-site locations of the Site Visit to any third parties or private party

3  plaintiffs and that such third parties or private party plaintiffs shall not be permitted to appear at

4  any site visit location.

5       **B.**     **Script and Prohibition on Ex-Parte Communications.**

6       14.     Prior to the safety briefing beginning, each Site Visit Attendee will introduce

7  himself or herself.

8       15.     At each identified stop on-Landfill and at the community locations, an agreed-upon

9  script will be read. The agreed-upon script for each on-Landfill and community location stop is

10  attached hereto as **Attachment A**.  No further commentary or discussion will occur at the stops.

11       16.     Only Court and Court staff may ask questions. Plaintiffs and Defendants will each

12  identify one spokesperson in advance who is authorized to respond to the Court's questions.

13       **C.**     **Site Visit Locations.**

14       17.     The Site Visit Attendees will be guided to the following on-Landfill locations in the

15  following order:

16       a.     The scale house (for introductions and safety briefing);

17       b.     The "top" of the Landfill with a view of the reaction area;

18       c.     Adjacent to Tank Farm 10; and

19       d.     Adjacent to Tank Farm 7.

20       18.     Following the on-Landfill site visit stops, the Site Visit Attendees will leave the

21  Landfill entrance on Henry Mayo Drive and be guided to the following community locations in

22  the following order:

23       a.     Castaic Middle School adjacent to air monitoring station AS-01;

24       b.     Live Oak Elementary School adjacent to air monitoring station MS-10;

25       c.     Val Verde adjacent to air monitoring station MS-12; and

26

27

28

JOINT STATEMENT RE JUDICIAL SITE VISIT PROTOCOL

d.  The Del Valle Training Center.[1], [2]

**D.  Permissible recording during the site visit.**

19.    The Parties agree that there shall be a single record of the on-Landfill site visit to ensure all Site Visit Attendees can revisit the site visit through audio, transcribed, and photographic methods.

20.    All Site Visit Attendees must turn off and refrain from using any other recording devices or cell phones while at the Landfill on the site visit. Any improper recording of the site visit shall be permanently deleted, and the offending Site Visit Attendee shall be removed from the site visit.

21.    No photography or other recording will be permitted at the Landfill during the site visit except for the below:

a.  The parties shall mutually agree to take a single audio recording of the site's explanation of the scripts read at the specified stops during the site visit, and any questions from the Court and responses from the Parties. The Parties shall use a shared audio recording device and agree that the cost of the subsequent transcription shall be shared equally as between Plaintiffs and Defendants, and a copy of the transcription shall be provided to the Court.

b.  The parties have mutually agreed to Schlick Art Photo and Video to serve as pool photographer to take photographs of the site visit stops to aid the Site Visit Attendees' memories. Decisions regarding whether the pool photographer's photographs may be admitted into evidence in any of the related actions, or otherwise used in any proceedings, may be brought before the Court at a later time. The Parties shall share the cost of the pool photographer and subsequent production of photos, to be shared equally as between Plaintiffs and Defendants, and a

---

[1] The Del Valle Training Center is an active training facility used by several different emergency response organizations and operated by the Los Angeles County Fire Department.  As such, Site Visit Attendees will need to sign a separate waiver, attached as Attachment B, prior to arrival at the Training Center.

[2] A map of the route taken between the community locations is attached as Exhibit C.

1    courtesy hard copy of the photographs shall be provided to the Court.

2

3    Dated: July 9, 2025                    BIRD, MARELLA, RHOW, LINCENBERG,
                                             DROOKS & NESSIM, LLP.
4                                            BEVERIDGE & DIAMOND, P.C.

5                                            By: /s/ Paul S. Chan
6                                                Paul S. Chan
                                                 Ariel A. Neuman
7                                                Shoshana E. Bannett
                                                 Jacob P. Duginski
8                                                Kaitlyn D. Shannon
                                                 Megan L. Morgan
9                                                James B. Slaughter
                                                 Katelyn E. Ciolino
10

11                                           *Attorneys for Defendants Chiquita Canyon,*
12                                           *LLC, Chiquita Canyon, Inc., and Waste*
                                             *Connections US, Inc.*
13

14   Dated: July 9, 2025                    LATHAM & WATKINS LLP
                                             By: /s/ Michael G. Romey
15                                               Michael G. Romey
                                                 Alexander C.K. Wyman
16                                               Joseph L. Teresi

17                                           *Attorneys for Defendant Ameresco Chiquita*
18                                           *Canyon Energy LLC*

19   Dated: July 9, 2025                    GORDON REES SCULLY MANSUKHANI, LLP
                                             By: /s/ Megan E. Gruber
20                                               Megan E. Gruber
                                                 Brian M. Ledger
21

22                                           *Attorneys for Defendant UltraSystems*
                                             *Environmental, Inc.*
23

24   Dated: July 9, 2025                    KLINEDINST PC

25                                           By: /s/ Carey L. Cooper
                                                 Carey L. Cooper
26                                               George R. Thomas

27                                           *Attorneys for Defendant Stearns, Conrad, and*
                                             *Schmidt Consulting Engineers, Inc.*
28

---

6

JOINT STATEMENT RE JUDICIAL SITE VISIT PROTOCOL

404

DATED: July 9, 2025                    KIESEL LAW LLP

                                       By:   /s/ Paul R. Kiesel
                                             Paul R. Kiesel
                                             Cherisse H. A Cleofe
                                             Nima M. Sadeghi

                                             *Plaintiffs' Co-Lead Counsel*

DATED: July 9, 2025                    SETHI ORCHID MINER LLP
                                       STRIS & MAHER LLP

                                       By:   /s/ Rahul Sethi
                                             Rahul Sethi
                                             Oshea Orchid
                                             Shelby Miner

                                             Peter K. Stris
                                             Elizabeth R. Brannen
                                             Victor O'Connell
                                             Colleen R. Smith

                                             *Plaintiffs' Co-Lead Counsel*

DATED: July 9, 2025                    SCHIMMEL & PARKS, APLC

                                       By:   /s/ Alan I. Schimmel
                                             Alan I. Schimmel
                                             Michael W. Parks
                                             Arya Rhodes

                                             *Plaintiffs' Co-Lead Counsel*

DATED: July 9, 2025                    MEYERS NAVE

                                       By:   /s/ Deborah J. Fox
                                             Deborah J. Fox
                                             Jenny L. Riggs
                                             Catherin L. Carlisle
                                             Seena M. Samimi

                                             *Attorneys for The People of the State of California and the County of Los Angeles*

---

7

## **ATTESTATION**

Pursuant to CIV. L.R. 5-4.3.4(a)(2)(i), the filer attests that all signatories listed, and on whose behalf this filing is submitted, concur in its content and have authorized the filing.

Dated: July 9, 2025                             /s/ Paul S. Chan

JOINT STATEMENT RE JUDICIAL SITE VISIT PROTOCOL

406

# ATTACHMENT A

407

<u>**ATTACHMENT A: Factual Script for Judicial Site Visit Stops**</u>

**I.    ON-SITE STOPS.**

    **A.    The scale house (near the entrance to the Landfill).**

The Chiquita Canyon Landfill is 639 acres in size. The hillside to the Northeast of the scale house is the original Landfill, called Primary Canyon, which began accepting non-hazardous municipal solid waste in the 1970s. To the south is the entrance to the Landfill, the four weigh scales, and the scale house. To the West is the Landfill's main office, and behind the office sits the stormwater basin.

The stormwater basin is designed to temporarily store and manage stormwater runoff at the Landfill to help prevent flooding, erosion, and migration of stormwater. We will be able to see the storm water basin more clearly at our final on-site stop.

Just North of the stormwater basin are seven leachate storage tanks. Leachate is the liquid that "leaches" through solid waste, and that the Landfill pumps out or flows to the bottom of the liner for collection and eventual disposal. These seven leachate tanks are for the collection of leachate from the bottom liner of the main canyon. The landfill liner is a High-Density Polyethylene (or HDPE) liner on the bottom and side slopes of main canyon waste mass cells. The HDPE liner has leachate collection piping along the floor to direct the flow of leachate.

Before we head to the first stop, here is a list of things you can see on our drive to the top of the Landfill.

- On our left will be the new Tank Farm 13 at Landfill Cell 8B, which is currently under construction. Tank Farm 13 will replace the top deck Tank Farm 9, and most of Tank Farm 7, which is currently located on Cell 8A;

- Next on the right you will see the Primary Canyon landfill and the three permanent flares. The flares are a system designed to safely burn off excess landfill gas that is produced as the waste decomposes in the Landfill. There will be an additional view of the permanent flares from the second stop near Tank Farm 10;

- Just beyond the flares on the right you will see the hydrogen sulfide tanks that are designed to remove hydrogen sulfide from the gas before the gas goes into the flares. The Landfill

9

1      uses a carbon filter to remove the hydrogen sulfide;

2     •   Next on the right you will see the former Gas to Energy Plant that is capable of producing

3      up to 9.2 megawatts of electricity (or enough for up to 10,000 homes a day). The plant is

4      presently shut down;

5     •   Next on the right you will see Canyon B Landfill, which is an old portion of the Landfill.

6     •   After going up the zig zag road on the Northeast corner of the main canyon, we will arrive

7      at the top deck of the Landfill and Tank Farm 9, near the geomembrane cover and the

8      reaction area.

9      **B.**     **Top of the Landfill with a view of the reaction area.**

10      We are now at the "top" of the Landfill and looking at the general area that is being

11 impacted by the reaction – which is commonly called the "reaction area."

12      From here, looking Northwest past the boundary of the Landfill is Val Verde. Hasley Hills

13 and Live Oak communities are to the Northeast of the Landfill.

14      You can see in front of us the geomembrane cover, gas wells, liquid and gas piping,

15 temperature probes, and thermal oxidizers. We can also see Tank Farm 9 to the East. We will talk

16 through each of those one by one.

17      *Geomembrane cover:* This is a 30-milimeter geomembrane cover, which is also referred to

18 as the geosynthetic cover. It is made of a plastic material. The cover currently measures

19 approximately 45.9 acres.  The geomembrane (sometimes called geosynthetic) cover is made of

20 high-density polyethylene (HDPE). The liner is white on the top and black underneath. The

21 geosynthetic cover is designed to capture the landfill gas or emissions that may come out of the

22 surface of the Landfill. The Landfill is required to inspect the cover daily. The Landfill will also

23 be installing additional geomembrane cover as required by the DTSC and LEA. The material has

24 been ordered, and Chiquita will begin installation once it arrives on site and DTSC has approved

25 the workplan.

26      *Landfill gas wells:* The Landfill has installed over 290 dual-phase landfill gas wells to the

27 existing wellfield. The wells are designed to extract gas produced within the waste mass, which

28 then is directed through the larger landfill gas collection and control system for collection,

10

**409**

1    treatment, and destruction.

2         *Liquid and gas piping:* Between the cover and the surface of the Landfill, the Landfill has

3    installed additional piping infrastructure that is designed to capture any surface emissions that

4    were trapped by the cover. The piping infrastructure is designed to move the gas to the flare

5    station and thermal oxidizers.

6         *Temperature probes:* As required by regulatory orders, the Landfill has installed

7    temperature probes in the waste mass, which are used to monitor in-situ waste temperatures at

8    various depths down in the waste mass.

9         *Thermal oxidizers:* In front of us you can also see two large stacks – those are thermal

10   oxidizers designed to destroy landfill gas. The gas pulled from the reaction area has a variety of

11   chemical constituents, and the thermal oxidizers are better equipped to destroy those gases as

12   compared to the standard flares at the Landfill.

13        *Tank Farm 9*: If you look East you can see Tank Farm 9. The Landfill has expanded its

14   onsite capacity to accumulate and treat leachate because of the increase in leachate production

15   caused by the reaction. The Site began using Tank Farm 9 in February 2024. The Landfill is in the

16   process of relocating Tank Farm 9, which is now required by the Imminent and Substantial

17   Endangerment (ISE) Determination and Order issued by the DTSC to Cell 8B. You will have a

18   view of Tank Farm 13/Cell 8B from our next stop. Some of the tanks have already been relocated

19   to Tank Farm 10, which we will also see at our next stop.

20        **C.    Adjacent to Tank Farm 10.**

21        We are now at Tank Farm 10, the newest tank farm on site. Before the reaction, leachate

22   was collected at the bottom of the liner and then flowed into a series of tanks by the office where

23   we started the visit. Now, the Landfill actively pumps leachate out of the Landfill, some of which

24   goes into these tanks at Tank Farm 10. Tank Farm 10 only receives characteristically non-

25   hazardous leachate, which is then trucked offsite to a treatment facility.

26        Just down the hill you can see Tank Farm 13/Cell 8B, which is the interim location for the

27   Landfill's Tank Farm 9. The tank farm is under construction. It will include approximately 150

28   tanks, with a total storage capacity of approximately 2.5 million gallons of leachate.

---

JOINT STATEMENT RE JUDICIAL SITE VISIT PROTOCOL

1    You can also see the three permanent flares from here. As we discussed near the scale

2 house, the flares are designed to burn and destroy traditional landfill gas. The Landfill's permit

3 application for a fourth permanent flare is currently pending with the South Coast Air Quality

4 Management District.

5    We will now proceed toward Tank Farm 7.

6    **D.    Adjacent to Tank Farm 7.**

7    Looking South from here, you can see the entirety of Tank Farm 7. Tank Farm 7 was built

8 in 2024 to address the increase in leachate production from the Landfill, and specifically to treat

9 leachate that is categorized as hazardous waste. The Landfill uses a granular activated carbon

10 treatment system – akin to a Brita filter for water – which is designed to filter and absorb the

11 contaminants so that the leachate becomes non-hazardous and can be disposed of at off-site

12 nonhazardous wase disposal facilities.

13    Below and to the East you can again see the under-construction Tank Farm 13.

14    To the South you can again see the stormwater basin we discussed at the beginning of the

15 visit. The system is designed so that stormwater that runs off the Landfill can make its way to a

16 channel or piping that directs the runoff into the stormwater basin. At the far end of the basin,

17 closest to the highway, is the discharge point that eventually leads to the Santa Clara River.

18 **II.    OFF-SITE STOPS.**

19    **A.    Castaic Middle School adjacent to air monitoring station AS-01.**

20    We are currently near Castaic Middle School and looking at air monitoring station AS-01.

21 This air monitoring station is voluntarily operated by Chiquita. It measures benzene, toluene,

22 ethylbenzene, xylene, hydrogen sulfide and sulfur dioxide. The one-hour average hydrogen sulfide

23 data is posted online at https://www.cclresponse.com/air-monitoring.

24    **B.    Live Oak Elementary School adjacent to air monitoring station MS-10.**

25    We are currently at Live Oak Elementary School and looking at air monitoring station MS-

26 10. This is an air monitoring station maintained by Chiquita pursuant to the AQMD Stipulated

27 Order for Abatement and the Conditional Use Permit for the Landfill. Chiquita is required to

28 maintain a monitoring network of 12 monitor stations – 5 are on the Landfill property at the

JOINT STATEMENT RE JUDICIAL SITE VISIT PROTOCOL

411

fenceline, and the other 7 are in the community. This station measures 2-Butane, Acetone, Benzene, Carbon Disulfide, Hydrogen Sulfide, Isopropyl Alcohol, m.p-Xylene, Methane, Propene, THF, Toluene, Acrolein, Sulfur Dioxide, and Methanol. The air quality monitoring data is posted to Chiquita's website.

**C.      Val Verde adjacent to air monitoring station MS-12.**

We are currently in Val Verde looking at air monitoring station MS-12. This is an air monitoring station maintained by Chiquita pursuant to the AQMD Stipulated Order for Abatement and the Conditional Use Permit for the Landfill. It measures 2-Butane, Acetone, Benzene, Carbon Disulfide, Hydrogen Sulfide, Isopropyl Alcohol, m.p-Xylene, Methane, Propene, THF, Toluene, Acrolein, Sulfur Dioxide, and Methanol. The air quality monitoring data is posted to Chiquita's website.

**D.      The Del Valle Training Center.**

We are currently at the Del Valle Training Center. From here, you can see the west slope of the Landfill and the geomembrane cover.

412

# ATTACHMENT B

413

# COUNTY OF LOS ANGELES
# FIRE DEPARTMENT

WAIVER AND RELEASE OF CLAIMS

**(PLEASE PRINT LEGIBLY IN INK OR TYPE)**

---
NAME

---
ADDRESS

---
CITY, STATE, ZIP CODE

(          )
---
AREA CODE & TELEPHONE NUMBER

---
E-MAIL ADDRESS

---

THIS RELEASE APPLIES TO:

JUDICIAL SITE VISIT – JULY 1, 2025 – FIRE STATION 126 AND DEL VALLE REGIONAL TRAINING CENTER

FIRE STATION 126/DEL VALLE REGIONAL TRAINING CENTER:  I AGREE MY ACTIVITIES AT THE ABOVE REFERENCED VISIT WILL BE LIMITED TO: ENTRY TO THE EXTERIOR PORTIONS OF THE PREMISES TO VIEW THE WEST SIDE OF THE CHIQUITA CANYON LANDFILL, THE WEST SLOPE OF THE CHIQUITA CANYON LANDFILL AND THE GEOMEMBRANE COVER ON CHIQUITA CANYON LANDFILL VISIBLE FROM THE PREMISES.

I AGREE TO COMPLY WITH APPLICABLE LAWS, ORDERS, REGULATIONS FOR THIS SITE VISIT INCLUDING ANY SAFETY INSTRUCTIONS AS DIRECTED.  I AGREE I WILL NOT INTERFERE WITH THE DUTIES AND RESPONSIBILITIES OF FIRE DEPARTMENT PERSONNEL ESPECIALLY WHILE IN THE COURSE OF RESPONDING TO EMERGENCY CALLS OR JEOPARDIZE THE SAFETY OR MEDICAL TREATMENT OF ANY PERSONS. I AGREE I WILL NOT CAPTURE ANY IMAGES OR VIDEO OF FIRE DEPARTMENT PERSONNEL, WITHOUT THEIR PERMISSION, AND WILL NOT ENTER INTO AREAS EXCLUSIVELY FOR FIRE DEPARTMENT PERSONNEL OR AREAS WHERE THERE IS AN EXPECTATION OF PRIVACY WITHOUT FIRE DEPARTMENT PERMISSION.

I AGREE TO WAIVE MY RIGHT TO SUE, AND HOLD THE COUNTY OF LOS ANGELES, THE CONSOLIDATED FIRE PROTECTION DISTRICT OF LOS ANGELES COUNTY, ANTHONY C. MARRONE, FIRE CHIEF, AND THEIR ELECTED AND APPOINTED OFFICERS, EMPLOYEES AND AGENTS, HARMLESS FROM ANY CLAIM, LOSS, DAMAGE, LIABILITY OR EXPENSE, INCLUDING DEFENSE COSTS AND LEGAL FEES, AND WORKERS' COMPENSATION SUITS ARISING DIRECTLY OR INDIRECTLY OR ALLEGED TO ARISE DIRECTLY OR INDIRECTLY OUT OF THE USE OF COUNTY PROPERTY AND/OR ATTENDANCE AT THE ABOVE REFERENCED EVENT. I AM VOLUNTARILY PARTICIPATING IN THIS ACTIVITY AND UNDERSTAND THERE MAY BE RISKS INCLUDING BUT NOT LIMITED TO INJURY OR ILLNESS, WHETHER KNOWN OR UNKNOWN TO ME, BY PARTICIPATING IN THIS ACTIVITY.

I consent to this agreement and hereby agree to the above provisions:

---
SIGNATURE

---
DATE

DISTRIBUTION:  VENDOR-COMPLIANCE-FILE          ORIGINAL KEPT IN RISK MANAGEMENT DIVISION

ESD 02252025
HOA.105441628.1

**414**

# ATTACHMENT C



**Google** Maps

29201 Henry Mayo Dr, Castaic, CA 91384 to
29201 Henry Mayo Dr, Castaic, CA 91384

Drive 17.8 miles, 42 min

⚠️ This route has restricted usage or private roads.

**29201 Henry Mayo Dr**
Castaic, CA 91384

↑ 1. Head south toward CA-126 E
   ⚠️ Partial restricted usage road

   35 sec (0.1 mi)

**Continue on CA-126 E. Take The Old Rd to Hillcrest Pkwy**

   8 min (5.0 mi)

↰ 2. Turn left at the 1st cross street onto CA-126 E

   1.5 mi

↱ 3. Take exit 13 toward Commerce Centre Dr

   0.3 mi

↰ 4. Use the left 2 lanes to turn left onto Henry Mayo Dr

   0.9 mi

↰ 5. Turn left onto The Old Rd

   1.2 mi

⟳ 6. At the traffic circle, take the 2nd exit and stay on The Old Rd

   1.0 mi

**Follow Hillcrest Pkwy to your destination**

416

7. Turn left onto Hillcrest Pkwy

                                                 1.4 mi

8. Turn left

                                                 367 ft

9. Turn left

                                                  33 ft

10. Turn right

                                               246 ft

12 min (6.6 mi)

**Castaic Middle School**
28900 Hillcrest Pkwy, Castaic, CA 91384

**Follow Hillcrest Pkwy to The Old Rd**

                                         3 min (1.6 mi)

11. Head east

                                                43 ft

12. Turn left

                                               0.1 mi

13. Slight right toward Hillcrest Pkwy

                                               89 ft

14. Turn right toward Hillcrest Pkwy

                                           135 ft

15. Turn right onto Hillcrest Pkwy

                                               1.4 mi

**Continue on The Old Rd to Cambridge Ave**

                                         2 min (1.3 mi)

16. Turn right onto The Old Rd

                                             1.0 mi

17. Slight right toward Hasley Canyon Rd

                                           440 ft

18. Merge onto Hasley Canyon Rd

                                           0.2 mi

**Continue on Cambridge Ave to your destination**

                                         2 min (0.5 mi)

19. Turn left onto Cambridge Ave

                                           0.2 mi

20. Turn right onto Quincy St

                                           0.2 mi

21. Turn left

417

↰   22.   Sharp left

440 ft

108 ft

8 min (3.3 mi)

**Live Oak Elementary School**
27715 Saddleridge Way, Castaic, CA 91384

**Take Quincy St and Cambridge Ave to Hasley Canyon Rd**

2 min (0.4 mi)

↑   23.   Head east

108 ft

↱   24.   Sharp right toward Quincy St

266 ft

↗   25.   Slight right toward Quincy St

180 ft

↱   26.   Turn right onto Quincy St

0.2 mi

↰   27.   Turn left onto Cambridge Ave

0.2 mi

**Follow Hasley Canyon Rd and Del Valle Rd to Lincoln Ave in Val Verde**

4 min (2.6 mi)

↰   28.   Turn left onto Hasley Canyon Rd

0.4 mi

↱   29.   Turn right to stay on Hasley Canyon Rd

1.0 mi

↖   30.   Slight left onto Del Valle Rd

1.2 mi

↱   31.   Turn right onto Hunstock St

223 ft

**Drive to Lincoln Ave**

2 min (0.3 mi)

↰   32.   Turn left onto Lincoln Ave

358 ft

↱   33.   Turn right onto Central Ave

59 ft

↰   34.   Turn left onto Lincoln Ave

0.2 mi

↰   35.   Turn left to stay on Lincoln Ave

75 ft

↱  36.  Turn right to stay on Lincoln Ave
ⓘ  Destination will be on the left

184 ft

8 min (3.4 mi)

**28732 Lincoln Ave**
Santa Clarita, CA 91384

↑  37.  Head south on Lincoln Ave toward Madison St

0.4 mi

↰  38.  Turn left onto Chiquito Canyon Rd

0.5 mi

↱  39.  Sharp right
⚠  Partial restricted usage road

0.5 mi

↰  40.  Turn left

0.3 mi

↗  41.  Slight right

157 ft

↰  42.  Turn left

367 ft

↱  43.  Turn right
⚠  Restricted usage road
ⓘ  Destination will be on the left

0.1 mi

6 min (1.8 mi)

**28101 Chiquito Canyon Rd**
Castaic, CA 91384

**Continue to Chiquito Canyon Rd**

4 min (0.9 mi)

↑  44.  Head east
⚠  Restricted usage road

0.1 mi

↰  45.  Turn left

367 ft

↱  46.  Turn right

0.1 mi

↗  47.  Slight right

0.2 mi

419

↱ 48.  Turn right
⚠ Partial restricted usage road

0.5 mi

### Drive

2 min (1.5 mi)

↱ 49.  Turn right onto Chiquito Canyon Rd

0.8 mi

↰ 50.  Turn left onto CA-126 E

0.7 mi

### Drive to your destination

2 min (0.2 mi)

↰ 51.  Turn left
⚠ Partial restricted usage road

0.1 mi

↰ 52.  Turn left
⚠ Restricted usage road

148 ft

↩ 53.  Make a U-turn
⚠ Restricted usage road

118 ft

↱ 54.  Turn right
⚠ Restricted usage road
ⓘ Destination will be on the right

167 ft

8 min (2.7 mi)

420

421

422

1  Paul S. Chan (SBN 183406)
   pchan@birdmarella.com
2
   Ariel A. Neuman (SBN 241594)
3    aneuman@birdmarella.com
   Shoshana E. Bannett (SBN 241977)
4    sbannett@birdmarella.com
5  BIRD, MARELLA, RHOW,
   LINCENBERG, DROOKS &
6  NESSIM, LLP
7  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
8  Telephone: (310) 201-2100
9
   Jacob P. Duginski (SBN 316091)
10   jduginski@bdlaw.com
11 BEVERIDGE & DIAMOND P.C.
   333 Bush Street, Suite 1500
12 San Francisco, CA 94104
   Telephone: (415) 262-4000
13

Kaitlyn D. Shannon (SBN 296735)
  kshannon@bdlaw.com
Megan L. Morgan *(pro hac vice)*
  mmorgan@bdlaw.com
Megan R. Brillault *(pro hac vice)*
  mbrillault@bdlaw.com
James B. Slaughter *(pro hac vice)*
  jslaughter@bdlaw.com
Katelyn E. Ciolino *(pro hac vice)*
  kciolino@bdlaw.com
Louis J. Manzo *(pro hac vice)*
  lmanzo@bdlaw.com
BEVERIDGE & DIAMOND P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036-1661
Telephone: (202) 789-6000

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc.*

14

15

16

17                **UNITED STATES DISTRICT COURT**

18        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

19 THE PEOPLE OF THE STATE OF
   CALIFORNIA, by and through Dawyn
20 R. Harrison, County Counsel for the
   County of Los Angeles, and THE
21 COUNTY OF LOS ANGELES,

22              Plaintiffs,

23        v.

24 CHIQUITA CANYON, LLC, a
   Delaware limited liability company;
25 CHIQUITA CANYON, INC., a
   Delaware corporation; WASTE
26 CONNECTIONS US, INC., a Delaware
   corporation; and DOES 1-50, inclusive,
27
                Defendants.
28

Case No. 2:24-cv-10819-MEMF (MARx)
Related Case: 2:23-cv-08380-MEMF
(MARx)

Hon. Maame Ewusi-Mensah Frimpong

**SUPPLEMENTAL DECLARATION
OF STEVEN J. CASSULO**

Date:       July 17, 2025
Time:       10:00 a.m.
Courtroom: 8B

Action Filed:    December 16, 2024
Trial Date:      None Set

---

SUPPLEMENTAL DECLARATION OF STEVEN J. CASSULO, IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## SUPPLEMENTAL DECLARATION OF STEVEN J. CASSULO

I, Steven J. Cassulo, declare as follows:

1.     I am of sufficient age and am competent to testify in this proceeding. I make this supplemental declaration in support of Defendant Chiquita Canyon, LLC's ("Chiquita") opposition to Plaintiffs' motion for preliminary injunction. This declaration supplements my declaration submitted on June 12, 2025, also in support of Chiquita's opposition to Plaintiffs' motion for preliminary injunction. That declaration outlines my background, role at the Chiquita Canyon Landfill (the "Landfill"), and the mitigation measures implemented at the Landfill to manage the elevated temperature landfill event ("ETLF event"). Everything stated in my June 12, 2025 declaration remains true and applicable for this upcoming hearing.

### July 1, 2025 South Coast AQMD Notice of Violation

2.     On July 1, 2025, Chiquita received a Notice of Violation ("NOV") from the South Coast Air Quality Management District ("South Coast AQMD"), numbered #P67000. A true and correct copy of the NOV is included herein as **Exhibit A**. As noted in the NOV, the South Coast AQMD inspector found us in violation of Sections 402 and 41700 of South Coast AQMD's Code for allegedly "discharging such quantities of air contaminants to cause injury, detriment, nuisance or annoyance to a considerable number of persons."

3.     In the email circulating the NOV, the inspector noted that "during the course of [her] inspection, [she] received/was assigned a total of 7 complaints that was [sic] received by [her] District between the time frame of approximately to [sic] 8:07 am to approximately 9:10 am [sic]." She also indicated that there were 6 odor complaints that came from the following street locations:

    a.  One complaint from Cottage Grove Drive;

    b.  One complaint from Jackson Street;

    c.  Three complaints from Lincoln Avenue; and

SUPPLEMENTAL DECLARATION OF STEVEN J. CASSULO, IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

d. One complaint from Buchanan Way.

4.    I followed up with the South Coast AQMD inspector via email to confirm what the intensity of the odor was on a scale from 1-5, which is the scale that is used by South Coast AQMD when conducting inspections. She replied explaining that "[t]he highest intensity was between 4 to 5 in the Val Verde / Lincoln Avenue area, between approximately 8:35 am up until about 8:55am, 9am, [sic] based on my surveillance and investigations, fyi." A true and correct copy of the full email exchange is attached hereto as **Exhibit B**.

**July 1, 2025 Judicial Site Visit**

5.    On the same day, July 1, 2025, the Honorable Maame Ewusi-Mensah Frimpong conducted a judicial site visit of the Landfill and the surrounding community.

6.    As part of the judicial site visit, we visited the community locations highlighted in the map included herein as **Exhibit C**. These locations are as follows:

a. Castaic Middle School adjacent to air monitoring station AS-01;

b. Live Oak Elementary School adjacent to air monitoring station MS-10;

c. Val Verde adjacent to air monitoring station MS-12; and

d. The Del Valle Training Center.

7.    Air monitoring station MS-12 is in the same area where the South Coast AQMD complaints originated. Air monitoring station MS-12 is located at the intersection of Lincoln Avenue and Taylor Street in the Val Verde neighborhood. Select photos of the monitoring station and intersection that were taken by a group photographer at the judicial site visit are included herein as **Exhibit D**. I reviewed all of the photos provided by the photographer that were taken at this location, including the metadata. The metadata shows that we were standing outside our

vehicles at that intersection from approximately 8:48-8:51 a.m.[1] This was during the time that the South Coast AQMD inspector was conducting her inspection and when she said that the odors were of "the highest intensity" of "4 to 5 in the Val Verde/Lincoln Avenue area."

8.    When we were standing at Air monitoring station MS-12, I did not smell odors.

**Photos of Chiquita Canyon Landfill from Judicial Site Visit**

9.    As noted above, during the judicial site visit, there was a group photographer that took photos to document the visit. The photos were made available to all parties that participated in the judicial site visit. True and correct copies of some of the photos taken during the judicial site visit are included herein as **Exhibit E**.

   a. Photos 1-2 show the 30-mil geosynthetic cover over the western slope of the Landfill, as seen from the Del Valle Training Center.

   b. Photos 3-4 show wellheads with the 30-mil geosynthetic cover and the area impacted by the reaction in the background.

   c. Photo 5 shows the existing 30-mil geosynthetic cover and the ongoing grading work to prepare to extend the cover with 60-mil EVOH material.

   d. Photo 6 shows a temperature monitoring probe with the 30-mil geosynthetic cover and the area impacted by the reaction in the background.

---

[1] I viewed the metadata of the photos using the "information" feature in the photo viewing application. Based on my recollection of the judicial site visit, I believe the metadata to be an accurate representation of when we were standing outside of our vehicles near the MS-12 air monitoring station.

4

e.  Photo 7 shows one of the two thermal oxidizers (TOX) that are currently operating onsite. We are in the process of installing a third TOX.

f.  Photo 8 shows Tank Farm 10, which handles non-hazardous leachate, and our three flares in the background.

g.  Photo 9 shows a portion of the south sedimentation basin or stormwater basin.

h.  Photos 10-11 show Tank Farm 7. Characteristically hazardous leachate is treated in Tank Farm 7 in the blue vessels seen in the photos and hauled offsite by tanker trucks.

i.  Photos 12-13 show the ongoing Tank Farm 13 construction. Tank Farm 9 and most of Tank Farm 7 will move to this area once construction is complete.

j.  Photo 14 shows Air Monitoring Station AS-01, which is located near Castaic Middle School.

k.  Photo 15 shows Monitoring Station MS-10, which is located near Live Oak Elementary School.

SUPPLEMENTAL DECLARATION OF STEVEN J. CASSULO, IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   I declare under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct to my personal knowledge.

3        Executed on this 7th day of July 2025, in Ventura , California.

4

5

6

7                                    Steven J. Cassulo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF STEVEN J. CASSULO, IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION

# Exhibit A

**South Coast Air Quality Management District**
21865 COPLEY DRIVE, DIAMOND BAR, CA 91765-4178

**P 67000**

# NOTICE OF VIOLATION

| DATE OF VIOLATION | | |
|---|---|---|
| Month | Day | Year |
| 07 | 01 | 2025 |

**Facility Name:** Chiquita Canyon Landfill    **Facility ID#:** 119219    **Sector:** VB

**Location Address:** 29201 Henry Mayo Drive    **City:** Castaic    **Zip:** 91384

**Mailing Address:** 29201 Henry Mayo Drive    **City:** Castaic    **Zip:** 91384

YOU ARE HEREBY NOTIFIED THAT YOU HAVE BEEN CITED FOR ONE OR MORE VIOLATIONS OF THE SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT (SCAQMD) RULES, STATE LAW OR FEDERAL LAW.  IF PROVEN, SUCH VIOLATION(S) MAY RESULT IN THE IMPOSITION OF CIVIL OR CRIMINAL PENALTIES.

EACH DAY A VIOLATION OCCURS MAY BE HANDLED AS A SEPARATE OFFENSE REGARDLESS OF WHETHER OR NOT ADDITIONAL NOTICES OF VIOLATION ARE ISSUED.

## DESCRIPTION OF VIOLATIONS

| # | Authority* | Code Section or Rule No. | SCAQMD Permit to Operate or CARB Registration No. | Condition No. (If Applicable) | Description of Violation |
|---|---|---|---|---|---|
| 1 | ☒ SCAQMD ☐ CH&SC ☐ CCR ☐ CFR | 402 | | ___ | For discharging such quantities of air contaminants to cause injury, detriment, nuisance or annoyance to a considerable number of persons. |
| 2 | ☒ SCAQMD ☐ CH&SC ☐ CCR ☐ CFR | 41700 | | ___ | For discharging such quantities of air contaminants to cause injury, detriment, nuisance or annoyance to a considerable number of persons. |
| 3 | ☐ SCAQMD ☐ CH&SC ☐ CCR ☐ CFR | | | | |
| 4 | ☐ SCAQMD ☐ CH&SC ☐ CCR ☐ CFR | | | | |
| 5 | ☐ SCAQMD ☐ CH&SC ☐ CCR ☐ CFR | | | | |

| Served To: Steve Cassulo | Phone: 661 371-9214 | Served By: Karen Woullard | Date Notice Served: 07/01/2025 |
|---|---|---|---|
| Title: District Manager | Email: steven.cassulo@ wasteconnections.com | Phone No: ☒ 909-396-2285 ☐ 310-233- | Email: kwoullard @aqmd.gov |

**\*Key to Authority Abbreviations:**

SCAQMD – South Coast Air Quality Management District
CCR – California Code of Regulations

CH&SC – California Health and Safety Code
CFR – Code of Federal Regulations

**Method of Service:**
☐ In Person    ☒ Certified Mail

**ORIGINAL**

430

# Exhibit B



**Assistant District Manager**
Chiquita Canyon Landfill
Office: (661) 257-3655
Cell; (661) 425-4619

---

**From:** Karen Woullard <kwoullard@aqmd.gov>
**Sent:** Tuesday, July 1, 2025 1:59 PM
**To:** Steve Cassulo <Steven.Cassulo@WasteConnections.com>
**Cc:** Nicole Ward <nicole.ward@wasteconnections.com>; Larry Israel <lisrael@aqmd.gov>
**Subject:** RE: Notice of Violation # P67000 - Chiquita Canyon Landfill for Tuesday 07/01/2025

Good Afternoon:

The highest intensity was between 4 to 5 in the Val Verde / Lincoln Avenue area , between approximately 8:35 am up until about 8:55am, 9am, based on my surveillance and investigations, fyi.

Thank you,
Karen

1

432

**From:** Steve Cassulo <Steven.Cassulo@WasteConnections.com>
**Sent:** Tuesday, July 1, 2025 1:54 PM
**To:** Karen Woullard <kwoullard@aqmd.gov>
**Cc:** Nicole Ward <nicole.ward@wasteconnections.com>; Larry Israel <lisrael@aqmd.gov>
**Subject:** [EXTERNAL] RE: Notice of Violation # P67000 - Chiquita Canyon Landfill for Tuesday 07/01/2025

What was the intensity on a scale of 1-5?

---

**From:** Karen Woullard <kwoullard@aqmd.gov>
**Sent:** Tuesday, July 1, 2025 10:13 AM
**To:** Steve Cassulo <Steven.Cassulo@WasteConnections.com>
**Cc:** Nicole Ward <nicole.ward@wasteconnections.com>; Larry Israel <lisrael@aqmd.gov>
**Subject:** Notice of Violation # P67000 - Chiquita Canyon Landfill for Tuesday 07/01/2025

Good Morning Mr. Steve Cassulo:

I have issued a Notice of Violation #P67000 pursuant to South Coast AQMD Rule 402 and CA H&SC Section 41700 for public nuisance odors to Chiquita Canyon Landfill for today, 07/01/2025. I have attached a copy of the Notice of Violation to this e-mail. I will also mail the Notice to your attention via USPS certified mail.

 During the course of my inspection, I received/was assigned a total of 7 complaints that was received by our District between the time frame of approximately to 08:07 am to approximately 09:10 am for 07/01/2025.

 Of the 7 complaints that I received today/this am assigned to me from my Supervision, there were 6 confirmed odor complaints for today Tuesday 07/01/2025 at the following street locations in the neighborhood of Val Verde:

- Cottage Grove Drive x1

- Jackson Street x1

- Lincoln Avenue x 3

- Buchanan Way x1

 If there are any questions or clarifications needed with regards to any of the information above, please let me know.

Thank you very much,



*Karen Woullard*
Air Quality Inspector III | Compliance & Enforcement
South Coast Air Quality Management District
21865 Copley Drive | Diamond Bar, CA 91765
(909) 396-2285 | kwoullard@aqmd.gov

2

433

# Exhibit C



### Google Maps

**29201 Henry Mayo Dr, Castaic, CA 91384 to 29201 Henry Mayo Dr, Castaic, CA 91384**

Drive 17.8 miles, 42 min

⚠️ This route has restricted usage or private roads.

**29201 Henry Mayo Dr**
Castaic, CA 91384

↑  1.  Head south toward CA-126 E
⚠️ Partial restricted usage road

35 sec (0.1 mi)

**Continue on CA-126 E. Take The Old Rd to Hillcrest Pkwy**

8 min (5.0 mi)

↰  2.  Turn left at the 1st cross street onto CA-126 E

1.5 mi

↱  3.  Take exit 13 toward Commerce Centre Dr

0.3 mi

↰  4.  Use the left 2 lanes to turn left onto Henry Mayo Dr

0.9 mi

↰  5.  Turn left onto The Old Rd

1.2 mi

⟲  6.  At the traffic circle, take the 2nd exit and stay on The Old Rd

1.0 mi

**Follow Hillcrest Pkwy to your destination**

↰ 7.  Turn left onto Hillcrest Pkwy

3 min (1.6 mi)

1.4 mi

↰ 8.  Turn left

367 ft

↰ 9.  Turn left

33 ft

↱ 10.  Turn right

246 ft

12 min (6.6 mi)

**Castaic Middle School**
28900 Hillcrest Pkwy, Castaic, CA 91384

**Follow Hillcrest Pkwy to The Old Rd**

3 min (1.6 mi)

↑ 11.  Head east

43 ft

↰ 12.  Turn left

0.1 mi

↗ 13.  Slight right toward Hillcrest Pkwy

89 ft

↱ 14.  Turn right toward Hillcrest Pkwy

135 ft

↱ 15.  Turn right onto Hillcrest Pkwy

1.4 mi

**Continue on The Old Rd to Cambridge Ave**

2 min (1.3 mi)

↱ 16.  Turn right onto The Old Rd

1.0 mi

↗ 17.  Slight right toward Hasley Canyon Rd

440 ft

↟ 18.  Merge onto Hasley Canyon Rd

0.2 mi

**Continue on Cambridge Ave to your destination**

2 min (0.5 mi)

↰ 19.  Turn left onto Cambridge Ave

0.2 mi

↱ 20.  Turn right onto Quincy St

0.2 mi

↰ 21.  Turn left

436

↖ 22. Sharp left

---

446 ft

108 ft

8 min (3.3 mi)

**Live Oak Elementary School**
27715 Saddleridge Way, Castaic, CA 91384

**Take Quincy St and Cambridge Ave to Hasley Canyon Rd**

2 min (0.4 mi)

↑ 23. Head east

108 ft

↱ 24. Sharp right toward Quincy St

266 ft

↗ 25. Slight right toward Quincy St

180 ft

↱ 26. Turn right onto Quincy St

0.2 mi

↰ 27. Turn left onto Cambridge Ave

0.2 mi

**Follow Hasley Canyon Rd and Del Valle Rd to Lincoln Ave in Val Verde**

4 min (2.6 mi)

↰ 28. Turn left onto Hasley Canyon Rd

0.4 mi

↱ 29. Turn right to stay on Hasley Canyon Rd

1.0 mi

↖ 30. Slight left onto Del Valle Rd

1.2 mi

↱ 31. Turn right onto Hunstock St

223 ft

**Drive to Lincoln Ave**

2 min (0.3 mi)

↰ 32. Turn left onto Lincoln Ave

358 ft

↱ 33. Turn right onto Central Ave

59 ft

↰ 34. Turn left onto Lincoln Ave

0.2 mi

↰ 35. Turn left to stay on Lincoln Ave

75 ft

437

↱ 36.  Turn right to stay on Lincoln Ave
ⓘ Destination will be on the left

184 ft

8 min (3.4 mi)

**28732 Lincoln Ave**
Santa Clarita, CA 91384

↑ 37.  Head south on Lincoln Ave toward Madison St

0.4 mi

↰ 38.  Turn left onto Chiquito Canyon Rd

0.5 mi

↳ 39.  Sharp right
⚠ Partial restricted usage road

0.5 mi

↰ 40.  Turn left

0.3 mi

↗ 41.  Slight right

157 ft

↰ 42.  Turn left

367 ft

↱ 43.  Turn right
⚠ Restricted usage road
ⓘ Destination will be on the left

0.1 mi

6 min (1.8 mi)

**28101 Chiquito Canyon Rd**
Castaic, CA 91384

**Continue to Chiquito Canyon Rd**

4 min (0.9 mi)

↑ 44.  Head east
⚠ Restricted usage road

0.1 mi

↰ 45.  Turn left

367 ft

↱ 46.  Turn right

0.1 mi

↗ 47.  Slight right

0.2 mi

438

↱ 48.  Turn right
⚠ Partial restricted usage road

0.5 mi

### Drive

2 min (1.5 mi)

↱ 49.  Turn right onto Chiquito Canyon Rd

0.8 mi

↰ 50.  Turn left onto CA-126 E

0.7 mi

### Drive to your destination

2 min (0.2 mi)

↰ 51.  Turn left
⚠ Partial restricted usage road

0.1 mi

↰ 52.  Turn left
⚠ Restricted usage road

148 ft

↰ 53.  Make a U-turn
⚠ Restricted usage road

118 ft

↱ 54.  Turn right
⚠ Restricted usage road
ⓘ Destination will be on the right

167 ft

8 min (2.7 mi)

439

440

441

# Exhibit D

Case 2:24-cv-10819-MEMF-MAR    Document 114    Filed 07/07/25    Page 21 of 39    Page ID #:16493



443

Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 22 of 39   Page ID #:16494



444



Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 23 of 39   Page ID #:11495

445

# Exhibit E

Case 2:24-cv-10819-MEMF-MAR Document 114 Filed 07/07/25 Page 25 of 39 Page ID #:16497



447

Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 26 of 39   Page ID #:16498



448



449

Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 28 of 39   Page ID #:1650



450

Case 2:24-cv-10819-MEMF-MAR    Document 114    Filed 07/07/25    Page 29 of 39    Page ID #:16601



Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 30 of 39   Page ID #:16502



452

Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 31 of 39   Page ID #:16503



Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 32 of 39   Page ID #:15504



454



455

Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 34 of 39   Page ID #:15606





Case 2:24-cv-10819-MEMF-MAR   Document 114   Filed 07/07/25   Page 36 of 39   Page ID #:16508







460



Paul S. Chan (SBN 183406)
 pchan@birdmarella.com
Ariel A. Neuman (SBN 241594)
 aneuman@birdmarella.com
Shoshana E. Bannett (SBN 241977)
 sbannett@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS &
NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100

Jacob P. Duginski (SBN 316091)
 jduginski@bdlaw.com
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 262-4000

Kaitlyn D. Shannon (SBN 296735)
 kshannon@bdlaw.com
Megan L. Morgan *(pro hac vice)*
 mmorgan@bdlaw.com
Megan R. Brillault *(pro hac vice)*
 mbrillault@bdlaw.com
James B. Slaughter *(pro hac vice)*
 jslaughter@bdlaw.com
Katelyn E. Ciolino *(pro hac vice)*
 kciolino@bdlaw.com
Louis J. Manzo *(pro hac vice)*
 lmanzo@bdlaw.com
BEVERIDGE & DIAMOND P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036-1661
Telephone: (202) 789-6000

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES,

　　　　　Plaintiffs,

　　v.

CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; WASTE CONNECTIONS US, INC., a Delaware corporation; and DOES 1-50, inclusive,

　　　　　Defendants.

Case No. 2:24-cv-10819-MEMF (MARx)

Hon. Maame Ewusi-Mensah Frimpong

**SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA**

Date:　　July 17
Time:　　10:00 AM
Dept.:　　8B

Action Filed:　　December 16, 2024
Trial Date:　　None Set

---

**SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA**

I, Patrick Sullivan, declare as follows:

1.    I am of sufficient age and am competent to testify in this proceeding. I make this supplemental declaration in support of the opposition of Defendants Chiquita Canyon, LLC ("Chiquita"), Chiquita Canyon, Inc., and Waste Connections US, Inc. (collectively, "Defendants") to Plaintiffs' motion for preliminary injunction. This declaration supplements my declaration submitted on June 12, 2025 (ECF 82-6) ("June 12 Declaration"), also in support of Defendants' opposition to Plaintiffs' motion for preliminary injunction. My prior conclusions and opinions remain unchanged—this supplemental declaration simply updates my prior analyses with more recently obtained and analyzed data with respect to the below-referenced exhibits. I am competent to testify to the facts and opinions set forth herein.

**<u>Onsite data continues to show that the potential for offsite emissions is decreasing.</u>**

2.    My June 12 Declaration analyzed some of the key onsite data points that are measured and monitored to assess the status of the reaction and Chiquita's overall efforts to mitigate the elevated temperature landfill ("ETLF") event. This supplemental declaration updates those prior analyses with respect to landfill gas recovery data, for which more up-to-date data has become available. The landfill gas recovery data continues to show that conditions are improving onsite, meaning that the potential for offsite emissions and other impacts has decreased and continues to decrease.

3.    Exhibit 4 to my June 12 Declaration summarized landfill gas recovery data from January 1, 2023 to June 4, 2025. My team and I have updated this summary to now reflect Chiquita's landfill gas recovery data collected through the end of June 2025, as summarized in the graph attached hereto as **Exhibit 22**. As

depicted in this graph, while there have been some fluctuations in landfill gas recovery over time, Chiquita has significantly increased its total recovery since the start of 2023. In my opinion, this overall increase is due to the significant improvements Chiquita has been making to the landfill gas collection and control system, as set forth in my June 12 Declaration. ECF 82-6 ¶¶ 18-19.

**Offsite air monitoring data continues to show that air quality in the community is improving and rarely, if ever, exceeds health protective thresholds.**

4.    My June 12 Declaration also analyzed air monitoring data from Chiquita's extensive air monitoring program. ECF 82-6 ¶¶ 25-37. Based on our review and analysis, including of the updated data referenced below, the air quality in the community has improved since early 2024.

5.    Exhibit 8 to my June 12 Declaration is a graph of hydrogen sulfide concentration data from February 20, 2024 to June 9, 2025. Attached as **Exhibit 23** is an updated graph of the hydrogen sulfide concentration data using data collected through June 29, 2025. This updated graph continues to show that hydrogen sulfide concentrations in the offsite air monitoring stations located in the communities surrounding the Chiquita Canyon Landfill ("Landfill") have decreased since 2024.[1]

6.    Exhibit 9 to my June 12 Declaration is a graph of the weekly average concentrations of benzene and dimethyl sulfide recorded at two of the offsite air monitoring stations, MS-10 and MS-12, from April 21, 2024 to June 9, 2025. Attached as **Exhibit 24** is an updated graph of benzene and dimethyl sulfide concentration data using data recorded through June 29, 2025. Concentrations of each constituent have also decreased since 2024.

---

[1] Note that while hydrogen sulfide concentrations are decreasing as a whole, the May and early June 2025 data increases slightly as compared with the March and April 2025 data. However, I do not think this means hydrogen sulfide concentrations are going back up significantly; instead, I think this is the typical slight increase that we would expect to see leading into the summer months as meteorological conditions change. This opinion is further evidenced by the most recent June 2025 data, which shows that concentrations are decreasing once again. Overall, the long-term trendline is continuing to move downward.

SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

7.      Exhibit 10 to my June 12 Declaration is a graph of the weekly average concentrations of benzene and dimethyl sulfide recorded from September 29, 2024 through June 9, 2025 at all of the offsite air monitoring stations equipped with microGC units.[2] Attached as **Exhibit 25** is an updated graph of the weekly average concentrations of benzene and dimethyl sulfide recorded from September 29, 2024 through June 29, 2025. Overall, the trendlines for these concentrations have been downward since 2024, although there will always be fluctuations based on wind conditions and/or the influence of other sources (e.g., vehicles), which especially affect benzene concentrations.

8.      Exhibit 11 to my June 12 Declaration is a chart showing the number of times there have been exceedances of the acute RELs offsite for the constituents shown from June 20, 2024 to June 9, 2025. My team and I have updated this chart using data through June 29, 2025, as shown in the chart attached hereto as **Exhibit 26**. As shown on this updated chart, most of these compounds have never been measured at a level above their acute REL during this time period. Only benzene and acrolein have exceeded their applicable acute RELs during this time period. For benzene, there have only been two such exceedances out of 38,978 data points, which equates to 0.005% of the total number of data points. For acrolein, there have been only seventeen such exceedances out of 3,635 data points, which equates to approximately 0.47% of the total number of data points. The numbers show that these acute RELs are rarely, if ever, exceeded. Note that my analysis includes REL exceedances when the Landfill was not upwind of the monitor location and where other sources were likely contributing to the exceedance.

9.      As discussed in my June 12 Declaration, it is and continues to be my opinion that these acrolein exceedances are not from the Landfill and instead are indicative of background levels caused by many other common sources of acrolein

---

[2] In my June 12 Declaration I stated this data was recorded starting on September 23, 2024. That was made in error, and the correct start date is September 29, 2024.

SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

that are not related to landfilling or the ETLF event, including vehicle exhaust, other combustion sources, wildfires, cigarette smoke, and high temperature cooking. ECF 82-6 ¶ 36.

10.    Exhibits 12 and 13 to my June 12 Declaration are graphs of toluene and acetone concentration data from August 15, 2023 through May 12, 2025. Attached as **Exhibits 27 and 28** are updated graphs of toluene and acetone concentration data using data collected through June 16, 2025. There have been strong downward trends for both of these constituents since 2023.

**<u>Odor surveillance data also continues to show conditions are improving in the community.</u>**

11.    In my June 12 Declaration, I analyzed odor surveillance data that Chiquita collects through twice-daily odor surveillance monitoring at 45 locations in the community. ECF 82-6 ¶¶ 38-41.

12.    Exhibit 14 to my June 12 Declaration is a histogram of the intensity of the odors logged since the Stipulated Order for Abatement (the "Stipulated Order") with the South Coast Air Quality Management District ("South Coast AQMD") first went into effect in September 2023 through May 27, 2025. This histogram has now been updated through June 26, 2025, and is attached hereto as **Exhibit 29**. Of the approximately 40,500 odor surveillance data points my team reviewed and analyzed, our analysis of the data still finds that the odor surveyors did not find any odors in the community over 80% of the time. Further, less than 5% of the odor detections showed an odor intensity of three or greater out of five based on the South Coast AQMD odor scale as listed in the Stipulated Order. According to this odor scale, an odor of three is a "moderate odor."

13.    Exhibit 15 to my June 12 Declaration is a graph of the daily average odor intensities recorded during the odor surveys since the Stipulated Order first went into effect in September 2023 through May 27, 2025. This graph was updated

through June 26, 2025, and is attached hereto as **Exhibit 30**. The blue line depicts the data from 2023, the orange line depicts the 2024 data, and the green line depicts the 2025 data through June 26, 2025. The updated graph continues to show that the average intensities recorded have decreased since the middle of 2024 and that there has been a significant reduction in odor intensity between comparable months in 2024 and 2025.

14.    My team and I also analyzed the odor description information provided by the odor surveyors. Exhibit 16 to my June 12 Declaration is a graphical summary of our analysis using data from September 25, 2023 through May 27, 2025. An updated graphical summary of our analysis using data through June 26, 2025 is attached hereto as **Exhibit 31**. In my expert opinion, this updated graph continues to show that the majority of odors detected by the odor surveyors were not of a landfill-related type—they were either "chemical" or "other." This means that most of the odors detected were unlikely to have been from the Landfill.

**Wind direction and odor surveillance data continue to show that subjective odor complaints attributed to the Landfill are more numerous than objective data supports.**

15.    As discussed in my June 12 Declaration, I conducted an analysis of wind direction and odor surveillance data to understand whether and when odor complaints could have come from the Landfill based solely on meteorological data. ECF 82-6 ¶¶ 44-47. After extending this test using data collected through May 31, 2025, we found that around 20% of the total (verified and unverified) complaints analyzed continued to fail the test.[3] This means that around 20% of the complaints

---

[3] The County provided supplemental address information for the complaints after I submitted my original declaration. However, the data was too numerous for me to geocode it in time to update my wind direction analysis using more specific complaint location information. It also only provided address information for complaints through April 23, 2025, and there was incomplete address information in certain instances, so it was not feasible to incorporate the updated address information into my analysis in the time available.

6

SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

originated from locations that were not within 100 degrees of the complaint line, meaning that it was unlikely that an odor from these complaint locations originated from the Landfill.

16.    Exhibit 17 of my June 12 Declaration shows pie graphs depicting the wind direction test results using data from January 6, 2023 through April 30, 2025. Updated pie graphs depicting the wind direction test results using data through May 31, 2025 are attached hereto as **Exhibit 32**.

17.    Exhibit 18 of my June 12 Declaration shows a pie graph of the wind direction test results for just the verified complaints from April 8, 2024 through April 30, 2025. An updated pie graph of the verified complaint results, using data through May 31, 2025, is attached hereto as **Exhibit 33**.

18.    To further assess the veracity of the odor complaint counts, we compared the odor intensity data from the odor surveillance logs against the odor complaints received by South Coast AQMD. In particular, we looked at odor surveillance data that was taken within one kilometer of the complaint location and within one hour that the complaint was made. Exhibit 19 of my June 12 Declaration is a graphical summary of this comparison using data from September 25, 2023 through April 30, 2025. An updated comparison using data through May 31, 2025 is attached hereto as **Exhibit 34**. This updated comparison shows that the majority of complaints continue to be made at times when odor intensities are low to none.

**Notice of violation data continues to show a decreasing trend.**

19.    The Rule 402 notice of violation ("NOV") data continues to show a strong downward trend as compared with the 2024 NOV data. Exhibit 21 of my June 12 Declaration is a graph of the number of Rule 402 NOVs issued by South Coast AQMD from 2023 through May 2025. An updated graph showing Rule 402 NOVs received through June 2025 is attached hereto as **Exhibit 35**. The 2023 data is in blue, the 2024 data is in orange, and the 2025 data is in green. This updated

SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

graph shows that the number of Rule 402 NOVs received in 2025 continues to be significantly less than the number of Rule 402 NOVs received in the same months in 2024.

**Conclusion**

20.    In conclusion, it is still my expert opinion that the subjective odor complaint data received by South Cost AQMD is artificially high and not useful as the primary indicator of the existence or source of any alleged odors. Instead, the Court should look to objective measures to assess the status of the reaction and Chiquita's mitigation efforts. The onsite data continues to show that the onsite emissions and the potential for offsite impacts from the Landfill is decreasing. The offsite air quality data continues to show that the community's air quality is improving, and that constituents detected in the ambient air rarely, if ever, exceed health protective thresholds. In my expert opinion, these improvements can be attributed to Chiquita's mitigation efforts. When each of these data streams are taken as lines of evidence, individually and especially collectively, they illustrate that conditions are improving, and the mitigation measures that Chiquita is implementing are working.

//
//
//
//
//
//
//
//
//

SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct to my personal knowledge.
3        Executed on this 7th day of July 2025, in Carmichael, California.

_____

Patrick Sullivan
Senior Vice President
SCS Engineers

SUPPLEMENTAL DECLARATION OF PATRICK SULLIVAN, BCES, CPP, REPA IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

470

# Exhibit 22

Case 2:24-cv-10819-MEMF-MAR   Document 113   Filed 07/07/25   Page 11 of 37   Page ID #:16446



# Exhibit 23



# Exhibit 24

Case 2:24-cv-10819-MEMF-MAR    Document 113    Filed 07/07/25    Page 15 of 37    Page ID #:16450



# Exhibit 25



# Exhibit 26

# Offsite Acute REL Exceedances

Data From 6-20-2024 To 6-29-2025

| Compound | Max Recorded | OEHHA REL | Number of Data Points | Number Above Threshold | Percent Above Threshold |
|---|---|---|---|---|---|
| | (parts per billion – PPB) | | | | |
| **Benzene** | **14.24** | **8** | **38978** | **2** | **0.005** |
| 2-Butanone | 11.15 | 4,500 | 38975 | 0 | 0 |
| Hydrogen Sulfide | 18 | 30 | 60395 | 0 | 0 |
| Isopropyl Alcohol | 32.33 | 1,300 | 38072 | 0 | 0 |
| Methanol | 89.81 | 21,000 | 38949 | 0 | 0 |
| Toluene | 10.84 | 1,300 | 38978 | 0 | 0 |
| m,p-Xylene | 57.45 | 5,000 | 37156 | 0 | 0 |
| Acrolein | 2.43 | 1.1 | 3635 | 17 | 0.467 |

480

# Exhibit 27

Case 2:24-cv-10819-MEMF-MAR    Document 113    Filed 07/07/25    Page 21 of 37    Page ID #:16456



# Exhibit 28

Case 2:24-cv-10819-MEMF-MAR    Document 113    Filed 07/07/25    Page 23 of 37    Page ID #:16458



Daily Average Concentration of Acetone from grab and 24H samples

# Exhibit 29



# Exhibit 30

Case 2:24-cv-10819-MEMF-MAR   Document 113   Filed 07/07/25   Page 27 of 37   Page ID #:16462



# Exhibit 31

Case 2:24-cv-10819-MEMF-MAR    Document 113    Filed 07/07/25    Page 29 of 37    Page ID #:16464



Descriptions of Odors from Surveillance Events

Legend:
- Landfill/Trash/Leachate
- Chemical
- Other

39.1%

1.1%

59.8%

# Exhibit 32

Case 2:24-cv-10819-MEMF-MAR    Document 113    Filed 07/07/25    Page 31 of 37    Page ID #:16466



# Exhibit 33



2024-2025 Verified Complaints
Wind Direction Test

Missing MET Data
Failed
Passed

75.5%

0.0%

24.5%

# Exhibit 34

Case 2:24-cv-10819-MEMF-MAR    Document 113    Filed 07/07/25    Page 35 of 37    Page ID #:16470



Histogram of Surveillance Intensity Adjacent to Complaints

# Exhibit 35



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| | |
|---|---|
| Case No. | 2:24-cv-10819-MEMF-MAR        Date: July 7, 2025 |
| Title | _The People of the State of California et al v. Chiquita Canyon, LLC et al_ |

Present: The Honorable:    Maame Ewusi-Mensah Frimpong

| Damon Berry | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: Order GRANTING IN PART and DENYING IN PART Defendants' Ex Parte Application for Leave to File Sur-Reply and Response to Evidentiary Objections [ECF No. 92]**

The Court is in receipt of Defendants' Ex Parte Application for Leave to File Sur-Reply and Response to Evidentiary Objections (ECF No. 92 ("Ex Parte Application")) and Plaintiffs' Opposition thereto (ECF No. 102 ("Ex Parte Application Opposition")).

For the reasons below, the Court GRANTS IN PART and DENIES IN PART the Ex Parte Application.

**Background**

On May 29, 2025, Plaintiffs filed a Motion for Preliminary Injunction. ECF No. 58 ("Motion"). On June 12, 2025, Defendants filed their Opposition to the Motion (ECF No. 82) and their Evidentiary Objections (ECF No. 82-9 ("Defendants' Evidentiary Objections")). With their Reply (ECF No. 87), Plaintiffs filed their own Evidentiary Objections (ECF No. 87-1 ("Plaintiffs' Evidentiary Objections")) and their Response to Defendants' Evidentiary Objections (ECF No. 87-2 ("Plaintiffs' Response")).

On June 26, 2025, Defendants filed the Ex Parte Application, seeking leave to file (1) a Sur-Reply, because Plaintiffs raised a new argument "for the first time in [the] Reply," (ECF No. 92-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.   2:24-cv-10819-MEMF-MAR                     Date: July 7, 2025

Title      *The People of the State of California et al v. Chiquita Canyon, LLC et al*

2 at 1 ("Sur-Reply")); and (2) their own response to Plaintiff's Evidentiary Objections (ECF No. 92-3 ("Defendants' Response").

**Discussion**

The Court finds that Plaintiffs have not raised a new argument "for the first time in [the] Reply." Defendants' assert that Plaintiffs did not argue in the Motion that there is a "presumption" of harm for the nuisance per se claim. Sur-Reply at 3. Plaintiffs, however, did so argue. *See* Mot. at 21 (quoting *IT Corp. v. Cnty. of Imperial*, 35 Cal.3d 63, 71 (1983) ("[W]here a legislative body has specifically provided injunctive relief for a violation of a statute or ordinance, a showing by a governmental entity that it is likely to prevail on the merits should give rise to a presumption of public harm.")); Reply at 8 (quoting from *IT Corp* to argue that irreparable harm to the public is presumed for their nuisance per se claim). Although Plaintiffs' argument in the Motion may not have been as explicit as that in the Reply, the Court nevertheless finds that this argument was raised in the Motion and again in the Reply. As such, the Court concludes that the Sur-Reply is not warranted. The Court therefore DENIES the Ex Parte Application with respect to the Sur-Reply.[1]

On the other hand, the Court finds it appropriate to consider the Defendants' Response.[2] Although neither party has provided any binding authority on the issue, the Court finds it aligned with the principles of fair play and substantial justice to allow Defendants to respond to the Plaintiffs' Evidentiary Objections, such as Plaintiffs have done so to the Defendants' Evidentiary Objections.[3] The Court therefore GRANTS the Ex Parte Application with respect to the Defendants' Response.

/ / /

---

[1] Because the Court DENIES the Ex Parte Application with respect to the Sur-Reply, the Court likewise DENIES Plaintiffs' request for an opportunity to respond to the Sur-Reply. *See* Ex Parte Opposition at 4–5.
[2] For clarity, the Court will not hold a separate hearing on the parties' evidentiary objections or their responses thereto.
[3] For the same reason—that Plaintiffs already responded to the Defendants' Evidentiary Objections—the Court DENIES Plaintiffs' request for an opportunity to respond to the Defendants' Response. *See* Ex Parte Application Opposition at 5–6.

500

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.   2:24-cv-10819-MEMF-MAR                    Date: July 7, 2025

Title   _The People of the State of California et al v. Chiquita Canyon, LLC et al_

**Conclusion**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Ex Parte Application and ORDERS as follows:

1. The Sur-Reply will not be considered for the Court's Order on the Motion;
2. Plaintiffs' request for an opportunity to respond to the Sur-Reply is DENIED;
3. The Defendants' Response will be considered for the Court's Order on the Motion; and
4. Plaintiffs' request for an opportunity to respond to the Defendants' Response is DENIED.

**IT IS SO ORDERED.**

|                       |     |
| --------------------- | --- |
|                       | :   |
| **Initials of Preparer** | DBE |

501

| | |
|---|---|
| Paul S. Chan (SBN 183406) | Kaitlyn D. Shannon (SBN 296735) |
| pchan@birdmarella.com | kshannon@bdlaw.com |
| Ariel A. Neuman (SBN 241594) | Megan R. Brillault (*pro hac vice*) |
| aneuman@birdmarella.com | mbrillault@bdlaw.com |
| Shoshana E. Bannett (SBN 241977) | Megan L. Morgan (*pro hac vice*) |
| sbannett@birdmarella.com | mmorgan@bdlaw.com |
| BIRD, MARELLA, RHOW, | James B. Slaughter (*pro hac vice*) |
| LINCENBERG, DROOKS & | jslaughter@bdlaw.com |
| NESSIM, LLP | Katelyn E. Ciolino (*pro hac vice*) |
| 1875 Century Park East, 23rd Floor | kciolino@bdlaw.com |
| Los Angeles, California 90067-2561 | Louis J. Manzo (*pro hac vice* |
| Telephone: (310) 201-2100 | *forthcoming*) |
| | lmanzo@bdlaw.com |
| Jacob P. Duginski (SBN 316091) | BEVERIDGE & DIAMOND P.C. |
| jduginski@bdlaw.com | 1900 N Street, NW, Suite 100 |
| BEVERIDGE & DIAMOND P.C. | Washington, DC 20036-1661 |
| 333 Bush Street, Suite 1500 | Telephone: (202) 789-6000 |
| San Francisco, CA 94104 | |
| Telephone: (415) 262-4000 | |

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, et al., | CASE NO. 2:24-cv-10819-MEMF-MAR |
| Plaintiffs, | **NOTICE OF ERRATA RE DECLARATION OF RICHARD PLEUS, PH.D., M.S.** |
| vs. | |
| CHIQUITA CANYON, LLC, et al., | |
| Defendants. | Hearing Date:    July 17, 2025 |
| | Time:    10:00 a.m. |
| | Dept.:    8B |
| | Action Filed: December 16, 2024 |
| | Trial Date: None Set |

-1-

502

**TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT, due to a clerical error and oversight, the Declaration of Richard Pleus, Ph.D., M.S., ECF 82-4 ("Pleus Declaration") filed by Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connections US, Inc. (together "Defendants") in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF 82), contained an error in its accompanying Exhibit 4, resulting in a calculation error in the Pleus Declaration. Those errors have been corrected in the contemporaneously filed version of the declaration and document:

1. "Exhibit 4" to the Pleus Declaration, "2025 – South Coast AQMD Visitor Log," erroneously omitted a May 8, 2025, Chiquita Canyon Landfill visitor log entry from South Coast AQMD's Alemayehu Solomon. Exhibit 4 has been corrected, with the May 8, 2025, entry added.

2. Page 19, paragraph 56.a., line 17 of the Pleus Declaration has been revised consistent with the correction to Exhibit 4.

3. Attached hereto as Attachment A is a redlined version of the Pleus Declaration and its Exhibit 4, showing the text that has been modified in the contemporaneously filed Pleus Declaration and Exhibit 4. A clean version of the Pleus Declaration and all associated exhibits are contemporaneously submitted herewith.

Defendants apologize for any confusion resulting from this error and respectfully request that the Court and the parties refer to and replace in their records the contemporaneously filed version of the Pleus Declaration (ECF 82-4) and Exhibit 4 attached thereto.

 Dated: July 7, 2025                    Respectfully submitted,


                                        By: */s/ Paul S. Chan*
                                            Paul S. Chan

Ariel A. Neuman
Shoshana E. Bannett
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM,
LLP
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
Telephone: (310) 201-2100
Email(s): pchan@birdmarella.com
           aneuman@birdmarella.com
           sbannett@birdmarella.com

Jacob P. Duginski (SBN 316091)
BEVERIDGE & DIAMOND, P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone:    415-262-4000
Email:   jduginski@bdlaw.com

Kaitlyn D. Shannon (SBN 296735)
Megan L. Morgan (*pro hac vice*)
Megan R. Brillault (*pro hac vice*)
Katelyn E. Ciolino (*pro hac vice*)
James B. Slaughter (*pro hac vice*)
Louis J. Manzo (*pro hac vice forthcoming*)
BEVERIDGE & DIAMOND, P.C.
1900 N. Street, N.W., Suite 100
Washington, DC 20036-1661
Telephone:    202-789-6040
Email(s): kshannon@bdlaw.com
           mmorgan@bdlaw.com
           mbrillault@bdlaw.com
           kciolino@bdlaw.com
           jslaughter@bdlaw.com
           lmanzo@bdlaw.com

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connections US, Inc.*

-3-

NOTICE OF ERRATA RE DECLARATION OF RICHARD PLEUS, PH.D., M.S. (ECF 82-4)

# EXHIBIT A

505

Paul S. Chan (SBN 183406)
  pchan@birdmarella.com
Ariel A. Neuman (SBN 241594)
  aneuman@birdmarella.com
Shoshana E. Bannett (SBN 241977)
  sbannett@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS &
NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100

Jacob P. Duginski (SBN 316091)
  jduginski@bdlaw.com
BEVERIDGE & DIAMOND P.C.
333 Bush Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 262-4000

Kaitlyn D. Shannon (SBN 296735)
  kshannon@bdlaw.com
Megan L. Morgan (pro hac vice)
  mmorgan@bdlaw.com
James B. Slaughter (pro hac vice)
  jslaughter@bdlaw.com
BEVERIDGE & DIAMOND P.C.
1900 N Street, NW, Suite 100
Washington, DC 20036-1661
Telephone: (202) 789-6000

Katelyn E. Ciolino (pro hac vice)
  kciolino@bdlaw.com
BEVERIDGE & DIAMOND P.C.
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 702-5428

*Attorneys for Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc. and Waste Connections US, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES,<br><br>        Plaintiffs,<br><br>        vs.<br><br>CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; and WASTE CONNECTIONS US, INC., a Delaware corporation,<br><br>        Defendants. | CASE NO. 2:24-cv-10819-MEMF-MAR<br><br>**DECLARATION OF RICHARD PLEUS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    July 17, 2025<br>Time:   10:00 a.m.<br>Dept.:   8B<br><br>Action Filed: December 16, 2024<br>Trial Date: None Set |

-1-

506

I, Richard Pleus Ph.D., M.S., declare as follows:

**Background and Experience**

1.     I am of sufficient age and am competent to testify in this proceeding. I provide this declaration based on my knowledge and expertise in human toxicology and psychopharmacology. I am competent to testify to the facts and opinions set forth herein.

2.     I am the Founder, Managing Director, and Chief Toxicologist at Intertox, Inc. ("Intertox") in Seattle, Washington. Intertox is a toxicology and environmental consulting firm with expertise in risk assessment, scientific research and communication, global regulatory compliance, and design and process evaluation. I have 40 years of experience in toxicology and psychopharmacology, specializing in interactions between chemicals and the brain and associated behavior. I hold a Bachelor of Science in Physiology, a Master of Science in Environmental Health, and a Ph.D. in Environmental Toxicology. My Ph.D. research was conducted in the Department of Pharmacology in a laboratory studying psychopharmacology. My postdoctoral training was in Neuropharmacology.  A copy of my curriculum vitae is attached to this declaration as **Exhibit 1**.

3.     I was retained by Chiquita Canyon, LLC ("Chiquita") in March 2024, to conduct air and odor sampling of the communities around Chiquita Canyon Landfill (the "Landfill") in an effort to evaluate potential physiological impacts from exposure to odorants.

4.     As explained further below, the County relies on subjective odor complaints and self-reported impacts, but fails to account for the objective data that contradicts these claims of widespread odors and health impacts. Because of the process by which people detect and recognize odors and the factors that influence individuals to report odor annoyance and adverse health symptoms from odors, reliance on purely subjective data, including the South Coast AQMD's inherently flawed odor verification process and an unreliable odor survey, results in overstated and inaccurate impacts from odors that allegedly emanated from the Landfill.

**Physiological Responses to Odors**

5.     An individual's sense of smell is initiated when the person sniffs air containing odorant molecules into their nose such that they bind to the olfactory receptors, which are located on neurons in

-2-

507

the roof of the nasal passages. When an odorant molecule binds to its corresponding olfactory receptor, it triggers a signaling cascade (e.g., often called a "nerve impulse" or more accurately, an action potential), ultimately sending an electrical signal to the brain. The brain then interprets the combination of signals from different types of receptors to identify the specific smell, a system known as olfaction (Kandel et al., 2013). This complex process involving interactions between olfactory receptors in the nose and interpretation by the brain is a normal physiological response to odor, based on the odor's nature and a person's experience with the odorant.

6.    In addition to an olfactory (smell) response to the odor, given sufficient concentration in the air, some odorous chemicals with irritation potential can cause transient physiological reactions due to the stimulation of specific facial, nose, mouth, and upper respiratory tract nerves by the odorant, such as respiratory irritation.

7.    These two systems for physiological responses to odorants are differentiated from the toxicological effects from exposure to chemicals in that physiological responses are automatic, unlearned physical responses that decrease or cease when exposure to the odorant ceases. Toxicological effects, on the other hand, are effects on the body that cause harm to tissues. Examples include diseases and cancers. Depending on the chemical agent, the exposures to specific chemicals can be very high (e.g., chlorine gas from a ruptured rail tank car) or continuous lower concentrations over extended periods. Compared to the physiological effects noted above, toxicological effects often require exposure to chemical agents at higher concentrations and longer durations.[1]

*Olfaction*

8.    Human odor detection thresholds ("ODT")—the lowest concentration of an odorant at which a particular individual can detect the presence of an odor—can vary by orders of magnitude from person to person, such that one person may be able to detect an odor at the parts per billion (ppb) level. In contrast, another person may not be able to perceive that same odor unless it is at the parts per million (ppm) level. Therefore, when determining an ODT for a particular chemical, they are typically established at the concentration at which fifty percent (50%) of a group of individuals (an odor panel)

---

[1] I understand that Dr. Perez is addressing the toxicology aspects of air contaminants for purposes of the opposition, and therefore I do not address them in my declaration.

-3-

508

with a normal sense of smell can detect an odor in a laboratory setting (more specifically, detect that there is something other than blank air within a sample), and often provided in a range (AIHA, 2024).

9.   Notably, the ODT is only the point at which the odor is able to be detected in a clean laboratory setting; however, that does not always allow the person to recognize or characterize the odor. The concentration at which an individual is able to describe the odor (e.g., identify the odor as floral or rotten egg as opposed to merely detecting that an odor is present) is called the odor recognition threshold. Recent studies have shown that an odor recognition threshold is 3–10 times higher than the ODT when tested in a laboratory environment (Wise, Soreth, & Dalton, 2018). For example, suppose an odorant's lab-measured ODT is 1 ppb. In that case, the level at which 50% of the panel can recognize the quality or identity of that odorant in a laboratory environment is 3-10 ppb.

10.   Because odor detection and recognition thresholds are determined in a laboratory setting, they may not be representative of what a person could detect in real-world situations. The ability to recognize a specific chemical outside of a laboratory, referred to as the level of distinct odor awareness, generally requires an increased concentration over the lab-measured ODT or recognition threshold. In part, this is due to the other odors we experience in our regular lives. Thus, the extrapolation of these laboratory-based values to detectability in the real world, where individuals are not always focused on detecting odors and with numerous background odors, is highly questionable.

11.   Odor detection, recognition and awareness thresholds vary among different chemicals but also vary across the population. Examples of the range of odor detection thresholds for several common odorant chemicals are as follows:

**Odor detection threshold ranges for select chemicals (from AIHA, 2024)**

| Odorant | Concentration Range (ppb in air) |
| --- | --- |
| Hydrogen Sulfide | 0.047-72 |
| Dimethyl Disulfide | 0.29-20.2 |
| Dimethyl Sulfide | 0.12-63 |

12.   A variety of factors, specific to each person, will determine whether that person can perceive a particular odor and the intensity with which it is perceived. These factors include smoking

-4-

509

1  status (smokers are less sensitive to odors), age, sex, other chemical exposures, and various illnesses

2  (nasal congestion can decrease the ability to detect an odor).

3      13.    Given the wide variability of odor perception in humans, the use of objective measuring

4  devices, such as the Nasal Ranger Field Olfactometer ("Nasal Ranger") (an ambient air portable

5  olfactometer for the human nose to detect odors, is a preferred and scientifically accepted methodology

6  for measuring odor strength. Intertox team members are officially trained in odor assessment and

7  measurement for ambient odors by an internationally recognized training program through St. Croix

8  Sensory odor school training program (https://www.fivesenses.com/odor-school-training-programs/ ).

9  Intertox also collects air samples simultaneously during odor episodes with silicone-coated canisters

10  (i.e., SilcoCan) or Tedlar sampling bags. These sampling devices ensure stability of the sample obtained

11  and minimal degradation of common landfill odorants (such as sulfur-based compounds).  In fact, many

12  states approach odor source control and violations systematically by using scentometry and setting

13  ambient odor limits through the use of devices such as the Nasal Ranger® (i.e. scentometry) and other

14  approved methods. Scentometry, using dilutions to threshold as an objective approach to quantifying

15  the strength of odors, is a scientifically accepted methodology for measuring odor strength based on the

16  ability to smell an odor after diluting a sample of ambient air with a known concentration of carbon-

17  filtered (odorless) air. The amount of dilution of carbon-filtered air required before an odor is no longer

18  detectable by a trained odor scientist is termed the "dilution to threshold" or D/T. The D/T is a unitless

19  ratio calculated as:

20  $$D/T = \frac{\text{Volume of carbon filtered air}}{\text{Volume of odorous air}}$$

22      14.    The greater the number of dilutions needed before the odor threshold is reached, the

23  stronger or greater intensity the odor. Air quality standards for nuisance odors have been established by

24  multiple regulatory agencies based on a D/T of 7:1 or greater, and most standards include a detection

25  frequency that must be met in a defined period of time in order to be classified as an "exceedance."

26      15.    Concerning odor character (what the odorant or mixture smells like) and hedonic tone

27  (the odor's relative pleasantness or unpleasantness), these parameters are subjective and highly

28

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  influenced by external factors. Therefore, the scientifically accepted methodology is to use resources

2  such as the odor wheel in the field to help standardize odor descriptors.

3  *Irritation*

4  16.    The irritation response is separate from olfaction and results from the odorant activating

5  free nerve endings of some nerves (those with "irritation" receptors). These neurons, when activated by

6  a chemical agent, cause a nerve impulse that is then transmitted to the brain, where the brain interprets

7  these sensations as temporary burning, stinging, tingling, or painful sensations in the eyes, nose, and

8  respiratory tract (AIHA, 2024; Dalton, 2003). However, while irritation may be unpleasant, these

9  sensations are not causing a toxicological effect. Key to this point is that sensations of irritation are

10  temporary and cease when the concentrations of the agent(s) are lower or when the agents are absent.

11  Many odorants have an irritation threshold, which refers to the concentration of a substance in the air

12  below which most people are unlikely to experience sensory irritation. The irritation threshold is

13  typically at a higher concentration than the odor detection threshold for the same chemical and varies

14  by chemical (Dalton, 2003).

15  17.    It is thus possible (and is oftentimes the case) that you can smell an odor at

16  concentrations well below a particular constituent's irritation threshold. For example, the range of odor

17  detection thresholds for hydrogen sulfide is 0.047–72 ppb, whereas the range of irritation thresholds is

18  5,000–10,000 ppb (ATSDR, 2016; Ruth, 1986). And even when an irritation threshold is reached,

19  typically a much higher concentration would be required (for a much more extended period) for adverse

20  health effects (toxicological health effects) to be expected. For example, the odor from cutting an onion

21  often causes lacrimation (eye watering and irritation of the eyes, nose, and throat), prompting people to

22  move away from the onion. However, the symptoms subside, and one returns to cutting an onion. Given

23  this strong irritation reaction, it serves as an indicator of exposure, rather than adverse health effects.

24  **Odor Habituation and Adaptation**

25  18.    The olfactory system can adapt to repeated or prolonged exposure to a given odorant,

26  reducing sensitivity to that odorant (Dalton, 2000). This habituation, or "odor fatigue," is a neural

27  process that leads to a decrease in nerve action, which can also lead to a change in a behavioral

28

-6-

1   response. Concerning odors, habituation is sometimes referred to as "odor fatigue." Essentially, this

2   reduced sensitivity results in a decrease in the perception of an odor's strength (Pellegrino et al., 2017).

3   As the olfactory system continually encounters various odorants, these mechanisms prevent the

4   olfactory system from being overwhelmed. During exposure to an odorant, the odor intensity will

5   decrease. Habituation occurs with frequent exposure to the odor; this happens at faster rates with longer

6   exposure length as well as with shorter intervals between exposures. Weaker odors also lead to more

7   rapid habituation. Although with substantial concentrations of an odor, recognizing it as a strong or

8   intense odor may diminish, the perception of the odor may not completely disappear (Pellegrino et al.,

9   2017).

10      19.    Regarding the context of odor perception and its potential impact on interpretation,

11  Dalton (1999) studied 180 healthy individuals in an experimental design that primed participants with

12  positive, negative, and neutral biases. From that point, they were tested for odor and irritation intensity,

13  as well as for any symptoms. The scientists purposely created bias, such that test individuals were told

14  that they would be exposed to either natural extracts with relaxing effects (positive bias), industrial

15  solvents (negative bias), or simply odorants used and approved for olfactory research (neutral bias.)

16  The reported results showed that individuals in the negative bias group consistently reported higher

17  odor intensity values than those in the neutral or positive bias groups, and they reported substantially

18  more symptoms than the neutral or positive bias groups. Dalton (1999) concluded that "[t]hese results

19  indicate that people's responses to ambient odors may be determined less by the sensory qualities of the

20  odor, and more by the context that is provided prior to exposure."

21      20.    For example, workers with frequent or daily exposure to a given airborne chemical can

22  become habituated to the odor of that chemical (Pellegrino et al., 2017). Habituation also occurs in

23  individuals who receive daily exposure to an air-freshener-type fragrance, over time developing a

24  persistent loss of sensitivity to the odor as well as a decrease in their perception of the odor's intensity,

25  e.g., in their home, demonstrating that habituation occurs even with odors that are deemed positive or

26  pleasant (Dalton and Wysocki, 1996).

27      21.    Habituation was found to occur more rapidly to unpleasant odors than to those deemed

28

-7-

512

1   more pleasant (Jacob et al., 2003). The authors also noted that with increasing odor strength, some

2   habituation is lost while sensitivity is restored. Therefore, even though continuous exposure to an

3   unpleasant odor will result in habituation, an increase in odor concentration will be detected readily.

4   The findings of Jacob (2003) were recapitulated in another study, which compared the time it takes to

5   become habituated to varying concentrations of hydrogen sulfide and phenylethyl alcohol (rose scent)

6   (Struck et al., 2014). These results show individuals adapt more rapidly to hydrogen sulfide ($H_2S$) than

7   phenylethyl alcohol, on the order of seconds (39.5 to 69.9 seconds for $H_2S$; 130.8 to 231.4 seconds for

8   phenylethyl alcohol). The time required to adapt to both odorants increased with increasing

9   concentration of the odorants. Interestingly, the longer the recovery time after habituation, the more

10  likely an individual was to perceive greater odor intensity, even when presented with the same

11  concentration of either $H_2S$ or phenylethyl alcohol (Struck et al., 2014).

12  **Emotional Responses and Misattribution**

13      22.    Odor perception and the resulting behavioral response are highly subjective among

14  individuals: a particular odor may be perceived as disagreeable by one person, neutral by another, and

15  agreeable by another. Cultural background, psychological health, and lived experience impact response

16  and thus, odor perception. The expectation that an odor may be more healthy or less healthy to breathe

17  can alter how much we attend to the odor and how we react to it when we smell it.

18      23.    A response to an odor can be one or a collection of physical or behavioral responses. An

19  example of physical responses is moving toward something (positive association, such as smelling a

20  rose) or away from a source (negative association, such as smelling feces). An example of a behavioral

21  response is the association with anger or fear (negative association, such as fear of being poisoned) and

22  happiness and joy (positive association, like the smell of fresh-baked bread). The interpretation of odor

23  and the resulting physical or behavioral actions a person takes is the result of the brain processing the

24  information. The brain's information processing integrates each person's history and culture. Briefly,

25  the neuronal physiology comprises the neurons in the olfactory tract that send nerve impulses to the

26  brain's limbic system (e.g., amygdala) and the piriform cortex. These components work together and

27  involve emotion, memory, motivation, and olfaction. Below is a visual representation of the olfactory

28

-8-

513

pathway from odorant in the nose to the brain (modified from Purves et al., 2001):



24.    For malodors specifically, studies have shown that annoyance responses are not primarily impacted by odor intensity but are by various factors specific to the individual (those discussed previously such as age, gender and perceived health status)—as well as beliefs about odors and their risks—e.g., are they harmful to me? do they depress my property value? (Dalton, 1996b; Distel et al., 1999; Distel & Hudson, 2001; Karnekull, Jonsson, Larsson, & Olofsson, 2011). These factors tend to be the drivers of increased odor annoyance and more drastic health complaints, rather than the strength and frequency of the odors experienced.

25.    As I reported in paragraph 19, Dalton (1999) demonstrated positive, negative, and neutral biases could be reflected in odor scoring. Individuals in the negative bias group consistently reported higher odor intensity values than those in the neutral or positive bias groups, and they reported substantially more symptoms than the neutral or positive bias groups.

26.    Additionally, the information provided about the source of an odor also affects how a person responds to the experience of an odor. For example, labeling an odor can significantly bias an individual's perception of its intensity and pleasantness. Studies have shown that individuals' perception of the same odor varied, depending on whether or not it was given a positive label, such as "*Christmas tree,*" or a negative label, such as "*spray disinfectant.*" (Herz and von Clef 2001).

27.    These suggestive responses also carry over into irritation sensations. Sniffing a green-colored liquid produced reports of nasal cooling sensations, whereas sniffing a red-colored liquid resulted in reports of nasal warming. (Michael, Galich, Relland, & Prud'hon, 2010; Michael & Rolhion, 2008).

28.    Emotional reactions and experiences with odors can lead to public concern, which can be exacerbated by media reports that lack appropriate context, such as the assumption that any exposure

-9-

514

to any chemical results in possible adverse health effects (Rosenkranz and Cunningham, 2003). Expectancies provided in the form of media warnings have been shown to exacerbate the acquisition of symptoms in response to benign odors (Winters et al., 2003).

29.     The expectations that arise from prior experiences with an odor, warnings and statements regarding potential effects (whether accurate or not), or other reasons can also cause individuals to misattribute pre-existing conditions to odor exposure. For example, I have experience with individuals alleging migraine headaches from a source and noting that the same individual has a history of migraine headaches. Though an individual knows they had migraine headaches before exposure to a source, the individual associates the cause of the migraine headache to the odor source, regardless of whether any causal connection is valid.

30.     The exposure to odors can result in psychogenic illness, where real physiological symptoms are triggered by misunderstood or false information (Jones, 2000; Bartholomew, 2005; Van der Auwera et al., 2007; Kanaan and Wessely, 2010).  Psychogenic illness has been defined as a constellation of symptoms suggestive of organic illness, with no identifiable cause and little clinical or laboratory evidence of disease (Jones, 2000). Predominant symptoms reported after a review of nine studies of psychogenic illness include headache, dizziness, nausea, cough, fatigue, drowsiness, weakness, watery or irritated eyes, inability to concentrate/trouble thinking, vomiting, tingling, and numbness (Jones, 2000). Of note, in incidents where psychogenic illness has been reported, a plausible pathogenic agent or source has not been identified. There is a misperception that detection of an odor indicates the exposure is health-threatening. As noted above in my declaration, it is essential to differentiate between concentrations at which odors can be detected and those associated with toxicity, which typically occur at much higher concentrations.  For example, hydrogen sulfide, depending on the individual, can be detected at very low levels in air (as low as 0.047 ppb in laboratory settings), (AIHA, 2024). Toxic effects, such as olfactory paralysis, however, occur at much higher concentrations of hydrogen sulfide (100–200 ppm, which is equivalent to 100,000-200,000 ppb), which is approximately 2,000,000 to 4,000,000 times higher than the lowest detection threshold (ATSDR, 2017, Ruth, 1986). Therefore, odor *detection* should not be considered a reliable indicator of toxicity (Beauchamp et al. 1984; Schiffman and Williams, 2005).

31.     The declarations of residents submitted by the County demonstrate that biases exist and are impacting residents' perception and beliefs of impacts resulting from alleged odor exposure. The

-10-

three residents believe that Landfill odors are the cause of a variety of physical and emotional symptoms including "nose bleeds, persistent headaches and migraines, nausea, vomiting, heart palpitations, shortness of breath, skin rashes, eye irritation, anxiety, sore through [sic], constant coughing, and dizziness," Suggs Decl. ¶ 7, "respiratory issues, headaches, nausea, chest pain, sinus issues," iron deficiency, cancer and miscarriages, (Howse Decl. ¶¶ 12-14), and "headaches, sinus issues, and fatigue," (Perera Decl. ¶¶ 4-5). The declarants all state that they "believe" these symptoms are caused by odors but do not provide any medical or scientific basis for their belief. Instead, as indicated in Mr. Howse's declaration, he read that benzene exposure can cause similar mild symptoms, without knowing whether he was ever exposed to concentrations that are required for exposure to cause such a response. To date, no medical records or information have been made available to evaluate whether the resident's general symptoms existed prior to the elevated temperature event or were a result of other preexisting illnesses (allergies, history of migraines).

32.    In my opinion, misattribution of common symptoms such as headaches, nausea, and fatigue to the alleged Landfill odors are a result of individual preconceived ideas about the alleged source of odors (the Landfill) and that such odors are "toxic." Odor perception and response is not always driven by the "bottom-up" features of the odorant (e.g., quality, intensity, and identifiability), but rather "top-down" features, such as expectations and beliefs about the odor. In other words, simply labeling an odor negatively (noxious; putrid) or as harmful (toxic), can impact how a person experiences that odor.

33.    Odors and their sources surround us. Thus, relying on self-reported complaints as evidence of objectionable odors can result in inaccurate or insufficient conclusions. Attributing odors to a specific source without proper validation lacks methodological consistency, as it depends heavily on the accuracy of subjective reports, including location, wind direction and speed, and odor descriptions provided by individuals who may not be trained in such assessments. For instance, odor complaints submitted without reliable meteorological data cannot be confidently linked to a single source when alternative sources and confounding factors cannot be effectively ruled out. Furthermore, untrained individuals often use inconsistent terminology; for example, two people might describe the same wind

-11-

516

1  direction differently—one calling it a "west wind" and the other an "east wind." As such, the quality of

2  data derived from self-reported complaints is insufficient for accurately attributing odors to a specific

3  source or characterizing the intensity or nature of the odor, including whether it could be characterized

4  as a nuisance-level odor.

5  **Intertox's Odor Impact Assessments To-Date**

6  34.     Intertox has completed two rounds of odor sampling and prepared one odor impact

7  assessment for Chiquita to date. The first round of sampling was conducted from June 11-18, 2024, and

8  the second round of sampling was completed July 29 - August 1, 2024. Data from the second round of

9  sampling was not available by the report deadline and was therefore not included in Intertox's August

10  1, 2024 Odor Impacts Assessment of Chiquita Canyon Landfill Elevated Temperature Landfill Event

11  (the "Odor Impacts Assessment"), which is attached as **Exhibit 2**, and highlighted in the August 1,

12  2024 Health Impacts Report – Public Summary ("HIR Public Summary"), which is attached as **Exhibit

13  3**. Intertox is conducting a third round of odor sampling from June 7-13, 2025. The methodology used

14  to perform these assessments is described below, along with a discussion of the results from these

15  efforts to date.

16  35.     In advance of participating in Intertox's 7-day study between June 11-18, 2024, CTEH

17  conducted a 28-day air quality study between March 4-31, 2024.  As part of CTEH's 28-day air quality

18  study, CTEH conducted an odor survey using Nasal Rangers to measure odors at fifteen off-site

19  locations throughout the Val Verde, Live Oak, and Hasley Hills neighborhoods surrounding Chiquita.

20  Approximately 2.5% of the total odor samples collected by CTEH from the March 2024 study were

21  detected at or above 7 D/T while 86.2% were below 2 D/T, the lowest odor intensity detectable on the

22  Nasal Ranger. Intertox utilized the data collected in CTEH's 28-day air quality study to identify

23  odorants detected at off-site sample locations in the neighborhoods surrounding Chiquita.  CTEH's data

24  informed Intertox's approach to selecting sampling locations to collect additional air quality and odor

25  data for the June 2024 odor assessment.

26  *Methodology for Odor Impacts Assessments at Chiquita Canyon Landfill*

27  36.     Using a scientific approach to assess the extent, character, and intensity of odors is

28

-12-

517

1 essential. As discussed above, the experience of odor is subjective and influenced by factors such as age

2 and sex. Behavior is the result of perception, cultural, and psychological factors as described above.

3 Intertox thus utilizes objective tools to evaluate odors and their potential impacts, thereby eliminating,

4 as much as possible, the subjective components of olfaction.

5      37.    Intertox's odor sampling consists of objective measurements of detected odors in the

6 community surrounding the Chiquita Canyon Landfill along with contemporaneous air sampling.  The

7 general approach used by Intertox is as follows:

8 - Canvass neighborhoods, stopping at 15 locations to assess odors, including in Val Verde and

9    Castaic, where the County is seeking relief.

10 - Use a Nasal Ranger to objectively measure odor strength using D/T and characterize the

11    odors.

12 - If an odor is detected at or above 7 D/T with the Nasal Ranger, a contemporaneous air sample

13    is collected and sent to an accredited lab to determine the chemical constituents in the air

14    causing the odor.

15 - Results from air samples taken are then compared against irritation thresholds.

16 *Analysis of Data*

17      38.    The odor measurements and air sampling data are then compared to irritation thresholds,

18 or the level and exposure time of a chemical at which most people do not experience irritation in

19 controlled studies, to assess the potential impacts the detected odors may have on residents of the

20 neighborhoods surrounding the Landfill (e.g., Val Verde, Live Oak, Hasley Hills).

21      39.    While individual odor perception varies, Intertox objectively measures the sensory

22 perception of odors by incorporating the four primary measures of odor into odor impact assessments:

23 odor intensity (or strength), threshold (D/T), character, and hedonic tone. Intertox also assessed the

24 potential for odorants to cause irritation as a measure of potential physiological response to odors.

25 *June 11-18, 2024 Odor Sampling Event*

26      40.    Intertox's first round of odor sampling was conducted from June 11-18, 2024,

27 approximately between the hours of 7 am and 7 pm. During this period, Intertox took air samples in

28

-13-

518

neighborhoods surrounding Chiquita when an odor was detected at or above 7 D/T using a Nasal Ranger. Intertox also evaluated each sample for odor character and hedonic tone. While both of these parameters are subjective and influenced by external factors, Intertox uses resources such as the odor wheel in the field to help standardize odor descriptors. In addition to measuring odors, Intertox also incorporated contemporaneous air samples in its sampling design to determine what chemicals were in the air when odors were detected.

41.     **Results:**  Based on the June 2024 odor study, Intertox found that odorants were detected at or above the "nuisance" level (at or above 7 D/T using a Nasal Ranger) at locations surrounding Chiquita less than 8% of the time. While some of the constituents measured in the contemporaneous air samples, along with their associated odorants, could trigger short-term physiological responses if residents near Chiquita are exposed to sufficient concentrations for sufficient periods of time, Intertox never detected odor or corresponding constituents above their corresponding irritation threshold. Further, during the sampling we noted that odors are episodic and of short duration lasting minutes. In other words, we did not experience any long-lasting odors.

*Sampling at Night in our July 2024 Odor Sampling Event*

42.     While taking the initial odor and air samples in June, community members informed the Intertox team that they were experiencing odors at night. Based on this feedback, Intertox conducted an additional round of odor sampling at night in July 2024 to capture and assess the potential impacts of odors in the community outside of the June 2024 sampling times.

43.     **Results:**  Based on the July 2024 night odor study, Intertox found that odorants were detected at or above the "nuisance" level (at or above 7 D/T using a Nasal Ranger) at locations surrounding Chiquita less than 8% of the time. While some of the constituents measured in the contemporaneous air samples, along with their associated odorants, could trigger short-term physiological responses if residents near Chiquita are exposed to sufficient concentrations for sufficient periods of time, Intertox never detected odor or corresponding constituents above their corresponding irritation thresholds. Further, during the sampling we noted that odors are episodic and of short duration lasting minutes. In other words, we did not experience any long-lasting odors.

-14-

519

**Intertox's Ongoing Landfill Odor Assessments**

44.    To build on Intertox's odor sampling and assessment conducted in June and July of 2024, Intertox is conducting an additional round of odor and air sampling on June 7-13, 2025.  This additional sampling and assessment incorporate the same design as previous odor assessments, but with increased locations and numbers of samples per location, with trained samplers.

45.    In addition to providing more confidence in Intertox's scientific method, expanding the data set of odor assessments over time permits the evaluation of odor trends in the communities surrounding Chiquita.

46.    At this time, we are conducting the study and do not have data to share.

**Alleged health impacts are physiological and result in behavioral responses. The plaintiff's responses are not toxicological.**

47.    Physiological actions in the body are a regular part of living. They are sometimes involuntary and resolve once the stimuli are removed.  An additional consideration is that the health impacts reported by residents are common and often part of one's everyday life or a result of other health issues (e.g., headaches, sleeplessness, nausea).

48.    I have reviewed the toxicological assessment of CTEH and of Dr. Perez. These toxicological assessments follow the gold standard of the toxicology profession. I agree with the conclusions of their reports.

49.    People also report health issues when exposed to harmless levels because of a negative association with the odors (i.e. a purely psychological response).

50.    Again, if told an odor is harmful or otherwise described in a negative fashion, reports of headaches, nausea and other impacts increase or individuals may incorrectly associate a preexisting condition (migraine headache) with the odor.

**South Coast AQMD's Odor Complaint Verification and Source Identification Process is Unscientific and Unreliable.**

51.    As discussed above, odors are largely subjective.  Humans generally, absent the use of objective tools, are not good at determining the source, character, or hedonic tone of an odor.  These

-15-

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    inadequacies of the human nose and the odor interpretation process form the basis of South Coast

2    AQMD's odor investigation and enforcement efforts at the Chiquita Canyon Landfill.  According to

3    Amanda Sanders' Declaration provided in support of the County's motion, South Coast AQMD

4    inspectors under her supervision are "responsible for both (a) verifying that odors are present, and (b)

5    verifying the source of the odors." Sanders Decl. ¶ 14. I have not received any documentation on the

6    training methods used by South Coast AQMD. So, while I use the word "trained" below because of the

7    testimony I have heard by members of South Coast AQMD, confirmation of the adequacy of training is

8    an open question. I enforce my concern of adequacy of training by the steps of odor complaint process

9    by the statements and work reported by South Coast AQMD personnel.

10       52.    As discussed step-by-step below, South Coast AQMD's odor complaint verification and

11    source investigation process is not scientifically-backed methodology, transparency, or reproducibility,

12    which contravenes the pillars of the scientific method. As a result, odor complaint data are highly

13    susceptible to biases of inspectors and residents when verifying odors and source tracing. South Coast

14    AQMD's failure to use objective tools and follow its own policies in the odor investigation process

15    undermines the validity and usefulness of any of the South Coast AQMD odor complaint data, and

16    generally calls into question the veracity of all the odor nuisance NOVs issued to the Landfill.

17       53.    **Step 1 – Receipt of Complaint:** The first step in South Coast AQMD's investigative

18    process is the receipt of a complaint from the community. Sanders Decl. ¶ 16.  South Coast AQMD

19    provides many ways for individuals to make complaints, including a 24-hour hotline, a website portal,

20    and an app that can be downloaded on an individual's phone. Sanders Decl. ¶ 15.  The odor complaints

21    South Coast AQMD receives generally allege a source from which the complained-of odor originates.

22    Sanders Decl. ¶ 16.  The first step of the process thus relies on the subjective determinations of an

23    individual as to the character of an odor (what it smells like), its hedonic tone (whether it is pleasant or

24    unpleasant), and the alleged source of the odor.  Untrained individuals using nothing but their nose are

25    unable to provide reliable and reproduceable information on any of these metrics.  As discussed above

26    regarding misattribution, when individuals have been told an odor comes from a specific source, they

27    are predisposed and biased to believe that a particular odor has come from that particular source, and

28

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1   individuals are therefore more likely to attribute odors to that source, regardless of whether that is the

2   case.

3       54.    **Step 2 – Dispatch to Complainant:** After South Coast AQMD receives a complaint, it

4   dispatches an air quality inspector to the location of the complainant. Sanders Decl. ¶¶ 16-17. If South

5   Coast AQMD receives a complaint outside of its business hours (Tuesday through Friday 7:00am to

6   5:30pm), an inspector typically calls the complainant and logs the complaint. (Sanders Decl. at ¶ 28.)

7   Laurance Israel, Supervising Air Quality Inspector at AQMD, testified to the South Coast AQMD

8   Hearing Board in August of 2024 ("Aug. 17, 2024 Hearing Tr."). Notably, Mr. Israel testified that it

9   "might take a while to get to the location" of a complainant after a complaint is received. (Aug. 17,

10  2024 Hearing Tr. 178:12-25).

11      55.    **Step 3 – Odor "Verification":**  Upon arrival at the complainant's location, the South

12  Coast AQMD inspector will discuss with the complainant and make a determination whether the odor

13  is "present and ongoing," – if so, this qualifies as a "verified" odor complaint. Sanders Decl. ¶ 23.

14  South Coast AQMD purposefully does not use any objective tools in this part of the process based on

15  the assumption that "noxious smells can be more aptly detected by the human nose as opposed to a

16  measuring device." Sanders Decl. at ¶ 23. Instead, inspectors talk to the complainant, "ask questions,"

17  and assess "whether the complainant themselves still detects the odor, and by relying on the inspector's

18  olfactory senses and historical experience within the geographic area." Sanders Decl. at ¶ 23. There are

19  numerous issues with this process:

20          a.   <u>Subjectivity of Verification</u>: An inspector's use of "historical experience" to verify

21             an odor presents significant reliability issues. As discussed more below, many South

22             Coast AQMD inspectors have not been on-site at the Landfill in over a year – some

23             have not been on site since 2023. An inspector's potentially year-old recollection of

24             the potential Landfill odors is not reliable, particularly when there is no evidence that

25             South Coast AQMD inspectors are trained in odor characterization or intensity. The

26             characteristics of the Landfill's odors also change over time, they are not static.

27             Further, each person's perception can vary greatly – both in terms of

28

-17-

522

pleasantness/unpleasantness and intensity. Mr. Israel previously testified that an odor may be "super intense" to one person may not be for others. Aug. 17, 2024 Hearing Tr. 193:1-12. Measuring devices, on the other hand, provide objective, standardized data on a clear scale.

    b.   <u>Confirmation Bias of Inspector:</u> Because many odor complaints allege or state a specific source of the complained-of odor, South Coast AQMD inspectors are susceptible to confirmation bias when a complainant alleges a specific source or source category. (Sanders Decl. ¶ 16.) When an odor complaint is made alleging odors from the Landfill, for example, South Coast AQMD inspectors are seeking to confirm the complainant's source hypothesis, rather than objectively evaluating the odor's characteristics and other environmental parameters (e.g., wind direction) to make a determination. The inspector's perception then is colored by the pre-existing source label from the claimant.

    c.   <u>Time Delay:</u> Odors detected in the communities surrounding the Landfill do not persist; odors are typically transient and variable, lasting for only a few minutes. (Aug. 17, 2024 Hearing Tr. 193:1-12; Odor Impacts Assessment at 66.) When inspectors are not on-site with a complainant in short order, it is uncertain whether the inspector is verifying the odor that the complainant actually reported.

    56.   **Step 4 – Odor Source Tracing:** The final step of South Coast AQMD's process is to "trace" the odor to the alleged source. Sanders Decl. ¶ 25. This is "typically" done by referencing wind data and "then seeking the same odor at locations up and down wind—narrowing this range until a single source is identified." Sanders Decl. ¶ 25. Mr. Israel previously testified that South Coast AQMD inspectors are supposedly trained to physically trace an odor all the way back to its source by driving around or canvassing the community on foot. Aug. 17, 2024 Hearing Tr. at 173:19-174:8. South Coast AQMD inspectors are also trained and empowered to come on-site to the Landfill to complete their inspection and determine the source of the particular complained-of odor. Sanders Decl. ¶ 25; Aug 17, 2024 Hearing Tr. at 180:2-5. But according to Ms. Sanders' declaration, an inspector "will often be

-18-

1  able to determine the source of the odor" based on "the inspector's training and knowledge of upwind

2  and downwind emission sources within the geographic area…combined with the immediate wind

3  data," without physically tracing the odor to the source. Sanders Decl. ¶ 25.  Again, there are numerous

4  issues with this process:

5       a.  Lack of Source Tracing to Landfill:  While South Coast AQMD inspectors are

6          expected to trace an odor all the way back to its source, this has rarely happened

7          with respect to the investigations regarding the Chiquita Canyon Landfill.  After

8          conducting a thorough review of the verified odor complaints that formed the basis

9          of odor NOVs served on Landfill from April 2024 through August 2024, not a single

10         South Coast AQMD inspector reported visiting the Landfill to determine the source

11         of the "verified" odor. Mr. Israel has also testified previously that his inspectors are

12         required to sign into a visitor log when entering the Chiquita Canyon Landfill. Aug.

13         17, 2024 Hearing Tr. at 190:7-11.  I understand that this is a safety requirement so

14         that Chiquita's operational staff may know who is on-site at any given time. I

15         similarly reviewed the Landfill's visitor logs from January 1, 2025 through May 31,

16         2025, attached hereto as **Exhibit 4**, and at best, South Coast AQMD inspectors may

17         have been on-site to trace complained-of odors back the Landfill for only ~~10~~13% of

18         odor nuisance NOVs issued by South Coast AQMD during that time period. Some

19         South Coast AQMD odor inspectors have not been on site at the Landfill in more

20         than a year.

21      b.  Lack of Analysis of Down-Wind Surveys/Meteorological Data:  While Ms. Sanders'

22         declaration indicates that South Coast AQMD inspectors are required to generate

23         reports after conducting their investigation process, including "how they responded"

24         and may perhaps include additional information such as "a summary of the

25         conversation with the complainant, the observations made, and the wind speed and

26         direction measurements," Sanders Decl. ¶ 29, this appears to have been rarely done.

27         I have been provided redacted versions of these investigative reports with respect to

28

-19-

the April through August of 2024 South Coast AQMD odor nuisance NOVs issued to Chiquita. Approximately 25% of those NOVs were composed of complaint reports that include neither upwind nor downwind surveillance, and more than 90% of the odor complaint reports that did contain upwind/downwind surveillance reused a single survey for *all complaints* received on that date, instead of conducting an upwind/downwind survey each time an odor was verified. The timing of the wind surveying ranged from within minutes of meeting a complainant to more than three hours before or after the meeting.

    c.  <u>Reliance on Odor Memory and Community Input</u>: South Coast AQMD's lack of tracing odors back to the actual source and lack of a recorded, verifiable process for confirming Chiquita as the source of odors raises a host of issues.  If South Coast AQMD inspectors are not confirming that an odor originated from the Landfill based on an evaluation of the Landfill itself, it appears, based on the declaration of Ms. Sanders and the prior testimony from Mr. Israel (that inspectors rely on their "historical knowledge"), that their inspectors are relying on what they recall the Landfill might smell like. But a recollection of what an odor may smell like is faulty, and fails to take into account the potential for sources of similar odors, that odor from a given sources may change over time, or that a single source may produce separate and distinct odors. This is particularly true when inspectors are not regularly at the Landfill, many of whom, based on available data, appear to have visited the Landfill a single time as part of their training to be educated on odors, and subsequently have not been on site for over a year. Moreover, reliance on "historical knowledge" may also result in the verification of complaints when the inspector themselves cannot smell the odor, and reliance on a community member's input about what the source of the odor may be (with all the faults of using the human odor interpretation process that this includes). Reliance on community member input is also susceptible to bias, particularly when there are habitual complaints who

attest to the close familial relationship they have with South Coast AQMD inspectors. Howse Decl. ¶ 4. Finally, South Coast AQMD's refusal to use objective tools in this process leads to the same problems of misattribution of a source of odors—particularly when the inspectors are told not only by the complainant what the alleged source may be, but by various members of their own agency about what the source may be.

57.    South Coast AQMD consistently references the total number of odor nuisance complaints it has received as a metric to argue odors from the Landfill have not improved. Ms. Sanders declared that from April 2023 through November 14, 2024, there have been more than 25,000 odor complaints from the public that alleged the Landfill as the source of odors. Sanders Decl. ¶ 31. But South Coast AQMD never distinguishes between verified odor complaints and unverified odor complaints, and does not exclude unverified odor complaints from their evaluation of odors allegedly coming from the Landfill. Those unverified complaints – meaning South Coast AQMD received the odor complaint via their hotline, their website, or their app, but no investigation was ever conducted – are an unreliable metric to assess the state of odors in the community. It is impossible to verify the legitimacy of the odor complaint if it is never investigated. It is also possible that the complainant was mistaken as to the source, or worse is motivated to file odor complaints when they cannot be verified (i.e. after hours or on weekends) to inflate the odor complaint figures. The subjectivity of odor complaints is amplified to the point of complete unreliability when the complaint is not verified.

**DPH's Odor Survey is Unreliable Given the Highly Suggestive Nature of the Questions and Answers**

58.    As noted above, biases in how odors are described can impact an individual's perception of their own odor experiences.  The survey distributed by the DPH exemplifies a biased and leading questionnaire. Titled "Odors and Health Impacts near the Chiquita Canyon Landfill Incident," the survey's introduction informs respondents that the Landfill is emitting "unpleasant odors," has generated "thousands of complaints," and that the County is seeking information about "the odor you've encountered and the impact of those odors," including effects on "health and daily activities."

-21-

1   This framing primes respondents with assumptions about the source, nature, and consequences of the

2   odors before they even begin answering, thereby compromising the objectivity of their responses.

3       59.    Additionally, the informational section of the survey advises respondents that they may

4   complete the survey each day they experience an odor. This framing implies that any and all odors

5   encountered by the person is attributable to the Landfill. The survey does not provide an option for

6   respondents to identify alternative sources for the odors they may have experienced, thereby reinforcing

7   a predetermined narrative that the Landfill is the source of all noxious odors.

8       60.    All three substantive survey questions are biased in that they suggest that the existence

9   of an odor negatively impacts their health and quality of life.

10      61.    For example, the third survey question asked "[w]hat symptom(s) did you have today

11  when the odor was present?" and then nine specific types of symptoms as potential responses, with the

12  10th being "other." The format of the question and possible responses improperly suggests to the

13  respondent that these symptoms could be caused by odor exposure, meaning that if a respondent had a

14  headache for an unrelated cause (stress, history of migraines), the respondent would still select

15  "headaches" since they were experiencing the headache while they detected an odor, despite there

16  being no causal connection.  In addition, there was no option to select "no symptoms" when

17  experiencing an odor.

18      62.    I studied survey research techniques during my education and training and evaluated

19  many surveys throughout my professional career.  It is my opinion that the DPH's survey was

20  constructed in a manner that lacks neutrality. Additionally, this survey tool does not have the ability to

21  identify whether a respondent lives near the Landfill area, as there is no requirement to enter an address

22  for identification, only selection of a street area. The website states, "[p]lease feel free to fill it out as

23  often as needed to help us track the effectiveness of the ongoing efforts," indicating an individual may

24  submit multiple surveys a day.

25      63.    Given that individual emotions and biases significantly influence odor perception and

26  response (beginning paragraph 22), the survey responses cannot be considered objective. The

27  conclusions drawn by the DPH are disproportionately favorable to its position that the Landfill is the

28

-22-

527

1  source of noxious odors in the community.

2  **Expert Conclusions**

3      64.    Odors detected in the communities surrounding the Landfill are generally below well-

4  recognized nuisance thresholds (7 D/T).

5      65.    Odors are intermittent, sometimes lasting tens of minutes, often less than a minute in a

6  gust of wind. Field testing conducted demonstrated a lack of persistent odors. As described in

7  paragraph 41, during the June 2024 odor study, odorants were detected at or above the "nuisance" at

8  locations surrounding Chiquita less than 8% of the time. None of the odors were ever detected above

9  their corresponding irritation thresholds. Follow-up sampling in July 2024 at night (paragraph 43)

10  found that odorants were detected at or above the "nuisance" at locations surrounding Chiquita less

11  than 8% of the time; these detected levels, again, never exceeded their corresponding irritation

12  thresholds. These data illustrate that odors are not consistently present.

13      66.    Intertox's odor samples taken from the communities surrounding the Landfill generally

14  do not rise above recognized odor irritation thresholds, indicating a low likelihood of any physiological

15  impacts in the community.

16      67.    Community odor nuisance complaints are not an objective or reliable metric for

17  assessing the frequency, intensity, or impact of odors from the Landfill.

18      68.    South Coast AQMD's odor verification and source tracing process, and resulting data,

19  are subjective, unscientific, and unreliable for purposes of evaluating potential odor impacts in the

20  communities surrounding the Landfill.

21      69.    DPH's odor survey is unreliable because it included highly-suggestive and biased

22  questions that likely influenced survey participants, skewing the data to the point of unreliability.

23      70.    The objective odor data collected by Chiquita does not indicate that odors from the

24  Landfill are prevalent in the communities surrounding the Landfill, and even when odors are present,

25  they are transient and long-term health impacts are not anticipated.

26

27

28

-23-

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct.

3        Executed on this 2nd day of July 2025, in Seattle, Washington.

4

5    By: _____

6    Richard Pleus, Ph.D., M.S.

7    Founder, Managing Director, and Chief Toxicologist

8    Intertox, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-

# Exhibit 4

| Waste Connections – Chiquita Canyon Landfill | | | |
| --- | --- | --- | --- |
| **2025 - South Coast AQMD Visitor Log** | | | |
| **Date** | **Name** | **Regulator** | **Purpose of Visit** |
| 2/27/2025 | Christina Ojeda | SCAQMD | Inspection |
| 2/27/2025 | Gerardo Vergara | SCAQMD | Inspection |
| 2/27/2025 | Larry Israel | SCAQMD | Inspection |
| 3/19/2025 | Rodney Davis | SCAQMD | Source Test |
| 3/19/2025 | Morgan Nguyen | SCAQMD | Source Test |
| 4/9/2025 | Larry Israel | SCAQMD | Inspection |
| 4/9/2025 | Al Soloman | SCAQMD | Inspection |
| 4/9/2025 | Christina Ojeda | SCAQMD | Inspection |
| 4/9/2025 | Eva Lopez | SCAQMD | Inspection |
| 4/9/2025 | Oerando Vergara | SCAQMD | Inspection |
| 4/30/2025 | Larry Israel | SCAQMD | Tom/Insp. |
| 4/30/2025 | Amanda Sanders | SCAQMD | Tom/Insp. |
| 5/8/2025 | Alemayehu Solomon | SCAQMD | Follow up on air quality complaints |
| 5/15/2025 | Alemayehu Solomon | SCAQMD | Issue NOV |
| 5/28/2025 | Christina Ojeda | SCAQMD | Title V Inspection |
| 5/28/2025 | Larry Israel | SCAQMD | Title V Inspection |
| 5/28/2025 | Gerardo Vergara | SCAQMD | Title V Inspection |
| 5/28/2025 | Justin Buncab | SCAQMD | Title V Inspection |

# EXHIBIT B

| | | |
|---|---|---|
| 1 | Paul S. Chan (SBN 183406) | Kaitlyn D. Shannon (SBN 296735) |
| 2 | pchan@birdmarella.com | kshannon@bdlaw.com |
| | Ariel A. Neuman (SBN 241594) | Megan L. Morgan (pro hac vice) |
| 3 | aneuman@birdmarella.com | mmorgan@bdlaw.com |
| 4 | Shoshana E. Bannett (SBN 241977) | James B. Slaughter (pro hac vice) |
| | sbannett@birdmarella.com | jslaughter@bdlaw.com |
| 5 | BIRD, MARELLA, RHOW, | BEVERIDGE & DIAMOND P.C. |
| 6 | LINCENBERG, DROOKS & | 1900 N Street, NW, Suite 100 |
| | NESSIM, LLP | Washington, DC 20036-1661 |
| 7 | 1875 Century Park East, 23rd Floor | Telephone: (202) 789-6000 |
| 8 | Los Angeles, California 90067-2561 | |
| | Telephone: (310) 201-2100 | Katelyn E. Ciolino (pro hac vice) |
| 9 | | kciolino@bdlaw.com |
| 10 | Jacob P. Duginski (SBN 316091) | BEVERIDGE & DIAMOND P.C. |
| | jduginski@bdlaw.com | 825 Third Avenue, 16th Floor |
| 11 | BEVERIDGE & DIAMOND P.C. | New York, NY 10022 |
| 12 | 333 Bush Street, Suite 1500 | Telephone: (212) 702-5428 |
| | San Francisco, CA 94104 | |
| 13 | Telephone: (415) 262-4000 | |
| 14 | | |
| 15 | *Attorneys for Defendants Chiquita* | |
| | *Canyon, LLC, Chiquita Canyon, Inc. and* | |
| 16 | *Waste Connections US, Inc.* | |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | | |
|---|---|---|
| 19 | THE PEOPLE OF THE STATE OF CALIFORNIA, by and through Dawyn R. Harrison, County Counsel for the County of Los Angeles, and THE COUNTY OF LOS ANGELES, | CASE NO. 2:24-cv-10819-MEMF-MAR |
| 20 | | **DECLARATION OF RICHARD PLEUS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 21 | | |
| 22 | Plaintiffs, | |
| 23 | vs. | |
| 24 | CHIQUITA CANYON, LLC, a Delaware limited liability company; CHIQUITA CANYON, INC., a Delaware corporation; and WASTE CONNECTIONS US, INC., a Delaware corporation, | Date:     July 17, 2025 |
| 25 | | Time:    10:00 a.m. |
| 26 | | Dept.:    8B |
| 27 | | Action Filed: December 16, 2024 |
| | Defendants. | Trial Date: None Set |
| 28 | | |

-1-

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**533**

I, Richard Pleus Ph.D., M.S., declare as follows:

**Background and Experience**

1.    I am of sufficient age and am competent to testify in this proceeding. I provide this declaration based on my knowledge and expertise in human toxicology and psychopharmacology. I am competent to testify to the facts and opinions set forth herein.

2.    I am the Founder, Managing Director, and Chief Toxicologist at Intertox, Inc. ("Intertox") in Seattle, Washington. Intertox is a toxicology and environmental consulting firm with expertise in risk assessment, scientific research and communication, global regulatory compliance, and design and process evaluation. I have 40 years of experience in toxicology and psychopharmacology, specializing in interactions between chemicals and the brain and associated behavior. I hold a Bachelor of Science in Physiology, a Master of Science in Environmental Health, and a Ph.D. in Environmental Toxicology. My Ph.D. research was conducted in the Department of Pharmacology in a laboratory studying psychopharmacology. My postdoctoral training was in Neuropharmacology. A copy of my curriculum vitae is attached to this declaration as **Exhibit 1**.

3.    I was retained by Chiquita Canyon, LLC ("Chiquita") in March 2024, to conduct air and odor sampling of the communities around Chiquita Canyon Landfill (the "Landfill") in an effort to evaluate potential physiological impacts from exposure to odorants.

4.    As explained further below, the County relies on subjective odor complaints and self-reported impacts, but fails to account for the objective data that contradicts these claims of widespread odors and health impacts. Because of the process by which people detect and recognize odors and the factors that influence individuals to report odor annoyance and adverse health symptoms from odors, reliance on purely subjective data, including the South Coast AQMD's inherently flawed odor verification process and an unreliable odor survey, results in overstated and inaccurate impacts from odors that allegedly emanated from the Landfill.

**Physiological Responses to Odors**

5.    An individual's sense of smell is initiated when the person sniffs air containing odorant molecules into their nose such that they bind to the olfactory receptors, which are located on neurons in

-2-

534

1  the roof of the nasal passages. When an odorant molecule binds to its corresponding olfactory receptor,

2  it triggers a signaling cascade (e.g., often called a "nerve impulse" or more accurately, an action

3  potential), ultimately sending an electrical signal to the brain. The brain then interprets the combination

4  of signals from different types of receptors to identify the specific smell, a system known as olfaction

5  (Kandel et al., 2013). This complex process involving interactions between olfactory receptors in the

6  nose and interpretation by the brain is a normal physiological response to odor, based on the odor's

7  nature and a person's experience with the odorant.

8       6.     In addition to an olfactory (smell) response to the odor, given sufficient concentration in

9  the air, some odorous chemicals with irritation potential can cause transient physiological reactions due

10  to the stimulation of specific facial, nose, mouth, and upper respiratory tract nerves by the odorant, such

11  as respiratory irritation.

12      7.     These two systems for physiological responses to odorants are differentiated from the

13  toxicological effects from exposure to chemicals in that physiological responses are automatic,

14  unlearned physical responses that decrease or cease when exposure to the odorant ceases. Toxicological

15  effects, on the other hand, are effects on the body that cause harm to tissues. Examples include diseases

16  and cancers. Depending on the chemical agent, the exposures to specific chemicals can be very high

17  (e.g., chlorine gas from a ruptured rail tank car) or continuous lower concentrations over extended

18  periods. Compared to the physiological effects noted above, toxicological effects often require exposure

19  to chemical agents at higher concentrations and longer durations.[1]

20      *Olfaction*

21      8.     Human odor detection thresholds ("ODT")—the lowest concentration of an odorant at

22  which a particular individual can detect the presence of an odor—can vary by orders of magnitude from

23  person to person, such that one person may be able to detect an odor at the parts per billion (ppb) level.

24  In contrast, another person may not be able to perceive that same odor unless it is at the parts per

25  million (ppm) level. Therefore, when determining an ODT for a particular chemical, they are typically

26  established at the concentration at which fifty percent (50%) of a group of individuals (an odor panel)

27

28

---

[1] I understand that Dr. Perez is addressing the toxicology aspects of air contaminants for purposes of the opposition, and therefore I do not address them in my declaration.

-3-

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  with a normal sense of smell can detect an odor in a laboratory setting (more specifically, detect that

2  there is something other than blank air within a sample), and often provided in a range (AIHA, 2024).

3       9.     Notably, the ODT is only the point at which the odor is able to be detected in a clean

4  laboratory setting; however, that does not always allow the person to recognize or characterize the odor.

5  The concentration at which an individual is able to describe the odor (e.g., identify the odor as floral or

6  rotten egg as opposed to merely detecting that an odor is present) is called the odor recognition

7  threshold. Recent studies have shown that an odor recognition threshold is 3–10 times higher than the

8  ODT when tested in a laboratory environment (Wise, Soreth, & Dalton, 2018). For example, suppose

9  an odorant's lab-measured ODT is 1 ppb. In that case, the level at which 50% of the panel can

10  recognize the quality or identity of that odorant in a laboratory environment is 3-10 ppb.

11       10.     Because odor detection and recognition thresholds are determined in a laboratory

12  setting, they may not be representative of what a person could detect in real-world situations. The

13  ability to recognize a specific chemical outside of a laboratory, referred to as the level of distinct odor

14  awareness, generally requires an increased concentration over the lab-measured ODT or recognition

15  threshold. In part, this is due to the other odors we experience in our regular lives. Thus, the

16  extrapolation of these laboratory-based values to detectability in the real world, where individuals are

17  not always focused on detecting odors and with numerous background odors, is highly questionable.

18       11.     Odor detection, recognition and awareness thresholds vary among different chemicals

19  but also vary across the population. Examples of the range of odor detection thresholds for several

20  common odorant chemicals are as follows:

Odor detection threshold ranges for select chemicals (from AIHA, 2024)

| Odorant | Concentration Range (ppb in air) |
|---|---|
| Hydrogen Sulfide | 0.047-72 |
| Dimethyl Disulfide | 0.29-20.2 |
| Dimethyl Sulfide | 0.12-63 |

26       12.     A variety of factors, specific to each person, will determine whether that person can

27  perceive a particular odor and the intensity with which it is perceived. These factors include smoking

-4-

status (smokers are less sensitive to odors), age, sex, other chemical exposures, and various illnesses (nasal congestion can decrease the ability to detect an odor).

13.     Given the wide variability of odor perception in humans, the use of objective measuring devices, such as the Nasal Ranger Field Olfactometer ("Nasal Ranger") (an ambient air portable olfactometer for the human nose to detect odors, is a preferred and scientifically accepted methodology for measuring odor strength. Intertox team members are officially trained in odor assessment and measurement for ambient odors by an internationally recognized training program through St. Croix Sensory odor school training program (https://www.fivesenses.com/odor-school-training-programs/ ). Intertox also collects air samples simultaneously during odor episodes with silicone-coated canisters (i.e., SilcoCan) or Tedlar sampling bags. These sampling devices ensure stability of the sample obtained and minimal degradation of common landfill odorants (such as sulfur-based compounds).  In fact, many states approach odor source control and violations systematically by using scentometry and setting ambient odor limits through the use of devices such as the Nasal Ranger® (i.e. scentometry) and other approved methods. Scentometry, using dilutions to threshold as an objective approach to quantifying the strength of odors, is a scientifically accepted methodology for measuring odor strength based on the ability to smell an odor after diluting a sample of ambient air with a known concentration of carbon-filtered (odorless) air. The amount of dilution of carbon-filtered air required before an odor is no longer detectable by a trained odor scientist is termed the "dilution to threshold" or D/T. The D/T is a unitless ratio calculated as:

$$D/T = \frac{\text{Volume of carbon filtered air}}{\text{Volume of odorous air}}$$

14.     The greater the number of dilutions needed before the odor threshold is reached, the stronger or greater intensity the odor. Air quality standards for nuisance odors have been established by multiple regulatory agencies based on a D/T of 7:1 or greater, and most standards include a detection frequency that must be met in a defined period of time in order to be classified as an "exceedance."

15.     Concerning odor character (what the odorant or mixture smells like) and hedonic tone (the odor's relative pleasantness or unpleasantness), these parameters are subjective and highly

-5-

537

1  influenced by external factors. Therefore, the scientifically accepted methodology is to use resources

2  such as the odor wheel in the field to help standardize odor descriptors.

3  *Irritation*

4  16.    The irritation response is separate from olfaction and results from the odorant activating

5  free nerve endings of some nerves (those with "irritation" receptors). These neurons, when activated by

6  a chemical agent, cause a nerve impulse that is then transmitted to the brain, where the brain interprets

7  these sensations as temporary burning, stinging, tingling, or painful sensations in the eyes, nose, and

8  respiratory tract (AIHA, 2024; Dalton, 2003). However, while irritation may be unpleasant, these

9  sensations are not causing a toxicological effect. Key to this point is that sensations of irritation are

10  temporary and cease when the concentrations of the agent(s) are lower or when the agents are absent.

11  Many odorants have an irritation threshold, which refers to the concentration of a substance in the air

12  below which most people are unlikely to experience sensory irritation. The irritation threshold is

13  typically at a higher concentration than the odor detection threshold for the same chemical and varies

14  by chemical (Dalton, 2003).

15  17.    It is thus possible (and is oftentimes the case) that you can smell an odor at

16  concentrations well below a particular constituent's irritation threshold. For example, the range of odor

17  detection thresholds for hydrogen sulfide is 0.047–72 ppb, whereas the range of irritation thresholds is

18  5,000–10,000 ppb (ATSDR, 2016; Ruth, 1986). And even when an irritation threshold is reached,

19  typically a much higher concentration would be required (for a much more extended period) for adverse

20  health effects (toxicological health effects) to be expected. For example, the odor from cutting an onion

21  often causes lacrimation (eye watering and irritation of the eyes, nose, and throat), prompting people to

22  move away from the onion. However, the symptoms subside, and one returns to cutting an onion. Given

23  this strong irritation reaction, it serves as an indicator of exposure, rather than adverse health effects.

24  **Odor Habituation and Adaptation**

25  18.    The olfactory system can adapt to repeated or prolonged exposure to a given odorant,

26  reducing sensitivity to that odorant (Dalton, 2000). This habituation, or "odor fatigue," is a neural

27  process that leads to a decrease in nerve action, which can also lead to a change in a behavioral

28

-6-

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1   response. Concerning odors, habituation is sometimes referred to as "odor fatigue." Essentially, this

2   reduced sensitivity results in a decrease in the perception of an odor's strength (Pellegrino et al., 2017).

3   As the olfactory system continually encounters various odorants, these mechanisms prevent the

4   olfactory system from being overwhelmed. During exposure to an odorant, the odor intensity will

5   decrease. Habituation occurs with frequent exposure to the odor; this happens at faster rates with longer

6   exposure length as well as with shorter intervals between exposures. Weaker odors also lead to more

7   rapid habituation. Although with substantial concentrations of an odor, recognizing it as a strong or

8   intense odor may diminish, the perception of the odor may not completely disappear (Pellegrino et al.,

9   2017).

10        19.     Regarding the context of odor perception and its potential impact on interpretation,

11   Dalton (1999) studied 180 healthy individuals in an experimental design that primed participants with

12   positive, negative, and neutral biases. From that point, they were tested for odor and irritation intensity,

13   as well as for any symptoms. The scientists purposely created bias, such that test individuals were told

14   that they would be exposed to either natural extracts with relaxing effects (positive bias), industrial

15   solvents (negative bias), or simply odorants used and approved for olfactory research (neutral bias.)

16   The reported results showed that individuals in the negative bias group consistently reported higher

17   odor intensity values than those in the neutral or positive bias groups, and they reported substantially

18   more symptoms than the neutral or positive bias groups. Dalton (1999) concluded that "[t]hese results

19   indicate that people's responses to ambient odors may be determined less by the sensory qualities of the

20   odor, and more by the context that is provided prior to exposure."

21        20.     For example, workers with frequent or daily exposure to a given airborne chemical can

22   become habituated to the odor of that chemical (Pellegrino et al., 2017). Habituation also occurs in

23   individuals who receive daily exposure to an air-freshener-type fragrance, over time developing a

24   persistent loss of sensitivity to the odor as well as a decrease in their perception of the odor's intensity,

25   e.g., in their home, demonstrating that habituation occurs even with odors that are deemed positive or

26   pleasant (Dalton and Wysocki, 1996).

27        21.     Habituation was found to occur more rapidly to unpleasant odors than to those deemed

28

-7-

1   more pleasant (Jacob et al., 2003). The authors also noted that with increasing odor strength, some

2   habituation is lost while sensitivity is restored. Therefore, even though continuous exposure to an

3   unpleasant odor will result in habituation, an increase in odor concentration will be detected readily.

4   The findings of Jacob (2003) were recapitulated in another study, which compared the time it takes to

5   become habituated to varying concentrations of hydrogen sulfide and phenylethyl alcohol (rose scent)

6   (Struck et al., 2014). These results show individuals adapt more rapidly to hydrogen sulfide ($H_2S$) than

7   phenylethyl alcohol, on the order of seconds (39.5 to 69.9 seconds for $H_2S$; 130.8 to 231.4 seconds for

8   phenylethyl alcohol). The time required to adapt to both odorants increased with increasing

9   concentration of the odorants. Interestingly, the longer the recovery time after habituation, the more

10  likely an individual was to perceive greater odor intensity, even when presented with the same

11  concentration of either $H_2S$ or phenylethyl alcohol (Struck et al., 2014).

12  **Emotional Responses and Misattribution**

13          22.    Odor perception and the resulting behavioral response are highly subjective among

14  individuals: a particular odor may be perceived as disagreeable by one person, neutral by another, and

15  agreeable by another. Cultural background, psychological health, and lived experience impact response

16  and thus, odor perception. The expectation that an odor may be more healthy or less healthy to breathe

17  can alter how much we attend to the odor and how we react to it when we smell it.

18          23.    A response to an odor can be one or a collection of physical or behavioral responses. An

19  example of physical responses is moving toward something (positive association, such as smelling a

20  rose) or away from a source (negative association, such as smelling feces). An example of a behavioral

21  response is the association with anger or fear (negative association, such as fear of being poisoned) and

22  happiness and joy (positive association, like the smell of fresh-baked bread). The interpretation of odor

23  and the resulting physical or behavioral actions a person takes is the result of the brain processing the

24  information. The brain's information processing integrates each person's history and culture. Briefly,

25  the neuronal physiology comprises the neurons in the olfactory tract that send nerve impulses to the

26  brain's limbic system (e.g., amygdala) and the piriform cortex. These components work together and

27  involve emotion, memory, motivation, and olfaction. Below is a visual representation of the olfactory

28

-8-

540

pathway from odorant in the nose to the brain (modified from Purves et al., 2001):



24.     For malodors specifically, studies have shown that annoyance responses are not primarily impacted by odor intensity but are by various factors specific to the individual (those discussed previously such as age, gender and perceived health status)—as well as beliefs about odors and their risks—e.g., are they harmful to me? do they depress my property value? (Dalton, 1996b; Distel et al., 1999; Distel & Hudson, 2001; Karnekull, Jonsson, Larsson, & Olofsson, 2011). These factors tend to be the drivers of increased odor annoyance and more drastic health complaints, rather than the strength and frequency of the odors experienced.

25.     As I reported in paragraph 19, Dalton (1999) demonstrated positive, negative, and neutral biases could be reflected in odor scoring. Individuals in the negative bias group consistently reported higher odor intensity values than those in the neutral or positive bias groups, and they reported substantially more symptoms than the neutral or positive bias groups.

26.     Additionally, the information provided about the source of an odor also affects how a person responds to the experience of an odor. For example, labeling an odor can significantly bias an individual's perception of its intensity and pleasantness. Studies have shown that individuals' perception of the same odor varied, depending on whether or not it was given a positive label, such as "*Christmas tree,*" or a negative label, such as "*spray disinfectant.*" (Herz and von Clef 2001).

27.     These suggestive responses also carry over into irritation sensations. Sniffing a green-colored liquid produced reports of nasal cooling sensations, whereas sniffing a red-colored liquid resulted in reports of nasal warming. (Michael, Galich, Relland, & Prud'hon, 2010; Michael & Rolhion, 2008).

28.     Emotional reactions and experiences with odors can lead to public concern, which can be exacerbated by media reports that lack appropriate context, such as the assumption that any exposure

-9-

to any chemical results in possible adverse health effects (Rosenkranz and Cunningham, 2003). Expectancies provided in the form of media warnings have been shown to exacerbate the acquisition of symptoms in response to benign odors (Winters et al., 2003).

29.     The expectations that arise from prior experiences with an odor, warnings and statements regarding potential effects (whether accurate or not), or other reasons can also cause individuals to misattribute pre-existing conditions to odor exposure. For example, I have experience with individuals alleging migraine headaches from a source and noting that the same individual has a history of migraine headaches. Though an individual knows they had migraine headaches before exposure to a source, the individual associates the cause of the migraine headache to the odor source, regardless of whether any causal connection is valid.

30.     The exposure to odors can result in psychogenic illness, where real physiological symptoms are triggered by misunderstood or false information (Jones, 2000; Bartholomew, 2005; Van der Auwera et al., 2007; Kanaan and Wessely, 2010).  Psychogenic illness has been defined as a constellation of symptoms suggestive of organic illness, with no identifiable cause and little clinical or laboratory evidence of disease (Jones, 2000). Predominant symptoms reported after a review of nine studies of psychogenic illness include headache, dizziness, nausea, cough, fatigue, drowsiness, weakness, watery or irritated eyes, inability to concentrate/trouble thinking, vomiting, tingling, and numbness (Jones, 2000). Of note, in incidents where psychogenic illness has been reported, a plausible pathogenic agent or source has not been identified. There is a misperception that detection of an odor indicates the exposure is health-threatening. As noted above in my declaration, it is essential to differentiate between concentrations at which odors can be detected and those associated with toxicity, which typically occur at much higher concentrations.  For example, hydrogen sulfide, depending on the individual, can be detected at very low levels in air (as low as 0.047 ppb in laboratory settings), (AIHA, 2024). Toxic effects, such as olfactory paralysis, however, occur at much higher concentrations of hydrogen sulfide (100–200 ppm, which is equivalent to 100,000-200,000 ppb), which is approximately 2,000,000 to 4,000,000 times higher than the lowest detection threshold (ATSDR, 2017, Ruth, 1986). Therefore, odor *detection* should not be considered a reliable indicator of toxicity (Beauchamp et al. 1984; Schiffman and Williams, 2005).

31.     The declarations of residents submitted by the County demonstrate that biases exist and are impacting residents' perception and beliefs of impacts resulting from alleged odor exposure. The

-10-

three residents believe that Landfill odors are the cause of a variety of physical and emotional symptoms including "nose bleeds, persistent headaches and migraines, nausea, vomiting, heart palpitations, shortness of breath, skin rashes, eye irritation, anxiety, sore through [sic], constant coughing, and dizziness," Suggs Decl. ¶ 7, "respiratory issues, headaches, nausea, chest pain, sinus issues," iron deficiency, cancer and miscarriages, (Howse Decl. ¶¶ 12-14), and "headaches, sinus issues, and fatigue," (Perera Decl. ¶¶ 4-5). The declarants all state that they "believe" these symptoms are caused by odors but do not provide any medical or scientific basis for their belief.  Instead, as indicated in Mr. Howse's declaration, he read that benzene exposure can cause similar mild symptoms, without knowing whether he was ever exposed to concentrations that are required for exposure to cause such a response.  To date, no medical records or information have been made available to evaluate whether the resident's general symptoms existed prior to the elevated temperature event or were a result of other preexisting illnesses (allergies, history of migraines).

32.    In my opinion, misattribution of common symptoms such as headaches, nausea, and fatigue to the alleged Landfill odors are a result of individual preconceived ideas about the alleged source of odors (the Landfill) and that such odors are "toxic." Odor perception and response is not always driven by the "bottom-up" features of the odorant (e.g., quality, intensity, and identifiability), but rather "top-down" features, such as expectations and beliefs about the odor. In other words, simply labeling an odor negatively (noxious; putrid) or as harmful (toxic), can impact how a person experiences that odor.

33.    Odors and their sources surround us. Thus, relying on self-reported complaints as evidence of objectionable odors can result in inaccurate or insufficient conclusions. Attributing odors to a specific source without proper validation lacks methodological consistency, as it depends heavily on the accuracy of subjective reports, including location, wind direction and speed, and odor descriptions provided by individuals who may not be trained in such assessments. For instance, odor complaints submitted without reliable meteorological data cannot be confidently linked to a single source when alternative sources and confounding factors cannot be effectively ruled out. Furthermore, untrained individuals often use inconsistent terminology; for example, two people might describe the same wind

-11-

543

1   direction differently—one calling it a "west wind" and the other an "east wind." As such, the quality of

2   data derived from self-reported complaints is insufficient for accurately attributing odors to a specific

3   source or characterizing the intensity or nature of the odor, including whether it could be characterized

4   as a nuisance-level odor.

5   **Intertox's Odor Impact Assessments To-Date**

6        34.     Intertox has completed two rounds of odor sampling and prepared one odor impact

7   assessment for Chiquita to date. The first round of sampling was conducted from June 11-18, 2024, and

8   the second round of sampling was completed July 29 - August 1, 2024. Data from the second round of

9   sampling was not available by the report deadline and was therefore not included in Intertox's August

10  1, 2024 Odor Impacts Assessment of Chiquita Canyon Landfill Elevated Temperature Landfill Event

11  (the "Odor Impacts Assessment"), which is attached as **Exhibit 2**, and highlighted in the August 1,

12  2024 Health Impacts Report – Public Summary ("HIR Public Summary"), which is attached as **Exhibit**

13  **3**. Intertox is conducting a third round of odor sampling from June 7-13, 2025. The methodology used

14  to perform these assessments is described below, along with a discussion of the results from these

15  efforts to date.

16       35.     In advance of participating in Intertox's 7-day study between June 11-18, 2024, CTEH

17  conducted a 28-day air quality study between March 4-31, 2024.  As part of CTEH's 28-day air quality

18  study, CTEH conducted an odor survey using Nasal Rangers to measure odors at fifteen off-site

19  locations throughout the Val Verde, Live Oak, and Hasley Hills neighborhoods surrounding Chiquita.

20  Approximately 2.5% of the total odor samples collected by CTEH from the March 2024 study were

21  detected at or above 7 D/T while 86.2% were below 2 D/T, the lowest odor intensity detectable on the

22  Nasal Ranger. Intertox utilized the data collected in CTEH's 28-day air quality study to identify

23  odorants detected at off-site sample locations in the neighborhoods surrounding Chiquita.  CTEH's data

24  informed Intertox's approach to selecting sampling locations to collect additional air quality and odor

25  data for the June 2024 odor assessment.

26       *Methodology for Odor Impacts Assessments at Chiquita Canyon Landfill*

27       36.     Using a scientific approach to assess the extent, character, and intensity of odors is

28

-12-

544

essential. As discussed above, the experience of odor is subjective and influenced by factors such as age and sex. Behavior is the result of perception, cultural, and psychological factors as described above. Intertox thus utilizes objective tools to evaluate odors and their potential impacts, thereby eliminating, as much as possible, the subjective components of olfaction.

37.    Intertox's odor sampling consists of objective measurements of detected odors in the community surrounding the Chiquita Canyon Landfill along with contemporaneous air sampling.  The general approach used by Intertox is as follows:

- Canvass neighborhoods, stopping at 15 locations to assess odors, including in Val Verde and Castaic, where the County is seeking relief.
- Use a Nasal Ranger to objectively measure odor strength using D/T and characterize the odors.
- If an odor is detected at or above 7 D/T with the Nasal Ranger, a contemporaneous air sample is collected and sent to an accredited lab to determine the chemical constituents in the air causing the odor.
- Results from air samples taken are then compared against irritation thresholds.

*Analysis of Data*

38.    The odor measurements and air sampling data are then compared to irritation thresholds, or the level and exposure time of a chemical at which most people do not experience irritation in controlled studies, to assess the potential impacts the detected odors may have on residents of the neighborhoods surrounding the Landfill (e.g., Val Verde, Live Oak, Hasley Hills).

39.    While individual odor perception varies, Intertox objectively measures the sensory perception of odors by incorporating the four primary measures of odor into odor impact assessments: odor intensity (or strength), threshold (D/T), character, and hedonic tone. Intertox also assessed the potential for odorants to cause irritation as a measure of potential physiological response to odors.

*June 11-18, 2024 Odor Sampling Event*

40.    Intertox's first round of odor sampling was conducted from June 11-18, 2024, approximately between the hours of 7 am and 7 pm. During this period, Intertox took air samples in

-13-

1  neighborhoods surrounding Chiquita when an odor was detected at or above 7 D/T using a Nasal

2  Ranger. Intertox also evaluated each sample for odor character and hedonic tone. While both of these

3  parameters are subjective and influenced by external factors, Intertox uses resources such as the odor

4  wheel in the field to help standardize odor descriptors. In addition to measuring odors, Intertox also

5  incorporated contemporaneous air samples in its sampling design to determine what chemicals were in

6  the air when odors were detected.

7       41.  **Results:** Based on the June 2024 odor study, Intertox found that odorants were detected

8  at or above the "nuisance" level (at or above 7 D/T using a Nasal Ranger) at locations surrounding

9  Chiquita less than 8% of the time. While some of the constituents measured in the contemporaneous air

10 samples, along with their associated odorants, could trigger short-term physiological responses if

11 residents near Chiquita are exposed to sufficient concentrations for sufficient periods of time, Intertox

12 never detected odor or corresponding constituents above their corresponding irritation threshold.

13 Further, during the sampling we noted that odors are episodic and of short duration lasting minutes. In

14 other words, we did not experience any long-lasting odors.

15     _Sampling at Night in our July 2024 Odor Sampling Event_

16      42.  While taking the initial odor and air samples in June, community members informed the

17 Intertox team that they were experiencing odors at night. Based on this feedback, Intertox conducted an

18 additional round of odor sampling at night in July 2024 to capture and assess the potential impacts of

19 odors in the community outside of the June 2024 sampling times.

20      43.  **Results:** Based on the July 2024 night odor study, Intertox found that odorants were

21 detected at or above the "nuisance" level (at or above 7 D/T using a Nasal Ranger) at locations

22 surrounding Chiquita less than 8% of the time. While some of the constituents measured in the

23 contemporaneous air samples, along with their associated odorants, could trigger short-term

24 physiological responses if residents near Chiquita are exposed to sufficient concentrations for sufficient

25 periods of time, Intertox never detected odor or corresponding constituents above their corresponding

26 irritation thresholds. Further, during the sampling we noted that odors are episodic and of short duration

27 lasting minutes. In other words, we did not experience any long-lasting odors.

28

-14-

**Intertox's Ongoing Landfill Odor Assessments**

44.     To build on Intertox's odor sampling and assessment conducted in June and July of 2024, Intertox is conducting an additional round of odor and air sampling on June 7-13, 2025.  This additional sampling and assessment incorporate the same design as previous odor assessments, but with increased locations and numbers of samples per location, with trained samplers.

45.     In addition to providing more confidence in Intertox's scientific method, expanding the data set of odor assessments over time permits the evaluation of odor trends in the communities surrounding Chiquita.

46.     At this time, we are conducting the study and do not have data to share.

**Alleged health impacts are physiological and result in behavioral responses. The plaintiff's responses are not toxicological.**

47.     Physiological actions in the body are a regular part of living. They are sometimes involuntary and resolve once the stimuli are removed.  An additional consideration is that the health impacts reported by residents are common and often part of one's everyday life or a result of other health issues (e.g., headaches, sleeplessness, nausea).

48.     I have reviewed the toxicological assessment of CTEH and of Dr. Perez. These toxicological assessments follow the gold standard of the toxicology profession. I agree with the conclusions of their reports.

49.     People also report health issues when exposed to harmless levels because of a negative association with the odors (i.e. a purely psychological response).

50.     Again, if told an odor is harmful or otherwise described in a negative fashion, reports of headaches, nausea and other impacts increase or individuals may incorrectly associate a preexisting condition (migraine headache) with the odor.

**South Coast AQMD's Odor Complaint Verification and Source Identification Process is Unscientific and Unreliable.**

51.     As discussed above, odors are largely subjective.  Humans generally, absent the use of objective tools, are not good at determining the source, character, or hedonic tone of an odor.  These

-15-

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   inadequacies of the human nose and the odor interpretation process form the basis of South Coast

2   AQMD's odor investigation and enforcement efforts at the Chiquita Canyon Landfill.  According to

3   Amanda Sanders' Declaration provided in support of the County's motion, South Coast AQMD

4   inspectors under her supervision are "responsible for both (a) verifying that odors are present, and (b)

5   verifying the source of the odors." Sanders Decl. ¶ 14. I have not received any documentation on the

6   training methods used by South Coast AQMD. So, while I use the word "trained" below because of the

7   testimony I have heard by members of South Coast AQMD, confirmation of the adequacy of training is

8   an open question. I enforce my concern of adequacy of training by the steps of odor complaint process

9   by the statements and work reported by South Coast AQMD personnel.

10      52.      As discussed step-by-step below, South Coast AQMD's odor complaint verification and

11  source investigation process is not scientifically-backed methodology, transparency, or reproducibility,

12  which contravenes the pillars of the scientific method. As a result, odor complaint data are highly

13  susceptible to biases of inspectors and residents when verifying odors and source tracing. South Coast

14  AQMD's failure to use objective tools and follow its own policies in the odor investigation process

15  undermines the validity and usefulness of any of the South Coast AQMD odor complaint data, and

16  generally calls into question the veracity of all the odor nuisance NOVs issued to the Landfill.

17      53.      **Step 1 – Receipt of Complaint:** The first step in South Coast AQMD's investigative

18  process is the receipt of a complaint from the community. Sanders Decl. ¶ 16.  South Coast AQMD

19  provides many ways for individuals to make complaints, including a 24-hour hotline, a website portal,

20  and an app that can be downloaded on an individual's phone. Sanders Decl. ¶ 15.  The odor complaints

21  South Coast AQMD receives generally allege a source from which the complained-of odor originates.

22  Sanders Decl. ¶ 16.  The first step of the process thus relies on the subjective determinations of an

23  individual as to the character of an odor (what it smells like), its hedonic tone (whether it is pleasant or

24  unpleasant), and the alleged source of the odor.  Untrained individuals using nothing but their nose are

25  unable to provide reliable and reproduceable information on any of these metrics.  As discussed above

26  regarding misattribution, when individuals have been told an odor comes from a specific source, they

27  are predisposed and biased to believe that a particular odor has come from that particular source, and

28

-16-

1    individuals are therefore more likely to attribute odors to that source, regardless of whether that is the

2    case.

3        54.    **Step 2 – Dispatch to Complainant:** After South Coast AQMD receives a complaint, it

4    dispatches an air quality inspector to the location of the complainant. Sanders Decl. ¶¶ 16-17. If South

5    Coast AQMD receives a complaint outside of its business hours (Tuesday through Friday 7:00am to

6    5:30pm), an inspector typically calls the complainant and logs the complaint. (Sanders Decl. at ¶ 28.)

7    Laurance Israel, Supervising Air Quality Inspector at AQMD, testified to the South Coast AQMD

8    Hearing Board in August of 2024 ("Aug. 17, 2024 Hearing Tr."). Notably, Mr. Israel testified that it

9    "might take a while to get to the location" of a complainant after a complaint is received. (Aug. 17,

10   2024 Hearing Tr. 178:12-25).

11       55.    **Step 3 – Odor "Verification":**  Upon arrival at the complainant's location, the South

12   Coast AQMD inspector will discuss with the complainant and make a determination whether the odor

13   is "present and ongoing," – if so, this qualifies as a "verified" odor complaint. Sanders Decl. ¶ 23.

14   South Coast AQMD purposefully does not use any objective tools in this part of the process based on

15   the assumption that "noxious smells can be more aptly detected by the human nose as opposed to a

16   measuring device." Sanders Decl. at ¶ 23. Instead, inspectors talk to the complainant, "ask questions,"

17   and assess "whether the complainant themselves still detects the odor, and by relying on the inspector's

18   olfactory senses and historical experience within the geographic area." Sanders Decl. at ¶ 23. There are

19   numerous issues with this process:

20           a.    <u>Subjectivity of Verification</u>: An inspector's use of "historical experience" to verify

21               an odor presents significant reliability issues. As discussed more below, many South

22               Coast AQMD inspectors have not been on-site at the Landfill in over a year – some

23               have not been on site since 2023. An inspector's potentially year-old recollection of

24               the potential Landfill odors is not reliable, particularly when there is no evidence that

25               South Coast AQMD inspectors are trained in odor characterization or intensity. The

26               characteristics of the Landfill's odors also change over time, they are not static.

27               Further, each person's perception can vary greatly – both in terms of

28

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1  pleasantness/unpleasantness and intensity. Mr. Israel previously testified that an odor

2  may be "super intense" to one person may not be for others. Aug. 17, 2024 Hearing

3  Tr. 193:1-12. Measuring devices, on the other hand, provide objective, standardized

4  data on a clear scale.

5      b.  <u>Confirmation Bias of Inspector:</u> Because many odor complaints allege or state a

6  specific source of the complained-of odor, South Coast AQMD inspectors are

7  susceptible to confirmation bias when a complainant alleges a specific source or

8  source category. (Sanders Decl. ¶ 16.) When an odor complaint is made alleging

9  odors from the Landfill, for example, South Coast AQMD inspectors are seeking to

10  confirm the complainant's source hypothesis, rather than objectively evaluating the

11  odor's characteristics and other environmental parameters (e.g., wind direction) to

12  make a determination. The inspector's perception then is colored by the pre-existing

13  source label from the claimant.

14      c.  <u>Time Delay:</u> Odors detected in the communities surrounding the Landfill do not

15  persist; odors are typically transient and variable, lasting for only a few minutes.

16  (Aug. 17, 2024 Hearing Tr. 193:1-12; Odor Impacts Assessment at 66.) When

17  inspectors are not on-site with a complainant in short order, it is uncertain whether

18  the inspector is verifying the odor that the complainant actually reported.

19      56.  **Step 4 – Odor Source Tracing:**  The final step of South Coast AQMD's process is to

20  "trace" the odor to the alleged source.  Sanders Decl.  ¶ 25.  This is "typically" done by referencing

21  wind data and "then seeking the same odor at locations up and down wind—narrowing this range until

22  a single source is identified."  Sanders Decl.  ¶ 25.  Mr. Israel previously testified that South Coast

23  AQMD inspectors are supposedly trained to physically trace an odor all the way back to its source by

24  driving around or canvassing the community on foot. Aug. 17, 2024 Hearing Tr. at 173:19-174:8. South

25  Coast AQMD inspectors are also trained and empowered to come on-site to the Landfill to complete

26  their inspection and determine the source of the particular complained-of odor. Sanders Decl. ¶ 25; Aug

27  17, 2024 Hearing Tr. at 180:2-5.  But according to Ms. Sanders' declaration, an inspector "will often be

28

-18-

550

1  able to determine the source of the odor" based on "the inspector's training and knowledge of upwind

2  and downwind emission sources within the geographic area…combined with the immediate wind

3  data," without physically tracing the odor to the source. Sanders Decl. ¶ 25. Again, there are numerous

4  issues with this process:

5      a. <u>Lack of Source Tracing to Landfill:</u>  While South Coast AQMD inspectors are

6         expected to trace an odor all the way back to its source, this has rarely happened

7         with respect to the investigations regarding the Chiquita Canyon Landfill.  After

8         conducting a thorough review of the verified odor complaints that formed the basis

9         of odor NOVs served on Landfill from April 2024 through August 2024, not a single

10         South Coast AQMD inspector reported visiting the Landfill to determine the source

11         of the "verified" odor. Mr. Israel has also testified previously that his inspectors are

12         required to sign into a visitor log when entering the Chiquita Canyon Landfill. Aug.

13         17, 2024 Hearing Tr. at 190:7-11.  I understand that this is a safety requirement so

14         that Chiquita's operational staff may know who is on-site at any given time. I

15         similarly reviewed the Landfill's visitor logs from January 1, 2025 through May 31,

16         2025, attached hereto as **Exhibit 4**, and at best, South Coast AQMD inspectors may

17         have been on-site to trace complained-of odors back the Landfill for only 13% of

18         odor nuisance NOVs issued by South Coast AQMD during that time period. Some

19         South Coast AQMD odor inspectors have not been on site at the Landfill in more

20         than a year.

21      b. <u>Lack of Analysis of Down-Wind Surveys/Meteorological Data:</u>  While Ms. Sanders'

22         declaration indicates that South Coast AQMD inspectors are required to generate

23         reports after conducting their investigation process, including "how they responded"

24         and may perhaps include additional information such as "a summary of the

25         conversation with the complainant, the observations made, and the wind speed and

26         direction measurements," Sanders Decl. ¶ 29, this appears to have been rarely done.

27         I have been provided redacted versions of these investigative reports with respect to

28

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

the April through August of 2024 South Coast AQMD odor nuisance NOVs issued to
Chiquita. Approximately 25% of those NOVs were composed of complaint reports
that include neither upwind nor downwind surveillance, and more than 90% of the
odor complaint reports that did contain upwind/downwind surveillance reused a
single survey for *all complaints* received on that date, instead of conducting an
upwind/downwind survey each time an odor was verified. The timing of the wind
surveying ranged from within minutes of meeting a complainant to more than three
hours before or after the meeting.

   c.   <u>Reliance on Odor Memory and Community Input</u>: South Coast AQMD's lack of
tracing odors back to the actual source and lack of a recorded, verifiable process for
confirming Chiquita as the source of odors raises a host of issues.  If South Coast
AQMD inspectors are not confirming that an odor originated from the Landfill based
on an evaluation of the Landfill itself, it appears, based on the declaration of Ms.
Sanders and the prior testimony from Mr. Israel (that inspectors rely on their
"historical knowledge"), that their inspectors are relying on what they recall the
Landfill might smell like. But a recollection of what an odor may smell like is faulty,
and fails to take into account the potential for sources of similar odors, that odor
from a given sources may change over time, or that a single source may produce
separate and distinct odors. This is particularly true when inspectors are not regularly
at the Landfill, many of whom, based on available data, appear to have visited the
Landfill a single time as part of their training to be educated on odors, and
subsequently have not been on site for over a year. Moreover, reliance on "historical
knowledge" may also result in the verification of complaints when the inspector
themselves cannot smell the odor, and reliance on a community member's input
about what the source of the odor may be (with all the faults of using the human
odor interpretation process that this includes). Reliance on community member input
is also susceptible to bias, particularly when there are habitual complainants who

attest to the close familial relationship they have with South Coast AQMD inspectors. Howse Decl. ¶ 4. Finally, South Coast AQMD's refusal to use objective tools in this process leads to the same problems of misattribution of a source of odors—particularly when the inspectors are told not only by the complainant what the alleged source may be, but by various members of their own agency about what the source may be.

57.    South Coast AQMD consistently references the total number of odor nuisance complaints it has received as a metric to argue odors from the Landfill have not improved. Ms. Sanders declared that from April 2023 through November 14, 2024, there have been more than 25,000 odor complaints from the public that alleged the Landfill as the source of odors. Sanders Decl. ¶ 31. But South Coast AQMD never distinguishes between verified odor complaints and unverified odor complaints, and does not exclude unverified odor complaints from their evaluation of odors allegedly coming from the Landfill. Those unverified complaints – meaning South Coast AQMD received the odor complaint via their hotline, their website, or their app, but no investigation was ever conducted – are an unreliable metric to assess the state of odors in the community. It is impossible to verify the legitimacy of the odor complaint if it is never investigated. It is also possible that the complainant was mistaken as to the source, or worse is motivated to file odor complaints when they cannot be verified (i.e. after hours or on weekends) to inflate the odor complaint figures. The subjectivity of odor complaints is amplified to the point of complete unreliability when the complaint is not verified.

**DPH's Odor Survey is Unreliable Given the Highly Suggestive Nature of the Questions and Answers**

58.    As noted above, biases in how odors are described can impact an individual's perception of their own odor experiences.  The survey distributed by the DPH exemplifies a biased and leading questionnaire. Titled "Odors and Health Impacts near the Chiquita Canyon Landfill Incident," the survey's introduction informs respondents that the Landfill is emitting "unpleasant odors," has generated "thousands of complaints," and that the County is seeking information about "the odor you've encountered and the impact of those odors," including effects on "health and daily activities."

-21-

1    This framing primes respondents with assumptions about the source, nature, and consequences of the

2    odors before they even begin answering, thereby compromising the objectivity of their responses.

3        59.    Additionally, the informational section of the survey advises respondents that they may

4    complete the survey each day they experience an odor. This framing implies that any and all odors

5    encountered by the person is attributable to the Landfill. The survey does not provide an option for

6    respondents to identify alternative sources for the odors they may have experienced, thereby reinforcing

7    a predetermined narrative that the Landfill is the source of all noxious odors.

8        60.    All three substantive survey questions are biased in that they suggest that the existence

9    of an odor negatively impacts their health and quality of life.

10       61.    For example, the third survey question asked "[w]hat symptom(s) did you have today

11   when the odor was present?" and then nine specific types of symptoms as potential responses, with the

12   10th being "other." The format of the question and possible responses improperly suggests to the

13   respondent that these symptoms could be caused by odor exposure, meaning that if a respondent had a

14   headache for an unrelated cause (stress, history of migraines), the respondent would still select

15   "headaches" since they were experiencing the headache while they detected an odor, despite there

16   being no causal connection.  In addition, there was no option to select "no symptoms" when

17   experiencing an odor.

18       62.    I studied survey research techniques during my education and training and evaluated

19   many surveys throughout my professional career.  It is my opinion that the DPH's survey was

20   constructed in a manner that lacks neutrality. Additionally, this survey tool does not have the ability to

21   identify whether a respondent lives near the Landfill area, as there is no requirement to enter an address

22   for identification, only selection of a street area. The website states, "[p]lease feel free to fill it out as

23   often as needed to help us track the effectiveness of the ongoing efforts," indicating an individual may

24   submit multiple surveys a day.

25       63.    Given that individual emotions and biases significantly influence odor perception and

26   response (beginning paragraph 22), the survey responses cannot be considered objective. The

27   conclusions drawn by the DPH are disproportionately favorable to its position that the Landfill is the

28

-22-

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1    source of noxious odors in the community.

2    **Expert Conclusions**

3    64.    Odors detected in the communities surrounding the Landfill are generally below well-
4    recognized nuisance thresholds (7 D/T).

5    65.    Odors are intermittent, sometimes lasting tens of minutes, often less than a minute in a
6    gust of wind. Field testing conducted demonstrated a lack of persistent odors. As described in
7    paragraph 41, during the June 2024 odor study, odorants were detected at or above the "nuisance" at
8    locations surrounding Chiquita less than 8% of the time. None of the odors were ever detected above
9    their corresponding irritation thresholds. Follow-up sampling in July 2024 at night (paragraph 43)
10    found that odorants were detected at or above the "nuisance" at locations surrounding Chiquita less
11    than 8% of the time; these detected levels, again, never exceeded their corresponding irritation
12    thresholds. These data illustrate that odors are not consistently present.

13    66.    Intertox's odor samples taken from the communities surrounding the Landfill generally
14    do not rise above recognized odor irritation thresholds, indicating a low likelihood of any physiological
15    impacts in the community.

16    67.    Community odor nuisance complaints are not an objective or reliable metric for
17    assessing the frequency, intensity, or impact of odors from the Landfill.

18    68.    South Coast AQMD's odor verification and source tracing process, and resulting data,
19    are subjective, unscientific, and unreliable for purposes of evaluating potential odor impacts in the
20    communities surrounding the Landfill.

21    69.    DPH's odor survey is unreliable because it included highly-suggestive and biased
22    questions that likely influenced survey participants, skewing the data to the point of unreliability.

23    70.    The objective odor data collected by Chiquita does not indicate that odors from the
24    Landfill are prevalent in the communities surrounding the Landfill, and even when odors are present,
25    they are transient and long-term health impacts are not anticipated.

26

27

28

-23-

1    I declare under penalty of perjury under the laws of the State of California that the

2 foregoing is true and correct.

3        Executed on this 2nd day of July 2025, in Seattle, Washington.

4

5                                          By: __

6                                          Richard Pleus, Ph.D., M.S.

7                                          Founder, Managing Director, and Chief Toxicologist

8                                          Intertox, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RICHARD PLEUS, PH.D., M.S., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

## References in Richard Pleus Declaration

AIHA. 2024. Odor thresholds for chemicals, 4th edition.

ATSDR (2016) *Toxicological Profile for Hydrogen Sulfide and Carbonyl Sulfide*, Atlanta, GA: Agency for Toxic Substances and Disease Registry.

ATSDR (2017). Are Environmental Odors Toxic? Accessed online June 9, 2025 at ATSDR Are_Environmental_Odors_Toxic_508.pdf .

Bartholomew RE. (2005). "Mysterious Illness" at Melbourne Airport:  Toxic Poisoning or Mass Hysteria? *Medical Journal of Australia* (11/12): 564-566.

Beauchamp RO Jr, Bus JS, Popp JA, Boreiko CJ, Andjelkovich DA. (1984). A critical review of the literature on hydrogen sulfide toxicity. Crit Rev Toxicol. 1984;13(1):25-97.

Dalton, P. (1996). Odor perception and beliefs about risk. *Chemical Senses, 21*, 447-458.

Dalton, P. (1999). Cognitive influences on health symptoms from acute chemical exposure. *Health Psychology*, 18(6), 579-590.

Dalton P. (2000). Psychophysical and behavioral characteristics of olfactory adaptation. *Chem Senses*. 25(4), 487-92. doi:10.1093/chemse/25.4.487.

Dalton P. (2003). Upper airway irritation, odor perception and health risk due to airborne chemicals. *Toxicol Lett*. 140-141, 239-48. doi:10.1016/s0378-4274(02)00510-6.

Dalton P, Wysocki CJ. (1996). The nature and duration of adaptation following long-term odor exposure. *Percept Psychophys*. 58(5), 781-92. doi:10.3758/bf03213109.

Distel H, Ayabe-Kanamura S, Martínez-Gómez M, Schicker I, Kobayakawa T, Saito S, Hudson R. Perception of everyday odors--correlation between intensity, familiarity and strength of hedonic judgement (1999). *Chem Senses*. 24(2):191-9. doi: 10.1093/chemse/24.2.191. PMID: 10321820.

Distel, H., & Hudson, R. (2001). Judgement of odor intensity is influenced by subjects' knowledge of the odor source. *Chem. Senses, 26*(3), 247-251.

Herz, R. S., & von Clef, J. (2001). The influence of verbal labeling on the perception of odors: Evidence for olfactory illusions? *Perception*, 30(3), 381-391. doi:10.1068/p3179

Jacob TJ, Fraser C, Wang L, Walker V, O'Connor S. (2003) Psychophysical evaluation of responses to pleasant and mal-odour stimulation in human subjects; adaptation, dose response and gender differences. *Int J Psychophysiol*. 48(1):67-80. doi: 10.1016/s0167-8760(03)00020-5. PMID: 12694902.

Jones, TF, (2000). Mass Psychogenic Illness: Role of the Individual Physician. *Am Fam Physician* (12): 2649-2653, 2655-2646.

1

Kanaan, RA and Wessely SC. (2010). The Origins of Factitious Disorder. *Hist Human Sci* (2): 68-85.

Kandel ER, Schwartz JH, Jessell TM. (2013). Principles of Neural Science. 5th ed. New York: McGraw-Hill.

Karnekull, S. C., Jonsson, F. U., Larsson, M., & Olofsson, J. K. (2011). Affected by Smells? Environmental Chemical Responsivity Predicts Odor Perception. *Chemical Senses, 36*(7), 641-648. doi:10.1093/chemse/bjr028

Michael, G. A., Galich, H., Relland, S., & Prud'hon, S. (2010). Hot colors: The nature and specificity of colorinduced nasal thermal sensations. *Behavioural Brain Research, 207*(2), 418-428. doi:10.1016/j.bbr.2009.10.027

Michael, G. A., & Rolhion, P. (2008). Cool colors: Color-induced nasal thermal sensations. *Neuroscience Letters, 436*(2), 141-144. doi:10.1016/j.neulet.2008.03.007

Pellegrino R, Sinding C, de Wijk RA, Hummel T. (2017). Habituation and adaptation to odors in humans. *Physiol Behav*. 2017 August 1;177:13-19. doi: 10.1016/j.physbeh.2017.04.006. Epub 2017 April 10. PMID: 28408237.

Purves D, Augustine GJ, Fitzpatrick D. (2001). The Organization of the Olfactory System. In Purves D, Augustine GJ, Fitzpatrick D (Eds.), Neuroscience (2nd ed.). Sunderland (MA): Sinauer Associates.

Rosenkranz HS, Cunningham AR. 2003. Environmental odors and health hazards. *Sci Total Environ*. 2003 Sep 1; 313(1-3), 15-24. doi:10.1016/S0048-9697(03)00330-9.

Ruth JH. (1986) Odor thresholds and irritation levels of several chemical substances: a review, *AIHA Journal,* 47(3), pp. A142-51.

Schiffman SS and Williams CM. (2005). Science of Odor as a Potential Health Issue. *Journal of Environmental Quality* (1): 129-138.

Stuck BA, Fadel V, Hummel T, Sommer JU (2014). Subjective olfactory desensitization and recovery in humans. *Chem Senses*. 39(2):151-7. doi: 10.1093/chemse/bjt064. Epub 2013 Nov 29. PMID: 24293565.

Van der Auwera M, Beckers R, Devue K, Claes P, De Cock A, Deleu N. (2007). Presumed mass illness following a pyridine fumes incident: environmental contamination versus mass hysteria. *Prehosp Disaster Med*. 2007 Mar-Apr;22(2):140-3. doi: 10.1017/s1049023x00004520. PMID: 17591187.

Winters, W, Devriese S, Van Diest I, Nemery B, Veulemans H, Eelen P, Van den Bergh O. (2003). Media warnings about environmental pollution facilitate the acquisition of symptoms in response to chemical substance. *Psychosomatic Medicine, 65*, 332-338.

Wise P, Rowe S, & Dalton P. (2021). Odorization of Natural Gas: What are the Challenges? *bioRxiv*.

2

# Exhibit 1

INTER**TOX**

## Richard C. Pleus, Ph.D., M.S.
Chief Toxicologist

## Professional Profile

## Fields of Expertise

Toxicology and Pharmacology: Neurological; Aerospace; Endocrinological; Respiratory; Reproductive; Developmental

## Education

**Postdoctoral training**, University of Nebraska Medical Center, 1992, Neuropharmacology

**Ph.D**., University of Minnesota, 1991, Environmental Toxicology. Research conducted in the Department of Pharmacology. Dissertation title: "Neurobehavioral assessment in offspring of the influence of maternal hypoxia and hypercapnia induced by injection of methadone in pregnant rats."

**M.S**., University of Minnesota, 1983, Environmental Health

**B.S**., Michigan State University, 1977, Physiology, Honors Graduate

## Current and Previous Positions

**Founder, Managing Director, & Chief Toxicologist,** Intertox, Inc., Seattle, WA (1995–present)

**Co-founder & Co-director,** Aerospace Toxicology Association, WA (2022)

**Co-founder**, Intertox Decision Sciences, Inc., Seattle, WA (2009-2015)

**Chair,** Working Group 3 – Health, Safety and Environment, ANSI-Accredited U.S. Technical Advisory Group, ISO/TC 229, Nanotechnologies (2007-present)

**Adjunct Associate Professor**, University of Nebraska Medical Center, Department of Pharmacology, Omaha, NE (1999–2014)

**Adjunct Associate Professor**, University of Nebraska, Center for Environmental Toxicology, Omaha, NE (2002–2012)

**President**, Environmental Toxicology International, Inc., Seattle, WA (1993–1995)

**Vice President**, Marketing & Communications, Environmental Toxicology International, Inc., Seattle, WA (1993)

560

**INTER TOX**

**Senior Toxicologist**, Environmental Toxicology International, Inc., Seattle, WA (1992–1993)

**Community Faculty**, Metropolitan State University, St. Paul, MN (1989–1996; taught courses in physiological psychology and psychopharmacology)

**Research Associate**, Department of Pharmacology, College of Medicine, University of Nebraska Medical Center, Omaha, NE (1989–1992)

**Instructor**, General College, University of Minnesota, Minneapolis, MN (1985–1989)

**Research Assistant**, Department of Pharmacology, Medical School, University of Minnesota, Minneapolis, MN (1985– 989)

**Instructor**, Lowthian College, Minneapolis, MN (1983–1985)

**Instructor**, Department of Continuing Education and Extension, University of Minnesota, Minneapolis, MN (1979–1983; taught courses on toxicology of cosmetic products and physiological factors contributing to accident susceptibility

### Select Project Experience

#### Aerospace

- Member of the aerospace medical team conducting a Root Cause Corrective Action (RCCA) for the U.S. Navy (NavAir) for Physiologic Episodes (P.E.) for aircrew of the F/A-18A, F/A-18G, and T- 45. As one of two toxicologists on the team, I reviewed possible chemical exposures to pilots and their potential contribution to P.E.s. The exposure route of concern was inhalation. Respiratory and neurologic systems were critical organ systems of evaluation.

- Led the Intertox team in toxicological assessments for two airlines' above-wing employees (e.g., aircrew). Evaluated laboratory data, as well as designed and conducted testing of uniforms for over 400 chemicals. The exposure route was absorption via the skin or by inhalation. Respiratory and skin were critical organ systems of evaluation.

- Conducted a toxicological assessment of data from the Bleed Air Extraction and Sampling System (BAESS) in a joint experiment with the U.S. Air Force, NASA, and the Boeing Company. This system simulated the ventilation of commercial aircraft. Jet oil was injected into the engine of a USAF C-17 Globemaster III, and samples of air were pulled from ports along the length of the ventilation system and assessed over 45 chemicals at a sample location comparable to where aircrew and passengers would be

561



exposed. The exposure route was inhalation, and the health assessment of interest was the respiratory and neurological systems.

- Conducted a toxicity assessment of a composite for passenger aircraft and laboratory testing data for certification of a new aircraft. The toxicological evaluation evaluated short-term (acute) toxic hazards of gaseous combustion products relating to human survivability in an aircraft cabin fire. The assessment was conducted using U.S. Federal Aviation Agency report DOT/FAA/AR-95 guidance and submitted to an international authority.

- Conducted an exposure assessment of airborne nanoparticles to aerospace workers. Nano-sized particles are thought to be released from sanding or grinding composite materials containing carbon nanotubules. Exposure routes were absorption via skin, inhalation, or ingestion. The evaluation focused on the health effects of the respiratory system.

- Conducted over 45 toxicological assessments of human exposure to jet oil and hydraulic fluid combustion in commercial aircraft. Chemicals evaluated were a group of organophosphates that included tricresyl phosphate isomers, tributyl phosphate, and combustion by-products. The triggering events were foul odors. The exposure route was inhalation, and the health assessment of interest was for the respiratory and neurological systems.

**Air**

- Designed and monitored a developmental study for airborne cellulose insulation treated with boron (e.g., boric acid). Pregnant rats were administered four doses during gestation. The experiment results produced a NOAEL to develop acceptable exposures for women workers or women residing in environments where cellulose insulation is used as insulation or acoustic attenuation. The exposure route was inhalation, and the health assessment of interest was reproductive and fetal developmental effects.

- Conducted toxicological assessment for clean-up of lead and arsenic-contaminated soil from smelter operating in the 1900s. Conducted historical toxicological research on articles and records dating back to the 1700s. Assessed what was known and when regarding the toxicology of lead (Pb) and arsenic (As) for all body systems and all exposure pathways for both human and ecological endpoints.

INTER**TOX**

- Assessed human health risks from gases released from a landfill. Triggering events for residents were from foul odors. Laboratory data was obtained, and carbon disulfide, formaldehyde, and hydrogen sulfide were identified as released chemicals. The route of exposure was inhalation. Cancer and non-cancer endpoints were assessed, focusing on the nervous system for non-cancer effects.

- A toxicological assessment was conducted for human chloroform and hydrogen sulfide exposure. These chemicals were released as gases from the wastewater treatment system of a pulp and paper mill. Residents were exposed via inhalation. Cancer and non-cancer effects were assessed, with non-cancer effects focused on the respiratory and neurological systems.

- Assessed adverse health consequences to an off-site neighborhood resident from an accidental release of chlorine gas from a manufacturing plant. Exposure was via inhalation. Toxicological assessment was focused on the respiratory system and assessed cancer and non- cancer endpoints.

- Assessed human health risks related to emissions from a composting facility to a nearby community and followed US EPA guidelines for the assessment. Triggering events were foul odors released. Exposure was via inhalation. Developed a monitoring program to measure 23 reduced sulfurs, volatile organic compounds, and ammonia. The toxicological assessment consisted of all organ systems, focusing on the nervous system assessed non-cancer endpoints.

- Conducted toxicological evaluation of sewer gases and their impact on community health and evaluated over 60 chemicals produced from plant, animal, and human waste degradation. All organ systems were evaluated, focusing on risk from adverse effects on the nervous system. The exposure to these gases was via inhalation.

- Conducted over 30 human and ecological health risk assessments of cement kilns. Chemicals of concern included metals (including As, Cu, Cr, Cd, Zn, Pb, Hg, Ni, Zn), dioxins, furans, and polyaromatic hydrocarbons (PAHs), nitrogen oxides, sulfur oxides, and many other EPA identified hazardous air pollutants. Depending on the case, assessments focused on specific endpoints, such as neuroanatomical effects, and vulnerable subpopulations, such as the developing fetuses of local pregnant women. Assessments included a review of laboratory data, a review of toxicological and medical literature, and a review of

**INTERTOX**

medical records. Considered routes of exposure included direct exposure from inhalation and multipathway exposures from oral and dermal exposures. US EPA guidelines for assessments were used. Cancer, non-cancer, and ecological endpoints were assessed.

- Conducted a toxicological assessment of residents living near a lead smelting and refining operation. The chemicals of concern were lead and arsenic. Considered multipathway exposure, but eventually focused on inhalation and ingestion as significant routes. The evaluation consisted of assessing laboratory data, reviewing the toxicological literature, and including information from government agencies. US EPA guidelines were used as a basis for the review. All body systems were evaluated.

- Evaluated a risk assessment for carcinogenic polycyclic aromatic hydrocarbons for a coal-burning power plant. The focus was eventually narrowed to assessing a system of toxic equivalency factors based on non-validated assumptions. US EPA guidelines were used as a basis for the assessment. Exposures were considered multipathway. Cancer and non-cancer endpoints were assessed.

- Conducted human health risk assessment from emissions of a thermoplastic extrusion plant. Assessed laboratory data, air dispersion modeling, and calculated estimates of hazards for acute exposures to residents living near the facility. US EPA guidelines were used as a basis for the evaluation. Chemicals evaluated included acrolein, 1,3-butadiene, 4-vinylcyclohexane, styrene, and triphenylphosphate. The exposure was via inhalation. Cancer and non-cancer endpoints for all body systems were considered.

- Assessed human health risks of workers in a facility that was being built to decommission chemical warfare agents. Evaluated human acute exposures to sarin and mustard gases. The route of exposure was inhalation. Compared and contrasted reported health effects from acute exposures to health effects reported to those published in the toxicological literature. Thirteen non-cancer endpoints, with a focus on the nervous system, were assessed.

- Evaluated human health risks to residents living near an accidental chemical release and subsequent fire from rail cars filled with chlorine and methyl mercaptan. The route of exposure was via inhalation of parent chemical agents, and work included assessing the human health risk from by-products of pyrolysis. Non-cancer endpoints were evaluated.

- Evaluated human health risks from exposure to stack emissions

**INTERTOX**

from a proposed fluidized bed incinerator. Air dispersion monitoring was used to estimate air concentrations at critical receptors in nearby neighborhoods and followed US EPA guidelines for the assessment. The toxicological evaluation was conducted for metals (As, Cr, Cd, Pb Hg, Ni), dioxins, furans, polyaromatic cyclic hydrocarbons, nitrogen oxides, sulfur oxides, and other US EPA-identified hazardous air pollutants and reviewed potential effects for all body systems for cancer and non-cancer endpoints. The results of this toxicological assessment were presented to the community.

- Conducted a review of a state's proposal for biological monitoring of residents and their pets in a town that built and operated a hazardous waste incinerator. Followed US EPA guidelines for the assessment. Assessed the reliability and accuracy of bio-monitoring parameters relative to chemicals of potential concern. The exposure route was inhalation. Non-cancer endpoints assessed.

- Conducted a toxicological assessment of multiple emission sources within an industrial park in the Bahamas to nearby residents. Oil terminals, pharmaceutical plants, power plants, and chemical plants operated in the park and conducted extensive emissions inventories and source evaluation surveys to gather data to assess individual contributions and cumulative effects of emissions. Toxicological assessment consisted of all organ systems. Cancer and non-cancer endpoints were evaluated.

- Conducted multiple human health risk assessments for several different facilities in a U.S. state. Facilities included a newly designed bus manufacturing plant and several beet processing plants. These were the first air screening risk assessments conducted by this state and conducted toxicological reviews of nearly 100 chemicals, including metals (As, Cr, Cu, Cd, Pb, Hg, Ni, Zn) emitted from each facility and assessed oral, dermal and inhalation routes of exposures through multipathway analysis. Cancer and non-cancer endpoints were evaluated.

- Reviewed multipathway human health risk assessment for a medical waste facility for the 173-acre Chris Hani Baragwanath Academic Hospital in Soweto, South Africa. Chemicals evaluated included metals (As, Cr, Cu, Cd, Pb, Hg, Ni, Zn), dioxin, furans, and polycyclic aromatic hydrocarbons. Exposure was evaluated for residents living nearby. Cancer and non-cancer endpoints were assessed.

- Conducted human health risk assessments for emissions from

**INTERTOX**

several coal-fired electric generating stations in Texas, Illinois, Massachusetts, Michigan, and Washington and followed US EPA and pertinent state guidelines for the assessments. The evaluations included metals (As, Cr, Cd, Pb, Hg, Ni), dioxins, furans, and polyaromatic hydrocarbons, which became newly reportable under the US EPA's Toxic Release Inventory (TRI) program. Toxicological assessment was conducted for other additional metals. Exposure was via inhalation. Potential risks through oral, inhalation, and dermal pathways were assessed for some facilities, and all organ systems for cancer, non-cancer, and ecological endpoints were evaluated.

- A toxicological assessment of human health risks from lead deposited in agricultural soil was conducted. Lead was released from the operation of a steel manufacturing plant. The evaluation used the US EPA Uptake/Biokinetic Model for Lead to evaluate human exposure. Environmental fate was followed through the food chain from soil to human food sources. A review of the literature was conducted. The route of exposure was primarily ingestion. Non-cancer endpoints were assessed with a focus on nervous system risks.

## Policy and Legislation

- Briefed Costa Rican governmental and private representatives on the principles that underlie the toxicological assessment of nanotechnology. Included in the briefing were the Minister of Science and Technology, the Vice Minister of Science and Technology, the President of Instituto Tecnológico de Costa Rica, and the Vice President of Research at the Instituto Tecnológico de Costa Rica.

- Participated in technical discussions with several members of the European Parliament in Brussels, Belgium, on developing appropriate scientifically based regulations to prevent adverse health effects from burning hazardous waste in cement kilns.

- Participated in technical discussions with South African governmental and private industry representatives on land, water, and air legislation and the benefits of science and risk-based on environmental legislation.

## Pharmaceuticals

- Conducted numerous toxicological assessments for ethanol as an agent of interest in legal proceedings. Tasks included reviewing case documents and testimony for relevant information regarding



potential ethanol exposure, developing physiologically-based pharmacokinetic models to scientifically estimate the likely degree of alcohol intoxication during relevant events, and drafting expert reports or providing testimony based upon the above analysis.

- Provided a toxicological assessment for over 30 toxicological assessments related to the testing and evaluation of biologic tissue (e.g., urine, hair, serum) samples for concerns of drug exposure, including ethanol, methamphetamine, benzoylecgonine, phencyclidine, nortriptyline, and amphetamine. Tasks included evaluations of test results for indications of adulterants or dilution, assessing methodological techniques, and determining the toxicological impacts and the signs and symptoms that might be associated with the levels of drugs detected routes of exposure, such as inhalation and ingestion. Research also focused on genetic determinants of nervous system effects, although other endpoints were included.

- Conducted numerous toxicological assessments for opiate and opioid narcotic analgesic agents as a possible cause of death. Assessments included analyzing laboratory data, medical records, and medical literature analyses. The route of exposure was ingestion. Toxicological assessment focuses on the neurological system, which includes respiratory and psychological effects.

- Conducted a toxicological assessment for an antibiotic agent as a possible cause of death. Assessments included analyzing laboratory data, medical records, and medical literature analyses. Toxicological assessment focused on numerous body organs.

**Product Safety**

- Conducted product safety assessments of bacteria for human health safety. Specific organisms are used to preserve fruit, de-nitrify surface water, improve water quality in swimming pools, conduct microbiological risk assessments for human health effects, and provide scientific documents to international governmental authorities.

- Conducted product safety assessment for laser printing devices. Assessed the materials used in the cutting process and the fumes from the cutting process. Evaluated the emissions related to possible human health effects for acute and chronic exposures.

- Conducted a scientific assessment for fungus for a toy distributed to the U.S., Europe, and Asia. Laboratory tests were conducted, biological assessment was performed, and an approach to

**INTERTOX**

possible disposal was developed to address possible disposal options. It also assisted in developing forensic analysis to determine the cause of the mold. We evaluated acute and subchronic exposures from contact with skin and breathing spores.

- Conducted toxicological assessment for consumer-used ink products for Japanese manufacturers and assessed human health risks using American Society for Testing and Materials (ASTM) standards. Over 50 chemicals were evaluated for various oral, dermal, and inhalation routes of exposure. Toxicological assessment for all body systems, and included cancer and non-cancer endpoints.

- A toxicological assessment of human exposure to chemicals found in a cell phone and its packaging was conducted. Employees were exposed to unknown chemicals and subsequently reported acute health effects. Developed a testing program to determine chemicals of potential concern. Identified several solvents and assessed toxicological effects from exposure via inhalation and dermal contact. Developed a forensic program to evaluate the source. Acute non-cancer endpoints evaluated.

- A toxicological human health assessment was conducted using several volatile organic compounds, silane, and siloxane released from weather-treating products. The route of exposure was inhalation, and the population of concern included children. Non-cancer endpoints were assessed and focused on the nervous and respiratory systems.

- A toxicological assessment of multiple chemical cleaning solutions and carbon monoxide on reproductive effects was conducted. Exposure to pregnant women occurred while visiting a commercial art store. Exposure was via inhalation. Toxicological assessment focused on reproductive and neurological systems. Research also focused on genetic determinants of nervous system effects.

- Conducted human and ecological risk assessment of ethylene vinyl alcohol, a chemical used to make shipping packaging "peanuts." Reviewed laboratory data, the toxicological literature, and the use and fate of the material as a consumer product. The endpoints of evaluation were human and ecological receptors. US EPA guidelines were used as a basis for the assessment. For human exposure, cancer and non-cancer endpoints were assessed.

- Conducted a toxicological assessment of a consumer product, an ink-pen barrel constructed of pressed recycled rubber. Reviewed laboratory data and conducted a review of the toxicological literature. US EPA risk assessment guidelines were used as a

568

**INTER TOX**

basis for assessment. Chemicals evaluated included metals (As, Cr, Cd, Pb, Hg, Ni) and organic hydrocarbons. Cancer and non-cancer endpoints for all body systems were considered.

- Prepared a human health risk assessment of occupational exposures to cellulose insulation. Conducted a review of the toxicological literature of paper dust, wood dust, and chemicals found in newsprint. The exposure from inhalation to paper and wood dust was assessed, and cancer and non-cancer endpoints were evaluated.

- Conducted toxicological, human, and ecological risk assessment of various herbicides used by WA State's Department of Transportation for use on state roadways and assessed human and environmental health risks associated with roadside vegetation management practice. Multipathway exposures were conducted and included the evaluation of sensitive human and ecological populations. Cancer and non-cancer endpoints were assessed.

- Conducted toxicological assessment of a consumer-related product used for cleaning outdoor camping equipment. The chemicals evaluated were ethylenediaminetetraacetic acid (EDTA), sodium hydroxide, nonylphenol polyethylene glycol ether, and dipropylene glycol monomethyl ether. The concern was these chemicals' adverse impact on the nervous system's non-cancer endpoints, particularly the eye.

- Conducted a toxicological assessment of fog oil released from a military training facility. Fog oil is used as a chemical obscurant in training exercises. Fog oil migrated off-base into residential neighborhoods. Benzene and several other volatile organic compounds were evaluated toxicologically via inhalation exposure. The evaluation focused on cancer and non-cancer hematological effects.

- Conducted toxicological assessment on human health risks from cellulose insulation containing ammonium sulfate-based flame retardant. Exposure was via inhalation. Developed a single-compartment, first-order model to describe ammonia's environmental fate and transport in a residential setting. I used US EPA guidelines for the evaluation. Cancer and non-cancer endpoints were considered. Also, the production of foul odor was evaluated.

- Conducted toxicological evaluation of boron (B)-containing pesticide. All organ systems were evaluated. Exposures were ingestion, dermal, and via inhalation. Conducted an exposure



assessment with a university laboratory as a part of the assessment and eventually focused on the reproductive effects of boron pesticides. All data was forwarded to the State of California for review and evaluation of the data. Cancer and non-cancer endpoints were considered.

## Workplace

- Developed medical monitoring protocol for governmental clients. The chemical of concern was mercury, including the various inorganic and organic mercury species. The key objective of the Mercury Medical Monitoring Program was to protect employees who may be exposed to elemental or organic mercury (Hg) during maintenance, construction, and remediation tasks.  Cancer and non-cancer endpoints were considered.

- Assessed several cases where employees were suspected of using recreational drugs. We reviewed drug testing data and performed physiologically based pharmacokinetic (PBPK) modeling when needed. The cases involved different families of drugs, including opiates, ethanol, and cannabinoids. Most exposure routes were oral and included injection and inhalation.

- Assessed risk to human health of workers exposed to chemicals from the re-entrainment of exhaust air in a pharmaceutical research laboratory. Exposure was via inhalation. Odors were detected and were the triggering event at the workplace. Chemicals were identified, and estimated concentrations were calculated. Toxicological assessment included all body systems, focusing on reproductive and nervous systems. Non-cancer endpoints assessed.

- Assessed health effects of a worker exposed to fumes asphalt roofing and solvent-based and latex paints. Exposures were via inhalation and dermal routes. Numerous non-cancer endpoints were evaluated.

- Conducted toxicological assessment for workers exposed to trichloroethylene (TCE) and evaluated the literature and laboratory data from the facility. TCE was used extensively in the facility as a degreaser, and all routes of exposure were assessed. However, the assessment eventually focused on risks for the development of neurobehavioral effects on the offspring of women exposed to TCE from drinking water ingestion, as that was deemed the most sensitive endpoint. It evaluated the use of medical monitoring for this population.



- A toxicological assessment of human health from exposure to perchloroethylene (PCE or tetrachloroethylene) from contaminated groundwater was conducted, and ingestion and dermal contact with water and inhalation of volatiles during showering or bathing were evaluated. Toxicological assessment included general toxicology and focused on the nervous system.

- Conducted toxicological evaluation of a worker to exposure to beryllium (Be) and polonium (Po) dust and residue. Evaluated exposures via inhalation, dermal, and, to a lesser degree, oral from dust. Cancer and non-cancer endpoints were assessed.

- Conducted toxicological assessments related to the waste from the production of plutonium (Pu) at the Hanford Reservation in eastern Washington for the US DOE site contractor. We conducted toxicological assessments for chemicals present in underground storage tanks, including metals and organic compounds. The work included developing Temporary Emergency Exposure Limits (TEELs) and other toxicity guidelines for worker exposure that were peer-reviewed by Argonne National Laboratories, evaluating exposures to workers related to potential accident scenarios, and developing computer visualization tools to assist workers with understanding the significance of detected chemical concentrations.

## Soil

- Conducted field research on workers in wood treatment facilities to copper chromium arsenate (CCA), formerly used as a wood preservative. Airborne exposures to hexavalent chromium (CrVI) and arsenic (As) were of primary focus. Data was submitted to the US EPA. A new technique for detecting lower quantities was developed. The route of exposure was primarily via inhalation. Cancer and non-cancer endpoints were assessed.

- Conducted a comprehensive risk assessment addressing human health risks related to dioxins and polyaromatic hydrocarbons (PAHs) in soil at a wood-treating facility listed by US EPA as a Superfund site and followed US EPA guidelines for the assessment. The exposure assessment was multipathway and included exposures to workers and residents living near the facility. A probabilistic risk assessment was conducted to characterize uncertainty and variability in worker exposures and identify parameters contributing most significantly to uncertainty in risk estimates. Developed site-specific parameter distributions and characterized current scientific knowledge of the bioavailability of

**INTERTOX**

dioxins and PAHs in soil. Work was submitted to the US EPA. Cancer and non-cancer endpoints assessed.

- Conducted human and ecological risk assessment from the effects of copper slag leachates. Reviewed laboratory data and conducted toxicological literature review on human and environmental receptors. Evaluated arsenic (As), copper (Cu), cadmium (Cd), and zinc (Zn). US EPA and Washington State guidelines were used for this assessment. For human exposures, cancer and non-cancer endpoints were considered.

## Water

- Reviewed and assessed the toxicity of multiple perfluorinated chemicals, including perfluorooctanoate (PFOA) and perfluorooctosulfonate (PFOS), and assessed the current state of toxicological knowledge, evaluated guideline levels of state and federal government. Issues of concern included assessing the appropriateness of extrapolating from other species, using safety factors, and co-exposure to different chemicals. Cancer and non-cancer endpoints were evaluated.

- Was a scientific expert input to a Court developed science panel (C-8 Science Panel) on behalf of legal settlement (PFOA was the chemical of concern) in West Virginia. The panel was made up of independent scientists jointly chosen by the plaintiff and defense as a component of a legal settlement. My work focused on identifying a laboratory to conduct biological analysis and experimental design for medical testing. Exposure to PFOA was from drinking water exposure that includes oral, respiratory (e.g., showering), and skin routes.

- Conducted a human health risk assessment for a city in Washington. We conducted a toxicological evaluation to estimate human health risks associated with exposure to polychlorinated biphenyls (PCBs) and other chemicals from building materials at the former water treatment plant. We focused on cancer and non-cancer endpoints.

- Evaluated non-standard neuropsychological tests to demonstrate adverse effects of chemical exposure. In groundwater, the chemicals evaluated were perchlorate and several petroleum-chlorinated solvents (e.g., TCE, PCE). Routes of exposure were via oral and inhalation. Non- cancer endpoints were assessed with a focus on the nervous system.

- Evaluated over 50 chemicals of potential human health and

**INTERTOX**

ecological consequences of exposure to Endocrine Disruption Chemicals (EDCs) and pharmaceuticals and personal care products (PPCPs) in reuse water for a large reuse water management agency and identified contaminants of most significant concern based on the likelihood of occurrence and resistance to treatment processes used at various facilities as well as potential for environmental exposure and health effects. Exposure routes of concern include drinking, breathing from aerosols from showering, and skin contact from bathing. Communicated the possible risks to the public and regulators.

- Assisted in evaluating and identifying sources of contamination for a screening-level ecotoxicologic assessment of select chemicals of potential concern (COPCs). The analysis concluded that sampling locations were associated with several COPCs exceeding their level of concern (LOC) for water. Further evaluation indicated that the relationship between sediment, water, and animal tissue was not always synchronous, COPCs with identified benchmarks should be evaluated, and LOCs not likely to pose a risk should be recognized appropriately. Ecological endpoints were assessed. COPCs including organics (chlorpyrifos, hexachlorobenzene, organochlorine pesticides, pentachloroanisole, pentachorobenzene, PCBs, and tetrachlorobenzene) and inorganics (Al, Sb, As, Ba, Be, B, Cd, Cr, Cu, Fe, Pb, Mg, Mn, Hg, Mo, Ni, Se, Sr, Ti, V, and Zn) were analyzed and assessed in water, sediment, fish, and bird eggs.

- Assisted in a toxicological assessment of human health risks from ingesting drinking water containing trace amounts of personal care products, endocrine-disrupting chemicals (EDCs), and pharmaceuticals in drinking water. Both cancer and non-cancer endpoints were assessed.  Non- cancer endpoints included the nervous system, endocrine system, reproductive system, and immune system. Ecological endpoints were examined.

- Conducted scientific assessment of the human health risk for exposure to perchlorate. Followed US EPA guidelines for the human health assessment. Addressed multipathway exposures to perchlorate included exposures to sensitive populations, such as pregnant women, and ecological endpoints. Provided scientific comments to the US EPA's development of a reference dose and the State of California regarding developing a Public Health Goal and proposed Proposition 65 listing. Cancer and non-cancer endpoints were assessed.

- Conducted a review of a state's proposal for biological monitoring of residents and their fluoride. This assessment considered human

**INTERTOX**

exposures to metals found as contaminants of sodium hexafluorosilicate or hexafluorosilicic acid. It evaluated fluoride ingestion in sensitive human populations, including older adults and children. Both cancer and non-cancer endpoints were assessed.

- Conducted toxicological assessment for health risks from drinking water. Chemicals evaluated included perchlorate, TCE, and N-nitrosodidimethylamine (NDMA). The evaluation assessed laboratory data, modeling data, toxicological literature, medical literature, and medical records. The primary route of exposure was ingestion; however, dermal and inhalation routes were also reviewed.

- Conducted toxicological evaluation of human health related to fluoride. Water fluoridation is the practice of adding fluoride compounds to water to reduce tooth decay in the general population. A review of the toxicological and medical literature was conducted in addition to U.S. and European governmental assessments of fluoridation. The primary route of exposure was ingestion; however, dermal and inhalation routes were also reviewed.

- Conducted toxicological assessment of the risk of oral exposure to lead to children via water from Seattle Public Schools and used physiologically based pharmacokinetic modeling to develop blood lead estimates for children of different ages. Non-cancer endpoints were focused on neurodevelopmental effects.

- Conducted a toxicological assessment related to oral exposures of ground water contaminated with low levels of perchlorate to community residents. Toxicological assessment considered possible doses, exposures via dermal, ingestion, and inhalation (e.g., taking a shower). Evaluated sensitive populations that included pregnant women and children.

**Biological Risk Assessment**

- Developed and conducted an independent sampling program to test certain building materials for fungal spores and hyphal fragments that might indicate current fungal growth or the possibility of fungal growth in the future. Analyses included direct microscopy for identifying any fungal spores to the genus level and culture of viable samples on appropriate nutrient media.

- Assisted in evaluating a proposed Concentrated Animal Feeding Operation (CAFO) facility for potential human health and

**INTERTOX**

ecological impacts from possible facility releases for both human and environmental endpoints. The facility was intended for closed-loop operation and designed to prepare 20,000 head of cattle for market. Chemicals of concern included hormones, antibiotics, and pesticides. Pathogens were also assessed. This unique CAFO design comprised the following operating units: beef facility, ethanol-producing facility, combined heat and power facility, nutrient separator, greenhouse facility, water treatment facility, fluidized bed reactor, and composing facility.

- Provided scientific support for numerous commercial and residential indoor air quality claims concerning alleged adverse health effects from microbiological agent exposure. Critically evaluated laboratory data, the method of collection and analysis, medical records, and toxicological literature regarding exposure to fungal toxins in indoor air and their potential for causing long-term adverse health effects. Also included in some assessments was the release of volatile organic compounds from fungi. Assessed validity and reliability of information on the nature and extent of exposure, interpreted receptor health status, evaluated toxicological basis for health complaints, and identified potential sources of confounding causality. Many organisms have been assessed; however, the most commonly evaluated are Aspergillus, Penicillium, and Stachybotrys.

- Conducted biological assessment of workers exposed to bioaerosols, a conditioning agent used to dewater sludge (CLARIFLOC® C-9525 POLYMER), and particulates from an advanced wastewater treatment plant and evaluated the chemical and biological constituents of dewatered sludge. Reviewed laboratory data, conducted microbial, viral, and chemical literature reviews, and conducted site assessments. Route of exposure were inhalation and ingestion. Non-cancer endpoints were assessed. A review of employee protection was also performed.

- Conducted an anthrax investigation at a military mail facility. Developed and implemented a sampling and analysis program to determine whether Bacillus anthracis (anthrax) organisms could be detected. The biological assessment included a review of the microbiological literature, development of a state-of-the-science sampling approach, refining a work plan to address site- specific elements, preparation of the work plan, collection of samples, coordination of laboratory analysis, interpretation of results, and preparation of final project documentation and results reporting.

- Conducted biological assessment of residents exposed to Salmonella and E. coli emanating from cattle feedlots as

**INTERTOX**

bioaerosols. Reviewed laboratory data, conducted microbial, viral, and chemical literature reviews, and conducted site assessments. Route of exposure were inhalation and ingestion. Non-cancer endpoints were assessed, and a work plan was to determine the adverse health effects related to microbial contamination of a potable private well-water supply. The work plan included examining exposure events, identifying microbial agents of concern (MAOC), and identifying possible health effects associated with direct and indirect contact with MAOCs detected in sewage.

- Evaluated the performance of immunoassay biological agent detection instrumentation for an instrument developer. Conducted independent tests to determine the minimum level of spore delectability of two specific instruments for viable anthrax spore vaccine and Bacillus thuringiensis.

## Pesticides

- Assisted with toxicological assessment of human exposure to an herbicide, acrolein, a pungent chemical used in urban settings to control weeds in public water systems. Odor is likely a human trigger to the presence of this chemical. Routes of exposure included inhalation, ingestion (from water and fish), and dermal exposure (from swimming). The toxicological assessment consisted of reviewing the toxicological literature, evaluating communities, and assessing accident scenarios. Non-cancer endpoints were assessed.  Managed a state Department of Transportation agency's human and ecological risk assessment project. The project aimed to estimate the potential human health and environmental risks associated with the Agency's use of herbicides for roadside vegetation management. The evaluation addressed the general public and workers applying herbicides. Produced a risk assessment report and recommended herbicide risk management to the client.

- Conducted a toxicological assessment for Malathion (pesticide) exposure on human health. The evaluation included analyzing laboratory data, medical records, and medical literature analyses. Non-cancer endpoints were evaluated, with an eventual focus on the nervous system.

- A toxicological assessment of human exposure to a chemical intermediate used in the production of carbamate pesticides was conducted. Worker exposures were assessed for inhalation of intermediate compounds. Conducted a toxicological assessment of



the literature and prepared a toxicology profile for the chemical. The work was submitted to the US EPA. A surrogate reference dose was developed and presented for information purposes. Toxicological assessment of all body systems was conducted for cancer and non-cancer endpoints.

- Conducted a toxicological evaluation of pesticides and their combustion by-products for residents living nearby a pesticide warehouse: chemicals evaluated pesticides (e.g., organophosphates) and herbicides (e.g., glyphosate). Toxicological assessment considered all organ systems. However, the evaluation eventually focused on the nervous system.

- A toxicological assessment related to a consumer from the use of indoor pesticides was conducted. Pesticides contained boron, which was the chemical evaluated. Exposure was predominately via inhalation. All organ systems were considered for non-cancer endpoints.

### Expert Peer Review Panels

- 2023 Neurotoxicology expert for Airborne Hazards and Burn Pit Exposure (AHBPE-2) peer review panel of the 2022 Toxic Exposures Research Program (TERP) for the Department of Defense (DOD) Congressionally Directed Medical Research Programs (CDMRP).

- 2018-2019 Aerospace medicine, physiology, and toxicology clinical review team for the U.S. Navy (NavAir) Root Cause Corrective Action (RCCA) for Physiological Episodes (P.E.s) for pilots of F/A-18H and G models and T-45.

- 2010-2012 Science Advisor for the Nanosafety Consortium for Carbon, Washington, D.C.

- 2004-present Ad Hoc Science Review Board Member of the U.S. Environmental Protection Agency (US EPA) Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Scientific Advisory Panel.

- 2009 U.S. Environmental Protection Agency (US EPA) Nanomaterial Case Studies Workshop: Developing a Comprehensive Environmental Assessment Research Strategy for Nanoscale Titanium Dioxide, Durham, NC, September 29 and 30.

- 2009 U.S. Environmental Protection Agency (US EPA) - External Peer Review Panel of the Toxicological Review of Nitrobenzene (CAS No. 98-95-3), In Support of Summary Information on the Integrated Risk Information System (IRIS), published January 2009.

**INTERTOX**

- 2009 Expert Peer Panel of Tertiary-Butyl Acetate (TBAC), Toxicology Excellence for Risk Assessment (TERA), Cincinnati, OH. January 7 - 8.

- 2007 U.S. Environmental Protection Agency (US EPA) - Integrated Risk Information System.  (IRIS) Peer Review of Nitrobenzene, Washington, DC. May 15.

- 2004 Resorcinol Peer Review Meeting: Follow-up Review to 2003, Toxicology Excellence for Risk Assessment, Harrisburg, PA. November 17-18.

- 2004 Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel Meeting: Consultation on Dermal Sensitization Issues for Exposures to Pesticides, Arlington, Virginia.  May 4-6.

- 2003 Resorcinol Peer Review Meeting, Toxicology Excellence for Risk Assessment (TBAC), Cincinnati, OH, April 18-19.

**Peer Reviewer**

- Environment International
- Chemical Research in Toxicology
- Journal of Agricultural and Food Chemistry
- International Journal of Environmental Research and Public Health
- Current Medicinal Chemistry

**Conferences and Symposiums**

- 2013 Steering Committee member for the Gordon Conference "Environmental Nanotechnology: Novel Approaches to Meet Global Challenges." Vermont, USA.

- 2013 Co-chair for "The Small-Business Community" breakout session of the "National Nanotechnology Initiative Workshop: Stakeholder Perspectives on the Perception, Assessment, and Management of the Potential Risks of Nanotechnology." National Nanotechnology Initiative, Washington D.C., USA. September 10--11.

- 2012 Organizer for the "Water Research Foundation Workshop Assessing Potential Short-Term Impacts of Chloramination." Water Research Foundation, Seattle, WA. December 6 - 7.

- 2011 Roundtable Participant for the "Washington State Green Chemistry Roundup," the Pacific Northwest Pollution Prevention Resource Center (PPRC), May 25 - 26.

INTER**TOX**

- 2010 Invited Speaker for the "Capstone Meeting: Risk Management Methods & Ethical, Legal, and Societal Implications of Nanotechnology", the National Nanotechnology Initiative (NNI), Washington DC, USA. March 30 - 31.

- 2009 Co-Chair for the In Vitro Plenary of the "Nanomaterials and Human Health & Instrumentation, Metrology, an Analytical Methods" Workshop, the National Nanotechnology Initiative, Washington DC, USA, November. The workshop brings together thoughts and ideas to recommend which direction the federal government's nano EHS research strategy.

- 2009 Planning Committee Chair Member for the "Nanotechnology Health & Safety Forum (NHSF)," Seattle, USA, June. The NHSF explored the multiple perspectives of nanotechnology.

- 2007 Committee Member for the "Naphthalene State-of-the-Science Symposium," University of Nebraska Center for Environmental Toxicology, Monterey, USA. October. The Symposium is a scholarly peer review of critical scientific information underlying a federal health risk assessment.

- 2003 Organizing Committee Member for the "Perchlorate State-of-the-Science Symposium," University of Nebraska Medical Center, Omaha, USA, September. The Symposium is a scholarly peer review of critical scientific information underlying a federal health risk assessment.

**Select Education Courses**

- Lecturer 2015-2017. Review of the human science for perchlorate. University of Minnesota.

- Lecturer 2015. Comparing the toxicology of conventional chemicals to nano-objects. Presented for the course 'ECE 383 / CSI 383 Nanotechnology: Simulation and Design', taught by the Department of Electrical & Computer Engineering, Portland State University.

- Lecturer 2013. Comparing the toxicology of conventional chemicals to nano-objects. Presented for the course 'ECE 399 / CSI 399 Nanotechnology: Simulation and Design', taught by the Department of Electrical & Computer Engineering, Portland State University.

- Lecturer 2012. Guidance on Physicochemical Characterization for Manufactured Nano-objects Submitted for Toxicological Testing: ISO TC-229 Project Work. Presented at a Bar-Ilan Institute of Nanotechnology and Advanced Materials Seminar. Tel Aviv, Israel.

**INTERTOX**

October 15.

- Lecturer for Department of Pharmacology, University of Nebraska Medical Center. Provided lectures on toxicology for medical, pharmacy, graduate, and physician assistant students at the University of Nebraska Medical Center, Department of Pharmacology.

- Presented two courses in human health risk assessment for the Technical Research Council staff in South Africa. The purpose of the course was to introduce multi-pathway risk assessment to evaluate potential chemical exposures associated with various industrial activities in South Africa.

- Developed and taught over five courses on risk assessment and communication for the Air & Waste Management Association. The courses address toxicology, multi-pathway risk assessments for combustion sources, uncertainty analyses, and risk communication.

- Lectured on toxicology of the sensory system and neuroimaging in graduate student courses at the University of Washington.

- Developed, managed, and team-taught several courses on toxicology, risk assessment, and risk communication for the managers and staff of chemical plants, utilities, oil companies, railroads, and government officials. Courses have been presented in California, Pennsylvania, Arizona, Missouri, France, and South Africa.

## Grants and Awards

- Grant Awarded, WRF 5085: Impact of Haloacetic Acid MCL Revision on DBP Exposure and Health Risk Reduction; (Richard Pleus Co-Investigator) 2021.

- Grant Awarded, WRF 4214: Development of Acceptable Daily Intakes (ADIs) for Pharmaceutical and Personal Care Product Ingredients, Hormonally Active Compounds, and Other Potentially Highly Toxic Compounds of Emerging Interest in Water Using the Minimum Anticipated Biological Effect Level (MABEL) Approach (Richard Pleus and Gretchen Bruce, Principal Investigators) 2008.

- Grant Awarded, WRF-05-005: Identifying Hormonally Active Compounds, Pharmaceutical Ingredients, and Personal Care Product Ingredients of Most Health Concern from Their Potential Presence in Water Intended for Indirect Potable Reuse; in collaboration with SNWA (Shane Snyder, Principal Investigator), 2007-2008.

**INTER TOX**

- Grant Awarded, Center for Produce Safety 2012-208: Apple growing and packing microbial risk factors and their potential to lead to foodborne disease outbreaks (Richard Pleus, Principal Investigator), 2012.

- Grant Awarded, WaterRF 4387: Development of a Water Utility Primer on EDCs/PPCPs for Public Outreach (Gretchen Bruce and Richard Pleus, Principal Investigators) 2012-2015.

- Grant Awarded, WaterRF 4320: Assessing Potential Short-Term Impacts of Chloramination. Water Research Foundation (Richard Pleus, Principal Investigator) 2011-2015.

- Grant Awarded, AwwaRF/WRF 3085/04-003: Toxicological Relevance of Endocrine Disruptors and Pharmaceuticals in Drinking Water (2004-2008); in collaboration with Southern Nevada Water Authority (SNWA) (Shane Snyder, Principal Investigator), 2008.

- Grant Awarded, AwwaRF 3033: Comprehensive Utility Guide for Endocrine Disrupting Chemicals, Pharmaceuticals, and Personal Care Products in Drinking Water; in collaboration with SNWA (SHANE Snyder, Principal Investigator), 2005-2006.

- Grant Awarded, WRF-06-018: Tools to Assess and Understand the Relative Risks of Indirect Potable Reuse and Aquifer Storage and Recovery Projects (2006-present) (DRAFT); in collaboration with Nellor Environmental Associates, Inc. and Soller Environmental, LLC (Margie Nellor and Jeff Soller, Principal Investigators).

- Elected to Delta Omega Honorary Society in Public Health, 2003.

- Best Paper: Pleus R.C., Goodman G. and Mattie D.R. Development of a Reference Dose for Perchlorate: Current Issues and Status. Presented at the 50th Joint Army-Navy-NASA-Air Force (JANNAF) Propellant Development and Characterization and Safety and Environmental Protection Subcommittees Joint Meeting, Cocoa Beach, FL. May 2000.

- Faculty Mentor of the Year Award, General College Student government, University of Minnesota, Minneapolis, MN. 1989.

- Director of Undergraduate Research Opportunities Program Award, University of Minnesota, for the research proposal, The effect of fetal hypoxia on fetal brain development. 1987.

- Director of Undergraduate Research Opportunities Program Award, University of Minnesota, for the research proposal, Use and operation of autoshaping and fixed ratio paradigm in

**INTERTOX**

environmental toxicology research. 1986.

- Scholl Fellowship, National Sudden Infant Death Foundation, Landover, MD. 1985.

- U.S. Public Health Traineeship Award, United States Public Health Service, Washington, DC. 1979.

## Professional Memberships

- American Society for Pharmacology and Experimental Therapeutics
- Association for the Advancement of Science
- Society for Neuroscience
- Society of Toxicology

## Directorships

- 2010–2018 Member, Board of Directors for the Nanotechnology Industries Association (NIA), Brussels, Belgium.

- 2004–2007 Member, Board of Directors, Frontier Geosciences, Inc. Seattle, WA.

- 2001–present Member and former Secretary, Board of Directors, Urban Environmental Institute. Seattle, WA.

- 1998–1999 Member, Board of Directors, Northwest Sculling Association. Seattle, WA.

- 1996–1998 Vice President, Seattle Yacht Club Rowing Foundation, Seattle, WA.

- 1989 Member, Board of Directors, Insight, Inc. Stillwater, MN.

## Advisory Positions

- 2019-present Head of US Working Group 3, ISO/TC 229/W.G. 3 "Health, Safety and Environmental Aspects of Nanotechnologies."

- 2007-2019 U.S. Delegate, ISO/TC 229/W.G. 3 "Health, Safety and Environmental Aspects of Nanotechnologies."

- 2013–2017 Member of the University of California Center for Environmental Implications of Nanotechnology (UC CEIN) External Science Advisory Committee (ESAC). Selected for expertise on nano-related EHS issues.

- 2012 Invited Expert for the "BRE Cabin Air Quality Workshop." The BRE Group, London, England, February 20-21.

**INTERT❂X**

- 2011 U.S. delegate for the U.S.-Russia Bilateral Presidential Commission on Science and Technology, March 1 through 5. Selected for expertise on nano- related EHS issues.

- 2010–2017 Chair of the Science Advisory Board, National Institute of Biomedical Imaging and Bioengineering (NBIB), Development and Launch of an Interoperable and Curated Nanomaterial Registry, Principal Investigator: Michele L. Ostraat, Ph.D.

- 2009–2011 Project Advisory Committee, WateReuse Foundation, Kennedy/Jenks Consultants, WRF 09-07: Risk Assessment Study of PPCPs in Recycled Water to Support Public Review.

- 2009 Peer Review Panel Member for the National Institute for Occupational Safety and Health (NIOSH) Intramural Proposal "International Coordination of Nanoscale Reference Materials" for the Nanotechnology Research Center (NTRC).

- 2008–2011 Project Advisory Committee, WateReuse Foundation, WRF 06-019:  Monitoring for Microconstituents in an Advanced Wastewater Treatment (AWT) Facility and Modeling Discharge of Reclaimed Water to Surface Canals for Indirect Potable Use, Florida, USA.

- 2008– 2012 Advisory Board Member, Center for Risk Communication Research, University of Maryland, College Park, MD, USA.

- 2007–2010 International Advisory Board, USA, International Symposium on Nanotechnology in Environmental Protection and Pollution, Fort Lauderdale, 'FL. USA.

- 2007–present Chair and U.S. Delegate on the International Organization for Standardization (ISO) Technical Committee (T.C.) 229, Nanotechnologies, leading the U.S. Technical Advisory Group (TAG) Working Group 3; Environmental and Occupational Health. This working group develops comprehensive technical standards for engineered nano-objects.

- 2006–2008 Counselor to the Regional Central States Chapter of the Society of Toxicology (CS-SOT).

- 2006 Stakeholder Advisory Committee Member to review Development of Indicators and Surrogates for Chemical Contaminant Removal During Wastewater Treatment and Reclamation, WateReuse Foundation Project WRF-03-014. Phoenix, Arizona. May 16-17

- 2002 Odors and Toxic Air Emissions Conference Program Committee Member. New Mexico, Rocky Mountain Water

INTER**T**OX

Environment Association, Air and Waste Management Association, and the International Water Association.

- 2000–2008 Member, Board of Advisors, Good Company, Eugune, OR.

## Community Service

- Panelist, Lakeside School Annual Biology Assessment Program. Seattle, WA (2001).
- Member & Co-director, Mayor's Small Business Task Force. Seattle, WA (1997-2001).
- Member, Sustainable Seattle: a voluntary network and civic forum for sustainability. Seattle, WA (1992-1993).

## Selected Professional Presentations

2010 **Pleus R.C.** Nanomaterials – Understanding and Managing ESOH Risks. Presented at the 8th Annual Nanotechnology for Defense Conference (NT4D). Atlanta, GA. May 3-6, 2010.

2010 **Pleus R.C.** The Importance of Defining Chemical and Physical Parameters for Toxicological Testing of Nanomaterials: Getting Two Scientific Groups to Help Each Other. Presented at the Bureau International des Poids et Mesures (BIPM) Workshop on Metrology at the Nanoscale. Sevres, France. February 18-19.

2009 **Pleus R.C.** Global Standardization: ISO TC 229. Nanotechnology Symposium California Department of Toxic Substances Control (DTSC). Sacramento, CA. November 16.

2009 **Pleus R.C.** Nanomaterials: Steps to Address EHS Concerns Businesses Should Consider Before Placing Nanomaterials on the Market. Nanotech in the Marketplace Webinar. Nanotechnology Today: A Web Series. June 4.

2009 **Pleus R.C.** Hexavalent Chromium and Mercury in the Cement Industry – Recent Concerns About Human Health Issues. Presented at the 2009 IEEE-IAS/PCA 51st Cement Industry Technical Conference. Palm Springs, CA. June 2.

2009 **Pleus R.C.** Pharmaceuticals & Endocrine Disrupting Chemicals (EDCs) in Water: Development of Health Risk-Based Screening Levels. Presented at the Water Quality Committee Program 2009 ACWA Spring Conference. Sacramento, CA. May 19-22.

2009 **Pleus R.C.** EHS: Policy, Regulation & Product Safety. Presented at the Nano Science and Technology Institute (NSTI) 2009 Products and Liability Panel. Houston, TX. May 5.

**INTERTOX**

2009 **Pleus R.C.** Environmental Health & Safety and Nanotechnology: Possible Issues in the Water Industry. Presented at the Washington Innovation Summit 2009. Bellevue, WA. April 9.

2009 **Pleus R.C.** Perchlorate, Pharmaceuticals and Personal Care Products, Endocrine Disrupting Chemicals, and Nanotechnology in Water. Presented for the Association of California Water Agencies (ACWA). Sacramento, CA. February 9.

2008 **Pleus R.C.**, Walker N., and Canady R. A. Minimal Set of Characterization Parameters. Presented at the Ensuring Appropriate Material Characterization in Nano-Toxicity Studies: A Workshop, Washington, DC. October 28.

2008 **Pleus R.C.** What We Are Learning About Micro Constituents in Drinking Water Pharmaceuticals and Endocrine Disruptors. Presented at the 2008 Water Quality and Regulatory Conference, Ontario, CA. October 16.

2008 **Pleus R.C.** Pharmaceuticals, Endocrine Disrupting Chemicals (EDCs), and Personal Care Products (PCPs) in Untreated and Treated Drinking Water: What We Know So Far. Presented at the AWWA/PNWS sponsored seminar, Pharmaceuticals in Water and Wastewater, Hillsboro, OR. September 11.

2008 **Pleus R.C.** Nanotechnology: Risk, Health, and Environmental Perspectives: Toxicology and Nano-objects. Boeing, Seattle, WA. July 25.

2008 **Pleus R.C.** Endocrine Disrupting Compounds (EDCs) and Pharmaceuticals and Personal Care Products (PPCPs). AWWA Webcast, May 7.

2008 Litigation Focusing on the Mechanism of Action—Yes, This Is Rocket Science! Presented at the DRI Conference, Phoenix, AZ. February 6, 2008.

2007 Linkov I., Peterson M.K., Corey L.M., and **Pleus R.C.** Assessing Environmental Risk of Nanomaterials: Approaches and Tools. 2007 NSTI Nanotechnology Conference and Trade Show, Santa Clara, CA. May 20-24.

2007 Snyder E.M., Bruce G.M., **Pleus R.C.**, and Snyder S.A. Incidence and Toxicological Significance of Selected Endocrine Disrupting Chemicals (EDCs) in Drinking Water and presented at the World Environmental and Water Resources Congress 2007, Tampa, FL. May 15-19.

2006 Snyder S.A. and **Pleus R.C.** Human Health Implications from Nanoparticles in Water. Presented at the International Symposium on Environmental Nanotechnology, South Korea. November 3.

**INTERTOX**

2006 **Pleus R.C**. and Snyder S.A. Risk Assessment of Pharmaceuticals and Endocrine Disruptors in Drinking Water. Presented at The Western Coalition of Arid States Conference, Tucson, AZ, November 2.

2006 **Pleus R.C**. and Snyder S.A. Toxicological Relevance of Pharmaceuticals and Endocrine Disruptors in Drinking Water. Presented to the Orange County Utilities Water Quality Section Conference, Orlando, FL. October 26.

2006 Linkov I., **Pleus R.C.**, Stevens J., and Ferguson E. EPA Peer Review Panel Recommendations on Environmental Risk of Nanomaterials & Multi-Criteria Decision Analysis and Environmental Risk Assessment for Nanomaterials. Presented at the U.S. Army Nanotechnology Development Coordination Meeting, Cambridge, MA. August 15-17.

2006 **Pleus, R.C.** Perchlorate in 2006: Where are we and where are we going? Invited speaker. Presented at the 2006 Superfund Program Managers Symposium, Scottsdale, AZ. August 13-16.

2006 Corey L.M., Peterson M.K., and **Pleus R.C**. Nanotechnology Environmental Health and Safety (EHS): Current Knowledge and Future Challenges. Presented at the 9th Annual Force Health Protection Conference, Albuquerque, NM. August 6-11.

2006 Corey L.M., Peterson M.K., and **Pleus R.C**. Nanotoxicology: Special Considerations for Assessing Risks from Very Small Particles. Presented at the 9th Annual Force Health Protection Conference, Albuquerque, NM, August 6-11.

2006 Corey L.M., Peterson M.K., and **Pleus R.C.** Developing Nanotechnology Health and Safety Standards. Invited speaker. Presented at the 2006 Micro Nano Breakthrough Conference, Vancouver, WA. July 25, 2006.

2006 **Pleus R.C.**, Bruce G.M., Snyder E.M., Snyder S.A., and Corey L.M. Toxicological Relevance of EDCs and Pharmaceuticals. Invited speaker. Presented at the 2006 AWWA Annual Conference in San Antonio, TX. June 11-15.

2006 **Pleus R.C.**, Bruce G.M., Snyder E.M., Snyder S.A., and Corey L.M. Incidence and Toxicological Significance of Selected Pharmaceuticals in Drinking Water. Presented at the Groundwater Resources Association's Emerging Contaminants in Groundwater Symposium, Concord, CA. June 7-8.

2006 **Pleus R.C.,** Bruce G.M., and Snyder E.M. Addressing the Significance of Trace Level Findings. Presented at the Association of California Water Agencies Groundwater/ Water Quality Track

586

**INTER TOX**

Pharmaceuticals in Groundwater: Public Health Issue or Public Relations Nightmare? Monterey, CA. May 10.

2006 Bruce G.M., **Pleus R.C.,** Snyder S.A., and Snyder E.M. Toxicological Relevance of Pharmaceuticals and Endocrine Disrupting Chemicals in Water. Presented at the National Ground Water Association's 5th International Conference on Pharmaceuticals and Endocrine Disrupting Chemicals in Water, Costa Mesa, CA. March 14, 2006.

2005 Snyder E.M., Snyder S.A., **Pleus R.C.**, Bruce G.M., Hemming J.D.C., and Hulsey R.A. Approach for Assessing the Toxicological Relevance of Endocrine Disruptors and Pharmaceuticals in Drinking Water. Submitted to Water Quality Technology Conference and Exhibition, Quebec, Canada. November 6-10.

2005 Corey L.M.**,** Bruce G.M., **Pleus R.C.** Development of Nano-Based Risk Assessments: Challenges for the Present and Future. Mechanisms of Action of Inhaled Fibers, Particles and Nanoparticles in Lung and Cardiovascular Disease, Research Triangle Park, NC. October 25-28.

**Pleus, R.C.** Perchlorate: Where We Are and Where We Are Going? Presented at the Environmental Law Conference at Yosemite, CA. October 22.

2005 **Pleus, R.C.** Emerging Chemicals of Concern-Effective Toxicological Assessment. Presented for the Society of Toxicology, Central State Chapter, Ames, IA. September 30.

2005 **Pleus, R.C.** Emerging Chemicals—Health Concerns About Endocrine Disruptors & Pharmaceuticals in Drinking Water Supplies. Presented at Mealey's Water Contamination Conference in Los Angeles, CA. September 26-27.

2005 **Pleus R.C.** Methods to Derive Safe Drinking Water Levels for Chemicals in Drinking Water. Invited to present at the 2005 Annual Conference & Exposition of the American Water Works Association: Natural Poisons & Unnatural Products Session, San Francisco, CA. June 14.

2005 Bruce G.M. and **Pleus R.C.** Private Toxicology: Testing and Analysis. Invited to present at the Winning: Hot Topics in Criminal Law—Alternatives to the State Crime Lab, Seattle, WA. May 24.

2005 Bruce G.M., Peterson M.K., and **Pleus R.C.** Comparative Risk Assessment of Multimedia Environmental Exposure to Perchlorate and Other Agents that Inhibit Iodide Uptake into the Thyroid. Poster presented at the Society of Toxicology 44th Annual Meeting, New Orleans, LA. March 10.

587

**INTERTOX**

2005 Peterson M.K., **Pleus R.C.,** and Hays S.M. Assessing the Risks Associated with Children Ingesting Lead in School Drinking Water: PBPK Modeling and Risk Communication. Poster presented at the Society of Toxicology 44th Annual Meeting, New Orleans, LA. March 8.

2005 Dodge D.G., Peterson M.K., and **Pleus R.C.** Addressing Toxicological Challenges to Community Water Fluoridation in Washington State. Poster presented at the Society of Toxicology 44th Annual Meeting, New Orleans, LA. March 7.

2004 **Pleus R.C.** 2004 Update: What Does Human Data Tell Us About How Much Perchlorate Exposure is Safe? Presented at the 2004 Water Quality Conference, Ontario, CA. October 26-28.

2004 **Pleus R.C.** Perchlorate dose-response relationship and the likelihood of effects at environmentally relevant levels. Presented at the URS Seminar—Perchlorate: Rush to Judgment or Serious Health Threat, Seattle, WA. September 28.

2004 **Pleus R.C.** Research, Discovery, and Contribution: Professional Experience in the Republic of South Africa. Invited speaker. Presented at the Pacific Northwest Association of Toxicologists (PANWAT) Annual Meeting: Toxicology in Third World Settings, Bend, OR. September 19.

2004 **Pleus R.C.** Product Liability: Emerging Contaminants of Concern. Presented to Bullivant Houser Bailey, Seattle, WA, and their satellite offices via video-conference. September 2.

2004 **Pleus R.C.** Perchlorate dose-response relationship and the likelihood of effects at environmentally relevant levels. Presented at the 228th ACS National Meeting, Philadelphia, PA. August 22-26.

2004 **Pleus R.C.** and Bruce G.M. Where Are We Now? An Update on the Perchlorate Action Level Debate. Presented at the 7th Annual Force Health Protection Conference, Albuquerque, NM. August 8-12.

2004 Belzer R.B., **Pleus R.C.,** Bruce G.M., and Peterson M.K. Using Comparative Exposure Analysis to Validate Low-Dose Human Health Risk Assessment: The Case of Perchlorate. Presented at the 7th Annual Force Health Protection Conference, Albuquerque, NM. August 8-12.

2004 **Pleus R.C.** and Bruce G.M. Perchlorate dose-response relationship and the likelihood of effects at environmentally relevant levels. Presented at the Groundwater Resources Association of California Conference, Glendale, CA. August 4.

2004 **Pleus R.C.** Asthma and Fungi: State of the Science. Presented at the ASTM International Boulder Conference on Mold in the Indoor

INTER**TOX**

Environment: Assessment, Health and Physical Effects, and Remediation, University of Colorado at Boulder, Boulder, CO. July 25-30.

2004 **Pleus R.C.**, Bruce G.M., Peterson M.K., and Dodge D.G. Comparative Contribution of Perchlorate and Anti-Thyroid Agents in American Diets to Iodide Uptake Inhibition. Presented at the 32nd Propellant Development & Characterization Subcommittee (PDCS) and the 21st Safety & Environmental Protection Subcommittee (S&EPS) Joint Meeting, Seattle, WA. July 25-29.

2004 **Pleus R.C.** Perchlorate dose-response relationship: Evidence from human studies. Presented at the 227th American Chemical Society National Meeting, Anaheim, CA. April 1.

2004 **Pleus R.C.** Establishing a Safe Dose for Perchlorate Based on Human Evidence of a No Effect Level. Presented at the Society of Toxicology 43rd Annual Meeting, Baltimore, MD. March 24.

2004 Peterson M.K. and **Pleus R.C.** Comparative Analysis of Neuropsychological Toxicity of Biological, Chemical, and Pharmaceutical Agents. Presented at the Society of Toxicology Annual Meeting, Baltimore, MD. March 22.

2004 **Pleus R.C.** Perchlorate: The Greer Study, the Critical Animal Studies, and the Evaluation Process by the National Academy of Science. Presented at the 14th Annual West Coast Conference on Soils, Sediments, and Water, San Diego, CA. March 16.

2004 **Pleus R.C.** and Bruce G.M. Adverse Effect Levels for Neurodevelopmental Effects Associated with Maternal Perchlorate Exposure: What do Existing Data Indicate? Presented at the 21st International Neurotoxicology Conference, Honolulu, Hawaii. February 12.

2003 **Pleus R.C.** Considerations related to sampling for bioterrorism agents. Presented at the Society for Risk Analysis Meeting - Bridging Risk Divides: Risk Assessment and Risk Communications Methodologies for Bioterrorism Incident Response Symposia, Baltimore, MD. December 8.

2003 **Pleus R.C.** A Review of the Science Required to Establish an Informed MCL for Perchlorate in Drinking Water. Presented to the Perchlorate Review Scholars Committee Urban Water Research Center, University of California, Irvine, CA. October 21.

2003 **Pleus R.C.** Perchlorate: The Questions You Have and The Answers You Need Presented at Fresh Summit 2003: Produce Marketing Association's 54th International Convention & Exposition, Orlando, FL. October 19.

589

**INTERT○X**

2003 **Pleus R.C.** What do we know about the neurotoxic effects of chemicals in aircraft cabin air?  Presented at the Northwest Occupational Health Conference Pacific Northwest Section of the American Industrial Hygiene Association, Seattle, WA. October 16.

2003 **Pleus R.C.** The Greer Study: Discussion of the Key Points. Presented at the UNMC Perchlorate State-of-the-Science Symposium, Omaha, NE. September 30.

2003 **Pleus R.C.** Making Sense of the Perchlorate Action Level Debate. Presented at the 6th Annual Force Health Protection Conference, Albuquerque, NM. August 11-14.

2003 **Pleus R.C.** Quantifying the Effects of Perchlorate. Presented at the California Minor Crops Council Technical Committee Meeting, Irvine, CA. June 26.

2003 **Pleus R.C.**, Bruce G.M., and Peterson M.K. Assessing Neurodevelopmental Effects of Environmental Exposures to Anti-Thyroid Agents: How Relevant are High Dose Rat Studies? Presented at the Society of Toxicology 42nd Annual Meeting, Salt Lake City, UT. March 9-13.

2003 Bruce, G.M., **Pleus, R.C.**, and Peterson M.K. Dose-Response Investigation of Tricresyl Phosphates Potentially Present in Airplane Cabin Air from Jet Engine Oils. Presented at the Society of Toxicology 42nd Annual Meeting, Salt Lake City, UT. March 9-13.

2003 **Pleus R.C.** Invited as Expert Panelist and presented, Making Sense of the Perchlorate Action Level Debate at AFCEE Technology Transfer Workshop, San Antonio, TX. February 24-27.

2003 **Pleus R.C.** Making Sense of the Perchlorate Action Level Debate. Presented at the 22nd Meeting of the RCC – Environmental Group AFCEE, San Francisco, CA. February 11-13.

2003 **Pleus, R.C**. Dose-Response Investigation of Tricresyl Phosphates Potentially Present in Airplane Cabin Air from Jet Engine Oils. Presented at the 20th Annual International Aircraft Cabin Safety Symposium. Universal City, CA. February 10-13.

2002 Belzer R.B., Johnson D., Peterson M.K., and **Pleus R.C.** Comparative Risk Assessment for Perchlorate: How does the US EPA's RfD Compare to Other Goitrogens that are Found in the US Diet. Presented at the Society for Risk Analysis Annual Meeting: Symposium on Perchlorate: Policy Implications, New Orleans, LA. December 8-11.

2002 **Pleus R.C.** and Bruce G.M. Assessing Developmental Neurotoxicity for Environmental Chemicals. Presented at the Society for Risk Analysis Annual Meeting Symposium on Perchlorate: Policy

INTERT OX

Implications, New Orleans, LA. December 8-11.

2002 Peterson M.K., Bruce G.M., and **Pleus R.C.** Implications for the Use of Thyroid Endpoints from Rat Reproductive/Developmental Toxicity Studies in Human Risk Assessment. Presented at the Society for Risk Analysis Annual Meeting Symposium on Perchlorate: Policy Implications, New Orleans, LA. December 8-11.

2002 **Pleus R.C.** Making Sense of the Perchlorate Action Level Debate. Presented at the SERDP Partners in Environmental Technology Technical Symposium & Workshop, Washington, D.C. December 5.

2002 **Pleus R.C.** What Do Human Data Tell Us About How Much Perchlorate Exposure is 'Safe'? Presented at the Perchlorate Conference, Ontario, CA. October 16.

2002 Bruce G.M., Peterson M.K., and **Pleus R.C.** Sequence of Neurodevelopmental Effects of Anti-thyroid Agents in Rat Offspring: What Should We Expect to See? Poster presented at the NIEHS Thyroid Hormone & Brain Development Conference, Research Triangle Park, NC. September 23-25.

2002 Wahlsten D., Colbourne F., and **Pleus R.C.** High throughput rat and mouse brain morphometry for toxicology research. Poster presented at the NIEHS Thyroid Hormone & Brain Development Conference, Research Triangle Park, NC. September 23-25.

2002 Belzer R.B., Bruce G.M., Peterson M.K., and **Pleus R.C.** Exposure to Anti-thyroid Chemicals in the Environment and Diet. Poster presented at the NIEHS Thyroid Hormone & Brain Development Conference, Research Triangle Park, NC. September 23-25.

2002 **Pleus R.C.** Understanding Mold-Related Health Effects. Presented at the Emerging Environmental Issues Workshop Environmental Issues in Transactions: The New Landscape & Mold: Why a Headline Now? Sidley Austin Brown & Wood, Chicago, IL. June 7.

2002 **Pleus R.C**. with Boss, et al. Decommissioning – Biological Risk course: Risk Assessment and Risk Communication: Strategic Tools. Presented at the American Industrial Hygiene Conference & Exposition, San Diego, CA. June 1-2.

2002 Peterson M.K., Bruce G.M., and **Pleus R.C.** Identification and Risk Assessment of Odorous Chemicals Associated with Combustion Processes. Poster presented at the Air & Waste Management Association's Hazardous Waste Combustors Specialty Conference & Exhibition, St. Louis, MO. April 17-19.

591



2002 **Pleus R.C.** The Toxicology of Terror and Tragedy. Presented at the Western Washington Emergency Network Conference, Bellevue, WA. April 2-3.

2002 **Pleus R.C.** Understanding Mold-Related Health Effects. Presented at the Mold Mania! A Growing Concern for the Insurance Industry Seminar, Pacific Northwest Chapter of the CPCU Society, Seattle, WA. March 13.

2002 Bruce G.M., Johnson D., and **Pleus R.C.** Assessment of the Validity of US EPA's Interpretation of an Effect of Altered Neurobehavior in Offspring Treated with Perchlorate in utero: A Critical Review of the Argus (1998) and Bekkedal, et al. (2000) Studies. Submitted to Eastern Research Group, Inc. for the US EPA/ORD Peer Review Workshop-Perchlorate Environmental Contamination: Toxicological Review and Risk Characterization, March 5-6, Sacramento, CA. February 19.

2002 Bruce G., Peterson M.K., Lincoln D.L., and **Pleus R.C.** Review and assessment of TSH and Thyroid Hormones during Pregnancy in the Rat and Human and Comparison to Hormone Values in the 2001 Effects Study. Submitted to Eastern Research Group, Inc. for the US EPA/ORD Peer Review Workshop-Perchlorate Environmental Contamination: Toxicological Review and Risk Characterization, March 5-6, Sacramento, CA. February 19.

2002 Bruce G. and **Pleus R.C.** Summary of the Expert Review of the Argus, 2001 ("Effects Study") Evaluation of Perchlorate Effects on Brain Morphometry in Neonatal Rats. Submitted to Eastern Research Group, Inc., for the US EPA/ORD Peer Review Workshop-Perchlorate Environmental Contamination: Toxicological Review and Risk Characterization. March 5-6, Sacramento, CA. February 19.

2002 **Pleus R.C.** Summary of the 1999 External Peer Review Panel Workshop, Submitted to Eastern Research Group, Inc., for the US EPA/ORD Peer Review Workshop – Perchlorate Environmental Contamination: Toxicological Review and Risk Characterization. March 5-6, Sacramento, CA. February 19, 2002.

Johnson D. and **Pleus R.C**. Assessment of Neuropsychological Studies by Haddow, et al. (1999) and Others Cited by US EPA to Support Their Concerns for Developmental Deficits Related to Maternal Thyroid Deficiency. Submitted to Eastern Research Group, Inc., for the US EPA/ORD Peer Review Workshop-Perchlorate Environmental Contamination: Toxicological Review and Risk Characterization. March 5 - 6, Sacramento, CA. February 19.

2001 **Pleus R.C.** Mercury Toxicology: Managing for Mercury in the Waste Stream. Presented at the Washington State Recycling

INTER**TOX**

Association Workshop: Managing for Mercury in the Recycling Stream, Olympia, WA. November 16.

2001 Peterson M.K., Bruce G.M., Johnson D.L., and **Pleus R.C.** Evaluation of Risks and Health Effects in Humans Exposed to the Herbicide Dinoseb: A Case Study. Poster presented at the 2001 Society for Risk Analysis Annual Meeting, Seattle, WA. December 2-5.

2001 Goodman G. and **Pleus R.C.** Report on Six Expert Reviews of the Levy Report (J. Levy, J.D. Spengler, D. Hlinka, and D. Sullivan, Estimated Public Health Impacts of Criteria Pollutant Air Emissions from the Salem Harbor and Brayton Point Power Plants, May 2000). Prepared for USGen New England, Inc., Boston, MA. August 4.

2001 **Pleus R.C.**, Goodman G. and Mattie D.R. Development of a Reference Dose for Perchlorate: Current Issues and Status. Paper presented at 50th JANNAF (Joint Army-Navy- NASA-Air Force) Propulsion Meeting, Salt Lake City, UT, July 12.

2001 **Pleus R.C.** and Bruce G. Report on Five Expert Reviews of the Primedica 2001 Study Report (Hormone, Thyroid and Neurohistological Effects of Oral (Drinking Water) Exposure to Ammonium Perchlorate in Pregnant and Lactating Rats and in Fetuses and Nursing Pups Exposed to Ammonium Perchlorate During Gestation or via Maternal Milk, March 2001. Prepared for the Perchlorate Study Group. May 16.

2000 Greer M.A., Goodman G., **Pleus R.C.,** and Greer S. Does Environmental Perchlorate Exposure Alter Human Thyroid Function? Determination of the Dose-Response for Inhibition of Radioiodine Uptake. Paper presented at the International Thyroid Meeting, Kyoto, Japan. October 22-27.

2000 Greer M.A., Goodman G., **Pleus R.C.,** and Greer S.E. Dose-Response for Perchlorate Effects on Thyroid Function in Human Subjects: Assessment of Environmental Risks. Submitted to US EPA. June 30.

2000 **Pleus R.C.** and Fulton K. Risk Assessment and Risk Communication: Strategic Tools. Course presented at the Air & Waste Management Association 93rd Annual Conference, Salt Lake City, UT. June 18-22.

2000 **Pleus R.C.**, Goodman G., and Mattie D.R. Development of a Reference Dose for Perchlorate: Current Issues and Status. Paper presented at the JANNAF Propellant Development & Characterization Subcommittee and 18th Safety & Environmental Protection Subcommittee Joint Meeting, NASA Kennedy Space Center, FL, May 11.

593

INTER**TOX**

1998 Goodman G. and **Pleus R.C.** Recommendations to the US EPA concerning deriving a reference dose for perchlorate. Prepared for the American Pacific Corporation, Submitted to the National Center for Environmental Assessment. Research Triangle Park, NC. September.

1998 Rogers D.E.C., Terblanche P., and **Pleus R.C.** Health risk assessment: its introduction to South Africa for the regulation of emissions from medical waste incinerators. Presented at the Papers of 11th World Clean Air and Environmental Congress, Volume 3. Durban, South Africa.

1998 **Pleus R.C.** Risk Assessment and Risk Communication: Strategic Tools. The course was presented at the Air & Waste Management Association Waste Combustion in Boilers and Industrial Furnaces Specialty Conference, Kansas City, MO. April 14.

1998 Johnson D.L. and **Pleus R.C.** Current Issues that Affect the Estimate of Cancer Risks and Non-cancer Hazards in Multipathway Risk Assessments for BIF Facilities. The paper was presented at the Air & Waste Management Association Waste Combustion in Boilers and Industrial Furnaces Specialty Conference, Kansas City, MO. April 15-16.

1998 **Pleus R.C.** and Johnson D.L. Assessing the Risks and Costs to Environmental Cases: Case Studies of Management Responses to Community Discontent. The paper was presented at the Air & Waste Management Association Waste Combustion in Boilers and Industrial Furnaces Specialty Conference, Kansas City, MO. April 15-16.

1998 **Pleus R.C.**, Dunn L., and Rogers D.E.C. Comparison of the Use of Risk Assessment for Human Health and Ecological Assessments in Developed and Developing Countries. Paper presented at the 11th World Clean Air and Environment Congress, Durban, South Africa. September 13-18.

1997 **Pleus R.C.** and Boss M.J. Risk Assessment and Risk Communication: Strategic Tools. The course was presented at the Air & Waste Management Association Waste Combustion in Boilers and Industrial Furnaces Specialty Conference, St. Louis, MO, April 7.

1997 Shirai J., **Pleus R.C.,** and Perry M. Chemical Characteristics of Cement Kiln Dust and their Effect on Dioxin-Related Health Risks. Paper presented at the Air & Waste Management Association Waste Combustion in Boilers and Industrial Furnaces Specialty Conference, St Louis, MO. April 8-10.

1997 **Pleus R.C.** Introduction to Risk Assessment and Risk Communication: Training Course I. Course presented at the Council on Scientific and Industrial Research (CSIR), Pretoria, South Africa.

594

INTER**TOX**

March 3.

1997 **Pleus R.C.** International Trend in Health Risk Assessment. Lecture to South African governmental officials, CSIR Boardroom, Building 46, Pretoria, South Africa. March 11.

1997 Perry M. and **Pleus R.C.** What are the Neighbors Smelling? Odor Investigation of a Portland Cement Plant. Paper presented at the Nevada Water Pollution Control Association Annual Conference, Las Vegas, NV. March 7.

1997 Perry M. and **Pleus R.C.** Managing Corporate and Citizen Response to Foul Odors: Case Studies Involving Commercial Disposal and Production Facilities. Paper presented at the Air & Waste Management Association Annual Meeting, Toronto, Canada. June 8-13.

1996 **Pleus R.C.** Risk Assessment and Risk Communication: Strategic Tools. The course was presented at the Air & Waste Management Association Waste Combustion in Boilers and Industrial Furnaces Specialty Conference, Kansas City, MO. March 25.

1996 **Pleus R.C.** and Boss M.J. Risk Assessment, Risk Communication, and Risk Management: Strategic Tools. Course presented at the Air & Waste Management Association Clean Air Conference, Orlando, FL. November 19.

1995 **Pleus R.C.** Risk Assessment and Risk Communication: Strategic Tools. The course was presented at the Air & Waste Management Association Waste Combustion in Boilers and Industrial Furnaces Specialty Conference, Kansas City, MO. March 27.

1995 **Pleus R.C.** and Minter S.L. Odor Investigation of a Portland Cement Plant. Paper presented at the Air and Waste Management Association Odors: Indoor and Environmental Air International Specialty Conference, Bloomington, MN. September 13-15.

1995 Brankovan V., **Pleus R.C.,** and Molholt B. A Reference Dose Concentration (Rfd) for Lithium. Paper presented at the Vth COMTOX Symposium on Toxicology and Clinical Chemistry of Metals, Vancouver, British Columbia, Canada. July 10-13.

1995 **Pleus R.C.** and Kelly K.E. Health Effects of Hazardous Waste Incineration Facilities. More of the Rest of the Story: An Updated Review of the Scientific Basis of Alleged Adverse Health Effects of Hazardous Waste Incineration. Paper presented at the Incineration Conference, Bellevue, WA. June.

1994 Kelly K.E. and **Pleus R.C.** Health effects of hazardous waste incineration - more of the story. Paper presented at Incineration Conference, Houston, TX. May.

595



1994 Kelly K.E. and **Pleus R.C.** Health effects of hazardous waste incineration. Paper presented at the Medichem Conference, Melbourne, Australia. October 18-21.

1993 Kelly K.E. and **Pleus R.C.** Identifying the species of metal-air toxics of greatest concern to human health and the environment. Paper presented at the Air & Waste Management Association Current Issues in Air Toxics Conference, Sacramento, CA. November 15-16.

1993 **Pleus R.C.** and Kelly K.E. Health effects of burning hazardous waste in hazardous waste Incinerators: U.S. and international experience. Paper presented at the International Congress on Health Effects of Hazardous Waste, Health and Human Services, Atlanta, GA. May 3-6.

1993 **Pleus R.C.** and Kelly K.E. Health effects of burning hazardous waste in cement kilns. Paper presented at the International Congress on Health Effects of Hazardous Waste, Health and Human Services, Atlanta, GA. May 3-6.

1993 **Pleus R.C.** and Kelly K.E. The health effects of burning hazardous waste in cement kilns in the US. Paper presented at the Spalování, nebezpecnych odpadu v cementárnách, Brno, Republic of Czech. January 27.

1992 O'Rourke M.F., **Pleus R.C.**, Iversen L.J., and Bylund D.B. Pharmacologic characterization of alpha-2 adrenergic receptor heterogeneity in rat brain. Abstract. Soc. Neurosci. Abstr. 18:457.

1992 Blaxall H.S., **Pleus R.C.**, Cerulis D.R., Hass N.A. and Bylund D.B. Regulation of the alpha-2C adrenergic and 5HT1B serotonergic receptors by dexamethasone in an opossum kidney (OK) cell line. Abstract. Soc. Neurosci. Abstr. 18:1538.

1992 Cerutis D., **Pleus R.C.**, Blaxall H., Hass N. and Bylund D.B. Characterization of an alpha- 2 adrenergic receptor expressed in the human pineal gland. Abstract. FASEB, April.

1992 **Pleus R.C.**, Shiue C.Y., Shiue G.G., Rysavy J.A., Huang H., Frick M.P., and Bylund D.B. Carbon-11 labeled alpha-2 adrenergic receptor antagonist: Synthesis of [11C]WY 26703 and its biodistribution in rodents. Abstract. IXth International Symposium on Radiopharmaceutical Chemistry, Paris, France. 6-10 April.

1992 Shiue C.Y., Bai L., Shiue G.G., Rysavy J.A., **Pleus R.C.**, Huang H., Frick M.P., Catt J.D., and Yevich J.P. Fluorine-18 labeled BMY 14802: Synthesis and anatomical distribution in rodents. Abstract. IXth International Symposium on Radiopharmaceutical Chemistry, Paris, France. 6-10 April.

1992 **Pleus R.C.**, Shiue C.Y., Shiue G.G., Rysavy J.A., Huang H.,

**INTERTOX**

Frick M.P., and Bylund D.B. Comparison of [$^{11}$C]MK-912 and[$^{11}$C]WY26703 as alpha-2 adrenergic receptor ligands. Abstract. J. Nucl. Med. 5: 861.

1991 **Pleus R.C.** and Bylund D.B. 1991. Regulation of the 5HT1B receptor in opossum kidney cells by serotonin. Abstract. Soc. Neurosci. Abstr. 17:1175.

1991 Shiue C.Y., Shiue G.G., Bai L.Q., Huang H., Rysavy J.A., **Pleus R.C.**, Sunderland J.J., and Fric M.P. Fluorine-18 and carbon-11 labeled amphetamine analogs: Synthesis, biodistribution in mice and the effect on D-2 receptor binding. Abstract. J. Nucl. Med. 32: 994.

1990 **Pleus R.C.** and Bylund D.B. 1990. Serotonin down-regulates 5HT$_{1B}$ receptors in opossum kidney cells. Abstract. Soc. Neurosci Abstr. 16:495.

1988 **Pleus R.C.** and Sparber S.B. Acute toxicity of methadone, measured as hypoxia and hypercapnia, in pregnant rats. Abstract. Soc. Neurosci. Abstr. 14: 34.

1987 **Pleus R.C.** and Sparber S.B. 1987. Transcutaneous monitoring of O$_2$ and CO$_2$ in conscious and methadone treated rats: Underestimates of hypoxia due to physiological adaptation in control subjects. Abstract. International Narcotics Research Conference, Adelaide, South Australia. 31 August - 4 September.

1986 **Pleus R.C.** Reactive astrogliosis and astrocytosis in infants who died of sudden infant death syndrome. Abstract. 7th European Conference on Brain Research, Val Thorens, France. 9-14 March.

1985 **Pleus R.C.** Chemical composition of cosmetic products. Department of Professional Development and Conferences, University of Minnesota, St. Paul, MN, Lecturer (1979, 1980, and 1982).

1983 **Pleus R.C.** Physiological factors contributing to accidental susceptibility. Midwest Center for Occupational Health and Safety, St. Paul Ramsey Hospital, St. Paul, MN, Lecturer (also 1981 and 1982).

## Professional Publications

Chung Y.H., Gulumian M., **Pleus, R.C.**, and Yu I.J. 2022. Animal welfare consideration in conducting OECD test guideline inhalation and toxicokinetic studies for nanomaterials. Submitted. Animals 2022, 12, 3305. https://doi.org/10.3390/ani12233305

Lafranconi M., Budinsky R., Corey L., Klapacz J., Crissman J., LeBaron M., Golden R., and **Pleus R.C**. A 90-day drinking water study in mice to characterize early events in the cancer mode of action of

**INTER TOX**

1,4-dioxane. Regul Toxicol Pharmacol. 2021 Feb;119:104819. doi: 10.1016/j.yrtph.2020.104819. Epub 2020 November 12. PMID: 33189748.

**Pleus R.C.** and Corey L.M. 2018. Environmental Exposure to Perchlorate: A Review of Toxicology and Human Health. Toxicol Applied Pharm. pii: S0041-008X(18)30401-0.

**Pleus R.C.**, Bruce G., Klintworth H., Sullivan D., Johnson W., Rajendran N., and Keenan. 2018. Repeated dose inhalation developmental toxicity study in rats exposed to cellulose insulation with boric acid additive. J. Inhal Toxicol. Nov - Dec; 30(13- 14):542-552.

**Pleus R.C.** and Murashov V. (eds.). 2018. Physico-Chemical Properties of Nanomaterials. Singapore: Pan Stanford Publishing Pte Ltd. (June 27, 2018).

Corey L.M., Bell G.P.,and **Pleus R.C.** 2017. Exposure of the U.S. Population to Nitrate, Thiocyanate, Perchlorate, and Iodine Based on NHANES 2005-2014. Bull Environ Contam Toxicol 99(1): 83-88.

**Pleus, R. C.** 2015. Assessing Potential Short-Term Impacts of Chloramination. Project 4320. Denver, CO: the Water Research Foundation.

**Pleus R.C.** 2013. Rethinking dose in a nano-world. Chemistry in Australia. May: 16-18.

**Pleus R.C**. 2013. Nanotoxicology: Physicochemical Properties and Good Experimental Design. GIT Laboratory Journal 3-4: 14-15.

Nel A.E., Nasser E., Godwin H., Avery D., Bahadori T., Bergeson L., Beryt E., Bonner J.C., Boverhof D., Carter J., Castranova V., DeShazo J.R., Hussain S.M., Kane A.B., Klaessig F., Kuempel E., Lafranconi M., Landsiedel R., Malloy T., Miller M.B., Morris J., Moss K., Oberdorster G., Pinkerton K., **Pleus R.C.**, Shatkin J.A., Thomas R., Tolaymat T., Wang A., and Wong, J. 2013. Multi-Stakeholder Perspective on the Use of Alternative Test Strategies for Nanomaterial Safety Assessment. ACS Nano 7(8): 6422-6433.

ISO/PDTR 13014:2012. 2012. Project Leader: **Pleus R.C.** Nanotechnologies – Guidance on Physico-Chemical Characterization for Manufactured Nano-Objects Submitted for Toxicological Testing, International Organization for Standardization, Geneva, Switzerland.

Bruce, G.M., Corey L.M., Mandel J.H., and **Pleus R.C.** 2012. Urinary Nitrate, Thiocyanate, Perchlorate, and Serum Thyroid Endpoints Based on NHANES 2001 to 2002. Journal of Occupational & Environmental Medicine. E-pub Ahead of Print.

598

INTER**TOX**

Rogers W.S. Jr., Clark J.A., **Pleus R.C.**, Wetherington D.R., and Cowart S.T. 2010. Nanotechnology: Insurance and Risk Management Implications. The Risk Report 32(8): 1-8. Snyder S., Lue-Hing C., Cotruvo J., Drewes J.E., Eaton A., **Pleus R.C.**, Schlenk D. 2010. Pharmaceuticals in the Water Environment. In association with the National Association of Clean Water Agencies and the Association of Metropolitan Water Agencies.

Bruce G.M., **Pleus R.C.**, and Snyder S.A. 2009. Toxicological Relevance of Pharmaceuticals in Drinking Water. Environmental Science & Technology 44(14): 5619-26.

Belzer R.B., Bus J.C., Cavalieri E.L., Lewis S.C., North D.W., and **Pleus R.C.** 2008. The Naphthalene State of the Science Symposium: Objectives, Organization, Structure, and Charge. Regulatory Toxicology and Pharmacology 51, 2; Suppl. 1: 1-5.

Snyder S.A., Vanderford B.J., Drewes J., Dickenson E., Snyder E.M., Bruce G.M., **Pleus R.C.** 2008. State of Knowledge of Endocrine Disruptors and Pharmaceuticals in Drinking Water, AWWA Research Foundation, Denver, CO.

Linkov I., Satterstrom F.K., Stevens J., Ferguson E., **Pleus R.C.** 2007. Multi-criteria decision analysis and environmental risk assessment for nanomaterials. Journal of Nanoparticle Research: 543-554.

Snyder S.A., **Pleus R.C.**, Vanderford B.J., Holady J.C. 2006. Perchlorate and chlorate in dietary supplements and flavor-enhancing ingredients. Analytica Chimica Acta 567(1): 26–32.

Snyder E.M., **Pleus R.C.**, Snyder S.A. 2005. Pharmaceuticals and EDCs in the U.S. water industry- an update. Journal of the American Water Works Association 97, 11: 32-36.

Chow J.C., Watson J.G., Savage N., Solomon C.J., Cheng Y., McMurry PH, Corey LM, Bruce GM, **Pleus R.C.**, Biswas P, Wu C. 2005. Critical Review: Nanoparticles and the Environment. Air & Waste Management Association 55: 1411-1417.

Wahlsten D., Colbourne F., and **Pleus R.C.** 2003. A robust, efficient, and flexible method for staining myelinated axons in blocks of brain tissue. Journal of Neuroscience Methods 123: 207-214.

Greer M.A., Goodman G., **Pleus R.C.,** and Greer S.E. 2002. Health Effects Assessment for Environmental Perchlorate Contamination: The Dose-Response for Inhibition of Thyroidal Radioiodine Uptake in Humans. Environmental Health Perspectives. 110: 927-937.

**Pleus R.C.**, Goodman G., and Mattie D.R. 2000. Development of a Reference Dose for Perchlorate: Current Issues and Status. CIPA Publication: 698.

599

**INTERTOX**

Greer M.A., Goodman G., **Pleus R.C.**, and Greer S.E. 2000. Does environmental perchlorate exposure alter human thyroid function? Determination of the dose-response for inhibition of radioiodine uptake. Abstract. Endocrine Journal 47:148.

Bylund D.B. and **Pleus R.C.** 2000. Alpha-2 adrenergic receptor binding in human pineal gland. Pharmacology Reviews and Communications 11: 1-10.

Shiue C., **Pleus R.C.,** Shiue G., Rysavy J.A., Sunderland J.L., Cornish K.G., Young S.D., and Bylund D.B. 1998 Synthesis and Biological Evaluation of [$^{11}$C]MK-912 as an Apha-2 Adrenergic Receptor Radioligand for PET Studies. Nuclear Medicine and Biology 25:127-133.

**Pleus R.C.**, Dunn L., and Rogers D.E.C. 1998. Comparison of the use of risk assessment for human health and ecological assessments in developed and developing countries. In Papers of 11th World Clean Air and Environmental Congress, Volume 2. Durban, South Africa, National Association for Clean Air: 6D-5.

**Pleus R.C.** and Kelly K.E. 1998. Health Effects from Hazardous Waste Incineration Facilities: Five Case Studies. Advances in Modern Environmental Toxicology 25: 179-192.

Shirai J., **Pleus R.C.,** and Perry M. 1997. Chemical Characteristics of Cement Kiln Dust and their Affect on Dioxin-Related Health Risks. In Waste Combustion in Boilers and Industrial Furnaces. Pittsburgh, PA; Air & Waste Management Association: 193-205.

**Pleus R.C**., Shiue C.Y., Shiue G.G., Rysavy J.A., Huang H., Sunderland J.J., and Bylund D.B. 1993. Synthesis and biodistribution of the □$_2$-adrenergic receptor antagonist ($^{11}$C)WY26703: Use as a radioligand for Positron Emission Tomography. Receptor 2:241-252.

**Pleus, R.C.**, Suder D.R., and C.E. Schmidt. 1993. Methodology for assessing the health impact of gaseous emissions from a pulp mill. Paper presented at the 86th Annual Air and Waste Management Association Meeting, Denver, Colorado, 13-18 June. Paper 93-TA-36A.05.

**Pleus R.C.** and Pascoe G.A. 1993. Assessing health risks from inhalation and oral exposure to chloroform in water. Abstract. FASEB Federation Proceedings. 7: 3323.

Shiue C.Y., Shiue G.G., Rysavy J.A., **Pleus R.C.**, Huang H., Bai L.Q., Cornish K.C., Sunderland J.J., and M.P. Frick. 1993. Fluorine-18 and carbon-11 labeled amphetamine analogs—Synthesis, distribution, binding characteristics in mice and rats and a PET study in monkeys.

600



Nuclear Medicine and Biology 20: 973-981.

Shiue C.Y., Bai L.Q., Shiue G.G., Rysavy J.A., **Pleus R.C.**, Hui H., Frick M.P., and Catt J.D. 1993. Synthesis of (±)-[$^{18}$F]BMY 14802, its enantiomers, and their anatomical distributions in rodents. Nuclear Medicine and Biology 20: 625-630.

**Pleus R.C.**, Shreve P.E., Toews M.L., and Bylund D.B. 1993. Down-regulation of alpha-2 adrenoceptor subtypes. European Journal of Pharmacology 244: 181-185.

Shiue C.Y., Shiue G.G., **Pleus R.C.**, Rysavy J.A., Huang H., Frick M.P., and Menolascino F.J. 1992. A comparison of the utility of N-[$^{11}$C]methylketanserin and N-[$^{11}$C]methylaltanserin for mapping serotonin receptors in vivo. Journal of Nuclear Medicine 33: 1026.

**Pleus R.C.**, Shiue C.Y., Shiue J., Rysavy J., Huang H., Sunderland J., Cornish K., Bai L., Frick M., and Bylund D.B. 1992. [$^{11}$C]MK-912 and [$^{11}$C]WY26703 as positron-emitting radioligands to label alpha-2 adrenergic receptors in vivo: Assessing their use in Rhesus monkey brain. Abstract. Abstracts – Society for Neuroscience 18: 590.

**Pleus R.C.** and Bylund D.B. 1992. Desensitization and down-regulation of the 5-HT1B receptor in the opossum kidney cell line. Journal of Pharmacology and Experimental Therapeutics 261: 271-277.

Gary V., Oatman L., **Pleus R.C.,** and Gray D. 1984. Formaldehyde in the home: Some disease perspectives. Minnesota Medicine 63: 107-110.

## Contributions to Book Chapters

**Pleus, R.C.** 2014. Toxicity Testing, Standards and Guidelines. In: Wexler, P. (Ed.), Encyclopedia of Toxicology, 3rd edition vol 4. Elsevier Inc., Academic Press, pp. 698-702.

**Pleus R.C.** 2012. The State of Science – Human Health, Toxicology, and Nanotechnological Risk. In Shatkin J., Nanotechnology Health and Environmental Risks. CRC Press.

Locascio L., Reipa V., Zook J., **Pleus R.C.** 2011. Nanomaterial Toxicity: Emerging Standards and Efforts to Support Standards Development. In Murashov V. and Howard J., Eds. Nanotechnology Standards. Springer: 179-208. New York, NY.

Belzer R.B., Bruce G.M., Peterson M.K. and **Pleus R.C.** 2004. Using Comparative Exposure  Analysis to Validate Low-Dose Human Health Risk Assessment: The Case of Perchlorate. In Linkov, I. and



Ramadan, A., Eds. Comparative Risk Assessment and Environmental Decision Making. Kluwer: 57-74. Norwell, MA.

Borak J.B. and **Pleus R.C.** 2003. Toxicology (Chapter 39). In McCunney R.J., Eds. A Practical Approach to Occupational and Environmental Medicine, 3rd Edition. Lippincott Williams & Wilkins Publishers: 554-570. Philadelphia, PA.

**Pleus R.C.** 2003. Perchlorate Regulation and Regulatory Activity (Chapter IX). In Schilt A.A. and McBride L.C., Perchloric Acid and Perchlorate, 2nd Edition. GFS Chemicals. Powell, OH.

**Pleus R.C.**, Ammann H.M., Miller R.V., and Robles H. 2003. Toxicology (Chapter 4). In Boss, M. and Day, D., Eds. Biological Risk Engineering Handbook: Infection Control and Decontamination. Lewis Publishers: 97-110. Boca Raton, FL.

Ammann H.M., Miller R.V. Robles H., and **Pleus R.C.** 2003. Risk Assessment (Chapter 5). In Boss M. and Day D., Eds. Biological Risk Engineering Handbook: Infection Control and Decontamination. Lewis Publishers: 111-134. Boca Raton, FL.

### Other Professional Publications

**Pleus R.C.** 2003. Perchlorate: Using Good Science to Derive a Safe Drinking Water Level. Water Conditioning & Purification Magazine. August: 36-40.

**Pleus R.C.** 2000. Riding the Rocket – How a Perchlorate Standard May Affect Those for Chlorine Dioxide and Its DBPs. Water Conditioning & Purification Magazine. September: 104-107.

**Pleus R.C.** 2000. Strategies to Manage POPs and PBTs in the Cement Industry. Cement Americas. May/June: 38-40.

**Pleus R.C.** and Kelly K.E. 1993. Health Effects of Hazardous Waste Incineration Facilities: Five Case Studies. U.S. Department of Health and Human Services. ATSDR Hazardous Waste and Public Health: International Congress on the Health Effects of Hazardous Waste: 815-825.

**Pleus R.C.** 1991. Book review of Jonsen, A.: The new medicine and the old ethics. Science Books and Films 27: 71.

**Pleus, R.C.** 1988. Book review of Thackray, S: Looking at pollution. Science Books and Films 24,1: 21.

**Pleus, R.C.** 1988. Biology textbook review of Wallace R. A., Biology; The world of life, 4th edition. Science Books and Films 23, 4: 217-218.

**Pleus R.C.** 1985. Biology textbook review of Bauer, et al. Experience in biology. 2nd edition. Science Books and Films 29.

**INTERTOX**

**Pleus R.C.** 1985. Chemical composition of cosmetic products. Course notes. Minnesota Cosmetology Workshop, Minneapolis, MN.